# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TAMER MAHMOUD AND ENAS BARAKAT; JEFF AND SVITLANA ROMAN; and CHRIS AND MELISSA PERSAK, *in their individual capacities and ex rel. their minor children,*

███████████

*Plaintiffs,*\*

v.

MONIFA B. MCKNIGHT, *in her official capacity as Superintendent of the Montgomery County Board of Education*; THE MONTGOMERY COUNTY BOARD OF EDUCATION; and SHEBRA EVANS, LYNNE HARRIS, GRACE RIVERA-OVEN, KARLA SILVESTRE, REBECCA SMONDROWSKI, BRENDA WOLFF, and JULIE YANG, *in their official capacities as members of the Board of Education,*

*Defendants.*

Case No. ___23-1380___

**VERIFIED COMPLAINT**

**DEMAND FOR JURY TRIAL**

---

\*   The individual Plaintiffs reside in Montgomery County, Maryland. In a concurrently filed motion, Plaintiffs have requested a waiver of the requirement under Local Rule 102.2(a) to provide their own and Defendants' home addresses in the caption of this complaint.

## NATURE OF THE ACTION

1. This lawsuit against the Montgomery County Board of Education and its superintendent and board members (collectively, the "School Board") is about whether parents have the right to opt their children out of classroom instruction regarding family life and human sexuality.

2. Maryland law says "yes." COMAR 13A.04.18.01(D)(2)(e)(iv), (i)-(ii).

3. Pursuant to written policy, the School Board has always said "yes" too, including in an email to parents as recent as March 22, 2023.

4. But on March 23, 2023, the School Board flipped positions.

5. Now, it claims authority to introduce pre-K and elementary school kids to certain books (the "Pride Storybooks") that promote one-sided transgender ideology, encourage gender transitioning, and focus excessively on romantic infatuation—with no parental notification or opportunity to opt out.

6. The Plaintiff Parents ("the Parents") have kids in the Montgomery County Public Schools ("MCPS").

7. They come from many faith backgrounds, including diverse strands of Islam and Christianity. Their concerns reflect those of thousands of other Montgomery County parents from a variety of faiths and political persuasions.

8. They are united in the conviction that the Pride Storybooks are age-inappropriate and inconsistent with their religious beliefs and practices and their child-raising philosophies.

1

9.  For example, one book invites three- and four-year-olds to look for images of things they might find at a pride parade, including an "intersex [flag]," a "[drag] king" and "[drag] queen," "leather," "underwear," and an image of a celebrated LGBTQ activist and sex worker, "Marsha P. Johnson."



10. A book mandated for fourth graders describes a child "blush[ing] hot" as she daydreams about "galloping off" with a classmate who makes her "heart skip."



11. The teachers' guide invites students to "acknowledg[e] how uncomfortable we might [be] … when we feel our heart beating 'thumpity thump' & how hard it can be [to] talk about our feelings with someone that we don't just 'like' but we 'like like.'"

12. Another book, for fifth graders, advocates a child-knows-best approach to gender transitioning, telling students that a decision to transition doesn't have to "make sense" and that students are the best "teacher" on such matters, not parents or other adults.



13.  If a student insists that you "can't be a boy if ... born a girl" or that sex depends on "[w]hat body parts [you] have," teachers are told to correct the student:

> When we are born, people make a guess about our gender and label us "boy" or "girl" based on our body parts. Sometimes they're right, and sometimes they're wrong. Our body parts do not decide our gender. Our gender comes from inside—we might feel different than what people tell us we are. We know ourselves best.

14.  This school year, after the Parents were told about the books, requests for their kids to opt out were honored.

15.   Now the Parents have been told that, next year, no notice will be given and no opt-outs tolerated because their kids must learn to be more "LGBTQ-Inclusive."

16.  Under long-standing precedent, government schools are not "empowered ... to 'save' a child from himself or his [religious] parents" by imposing "compulsory" education to "influence ... the religious future of the child." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

17.  The Maryland law that lets parents opt their children out from instruction on "family life and human sexuality" reflects that principle. *See* COMAR 13A.04.18.01(D)(2)(e)(iv), (i)-(ii).

18.  So do the School Board's own written policies on upholding religious diversity. *See, e.g.*, Ex. A at 3 (committing "to accommodate requests from students, or requests from parents/guardians on behalf of their students, to be excused from specific classroom discussions or activities that they believe would impose a substantial burden on their religious beliefs").

19.  The School Board's recent about-face strips away this long-standing protection of parental rights. This violates not just Maryland law and Board policy and practice but also the United States Constitution.

20.  Specifically, the First Amendment's Religion and Free Speech Clauses and the Fourteenth Amendment's Due Process Clause guarantee the parental right to opt

children out of classroom instruction on such sensitive religious and ideological issues.

21.   The Parents bring this lawsuit to vindicate that long-recognized right.

## JURISDICTION AND VENUE

22.   The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

23.   Venue lies in this district under 28 U.S.C. § 1391(b).

## THE PARTIES

### *The Mahmoud-Barakat Family*

24.   Plaintiffs Tamer Mahmoud and Enas Barakat are Muslims and residents of Montgomery County.

25.   They currently have three children enrolled in MCPS—a son and daughter in tenth grade and a son in second grade.

### *The Roman Family*

26.   Plaintiffs Jeff and Svitlana Roman are also Montgomery County residents.

27.   Jeff is Roman Catholic and an MCPS graduate of Sherwood High School; Svitlana is Ukrainian Orthodox.

28.   The Romans currently have one son enrolled in MCPS in second grade.

### *The Persak Family*

29.   Plaintiffs Chris and Melissa Persak are Catholic and life-long residents of Montgomery County.

30.   Melissa is an MCPS graduate of Sherwood High School.

31.   The Persaks have two elementary school age daughters (the "Student Plaintiffs") enrolled in MCPS.

### *Defendants*

32.   Defendant Montgomery County Board of Education is a government entity authorized by the State of Maryland to administer MCPS. Md. Code, Educ. Art. §§ 3-103, 3-104(a).

33. It controls educational matters that affect Montgomery County, *id.* at § 4-101, and is authorized to adopt educational policies, rules, and regulations for MCPS, as long as they are consistent with State law, *id.* at § 4-108(3)-(4).

34. As of fall 2021, MCPS comprises 209 schools and approximately 160,000 students, including approximately 70,000 elementary school students.

35. It is the largest public school system in Maryland and routinely among the twenty largest public school systems in the United States. *See At a Glance*, Montgomery County Public Schools (Oct. 2019), https://perma.cc/U3AS-EMWT.

36. Its principal place of business is 850 Hungerford Drive, Rockville, Maryland.

37. Defendant Monifa B. McKnight, Ed.D., is the superintendent of MCPS.

38. In that role, Dr. McKnight is charged with implementing the policies at issue.

39. She regularly attends board meetings and participated in the decision to strip parents of their notice and opt-out rights with respect to the Pride Storybooks.

40. At all relevant times, Dr. McKnight was acting under color of state law.

41. She is sued in her official capacity only.

42. Defendants Karla Silvestre, Shebra Evans, Grace Rivera-Oven, Rebecca Smondrowski, Julie Yang, Brenda Wolff, and Lynne Harris are elected members of the Montgomery County Board of Education.

43. Each regularly attends board meetings and participated in the decision to strip parents of their notice and opt-out rights with respect to the Pride Storybooks.

44. At all relevant times, they were acting under color of state law.

45. They are sued in their official capacities only.

## FACTUAL BACKGROUND

### *The Parents' religious beliefs*

#### The Mahmoud/Barakat Family

46. As taught by the Qu'ran, Plaintiffs Tamer Mahmoud and Enas Barakat believe that all humans are God's creations with God-given dignity that must be

respected, regardless of the person's faith, race, ethnic origin, sex, gender identity, sexual orientation, or social status. *Surah al-Israa* 17:70.

47.   As also taught by the Qu'ran, they believe that mankind has been divinely created as male and female, *Surah al-Hujurat* 49:13, and that all people are connected through a common ancestor: the first male and the first female, *Surah an-Nisaa* 4:1.

48.   Based on this teaching, Tamer and Enas believe that sex and sexuality are sacred gifts from God to be expressed through the forming of a spiritual, marital bond between spouses—one male and one female—for the shared promise of security, tranquility, compassion, contentment, and joy. *Surah al-A'raf* 7:189; *Surah ar-Rum* 30:21.

49.   Tamer and Enas believe that this sacred bond between husbands and wives entails sexually distinct but mutual duties and affections: "They are clothing for you and you are clothing for them." *Surah al-Baqarah* 2:187.

50.   Tamer and Enas believe that marriage, sex, and sexuality are also meant for creating children and teaching them virtue—not only to build a loving family but also to serve as an example of righteousness for society at large. *Surah al-Furqan* 25:74.

51.   Inherent in this teaching, Tamer and Enas believe that "gender" cannot be unwoven from biological "sex"—to the extent the two are even distinct—without rejecting the dignity and direction God bestowed on humanity from the start.

52.   Tamer and Enas believe that humans attain their fullest God-given potential by embracing their biological sex.

53.   Tamer and Enas believe that they have a sacred obligation to teach these principles to their children.

<u>The Roman Family</u>

54.   The Romans' Christian faith teaches that all humans are children of God created in God's image and likeness.

8

55.   Based on this teaching, they believe God commands them to treat others as bearers of this intrinsic nature. They believe that what God has created by His design cannot be redefined or recreated by man.

56.   Also based on this teaching, they believe that sexuality is a sacred gift from God, reflecting that men and women together are capable of cooperating with God in creating new life.

57.   For this reason, the Romans believe sexuality is expressed only in marriage between a man and a woman for creating life and strengthening the marital union.

58.   For the same reasons, the Romans believe that gender and biological sex are intertwined and inseparable and that encouraging children to unwind them will teach them that their bodies are "an object, a mere tool at the disposal of the soul, one that each person may dispose of according to his or her own will," rather than a "constitutive part of the human subject, a gift to be received, respected, and cared for as something intrinsic to the person." Committee on Doctrine United States Conference of Catholic Bishops, *Doctrinal Note on the Moral Limits to Technological Manipulation of the Human Body* 4 (2023), https://perma.cc/T6Y6-NXAB.

59.   The Romans believe that humans attain their fullest God-given potential by embracing their biological sex.

60.   They believe they have a sacred obligation to teach these principles to their son.

<u>The Persak Family</u>

61.   The Persaks believe that questions about sex and sexuality should be informed by sound science and common sense.

62.   They believe that all persons should be treated with respect and dignity regardless of religion, race, sex, ethnicity, gender identity, sexual orientation, or other characteristics.

9

63.  The Persak parents want their daughters to understand and appreciate the unique gifts and challenges of every individual.

64.  The Persaks' understanding of what is best for their child is informed by their Roman Catholic faith.

65.  The Persaks believe that matters regarding family life and human sexuality should be taught in a way that is consistent with their beliefs, sound science, and common sense.

66.  They believe that children—particularly those, like their own, in elementary school—are highly impressionable to ideological instruction presented in children's books or by schoolteachers.

67.  They believe this risk is even more serious when ideological instruction is imposed to the exclusion of other viewpoints.

**\* \* \***

68.  The Parents believe that every individual has equal dignity before God and should be treated with love, kindness, and respect.

69.  They want their children to understand and appreciate the unique gifts and challenges of every individual.

70.  The Parents believe that matters regarding family life and human sexuality should be taught in a way that is consistent with their respective religious beliefs.

71.  The Parents also believe that such matters should be taught to children in age-appropriate ways. This includes teaching children, at the proper time, to channel their romantic passions, rather than indulge them at first spark.

72.  The Parents also believe that the Pride Storybooks go far beyond teaching kindness and respect (as a matter of manners or virtuous citizenship).

73.  Rather, the Pride Storybooks are being used to impose an ideological view of family life and sexuality that characterizes any divergent beliefs as "hurtful."

74. The Pride Storybooks also promote political ideologies about family life and human sexuality that are inconsistent with sound science, common sense, and the well-being of children.

75. The Parents believe it is spiritually, mentally, and physically injurious to introduce children prematurely to many of the topics introduced by the Pride Storybooks.

### Instruction on family life and human sexuality

76. By regulation, every "local school system" in Maryland is required to provide a "comprehensive health education" that includes "family life and human sexuality." COMAR 13A.04.18.01(A), (C)(1)(c), (D)(2).

77. Such instruction "will begin in or prior to the grade 5." *Id.* at 18.01(D)(2)(d).

78. Nothing in Maryland law requires that this instruction be reserved to a single class or a discrete section of the curriculum.

79. Rather, schools are required to teach "indicators and objectives" and "concepts and skills" related to "family life and human sexuality." *Id.* at 18.01(D)(2)(d), (g).

80. Such "indicators and objectives" and "concepts and skills" comprise a wide range of instruction.

81. This instruction must "represent all students regardless of ability, sexual orientation, gender identity, and gender expression." *Id.* at 18.01(D)(2)(a).

82. By grade 7, the instruction "shall emphasize that refraining from sexual activity is the best method to avoid sexually transmitted infections, including HIV, and unintended pregnancy." *Id.* at 18.01(D)(2)(b).

83. It must also include "medically accurate information about contraception and condoms." *Id.*

84. And "in every grade in which the curriculum is taught," there must be "age-appropriate instruction on the meaning of 'consent' and respect for personal boundaries." *Id.* at 18.01(D)(2)(f).

***The national consensus on notice and opt-outs***

85.  Forty-three states and the District of Columbia require or permit some instruction in human sexuality.

86.  In some states, that instruction is limited to reproductive health or HIV/AIDS, while other states—like Maryland—speak more broadly to "family life" and "human sexuality."

87.  Thirty-two of those 44 jurisdictions allow for student opt-outs, including Maryland.[1]

88.  Another four states require that human sexuality be taught to children only when parents opt *in*.[2]

89.  One state doesn't require human sexuality instruction—but still requires opt-outs should any schools implement that instruction.[3]

---

[1]  *See* Ariz. Rev. Stat. Ann. § 15-716(E); Cal. Educ. Code § 51937; Conn. Gen. Stat. Ann. § 10-16e; Fla. Stat. Ann. § 1003.42(5); Ga. Code Ann. § 20-2-143(d); Idaho Code Ann. § 33-1611; 105 Ill. Comp. Stat. Ann. 5/27-9.1a(d); Iowa Code Ann. § 256.11(6)(a); La. Rev. Stat. Ann. § 17:281(D); Mass. Gen. Laws Ann. Ch. 71, § 32A; Me. Rev. Stat. Ann. tit. 22, § 1911; Mich. Comp. Laws. § 380.1507(4); Minn. Stat. Ann. § 120B.20; Mo. Ann. Stat. § 170.015(5)(2); N.J. Stat. Ann. § 18A:35-4.7; N.C. Gen. Stat. § 115C-81.30(b); Ohio Rev. Code Ann. § 3313.60(A)(5)(c); Okla. Stat. Ann. tit. 70, § 11-103.3(C); Or. Rev. Stat. § 336.465(1)(b); R.I. Gen. Laws § 16-22-17(c); S.C. Code Ann. § 59-32-50; Tenn. Code Ann. §49-6-1305; Va. Code. Ann. § 22.1-207.2; Vt. Stat. Ann. tit. 16, § 134; Wash. Rev. Code. Ann. § 28A.230.070(4); W. Va. Code Ann. § 18-2-9(c); D.C. Mun. Regs. subtit. 5e, § 2305.5; Kan. Admin. Regs. § 91-31-35(a)(5)(b); N.M. Pub. Educ. Dep't, Health Education Standards with Benchmarks and Performance Standards § 6.29.6.11 (2009); N.M. Code R. § 6.29.6 (2018); N.Y. Comp. Codes R. & Regs. tit. 8, § 135.3 (Westlaw through Oct. 10, 2018); 22 Pa. Code § 4.29(c).

[2]  *See* Colo. Rev. Stat. Ann. § 22-25-104(6)(d); Miss. Code Ann. § 37-13-173; Nev. Rev. Stat. Ann. § 389.036(4); Utah Code Ann. § 53E-9-203(3).

[3]  *See* Tex. Educ. Code Ann. § 28.004(i).

***Maryland law on notice and opt-outs***

90.   Within this broad consensus for ensuring opt-outs, Maryland is among the jurisdictions most protective of parental rights, broadly requiring both parental notice and the ability to opt out.

91.   Maryland law provides, "The local school system shall provide an opportunity for parents/guardians to view instructional materials to be used in the teaching of family life and human sexuality objectives." COMAR 13A.04.18.01(D)(2)(e)(iv).

92.   And there must be "policies, guidelines, and/or procedures for student opt-out regarding instruction related to family life and human sexuality objectives." *Id.* at 18.01(D)(2)(e)(i).

93.   Students that opt out of this instruction must then be provided "with appropriate alternative learning activities and/or assessments in health education." *Id.* at 18.01(D)(2)(e)(ii).

94.   The opt-out provision does not require a religious or moral objection.

***The School Board's own rules on notice and opt-outs***

95.   Beyond the state regulations protecting opt-outs, the School Board's own guidelines reinforce this parental right.

96.   In particular, the School Board's 2022-2023 "Guidelines for Respecting Religious Diversity" (the "Guidelines") "commit to making feasible and reasonable accommodations for [religious] beliefs and practices." *See* Ex. A at 1.

97.   The School Board's Guidelines promise:

> a. "to accommodate requests from students, or requests from parents/guardians on behalf of their students, to be excused from specific classroom discussions or activities that they believe would impose a substantial burden on their religious beliefs," *id.* at 3;
>
> b. to allow students "to be excused from the classroom activity if the students, or their parents/guardians, believe the activity would invade student privacy by calling attention to the student's religion," *id.* at 3-4; and

   c.  to "accommodate objections from students or their parents/guardians to a particular reading assignment on religious grounds by providing an alternative selection that meets the same lesson objectives," *id.* at 4.

98.  The Guidelines also ensure other religious accommodations for MCPS students.

99.  They provide for excused absences for religious holidays—with a "case-by-case" approach to determining whether students must make up missed assignments. *Id.* at 2.

100. They also allow for "excus[ing] students who do not want to participate" in "activities" that "may be viewed by others as having religious overtones," including "birthdays or other occasions that many may consider to be secular, such as Halloween and Valentine's Day." *Id.* at 4.

101. Beyond religious accommodations, the Guidelines also "expect instructional activities to be fair, objective, and not demean any religious or nonreligious beliefs." *Id.* at 4.

102. They provide that "[r]especting students' differing beliefs is an essential element of a pluralistic society." *Id.*

103. Accordingly, the Guidelines prohibit "teachers, students, and guest speakers" from "advocat[ing] particular religious viewpoints as superior to other religious or nonreligious viewpoints." *Id.*

104. Similarly, when guest speakers come to school or students are allowed to speak at assemblies, "[s]chools should make appropriate, neutral disclaimers to avoid conveying the perception to other students, their parents/guardians, or guests that the school endorses the student's or guest speaker's viewpoints (whether religious or not)." *Id.*

### The Pride Storybooks

105. In October 2022, the School Board announced it had "approved a selection of over 22 LGBTQ+-inclusive texts for use in the classroom." *See Diverse and Inclusive*

*Instructional Materials & Resources*, Montgomery County Public Schools, https://perma.cc/B5B3-GCEU; *See* also Ex. B. This came in response to a comprehensive "Antiracist System Audit" that the School Board commissioned in 2021. *See* Dr. Monifa McKnight, *MCPS Antiracist Audit Implementation*, Montgomery County Public Schools (Feb. 2, 2022), https://perma.cc/ZT69-ZURR.

106. For children in pre-K and Head Start programs, the School Board approved *Pride Puppy*, a book relating the story of two women taking their children to a pride parade, where their puppy gets lost. Ex. C.



107. The story uses the letters of the alphabet to illustrate what a child might see at a pride parade.

108. The book's "Search and Find Word List" encourages children to search for images of, among other things, the "intersex [flag]," a "[drag] king," "leather," a "lip ring," a "[drag] queen," "underwear," and a celebrated sex worker.

109. The book's illustrations encourage unqualified support for pride parades, with illustrations ostensibly geared toward three- and four-year-olds, showing things such as a minister wearing pride apparel and students and teachers enthusiastically advocating for "Peers + Queers," "Pride Club," "Love Knows No Gender," and "Two Spirit Pride."

110. One illustration celebrates Marsha P. Johnson, a self-defined "transvestite" or "queen" who, again as self-described, built a life "around sex and gay liberation, being a drag queen" and sex work. *Stonewall 1979: The Drag of Politics*, The Village Voice, https://perma.cc/9NRA-JF2A.

111. Other illustrations similarly introduce concepts around transgenderism, "queer" ideology, same-sex marriage, intersectionality, gender transitioning, drag, and drag shows. Ex. C at 3-17.

112. Pre-K teachers assigned to read the book in their classrooms are provided a resource guide from the Human Rights Campaign (HRC) for "defining LGBTQ+ words for elementary students." Ex. D at 2.

113. HRC is an activist organization that advocates for ideological education on sexual orientation and gender identity starting in kindergarten. To that end, it publishes teaching guides using some of the books approved by the School Board. *See, e.g.,* Ex. D at 2.

114. Beyond laudable aims of promoting equality, fairness, and the end of bullying, HRC espouses a specific ideology on issues regarding family life and human sexuality.

115. For example, HRC advocates "sex positivity," *HRC Foundation Launches Gen Z Sexual Health Program: GENERATE*, Human Rights Campaign, https://perma.cc/P4S4-3VSN, which is generally understood as promoting "an attitude towards human sexuality that regards all consensual sexual activities as fundamentally healthy and pleasurable, encourages sexual pleasure and experimentation." Allena Gabosch, *A Sex Positive Renaissance* (Dec. 8, 2014), https://perma.cc/92WD-W94R.

116. "[S]ex positivity can be understood as an ideology that promotes, with respect to gender and sexuality, being open-minded, non-judgmental and respectful of personal sexual autonomy, when there is consent." Chantelle Ivanski & Taylor Kohut, *Exploring definitions of sex positivity through thematic analysis*, 26 Can. J. of Hum. Sexuality 3, 216-25 (2017), https://utpjournals.press/doi/10.3138/cjhs.2017-0017.

117. The HRC guide promotes discussion with students including vocabulary such as "cisgender," "gender binary," "transgender," "pansexual," and "queer." Ex. D at 2.

118. Many individuals who argue in favor of children attending pride parades do so for reasons that the Parents—and countless others—find ideological and objectionable.

119. For example, a recent article in *Fatherly* argues for kids "absolutely" participating in pride parades, opining that it is simply "necessary to talk to [them]" in advance "about new things they may see," like "public nudity and kink." Heather Tirado Gilligan, *Should You Take Your Kids To A Pride Parade?*, Fatherly (June 1, 2022), https://perma.cc/E22H-5DN4.

120. One parent quoted in the article contended that her kids "just had to learn to laugh and enjoy things. Like there were these Beanie Babies with giant penises on them. … For a fourth- and fifth-grade kid, that's super funny." *Id.*

121. A 2021 op-ed in the *Washington Post* argued in support of exposing children to "a few dozen kinksters who danced down the street, laughing together as they twirled their whips and batons, some leading companions by leashes." Lauren Rowello, *Yes, kink belongs at Pride. And I want my kids to see it*, Washington Post (June 29, 2021), https://perma.cc/RM3Q-9W6N.

122. This parent was happy to explain to her elementary-age child and toddler why a "bare-chested man in dark sunglasses whose black suspenders clipped into a leather thong … paused to be spanked playfully by a partner with a flog." *Id.*

123. The storybook *Pride Puppy* makes no mention of this broader context, instead promoting pride parades only as a laudable family experience, without acknowledging they often contain material that many parents find inappropriate for young children.

124. Other Pride Storybooks similarly promote an ideologically one-sided view of issues that are religiously, socially, and scientifically controverted.

125. For example, books for first through fifth graders include *Uncle Bobby's Wedding*; *Intersection Allies*; *My Rainbow*; *Prince & Knight*; *Love, Violet*; and *Born Ready—The True Story of a Boy Named Penelope*.

126. *Uncle Bobby's Wedding* is a story meant, as its jacket states, to "validat[e]" same-sex marriage in the eyes of a small child. The book describes itself as a "celebration of love in all its forms." The story consists of a young girl upset that her uncle wants to marry, until her uncle's boyfriend befriends her and gains her trust. Ex. E. 

127. The book *Intersection Allies* describes nine interconnected characters and what makes them unique. Ex. F. One character's story advocates that, to be "safe,"  bathrooms should be gender neutral. Ex. F at 15.

128. The text also defines the terms "sex," "gender," "transgender," and "non-binary," followed by a discussion of pronouns that asks elementary-aged children, "What pronouns fit you best?" Ex. F at 42.

129. *My Rainbow* tells the story of an elementary-age, autistic, boy who believes that short hair keeps him from being a real girl. When the mother points to her own short hair, he responds "People don't care if cisgender girls like you have short hair. But it's different for transgender girls. I *need* long hair!" The mother concludes that her son knows best and sews him a rainbow-colored wig. Ex. G at 16. 

130. The teacher's guide eschews analysis of the various other ways parents might appropriately help their children experiencing gender dysphoria, concluding simply that "[s]tudents will recognize unfairness on the individual level (e.g., biased speech) and injustice at the institutional or systemic level (e.g., discrimination)." Ex. D at 4.

131. *Prince and Knight* is the story of a prince being arranged for marriage by his



parents, the king and queen. After "[t]he prince met many ladies (and made the maidens swoon!)," he tells his parents "I'm looking for something different in a partner by my side." After "climb[ing] atop" an attacking dragon to "tie[] a rope around its head," he fell and was "caught" in the "embrace" of a knight. The knight "reveal[ed] his handsome face," "and as they gazed into each other's eyes, their hearts began to race." The story ends with the kingdom cheering on "the two men's wedding day," while the prince and the knight dance intimately. Ex. H.

132. The story, *Love, Violet*, is about an elementary school girl's crush on one of her classmates. "As far as Violet was concerned," it reads, "only one person in her class raced like the wind. Only one had a leaping laugh. Only one made Violet's heart skip." Ex. I at 4. The story details Violet's inhibition to express her romantic feelings until the end of the



story when the two classmates exchange a valentine and a locket. Violet is described as "blush[ing] hot" when asked about her valentine. *Id*. at 8.

133. A school resource encourages a "think aloud" moment with the students so they can "acknowledg[e] how uncomfortable we might [be] in stuations when we feel our heart beating 'thumpity thump' & how hard it can be [to] talk about our feelings with someone that we don't just 'like' but we 'like like.'" Ex. D at 4.

134. *Born Ready* is based on the true story of a girl named Penelope who explains



to her mother, "I don't *feel* like a boy. I AM a boy." The mother agrees to tell their family "what we know. … You are a boy." Grandpa agrees that "gender isn't such a big deal." When Penelope's brother protests—"You can't *become* a boy. You have to be born one"—he's told that "[n]ot everything *needs* to make sense. *This is about love.*" Papa agrees that Penelope is a boy as long as Penelope will "tell me yourself." And when Penelope tells the principal "I think like a boy. I feel like a boy. … I'm sure I'm a boy," the teacher says, "today you're *my* teacher." Ex. J.

135. The resource guide for this book encourages children to notice "how happy Penelope is when his mom … commits to sharing with their loved ones that he is a boy" and to question why gender is "such a big deal [in the United States]." Ex. D at 5; Ex. J at 18.

136. If students question the story's narrative with comments like "[h]e can't be a boy if he was born a girl" or "[w]hat body parts do they have?," the School Board's guidance encourages teachers to impose an ideological response:

> When we are born, people make a guess about our gender and label us "boy" or "girl" based on our body parts. Sometimes they're right, and sometimes they're wrong. Our body parts do not decide our gender. Our gender comes from inside—we might feel different than what people tell us we are. We know ourselves best.

Ex. D at 5.

### *The science around transgenderism and sexual orientation*

142. A significant body of scientific evidence indicates that most children who experience gender dysphoria will outgrow those feelings. *See, e.g.*, Devita Singh et al., *A Follow-Up Study of Boys With Gender Identity Disorder*, 12 Frontiers Psych., Mar. 2021, https://perma.cc/5CRN-3LXU (almost 88% of observed gender dysphoria resolved by puberty); World Pro. Ass'n for Transgender Health, *Standards of Care for*

*the Health of Transsexual, Transgender, and Gender Nonconforming People* 11 (7th ed. 2012), https://perma.cc/2DGD-AXFT (footnote omitted); *see also* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31435 n.263 (May 18, 2016) ("Gender dysphoria … does not inevitably continue into adulthood," with "persistence rate[s]" in boys of "only 6-23%" and "12-27%" for girls).

143. This desistance data comes from an association that *supports* sex "reassignment" surgery—"one side in a sharply contested medical debate." *See Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019) (agreeing with the First Circuit that "Standards of Care" from the World Professional Association for Transgender Health—"WPATH"—"reflect not consensus").

144. As the American College of Pediatrics put it in 2018, "[t]he debate over how to treat children with [gender dysphoria] is primarily an ethical dispute; one that concerns physician worldview as much as science. … Medicine also does not occur in a political vacuum and being on the wrong side of sexual politics can have severe consequences for individuals who hold the politically incorrect view." Am. Coll. of Pediatricians, *Gender Dysphoria in Children* (Nov. 2018), https://perma.cc/HY5B-C24Q; *see also* Jennifer Block, *Gender dysphoria in young people is rising—and so is professional disagreement*, BMJ (Feb. 23, 2023), https://perma.cc/DE8X-CZWT.

145. Many children also experience feelings of same-sex attraction or infatuation but do not identify as gay or lesbian in adulthood. *See* Miles Ott et al., *Stability and Change in Self-Reported Sexual Orientation Identity in Young People: Application of Mobility Metrics*, 40 Archives Sexual Behav. 519, 520 (2011), https://perma.cc/VY75-RVEC ("[I]t has been acknowledged that a person's sexual orientation may change not only during adolescence but also across the adult lifespan."); *see also* Bennett McIntosh, *There's (Still) No Gay Gene*, Harv. Mag. (Aug. 29, 2019), https://perma.cc/KJ8P-TFCE ("'It's effectively impossible to predict an individual's sexual behavior from their genome,' said Neale, director of genetics at the Stanley

Center for Psychiatric Research at the Broad and an associate professor in medicine at Harvard Medical School (HMS), during a Tuesday teleconference introducing the paper's findings.").

146. There is also significant evidence that an individual's well-being is not improved to a statistically significant degree by indulging that individual's subjective perception of his gender identity. *See, e.g.*, William Malone, *Puberty Blockers for Gender Dysphoria: The Science is Far from Settled*, 5 Lancet Child & Adolescent Health 33 (2021), https://perma.cc/5RCS-HHVH; Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 Archives Sexual Behav. 3353 (2021), https://perma.cc/852N-6EHW; *see also Gibson*, 920 F.3d at 222 (quoting expert who "emphasized that 'large gaps' exist in the medical community's knowledge regarding the long-term effects of [sex "reassignment" surgery] and other [gender dysphoria] treatments in relation to its positive or negative correlation to suicidal ideation.'" (alterations in original)).

147. This scientific and experiential data is consistent with many parents' religious beliefs that a person's biological sex is a gift from God and that the greatest happiness comes from appreciating the body given as a free gift to the person.

148. Many religious believers also accept that sexual relations are intended by God to take place only within marriage between a man and a woman and encourage their children to live consistent with those religious teachings.

### The School Board's decision to conceal information and reject opt-outs

149. Hundreds of parents in Montgomery County have expressed concern that the new Pride Storybooks introduce issues around family life and sexuality that are inappropriate for children in elementary school.

150. Indeed, a poll by the *Washington Post* and University of Maryland showed that, among registered voters, sixty-six percent of Marylanders disapproved of

schoolteachers discussing LGBTQ issues with students from kindergarten through third grade. Nicole Asbury and Emily Guskin, *Most Md. voters say elementary school discussion of LGBTQ acceptance 'inappropriate,'* The Washington Post (Oct. 12, 2022), https://perma.cc/6NED-E9RH.

151. Fifty-six percent disapproved for fourth and fifth graders. *Id.*

152. Even for middle schoolers, forty-two percent of voters disapproved. *Id.*

153. Only for high schoolers, did a strong majority support such conversations, with only twenty-seven percent of voters disapproving. *Id.*

154. One parent expressed concern at a School Board meeting that the book *My Rainbow* was pushing transgender ideology: "this is not instruction, it is indoctrination." Testimony at the Montgomery County Public Schools Business Meeting, at 27:11-29:09 (Jan. 12, 2023), https://perma.cc/T234-559Q.

155. Defendant Harris responded urging the School Board to adhere to the curriculum, and a colleague emphasized in reference to the parent's testimony that, "[y]es, ignorance and hate does exist in our community." *Id.* at 38:34-40:40.

156. Nevertheless, on March 22, 2023, consistent with its policies and past practices, the School Board issued a statement confirming parents' notification and opt-out rights:

> When a teacher selects a curriculum, a notification goes out to parents about the book. If a parent chooses to opt out, a teacher can find a substitute text for that student that supports these standards and aligns with curriculum.

*See* Stephanie Ramirez, *MCPS revises policy on LGBTQ-friendly books*, Fox 5 Washington DC (Mar. 22, 2023), https://perma.cc/8L5G-XQ9X.

157. But the next day, in a "Revised Message Regarding the Use of Inclusive Texts," the School Board reversed course:

> [T]here is as an expectation that teachers utilize these inclusive lessons and texts with all students. … Students and families may not choose to opt out of engaging with any instructional materials, other than "Family Life and

Human Sexuality Unit of Instruction" which is specifically permitted by Maryland law. As such, teachers will not send home letters to inform families when inclusive books are read in the future.

*See 5 Things to Know*, Montgomery County Public Schools (March 23, 2023), https://perma.cc/6XVG-R3CF.

158. The School Board's attempt to segregate the Pride Storybooks from "family life and human sexuality" is inconsistent with the Maryland regulation requiring parental notice and opt-outs.

159. The regulation extends parental notice and opt-out rights to any teaching of "indicators and objectives" or "concepts and skills" regarding family life and human sexuality—not a single class or "[u]nit." *See* COMAR 13A.04.18.01(D)(2)(d)(g).

160. The next day in the Persak Plaintiffs' elementary school, teachers were instructed to introduce and read the books in their classrooms.

161. The principal informed the Persaks that, because they had requested an opt-out, their daughter was excused from the classroom when one of the Pride Storybooks was read.

162. The principal made clear, however, that no further notifications or opt-outs would be provided.

163. As the principal put it earlier, these opt-outs were made "[t]o accommodate [parents'] fears" and she "disagree[d] with th[em] unequivocally." Ex. K.

164. The Roman Plaintiffs corresponded with the principal of their elementary school, seeking both an opt-out for their son and guarantees that parents would continue to receive notice about the Pride Storybooks and that teaching them would be optional for teachers. *See* Ex. L.

165. On February 1, 2023, the principal told the Romans that "it is your right to ask that [your son] not be present when this book is read to the class and if any other parents reach out I will meet with them to have the same discussion we engaged in and they can make a decision for their family." *Id.* at 7.

166. Plaintiffs Tamer Mahmoud and Enas Barakat asked the acting principal of their elementary school to opt their son out of class reading of *Prince and Knight*, and to assign him an alternative activity. Ex. M.

167. The acting principal offered the parents an opportunity to read the book. *Id.*

168. The acting principal then followed up by stating that MCPS is not supporting parents opting out of the Pride Storybooks, and teachers are not required to provide alternative assignments. *Id.*

169. Tamer and Enas responded by saying that their decision to opt-out did not change after reading the book. *Id.*

170. They again asked for their son to receive an alternate assignment. *Id.*

171. The acting principal finally responded (on March 20) that he would allow their son to sit outside the classroom while the book was discussed. *Id.*

172. Nevertheless, on March 23, the School Board announced that the Pride Storybooks were being read to students and that parents would no longer receive advance notice or opportunity to opt their children out. *Id.*

173. On March 28, Defendant Harris addressed the issue at a School Board meeting, accusing parents who had just testified in support of opt outs that they were motivated by hate::

> Rogers and Hammerstein got it right seven years: "You have to be taught to hate." You know, no child is born other-izing, marginalizing, thinking somebody else is not as good as they are …. Saying that a kindergartener can't be present when you read a book about a rainbow unicorn because it offends your religious rights or your family values or your core beliefs is just telling that kid, "Here's another reason to hate another person."

Lynne Harris, Remarks at the MCPS Board Meeting at 1:48:00-1:48:15 (March 28, 2023), https://perma.cc/AW3T-DMJB; *see also* Ex. N at 16 (suggesting that parents seeking opt-outs are engaging in a "dehumanizing form of erasure").

## CLAIMS FOR RELIEF

### Count I

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Religious Upbringing of Children**

174. Plaintiffs incorporate by reference all preceding paragraphs.

175. Independent of the lack of general applicability or neutrality toward religion, the Pride Storybooks violate the Free Exercise Clause's guarantee of an "enduring American tradition": "the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) (quoting *Yoder*, 406 U.S. at 213-14); *Emp. Div. v. Smith*, 494 U.S. 872, 881 (1990) (citing "the right of parents … to direct the education of their children" even against laws that are "neutral, generally applicable"); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129-30 (2022) ("how we protect other constitutional rights" is to analyze whether a constitutional amendment's "plain text covers an individual's conduct," and if so, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition"); *see also Firewalker-Fields v. Lee*, 58 F.4th 104, 123 n.7 (4th Cir. 2023) (historical tradition analysis applies to "constitutional provisions where the Supreme Court has directed that historical tradition defines an exception, rather than the rule"); *Espinoza*, 140 S. Ct. at 2258-59 (analyzing whether Montana could identify a "comparable 'historic and substantial tradition'" to overcome protection of the Free Exercise Clause).

176. The long-standing American tradition protecting the right of parents to shape their children's religious education meant "courts tended to rely on a common law presumption of the soundness of parental judgment in making educational decisions pertaining to their children." Ralph D. Mawdsley & Daniel Drake,

Commentary, *Involving Parents in the Public Schools: Legal and Policy Issues*, 76 Educ. L. Rep. 299, 301 (1992).

177. The American tradition was a departure from the English religious establishment, where laws fined parents for instructing their children "in the popish religion." 1 William Blackstone, *Commentaries on the Laws of England* 451 (Edward Christian ed., 1793); *see also id.* at 450 ("Yet in one case, that of religion, [parents] are under peculiar restrictions.").

178. Under the American tradition, unless the parental decision would detrimentally "affect the government of the school or incommode the other students or the teachers," "it is for the parent, not the [school], to direct the branches of education [a child] shall pursue, so far as they are taught." *Trs. of Schs. v. People ex rel. Van Allen*, 87 Ill. 303, 309 (1877); *see also Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring) ("It is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities."); *Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 391 (5th Cir. 2015) (en banc) (explaining "Justice Alito's controlling concurrence").

179. Accordingly, unless public safety or the "special characteristics" of the school setting are at issue, a school's desired "educational mission" is insufficient to restrict First Amendment rights. *Morse*, 551 U.S. at 423 (Alito, J., concurring).

180. Here, the forced inculcation of the Pride Storybooks without parental notice or opt-out rights burdens the Parents' right to form their children on a matter of core religious exercise and parenting: how to understand who they are.

181. There is no analogous tradition of restricting this right.

182. To the contrary, as discussed above, a long-standing national consensus of broadly allowing opt-outs from instruction on family life and human sexuality instruction exists, including in Maryland. *Supra* ¶¶ 85-94.

183. And at least one court has already blocked an earlier effort by the Board to transgress the First Amendment rights of parents through related instruction. *Citizens for a Responsible Curriculum v. Montgomery County Public Schools*, No. CIV.A.AW-05-1194, 2005 WL 1075634, at *11 (D. Md. May 5, 2005) ("The Court is extremely troubled by the willingness of Defendants to venture—or perhaps more correctly bound—into the crossroads of controversy where religion, morality, and homosexuality converge.").

184. Unable to show a contrary tradition of restricting parental control over family life and human sexuality education by denying opt-outs, the School Board cannot overcome the Parents' free exercise right. *See Bruen*, 142 S. Ct. at 2126 (holding that the Constitution "presumptively protects that conduct" not rebutted by an analogous "historical tradition" of regulation).

185. The Parents have and will continue to suffer the irreparable injury of their First Amendment rights being denied by Defendants.

186. The Parents also have or may in the future suffer monetary damages in being forced to pursue other educational opportunities for their children because of the School Board's disregard for their constitutional rights.

187. To remedy their injuries, Plaintiffs are entitled to declaratory, injunctive, and monetary relief.

188. To the extent that the Court finds the Free Exercise Clause inapplicable to the Parents' rights, then *Employment Division v. Smith*, 494 U.S. 872 (1990) was wrongly decided.

### Count II

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**General Applicability**

189. Plaintiffs incorporate by reference all preceding paragraphs.

190. A government policy will fail the Free Exercise Clause's general applicability requirement if it prohibits any religious conduct while permitting similar conduct that "undermines the government's asserted interests in a similar way, or if it provides a mechanism for individualized exemptions." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022) (cleaned up).

191. The mere existence of a mechanism for individualized exemptions means the policy at issue is not generally applicable, "regardless whether any exceptions have been given." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021).

192. If a policy is not generally applicable for either of these reasons, that "is sufficient to trigger strict scrutiny." *Kennedy*, 142 S. Ct. at 2422 (citation omitted).

193. Here, both general applicability triggers are met by the School Board's refusal to accommodate Plaintiffs' notification and opt-out requests from the Pride Storybooks.

194. This failure burdens the Parents' freedom to form their children on a matter of core religious exercise and parenting: how to understand who they are.

195. It also burdens the Student Plaintiffs' rights to opt out of books that violate their religious beliefs and practices.

196. The first trigger—not accommodating some opt-out requests while permitting conduct that similarly undermines the supposed government interest—is demonstrated in multiple ways.

197. Maryland law requires parental notification and opt-out rights for instruction regarding family life and human sexuality for any reason, religious or not.

198. The School Board has traditionally extended parental notification and opt-out rights for instruction regarding family life and human sexuality.

199. For the 2022-23 school year, the School Board provided parental notification and allowed parental opt outs for the new Pride Storybooks.

200. This included honoring opt-out requests for the Persak children, acknowledging an opt-out for the Roman's son, and giving Tamar and Enas's son an opt-out.

201. The School Board has also traditionally allowed students to opt out of books that violate their religious beliefs and receive a different reading assignment instead.

202. But then, on March 23, the School Board suspended all opt-outs without explanation.

203. The second trigger for general applicability—a mechanism for individualized assessments—is also met by much of the same evidence.

204. The School Board has allowed administrators and teachers to provide parental notification and opt outs on a case-by-case basis.

205. Indeed, the School Board's written Guidelines provide that "each situation" of religious-based absence from school "must be addressed on a case-by-case basis." Ex. A at 2.

206. The School Board's decision to reverse itself and no longer honor opt-outs from the Pride Storybooks—when it had already allowed some, and continues to allow analogous opt-outs (as they must under Maryland law and their own Guidelines)—is not generally applicable.

207. Strict scrutiny therefore applies.

208. The School Board cannot meet its burden to prove that forced exposure to the Pride Storybooks pursues a compelling governmental interest or that it is narrowly tailored to achieve such an interest.

209. The School Board cannot "rely on broadly formulated interests" but must explain "the asserted harm of granting specific exemptions to particular religious claimants." *Fulton*, 141 S. Ct. at 1881 (cleaned up).

210. In other words, the School Board cannot explain why it must force *these* Parents to violate *their* religious freedom to form their children in their own religious

traditions. *See, e.g.*, *id.* ("[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so.").

211. The School Board cannot show forcing all children to read the Pride Storybooks is the only way to teach inclusion and civility toward all individuals.

212. Plaintiffs have and will continue to suffer the irreparable injury of their First Amendment rights being denied by Defendants.

213. The Parents also have or may in the future suffer monetary damages in being forced to pursue other educational opportunities for their children because of the Board's disregard for their constitutional rights.

214. To remedy their injuries, Plaintiffs are entitled to declaratory, injunctive, and monetary relief.

215. To the extent this Court finds the Board's Pride Storybooks policy generally applicable, then *Employment Division v. Smith*, 494 U.S. 872 (1990) was wrongly decided.

**Count III**

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Neutrality**

216. Plaintiffs incorporate by reference all preceding paragraphs.

217. The Free Exercise Clause requires that government policies be "neutral" toward religious exercise.

218. "A government policy will not qualify as neutral if it is specifically directed at religious practice"—detectable if the policy "discriminates on its face, or if a religious exercise is otherwise its object." *Kennedy*, 142 S. Ct. at 2422 (cleaned up).

219. "A plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise; in cases like that [the Supreme Court] ha[s] 'set aside' such policies without

31

further inquiry." *Id.* at 2422 n.1 (citing *Masterpiece Cakeshop, Ltd. V. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1732 (2018)).

220. But even "[f]acial neutrality is not determinative." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

221. The Free Exercise Clause also "forbids subtle departures from neutrality," "protect[ing] against governmental hostility which is masked, as well as overt." *Id*.

222. The School Board's policy to mandate the Pride Storybooks to discourage a biological understanding of human sexuality is not neutral toward religion, in part because it assumes that traditional religious views regarding family life and sexuality as supported by sound science and common sense are hurtful, hateful, or bigoted.

223. This burdens the Parents' freedom to form their children on a matter of core religious exercise and parenting: how to understand who they are.

224. It also burdens the Student Plaintiff's freedom to receive an education in an environment free from religious discrimination.

225. The School Board's policy of forced participation in the Pride Storybooks is not neutral toward religious exercise and expressly encourages teachers to tell students that their religious and scientific perspectives are "hurtful."

226. A principal at one School made this explicit when saying that parents who voiced religious-based concerns over subjecting their children to Pride Storybooks are being "motivat[ed]" by "fear." "Fear is a powerful motivator," and the School Board only considered an opt out from the Pride Storybooks "[t]o accommodate these fears." Ex. K.

227. And Defendant Harris was even more explicit after the School Board decided to end opt-outs on the Pride Storybooks. She said that allowing such opt-outs for religious reasons "is just telling that kid, 'Here's another reason to hate another person.'"

228. To the contrary, the School Board's Guidelines permit opt-out requests on any subject, classroom discussion, or activity that violates parents' or students' religious beliefs or practices.

229. Maryland also requires opt-outs from instruction on "family life and human sexuality," which extends to issues of sexual orientation, gender identity, and gender expression, consent, and personal boundaries.

230. It is not neutral to exclude the Pride Storybooks from these otherwise general religious accommodations.

231. Moreover, non-neutrality toward religion is also demonstrated by teachers no longer notifying parents when the Pride Storybooks will be read to their children.

232. The School Board's Guidelines require that affirmative steps be taken by schools to ensure that "instructional activities" are "fair, objective, and [do] not demean any religious or nonreligious beliefs." *Supra* ¶ 101.

233. Those steps, when guest or student speakers are involved, can also include "disclaimers" issued to parents and guardians. *Supra* ¶ 104.

234. Now, however, the Parents will have no way of knowing when or how these books are foisted upon their children—despite their religious objections.

235. As with general applicability, the School Board's lack of neutrality toward religious concerns "is sufficient to trigger strict scrutiny." *Kennedy*, 142 S. Ct. at 2422 (citation omitted).

236. For the foregoing reasons, the School Board cannot meet its burden to establish that the Pride Storybooks achieve a compelling government interest, and that forcing Plaintiffs to violate their religious beliefs toward is narrowly tailored to achieve that interest.

237. Plaintiffs have and will continue to suffer the irreparable injury of their First Amendment rights being denied by Defendants.

238. The Parents also have or may in the future suffer monetary damages in being forced to pursue other educational opportunities for their children because of the School Board's disregard for their constitutional rights.

239. To remedy their injuries, Plaintiffs are entitled to declaratory, injunctive, and monetary relief.

240. To the extent this Court finds the Board's Pride Storybooks policy neutral, then *Employment Division v. Smith*, 494 U.S. 872 (1990) was wrongly decided.

## Count IV

### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Speech Clause
### Viewpoint Discrimination

241. Parents incorporate by reference all preceding paragraphs.

242. The School Board's policy to discourage a biological understanding of human sexuality through the Pride Storybooks is religious viewpoint discrimination and thereby violates the First Amendment's Free Speech Clause.

243. No matter the "forum" in which speech occurs, viewpoint discrimination is always prohibited. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

244. Accordingly, schools—like other fora for private speech—cannot exclude speech "on the basis of the religious nature of the speech." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 105 (2001); *Rosenberger*, 515 U.S. at 831 ("Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.").

245. Here, however, the School Board's Pride Storybooks are excluding religious perspectives on the topic of gender identity.

34

246. As early as pre-K, children will be introduced to what it means to be "cisgender," "gender binary," "transgender," "pansexual," and "queer." Ex. D.

247. First-graders will read a book discussing being "non-binary" and "what pronouns fit you best." *Id.*

248. In second grade, the Pride Storybooks will make children recognize "biased speech" and "discrimination." *Id.* Later in fifth grade, children will read about a mother committing to sharing with loved ones that her boy "is" a girl. *Id.*

249. The Pride Storybooks promote a single viewpoint on what it means to be "affirming" on matters of and human sexuality. Different viewpoints on what "affirming" means in this context are either not provided or outright discouraged.

250. Moreover, and despite the School Board's Guidelines on religious diversity, its "resource guide" on the Pride Storybooks prohibits divergent religious perspectives too.

251. For example, the resource guide suggests teachers tell students who question the premise of gender identity that the "comment is hurtful; we shouldn't use negative words to talk about peoples' identities." *Id.* at 5.

252. Were other students to state what their parents taught them—that gender is not "assigned" at birth but an observation of biological reality—the teacher is suggested to tell the student that "[w]hen we are born, people make a guess about our gender and label us 'boy' or 'girl' based on our body parts. Sometimes they're right, and sometimes they're wrong." *Id.*

253. Similarly, were a student to question why subjective feelings override objective biological reality, teachers are suggested to say that "[o]ur gender comes from inside – we might feel different than what people tell us we are. We know ourselves best." *Id.*

254. Far from guaranteeing a fair and objective discussion of religious perspectives, the School Board's Pride Storybooks and corresponding "resource guide"

preclude religious viewpoints on the topics of sexual orientation and gender identity—because of their viewpoint. That is unconstitutional.

255. As a "finding of viewpoint bias end[s] the matter," there is no subsequent analysis of strict scrutiny. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) ("Once we have found that a law aims at the suppression of views, why would it matter that Congress could have captured some of the same speech through a viewpoint-neutral statute.") (cleaned up).

256. Plaintiffs have and will continue to suffer the irreparable injury of their First Amendment rights because of the School Board's viewpoint discrimination.

257. The Parents also have or may in the future suffer monetary damages in being forced to pursue other educational opportunities for their children because of the Board's disregard for their constitutional rights.

258. To remedy their injuries, Plaintiffs are entitled to declaratory, injunctive, and monetary relief.

### Count V

**42 U.S.C. § 1983**
**Violation of the Fourteenth Amendment to the U.S. Constitution**
**Substantive Due Process**
**Parental Right to Direct Children's Education and Upbringing**

259. Plaintiffs incorporate by reference all preceding paragraphs.

260. "[T]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925)).

261. That right—that high duty—is not only deeply embedded in "[t]he history and culture of Western civilization," *Yoder*, 406 U.S. at 232; it also has "a constitutional dimension," *Troxel*, 530 U.S. at 65.

262. A century of Supreme Court decisions establish that "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 66.

263. Simply put, the "'liberty' specially protected by the Due Process Clause includes the right[] … to direct the education and upbringing of one's children." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

264. The School Board's policies regarding the Pride Storybooks violate the Parents' fundamental right to make key decisions regarding the upbringing, education, custody, care, and control of their children, including the right to opt their children out of instruction on family life and human sexuality that violates their religious beliefs and practices.

265. There is no compelling state interest in forcing elementary school children to participate in the Pride Storybooks that outweighs the Parents' constitutional right to direct the education, upbringing, care, custody, and control of their children.

266. The Parents have and will continue to suffer irreparable injury to their constitutional rights because of Defendants' actions.

267. The Parents also have or may in the future suffer monetary damages in being forced to pursue other educational opportunities for their children because of the Board's disregard for their constitutional rights.

268. At bottom, the School Board's actions violate the "cardinal" principle "that the custody, care and nurture of the child reside *first* in the *parents*, whose primary function and freedom include preparation for obligations the state can *neither supply nor hinder*." *Troxel*, 268 U.S. at 65-66 (emphases added) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).

269. Eyes wide open, the School Board has disavowed what "[p]ublic schools must not forget": "that '*in loco parentis*' does not mean 'displace parents.'" *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000).

270. The Parents have and will continue to suffer the irreparable injury of their Fourteenth Amendment rights being denied by Defendants.

271. The Parents also have or may in the future suffer monetary damages in being forced to pursue other educational opportunities for their children because of the Board's disregard for their constitutional rights.

272. To remedy their injuries, the Parents are entitled to declaratory, injunctive, and monetary relief.

## Count VI
## Violation of Maryland State Law

273. Plaintiffs incorporate by reference all preceding paragraphs.

274. Article 24 of the Declaration of Rights of the Maryland Constitution provides, "That no man ought to be … disseized of his … liberties or privileges … or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Md. Const. Declaration of Rights Art. § 24.

275. Article 5(a)(1) of the Declaration of Rights of the Maryland Constitution also provides, that "the Inhabitants of Maryland are entitled to the Common Law of England … and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six … subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State." Md. Const. Declaration of Rights Art. § 5(a)(1).

276. These provisions in Maryland's Constitution protect parents' fundamental rights to direct the care, custody, education, welfare, safety, and control of their minor children.

277. The State of Maryland by regulation has given explicit protection for these rights in the context of public school instruction regarding "family life and human sexuality."

278. State regulations require a local school system like MCPS to "provide an opportunity for parents/guardians to view instructional materials to be used in the teaching of family life and human sexuality objectives." COMAR 13A.04.18.01(D)(2)(e)(iv)

279. They further provide that the local school system "shall establish policies, guidelines, and/or procedures for student opt-out regarding instruction related to family life and human sexuality objectives." *Id.* at 18.01(D)(2)(e)(i).

280. The School Board's own policies reinforce these rights to notice and opportunity to opt out, committing "to accommodate requests from students, or requests from parents/guardians on behalf of their students, to be excused from specific classroom discussions or activities that they believe would impose a substantial burden on their religious beliefs". Ex. A at 3.

281. The School Board's policy of withholding notice and opt-outs violates Maryland's Constitution, state law, and the School Board's own regulations.

282. Plaintiffs have and will continue to suffer the irreparable injury of their state rights being denied by Defendants.

283. The Parents also have or may in the future suffer monetary damages in being forced to pursue other educational opportunities for their children because of the Board's disregard for their state rights.

284. To remedy their injuries, Plaintiffs are entitled to declaratory, injunctive, and monetary relief.

## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a.  Enter a declaration that the refusal to afford Plaintiffs a right to opt out from family life and human sexuality instruction, including the forced reading of the Board's Pride Storybooks, violates the Free Exercise Clause of the First Amendment;

b.  Enter a declaration that forcing Plaintiffs to educate their children, read, and/or speak consistently with the perspectives contained in the Pride Storybooks and compelling the Student Plaintiffs to accept one viewpoint to the exclusion of all others violates their rights under the Free Speech Clause of the First Amendment;

c.  Enter a declaration that forcing students, over their Parents' objection, to read or listen to the School Board's Pride Storybooks violates the Parents' rights under the Due Process Clause of the Fourteenth Amendment;

d.  Enter a declaration that forcing students, over their Parents' objection, to read or listen to the School Board's Pride Storybooks violates the Parents' rights under Maryland law;

e.  Enter preliminary and permanent injunctions prohibiting the School Board from forcing the Parents' children and other students—over the objection of their parents—to read, listen to, or discuss the School Board's Pride Storybooks, and also requiring the School Board to provide advance notice and an opportunity for opt-outs to any other instruction related to family life or human sexuality.

f.  Award nominal damages to the Parents;

g.  Award actual damages incurred by the Parents in being forced to pursue other educational opportunities for their children because of the School Board's disregard for their constitutional rights;

h.  Award attorneys' fees and costs under 42 U.S.C. § 1988; and

i.  Award such other relief as the Court may deem just and proper.

Respectfully submitted this 24th day of May, 2023.

/s/ James C. Mehigan
James C. Mehigan, (Bar #: 16239)
MEHIGAN LAW GROUP PLLC
11921 Freedom Drive
   Suite 550
Reston, Virginia 20190
(703) 774-7281
jmehigan@mehiganlawgroup.com

Eric S. Baxter
  (admission pending)
William J. Haun
  (pro hac vice pending)
Michael O'Brien*
  (pro hac vice pending)
Brandon L. Winchel**
  (pro hac vice pending)
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W.
  Suite 400
Washington, DC 20006
(202) 955-0095
ebaxter@becketlaw.org

*Attorneys for Plaintiffs*

\*Not a member of the DC Bar; admitted in
Louisiana. Practice limited to cases in federal court.

\*\*Not a member of the DC Bar; admitted in
California. Practice limited to cases in federal court.

41

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Tamer Mahmoud, declare under penalty of perjury that the foregoing allegations that pertain to me are true and correct to the best of my knowledge.

Dated: __5|23|23__

_____
Tamer Mahmoud

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Enas Barakat, declare under penalty of perjury that the foregoing allegations that pertain to me are true and correct to the best of my knowledge.

Dated: ___5/23/23___

_____

Enas Barakat

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Jeff Roman, declare under penalty of perjury that the foregoing allegations that pertain to me are true and correct to the best of my knowledge.


Dated: May 5, 2023

_____

Jeff Roman

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Svitlana Roman, declare under penalty of perjury that the foregoing allegations that pertain to me are true and correct to the best of my knowledge.

Dated: _5/23/23_

_____
Svitlana Roman

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Chris Persak, declare under penalty of perjury that the foregoing allegations that pertain to me are true and correct to the best of my knowledge.

Dated: 08/23/23

_____
Chris Persak

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Melissa Persak, declare under penalty of perjury that the foregoing allegations that pertain to me are true and correct to the best of my knowledge.

Dated: 5/23/23

Melissa Persak