## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TAMER MAHMOUD, *et al.*,<br><br>     *Plaintiffs,*<br><br>   v.<br><br>MONIFA B. MCKNIGHT, *in her official capacity as Superintendent of the Montgomery Board of Education, et al.*,<br><br>     *Defendants.* | Case No. 8:23-cv-01380-DLB<br><br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Hearing Requested** |

Eric S. Baxter (readmission pending)
William J. Haun (pro hac vice)
Michael J. O'Brien* (pro hac vice)
Brandon L. Winchel* (pro hac vice)
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W., Suite 400
Washington, DC 20006
(202) 955-0095
whaun@becketlaw.org

James C. Mehigan, (Bar # 16239)
MEHIGAN LAW GROUP PLLC
11921 Freedom Drive, Suite 550
Reston, Virginia 20190
(703) 774-7281
jmehigan@mehiganlawgroup.com

*Not a member of the DC Bar; admitted in Louisiana and California respectively. Practice limited to cases in federal court.

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................. 1

BACKGROUND .................................................................................... 4

   A.  The Pride Storybooks ................................................................. 4

   B.  The Parents' Beliefs .................................................................. 9

   C.  Notice and Opportunity to Opt Out .......................................... 12

LEGAL STANDARD............................................................................ 13

ARGUMENT ....................................................................................... 13

   I.  The Parents are likely to succeed on the merits of their claims ................... 13

     A.  Stripping opt-out rights triggers strict scrutiny under the
       Free Exercise Clause. ................................................................. 14

       1.  The School Board's no-opt-out policy violates the Free Exercise
          Clause under *Yoder* by interfering with the Parents' right to
          direct their children's religious upbringing........................... 14

       2.  The School Board's no-opt-out policy separately violates the
          Free Exercise Clause under *Fulton* by allowing individualized
          exemptions. .......................................................................... 17

       3.  The School Board's no-opt-out policy violates the Free Exercise
          Clause under *Tandon* because it includes categorical exclusions
          for comparable secular conduct. ........................................... 18

       4.  The School Board's no-opt-out policy separately violates the Free
          Exercise Clause under *Lukumi* and *Masterpiece* because it targets
          religious exercise ................................................................. 20

     B.  Stripping opt-out rights also triggers strict scrutiny under the Due
       Process Clause ........................................................................ 23

   II.  The no-opt-out policy cannot survive strict scrutiny. ...................................... 24

     A.  The School Board lacks a compelling governmental interest in
       stripping the Parents' opt-out rights for the Pride Storybooks........... 24

     B.  The no-opt-out policy is not the least restrictive means for
       achieving the asserted government interest ......................................... 29

III.   The Parents satisfy the remaining preliminary injunction factors. ............ 30

CONCLUSION ....................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of Cmty. Cancer Ctrs. v. Azar,*
    509 F. Supp. 3d 482 (D. Md. 2020) ....................................................... 31

*Burwell v. Hobby Lobby,*
    573 U.S. 682 (2014) ............................................................................ 29

*C.N. v. Ridgewood Bd. of Educ.,*
    430 F.3d 159 (3d Cir. 2005)................................................................. 28

*Centro Tepeyac v. Montgomery County,*
    722 F.3d 184 (4th Cir. 2013) ............................................................... 30

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ................................................................. 14, 21, 24

*Citizens for a Responsible Curriculum v. Montgomery Cnty. Pub. Schs.,*
    No. 05-1194, 2005 WL 1075634 (D. Md. May 5, 2005)......................... 30

*Conrad v. City & Cnty. of Denver,*
    656 P.2d 662 (Colo. 1982) ................................................................... 28

*Dmarcian, Inc. v. Dmarcian Europe BV,*
    60 F.4th 119 (4th Cir. 2023)........................................................... 13, 30

*Edwards v. Aguillard,*
    482 U.S. 578 (1987) ............................................................................ 23

*Employment Division v. Smith,*
    494 U.S. 872 (1990) ....................................................................... 14, 17

*Espinoza v. Mont. Dep't of Revenue,*
    140 S. Ct. 2246 (2020) ..................................................... 14, 26, 27, 29

*Firewalker-Fields v. Lee,*
    58 F.4th 104 (4th Cir. 2023).................................................................. 27

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) .................................................................*passim*

*Giovani Carandola, Ltd. v. Bason,*
    303 F.3d 507 (4th Cir. 2002) ............................................................... 32

*Grove v. Mead Sch. Dist. No. 354*,
    753 F.2d 1528 (9th Cir. 1985) ................................................................ 28

*Gruenke v. Seip*,
    225 F.3d 290 (3d Cir. 2000) ................................................................... 23

*Hardwick v. Bd. of Sch. Trs.*,
    205 P. 49 (Cal. App. 1921) .................................................................... 28

*Herndon by Herndon v. Chapel-Hill Carrboro City Bd. of Educ.*,
    89 F.3d 174 (4th Cir. 1996) ............................................................ 13, 24

*Holt v. Hobbs*,
    574 U.S. 352 (2015) ............................................................................. 30

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) ................................................................... 21, 22

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) ............................................................ 31, 32

*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) ................................................................ 31

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
    141 S. Ct. 2038 (2021) ......................................................................... 23

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
    138 S. Ct. 1719 (2018) ........................................................... 20, 21, 22

*Meyer v. Nebraska*,
    262 U.S. 390 (1923) ............................................................................. 14

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ............................................................ 31

*Miranda v. Garland*,
    34 F.4th 338 (4th Cir. 2022) ................................................................. 31

*Moody v. Cronin*,
    484 F. Supp. 270 (C.D. Ill. 1979) ......................................................... 29

*Morrow v. Wood*,
    35 Wis. 59 (Wis. 1874) ......................................................................... 28

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ......................................................................... 27

*Nken v. Holder,*
　　556 U.S. 418 (2009) .......................................................................................... 31

*Obergefell v. Hodges,*
　　576 U.S. 644 (2015) .......................................................................................... 16

*Pierce v. Soc'y of Sisters,*
　　268 U.S. 510 (1925) ..................................................................................... 14, 23

*Pursuing Am. Greatness v. Fed. Election Comm'n,*
　　831 F.3d 500 (D.C. Cir. 2016) .......................................................................... 31

*Ramirez v. Collier,*
　　142 S. Ct. 1264 (2022) ................................................................................ 25, 27

*Redeemed Christian Church of God v. Prince George's County,*
　　17 F.4th 497 (4th Cir. 2021) ................................................................. 14, 24, 25

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
　　141 S. Ct. 63 (2020) ................................................................................... 18, 30

*Rulison v. Post,*
　　79 Ill. 567 (Ill. 1875) ....................................................................................... 28

*Sherbert v. Verner,*
　　374 U.S. 398 (1963) .......................................................................................... 17

*Spence v. Bailey,*
　　465 F.2d 797 (6th Cir. 1972) ........................................................................... 28

*Spiller v. Inhabitants of Woburn,*
　　12 Allen 127 (Mass. 1866) ............................................................................... 28

*Stanley v. Illinois,*
　　405 U.S. 645 (1972) .......................................................................................... 23

*State v. Ferguson,*
　　144 N.W. 1039 (Neb. 1914) ............................................................................. 28

*Tandon v. Newsom,*
　　141 S. Ct. 1294 (2021) .............................................................................*passim*

*Tatel v. Mt. Lebanon Sch. Dist.,*
　　No. 22-837, 2022 WL 15523185 (W.D. Pa. Oct. 26, 2022).......................... 25, 29

*Tatel v. Mt. Lebanon Sch. Dist.,*
　　No. 22-837, 2023 WL 3740822 (W.D. Pa. May 31, 2023) ................................ 29

v

*Troxel v. Granville,*
    530 U.S. 57 (2000) .................................................................. 3, 23

*Trs. of Schs. v. People ex rel. Van Allen,*
    87 Ill. 303 (Ill. 1877) .................................................................. 28

*W. Va. Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) .................................................................. 14

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) .................................................................. 23

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .................................................................. 13

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ...........................................................*passim*

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave,*
    553 F.3d 292 (4th Cir. 2009) .................................................... 30

**Statutes**

COMAR § 123A.04.18 .................................................................. 19

COMAR § 13A.01.06.01 .................................................................. 19

COMAR § 13A.01.06.03 .................................................................. 19

COMAR § 13A.04.18.01 .................................................................. 19, 20, 21

**Other Authorities**

*Age-Appropriate and Grade-Level Inclusive Books to be Added to MCPS
    Schools*, Montgomery County Public Schools (Jan. 18, 2023) ............................. 18

Nicole Asbury and Emily Guskin, *Most Md. voters say elementary
    school discussion of LGBTQ acceptance 'inappropriate,'* Washington
    Post (Oct. 12, 2022)................................................................ 11

Eric A. DeGroff, *Parental Rights & Public School Curricula: Revisiting
    Mozert After 20 Years*, 38 J.L. & Educ. 83 (2009).......................................... 23, 27

Em Espey, *Parents, students, doctors react to MCPS lawsuit targeting
    LGBTQ+ storybooks* (June 2, 2023) ............................................. 22, 25

Conor Friedersdorf, *What to Teach Young Kids About Gender*, The
Atlantic (Sept. 16, 2022) ............................................................... 11

Heather Tirado Gilligan, *Should You Take Your Kids To A Pride
Parade?*, Fatherly (June 1, 2022) ................................................... 5

Hannah Grossman, *Dem Maryland official says Muslim children
aligned with 'White supremacists' for opposing LGBTQ curriculum*,
Fox News (June 7, 2023) ............................................................... 22

Memorandum from Karen B. Salmon, Ph.D. to Members of the State
Board of Education 12 (June 25, 2019) ......................................... 19

Lauren Moss, *Puberty blockers to be given only in clinical research*,
BBC News (June 2023) .................................................................. 10

Brad Polumbo, *This Pride month, fellow gays, keep your kinks at
home—and away from kids*, New York Post (June 8, 2023) ............ 5

Stephanie Ramirez, *MCPS revises policy on LGBTQ-friendly books*,
Fox 5 Washington DC (Mar. 22, 2023) ...................................*passim*

Lauren Rowello, *Yes, kink belongs at Pride. And I want my kids to see
it.*, Washington Post (June 29, 2021) .............................................. 5

Brianna Sharpe, *Are Pride Parades Kid-Friendly? Parents Say
Children Can Handle The Kink*, HuffPost (June 13, 2019) ............... 5

*The evidence to support medicalized gender transitions in adolescents is
worryingly weak,* The Economist (Apr. 5, 2023) ............................. 10

Steve Watson, *Stonewall 1979: The Drag of Politics*, The Village Voice
(June 15, 1979) .............................................................................. 4

## INTRODUCTION

Defendants Montgomery County Board of Education and its superintendent and board members (the "School Board") recently introduced a series of storybooks (the "Pride Storybooks") to be read to students beginning in pre-K. One book focuses on a pride parade and what a child might find there. Another is about a same-sex playground romance, with a teacher's guide that encourages young students to explore how it feels when they "don't just like" but "like like" someone. Another focuses on a child named Penelope who identifies as a boy. The mother chides Penelope's brother for trying to "make sense" of it: *This is about love*," she insists. The discussion guide encourages teachers to instruct children that, at birth, doctors only "guess about our gender," but "we know ourselves best." Another book invites children to ponder what it means to be "cisgender" or "nonbinary," and asks "[w]hat pronouns fit you?" In yet another story, "Uncle Lior" visits to comfort "their" niece/nephew, whose pronouns are "like the weather. They change depending on how I feel." Yet another book is a *cri de cœur* for children to use whatever bathroom they wish, with young children carrying signs in front of the bathroom that read "Use the bathroom that is comfy 4 u," "Bathrooms are for every bunny," and "I have to pee, so let me be."

Plaintiffs Tamer Mahmoud and Enas Barakat are Muslim. They have three kids in the Montgomery County Public Schools ("MCPS"), including one in second grade. Plaintiffs Jeff and Svitlana Roman are Catholic and Ukrainian Orthodox respectively and also have a son in second grade. Plaintiffs Chris and Melissa Persak  and their daughters are Catholic. The daughters are enrolled in an MCPS elementary school. This lawsuit is about whether they (collectively, the "Parents") will be given notice and opportunity to opt their children out of story hour when the Pride Storybooks are read—just as parents were given notice and opt-out rights for these books prior to March 23, 2023, and are still give notice and opt-out rights for other aspects of public

school instruction, as they have been for decades. By refusing notice and opt-outs—
and forcibly exposing children to complex and confusing questions about their
sexuality and gender identity at such a young age—the School Board is infringing the
Parents' and children's religious beliefs and interfering with the Parents' ability to
form their children in their distinct faiths. This interference violates the Free
Exercise and Due Process Clauses under decades of Supreme Court precedent.

Moreover, the denial of notice and an opportunity to opt out is inconsistent with
Maryland law and the School Board's own guidelines. Maryland law requires all
public schools in the state to create opt-out procedures for concerned parents to excuse
their children for *any* reason from *any* instruction concerning "family life and human
sexuality." So do the School Board's own guidelines, which direct schools to
"accommodate requests from students" or their parents "to be excused from specific
classroom discussions or activities that they believe would impose a substantial
burden on their religious beliefs." Yet the School Board refuses. It won't even notify
the Parents when the Pride Storybooks will be read.

The School Board's disregard for Maryland law and its own regulations
underscores the underlying constitutional violation. The Free Exercise and Due
Process Clauses to the United States Constitution have long guaranteed parents'
right to control the upbringing of their children. This parental right is at its apex
when schools try to form young children to think about controversial social topics in
ways that conflict with parents' religious beliefs. Restrictions that cut parents out of
such instruction can substantially interfere with their attempt to follow God's will,
their religious way of life, and their aspirations for their children—and therefore
trigger strict scrutiny. Such a restriction can survive only if it serves a compelling
government interest that cannot be met any other way.

That demanding test cannot be met here. A government's asserted interest cannot
be compelling when duly enacted laws repudiate it, and existing Maryland and School

Board guidelines already allow for opt-outs in the precise circumstance at issue. Indeed, when the controversial books were first introduced, the School Board promised parents they would be notified when the books were read (and they were), and that they could opt their children out (and many did). The promise was repeated in a public statement on March 22 of this year.

But the very next day, the School Board announced no further notice would be given and no more opt-outs tolerated. Even then, the School Board authorized teachers to honor opt-outs for individual students through the end of the semester, as long as they understood there would be no such option next semester. What's more, the March 23 email flouting Maryland's opt-out law admitted that opt-outs would still be honored for students taking the sex-ed unit of their health classes. A no-opt-out policy that lets high school students skip sex-ed but compels kindergarteners to receive instruction on sexuality, gender identity, and gender transitioning cannot—as a matter of law—be "compelling."

That conclusion is consistent with our nation's constitutional history and tradition. The parental right to decide how to direct a child's religious upbringing was established well before the founding. Early cases granted parental opt-outs from Bible reading, dance class, and even grammar lessons. In 1972, the Supreme Court upheld the right of the Amish to opt their children out of high school altogether. The Court concluded that, under the Free Exercise Clause, the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). And under the Due Process Clause, this right has been recognized as "perhaps the oldest of the fundamental liberty interests" ever "recognized by [the] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

In this context, the Parents are highly likely to succeed on the merits of their free exercise and due process claims. Forcing them to choose between keeping their

children in public schools and protecting them from instruction that violates their religious beliefs imposes immediate and irreparable harm. Equitable factors also weigh overwhelmingly in favor of maintaining the status quo by upholding the existing Maryland and School Board policies. On such foundational and controversial matters, children are entitled to the guidance of their parents—their first teachers, who love them best. For all these reasons, the Parents' motion for a preliminary injunction must be granted.

## BACKGROUND

### A. The Pride Storybooks

Last fall, the School Board introduced a series of new "LGBTQ+ Inclusive" books for students in elementary and middle school. But rather than focus on teaching basic civility and kindness toward all, the new books encourage children to question sexuality and gender identity, focus on romantic feelings, and embrace gender transitioning. Each book advocates a child-knows-best approach to these sensitive and controversial issues. They encourage students to disregard the relevant science, to ignore doctors, parents, and others with relevant knowledge and experience, and to explore their sexuality and gender identity at a young age in discussions with teachers and classmates.

For example, the book *Pride Puppy*, assigned for pre-K students, Compl. Ex. B, relates the story of two children whose puppy leads them on a chase through the



crowd at a pride parade. Compl. Ex. C. A "Search and Find Word List" at the end of the book invites children to search for things they might see at a pride parade, including an "intersex [flag]," a "[drag] king" and "queen," "leather," a "lip ring," "underwear," and an image of "Marsha P. Johnson," an LGBTQ activist whose life was "built around sex and gay liberation, being a drag queen and dating all the time." Steve Watson, *Stonewall 1979: The Drag*

4

*of Politics*, The Village Voice (June 15, 1979), https://perma.cc/9NRA-JF2A; Compl. Ex. C at 18. The book also depicts a minister wearing a rainbow stole and students and teachers enthusiastically advocating for "Peers + Queers," "Pride Club," "Love Knows No Gender," and "Two Spirit Pride." *Id*. at 10. The book promotes pride parades as family-friendly events without cautioning about the frequent nudity and sexually explicit conduct that many parents find objectionable—especially for children. *See, e.g.,* Heather Tirado Gilligan, *Should You Take Your Kids To A Pride Parade?*, Fatherly (June 1, 2022), https://perma.cc/E22H-5DN4. ("[The kids] just had to learn to laugh and enjoy things. Like there were these Beanie Babies with giant penises on them.") Lauren Rowello, *Yes, kink belongs at Pride. And I want my kids to see it.*, Washington Post (June 29, 2021), https://perma.cc/RM3Q-9W6N ("[O]ur elementary-schooler … rais[ed] an eyebrow at a bare-chested man in dark sunglasses whose black suspenders clipped into a leather thong" and "a few dozen kinksters who danced down the street, laughing together as they twirled their whips and batons, some leading companions by leashes."); Brad Polumbo, *This Pride month, fellow gays, keep your kinks at home—and away from kids*, New York Post (June 8, 2023), https://perma.cc/4QBM-8QPG ("Riding in the back of a parade truck, a man clad in 'dominatrix' gear choked and whipped another man, scantily clad, to a cheering audience. … 'Tons of kids were present.'"); Brianna Sharpe*, Are Pride Parades Kid-Friendly? Parents Say Children Can Handle The Kink*, HuffPost (June 13, 2019), https://perma.cc/P6EW-HYFT ("It's their right as queer spawn.' … [N]obody likes nakedness more than children.").

All of the stories are assigned for students as young as kindergarten. Compl. Ex. B. *Love, Violet* is about Violet's crush on a female classmate who "made Violet's heart skip." Compl. Ex. H at 4. On the playground Violet is enthralled with her classmate: "Snow sparkled on Mira's eyelashes.  *Mira was magnificent.*" *Id.* at 9. Violet is described as "blush[ing] hot" when asked about her valentine, *id.* at 8, but is ultimately rewarded when Mira returns Violet's affection with a heart-shaped locket. The teacher's resource encourages a "think aloud" moment with elementary students about how "uncomfortable we might [be] in situations when we feel our heart beating 'thumpity thump' & how hard it can be [to] talk about our feelings with someone that we don't just 'like' but we 'like like.'" Compl. Ex. D at 4.

*Prince and Knight* is another romance about a prince who "met many ladies (and  made the maidens swoon!)" but ultimately tells his parents "I'm looking for something different in a partner by my side." Compl. Ex. I at 12. He finally finds what he's looking for when thrown by an attacking dragon into the "embrace" of an arriving knight. *Id.* at 27. When the knight "reveals his handsome face," the two men "gaze[] into each other's eyes," and "their hearts beg[i]n to race." *Id.* at 30-31.

The book *Intersection Allies* introduces a nonbinary character whose friends "defend my choices" and "place" in the "bathroom" even when  other kids are "confused" and portrays dual-gender bathrooms as "safe." Compl. Ex. F at 15. Teachers are encouraged to use the story to discuss terms like "sex," "gender," "transgender," and "non-binary" and to encourage each child to consider "What pronouns fit you best?" *Id.* at 42.

The books *My Rainbow* and *Born Ready—The True Story of a Boy Named Penelope*
promote a child-knows-best approach to gender transitioning. In *My Rainbow*, a



young, autistic boy believes that short hair keeps him from being
a girl. When his mother points to her own short hair, the child
responds "People don't care if cisgender girls like you have short
hair. But it's different for transgender girls. I *need* long hair!"
Compl. Ex. G at 16. The mother concludes her son knows best
and sews him a rainbow-colored wig. The story and teachers'
guide ignore the complexities and consequences of gender transitioning at a young
age. Instead, young students are encouraged to just accept that a child's "identities"
are part of what makes him or her a "masterpiece." *Id.* at 15.

   *Born Ready* further insists on affirming a child's declared identity, however
fledgling or confused. In it, Penelope explains, "I don't *feel* like a boy. I AM a boy."
Compl. Ex. J. at 12. Penelope's mother agrees to tell their 
family "what we know. … You are a boy." *Id.* at 15. Grandpa
agrees that "gender isn't such a big deal" because in his first
language "[w]e don't use gender pronouns." *Id.* at 18. But when
brother protests—"You can't *become* a boy. You have to be born
one"—he's told that "[n]ot everything *needs* to make sense. *This is about love.*" *Id.* at
19. Papa agrees that Penelope is a boy as long as Penelope will "tell me yourself." *Id.*
at 20. And when Penelope tells the principal "I think like a boy. I feel like a boy. …
I'm sure I'm a boy," the teacher says "today you're *my* teacher." *Id.* at 24.

   The teacher's guide encourages children to notice "how happy Penelope is when
his mom" agrees "he is a boy" and how people in other countries "think about gender
differently than we do in the U.S." Compl. Ex. D. at 5. Teachers are prompted to ask
the students to consider "why is it such a big deal here?" *Id.* If a student states that

Penelope "can't be a boy if he was born a girl" or asks "[w]hat body parts" Penelope has, the School Board directs teachers to correct these "false" assumptions:

> When we are born, people make a guess about our gender and label us "boy" or "girl" based on our body parts. Sometimes they're right, and sometimes they're wrong. Our body parts do not decide our gender. Our gender comes from inside—we might feel different than what people tell us we are. We know ourselves best.

Compl. Ex. D at 5. Any disagreement is labeled "hurtful." *Id.*

Other books promoted by the School Board are similarly ideological in ways that violate the Parents' and their children's religious beliefs. The storybook *What Are*



*Your Words* is about a child who changes pronouns based on how he feels at any given moment. Feeling "HAPPY! CREATIVE! FUNNY!" suggests "HE/HIM." Baxter Decl. Ex. O at 5. Feeling "THOUGHTFUL! ATHLETIC! SILLY!" suggests "SHE/HER." *Id.* And feeling "SLEEPY! CALM! HONEST!" suggests "EY/EM." *Id.* Through the entire story, the child is in angst trying to figure out "which pronouns fit today." *Id.* at 7. It's not until late in the evening, while at fireworks with "Uncle Lior," that the child finally finds his pronouns: "Those are my words! I'm like fireworks! … My words finally found me! *They* and *them* feel warm and snug to me" … for "today." *Id.* at 16.

*Jacob's Room to Choose* is about a transgender boy and transgender girl who appear to be in pre-K or kindergarten. During a break, they both run to the bathroom that corresponds with their biological sex but get "chased out" by other students. Baxter Decl. Ex. P at 6. A teacher uses a game to persuade her class that "a lot of you don't look like the signs" on the bathroom door. *Id.* at 12, "I wonder," she asks, "if there is another way?" *Id.* at 13. Soon the students come up with their own ideas and stage a bathroom demonstration. *Id.* The doors



are relabeled to welcome multiple genders and to indicate as being "with" or "without a urinal." *Id.* at 15. The children post signs and parade in front with placards that proclaim "Bathrooms are for every bunny" and "I have to pee so let me be." *Id.*

## B. The Parents' Beliefs

The Parents are Muslim, Catholic, and Ukrainian Orthodox. Mahmoud ¶ 3; Roman ¶ 3; Persak ¶ 3. They teach their children that, as God's creation, each individual has equal dignity before God and is entitled to love, kindness, and respect from others. Mahmoud ¶¶ 3, 5; Roman ¶¶ 4-5; Persak ¶ 8. They believe that sexuality is a sacred gift from God to be expressed in marriage between a man and a woman for creating life and strengthening the marital union. Mahmoud ¶¶ 6-8; Roman ¶¶ 7-9; Persak ¶¶ 6-7. They also believe that biological sex is a God-given, immutable reality integral to each individual. Mahmoud ¶¶ 5-6, 9-12; Roman ¶¶ 6-7, 10-11; Persak ¶¶ 5, 7.

The Parents have a religious obligation to teach these principles to their children. Mahmoud ¶¶ 4, 14; Roman ¶ 12; Persak ¶ 7. They believe that young children should enjoy a time of innocence, when it is not necessary for them to have detailed understanding of issues surrounding human sexuality. *See* Mahmoud ¶¶ 14-18; Roman ¶ 13; Persak ¶¶ 10-12. As their children mature, the Parents believe they should be taught in age-appropriate ways and consistent with the Parents' religious beliefs. Mahmoud ¶¶ 14-18; Roman ¶ 12-13; Persak ¶¶ 10-12. This includes teaching young children to channel eventual romantic passions, rather than indulge them at first spark. Mahmoud ¶ 14-16; Roman ¶ 12, 14; Persak ¶¶ 3-4, 6-7, 16. The Parents believe that encouraging children prematurely to question their sexuality and gender identity can be spiritually injurious. Mahmoud ¶¶ 16-20; Roman ¶¶ 10-13, 20; Persak ¶¶ 4-6, 11-12.

The Parents also believe that some of what is taught via the Pride Storybooks is false. *See, e.g.*, Mahmoud ¶¶ 9, 19; Roman ¶ 14; Persak ¶¶ 5, 16. They disagree that

a child's sex can be separated from his or her biology and that "gender" is a separate form of identity that is manipulable at will or depends upon the child's conformance to stereotypes about masculinity and femininity. Mahmoud ¶ 9; Roman ¶ 14; Persak ¶ 5. Teaching such principles to children is inconsistent with the Parents' various religious beliefs and interferes with their chosen way of life, their aspirations for their children, and their understanding of God's will, each according to their particular religious tradition. Mahmoud ¶¶ 19-20; Roman ¶¶ 19-20; Persak ¶¶ 12-16. The Parents also believe that directing teachers to talk to children about sexuality, to invite children to question their gender identity, or to encourage young children to embrace gender transitioning can be spiritually and emotionally harmful to children's well-being. Mahmoud ¶¶ 16-20; Roman ¶¶ 10-13; Persak ¶¶ 4-6, 11-12.

Parents' beliefs are informed in part by their understanding that the science on questions regarding gender transitioning is complex and unsettled. *See, e.g.*, Mahmoud ¶ 9; Roman ¶ 14; Persak ¶ 5; *see also* Compl. ¶¶ 142-46; *The evidence to support medicalized gender transitions in adolescents is worryingly weak,* The Economist (Apr. 5, 2023), https://perma.cc/WXP4-PM7H ("[I]t is impossible to justify the current recommendations about gender-affirming care based on the existing data."); Lauren Moss, Pu*berty blockers to be given only in clinical research,* BBC News (June 2023), https://perma.cc/QT3L-2JLD (reporting that "gaps in evidence" have led NHS England away from puberty blockers and toward a "new 'holistic' approach" with "careful therapeutic exploration" of "other complexities related to mental health, neuro-development and family or social matters" that frequently accompany gender dysphoria). And because children—particularly those, like the Parents' own, in elementary school—are highly impressionable, exposing them to one-sided ideological instruction from authoritative schoolteachers on such complex and sensitive issues imposes serious risks. Mahmoud ¶¶ 16-20; Roman ¶¶ 10-13, 19-20; Persak ¶¶ 11-16. Similarly, children lack the physical and emotional maturity to

understand the obligations and consequences connected to romantic relationships. Mahmoud ¶¶ 2, 18-19; Roman ¶¶ 2, 19; Persak ¶¶ 2, 10-14. Encouraging them to focus prematurely on such issues can similarly distort their understanding of who they are and what is most important in life—questions young children are entitled to consider with the guidance of their parents and religious communities. Mahmoud ¶¶ 16-20; Roman ¶¶ 10-13; Persak ¶¶ 4-6, 11-12.

The Parents are not alone in their concern about prematurely encouraging children to question their sexuality and gender identity. A recent poll by the *Washington Post* and University of Maryland showed that, among Maryland registered voters, sixty-six percent disapproved of schoolteachers discussing LGBTQ issues with students from kindergarten through third grade. Nicole Asbury and Emily Guskin, *Most Md. voters say elementary school discussion of LGBTQ acceptance 'inappropriate,'* Washington Post (Oct. 12, 2022), https://perma.cc/6NED-E9RH. Fifty-six percent disapproved for fourth and fifth graders. *Id.* Even for middle schoolers, forty-two percent of voters disapproved. *Id.* Only for high school did a strong majority support such conversations, with twenty-seven percent disapproving. *Id*. A similar poll sponsored by the American Federation of Teachers produced a similar result, finding that "58 percent of likely voters in battleground states disapprove of the way students are taught about 'sexual preference and gender identity,'" either because "students are too young for [the] material" or because "parents are responsible for teaching it." Conor Friedersdorf, *What to Teach Young Kids About Gender*, The Atlantic (Sept. 16, 2022), https://perma.cc/R3DC-GHES.

The Parents agree with the School Board that every student deserves to be understood and respected. Mahmoud ¶¶ 3, 29; Roman ¶¶ 4-5; Persak ¶ 8. They abhor the notion that any students could be bullied or harassed for any reason, and they teach their own children to treat all others with kindness and love. Mahmoud ¶¶ 3-4; Roman ¶¶ 4-5; Persak ¶¶ 8-10. But decisions around sexuality and gender identity

are complex and enormously consequential. The Parents believe that children lack maturity to make them on their own. Mahmoud ¶¶ 2, 18-19; Roman ¶¶ 2, 19; Persak ¶¶ 2, 10-14. The Parents' religious beliefs and practices provide critical guidance on how to help their children navigate these issues for their long-term well-being. Mahmoud ¶¶ 4-16; Roman ¶¶ 4-13; Persak ¶¶ 3-7. The School Board's interference by encouraging children to prematurely question their sexuality and gender identity substantially interferes with the Parents' various religious ways of life. Mahmoud ¶¶ 19-20; Roman ¶¶ 19-20; Persak ¶¶ 12-16. The School Board rightly says that it welcomes people of diverse communities and celebrates the diverse cultural, racial, ethnic, and religious groups who call Montgomery County home. The Parents are only asking the School Board to live up to that commitment by respecting their religious beliefs and practices as well.

C. **Notice and Opportunity to Opt Out**

Based on their religious beliefs and desire for their children's well-being, each of the Parents requested that their children be excused from class when the Pride Storybooks are read. Compl. Ex. L; Compl. Ex. M at 2. Initially, these requests were granted. Mahmoud ¶ 27; Compl. ¶ 161; Compl. Ex. L at 7. This complied with Maryland law, which—like most states, *see id.* ¶¶ 85-87—requires that parents be allowed to opt their children out from instruction on "family life and human sexuality." *Id.* ¶¶ 85-94. It also complied with the School Board's own policies that promise to "accommodate requests from students" or their parents "to be excused from specific classroom discussions or activities that they believe would impose a substantial burden on their religious beliefs." Compl. Ex. A.

The School Board confirmed these opt-out policies in a public statement on March 22, 2023. Stephanie Ramirez, *MCPS revises policy on LGBTQ-friendly books*, Fox 5 Washington DC (Mar. 22, 2023), https://perma.cc/8L5G-XQ9X. But the very next day, it reversed course, announcing that—with regard to the Pride Storybooks—no further

notice would be provided and no opt-outs tolerated. *See 5 Things to Know*, Montgomery County Public Schools (Mar. 23, 2023), https://perma.cc/6XVG-R3CF. The School Board affirmed that high school students can still opt out of the "Family Life and Human Sexuality Unit of Instruction," while elementary students are compelled to participate in instruction encouraging them to question their sexuality and gender identity. *5 Things to Know*, https://perma.cc/6XVG-R3CF. When the Parents and others protested this unlawful decision, the School Boards' response was to accuse the Parents of promoting "hate," of promoting "a dehumanizing form of erasure," and of being "white supremacists" and "xenophobes." Testimony at the Montgomery County Public Schools Business Meeting, at 27:11-29:09 (Jan. 12, 2023), https://perma.cc/T234-559Q; Compl. Ex. N at 16; Lynne Harris, Remarks at the MCPS Board Meeting, at 1:48:00-1:48:15 (Mar. 28, 2023), https://shorturl.at/fAET6.

## LEGAL STANDARD

A preliminary injunction is appropriate "where the plaintiff has established 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Dmarcian, Inc. v. Dmarcian Europe BV*, 60 F.4th 119, 138 (4th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)). That standard is easily met here.

## ARGUMENT

## I.  The Parents are likely to succeed on the merits of their claims.

Under the Free Exercise and Due Process Clauses, government restrictions on the right of parents to direct the religious upbringing of their children are subject to strict scrutiny. *See Herndon by Herndon v. Chapel-Hill Carrboro City Bd. of Educ.*, 89 F.3d 174, 178-79 (4th Cir. 1996). Under strict scrutiny, a restriction is unlawful unless the government can show it is essential to protect a historically rooted "compelling governmental interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,

13

508 U.S. 520, 531-32 (1993). This interest must be both "of the highest order" and "particular to the specific case." *Redeemed Christian Church of God v. Prince George's County*, 17 F.4th 497, 510 (4th Cir. 2021). The School Board's no-opt-out policy cannot survive this exacting standard.

**A. Stripping opt-out rights triggers strict scrutiny under the Free Exercise Clause.**

In *Employment Division v. Smith*, the Supreme Court held that laws burdening a person's religion escape strict scrutiny only if they are "neutral" and "of general applicability." 494 U.S. 872, 879 (1990). But neutral and generally applicable laws are the exception. Here, strict scrutiny is required for at least four reasons.

**1. The School Board's no-opt-out policy violates the Free Exercise Clause under *Yoder* by interfering with the Parents' right to direct their children's religious upbringing.**

Strict scrutiny applies to laws that restrict the "right of parents … to direct the [religious] education of their children." *Id*. at 881 (citing *Yoder*, 406 U.S. 205). The Supreme Court has long recognized this right. *See, e.g., Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 400-01 (1923). It is rooted in "[t]he history and culture of Western civilization," which "reflect a strong tradition of parental concern for the nurture and upbringing of their children." *Yoder*, 406 U.S. at 232; *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020). Under the Free Exercise Clause, this parental right is "now established beyond debate as an enduring American tradition." *Yoder*, 406 U.S. at 214, 232; *see also W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) (upholding parents' right to opt Jehovah's Witness schoolchildren out of saying the Pledge of Allegiance, because "[f]ree public education … will not be partisan or enemy of any class, creed, party, or faction.").

In *Yoder*, the Court invoked this right to protect Amish parents opting their children out of high school entirely, notwithstanding state mandatory attendance

laws. 406 U.S. at 214, 232. The Court agreed that public schooling ranked "at the very apex" of the state's role, and that the state had a "duty to protect children from ignorance," *id.* at 213, 222. But those interests were insufficient to interfere with the parents' decisions to have their children work full-time after eighth grade as part of their religious formation within the Amish community. *Id.* at 214. The Court emphasized that the rights of parents to direct "the religious upbringing and education of their children in their early and formative years have a high place in our society." *Id.* at 213-14. Thus, despite the state's strong interest in "compulsory education," "fundamental claims of religious freedom [were] at stake." *Id.* at 221. And because "exposing Amish children to worldly influences" at school could "substantially interfer[e]" with their religious development "at the crucial adolescent stage," the Court applied strict scrutiny. *Id.* at 218.

Strict scrutiny applies here for similar reasons. The Parents' religious beliefs regarding marriage and family are central to their way of life, their aspirations for their children, and their understanding of God's will. Mahmoud ¶¶ 4-16; Roman ¶¶ 4-13; Persak ¶¶ 3-7. They believe a child's biological sex is a gift from God, Mahmoud ¶¶ 5-6, 9-12; Roman ¶¶ 6-7, 10-11; Persak ¶¶ 5, 7, and that marriage between a man and a woman is an important part of God's plan for this life. Mahmoud ¶¶ 6-8; Roman ¶¶ 7-9; Persak ¶¶ 6-7.

The Parents further believe they have a sacred obligation to form their children in their beliefs. Mahmoud ¶¶ 4, 14; Roman ¶ 12; Persak ¶ 7. This includes helping them accept the bodies they were born with, channel their sexual desires in healthy ways, and learn self-discipline. Mahmoud ¶¶ 5-6, 9-12, 15-16; Roman ¶¶ 6-7, 12; Persak ¶¶ 3-4, 5-7, 12. Issues around human sexuality and gender identity can be confusing to children, who lack sufficient maturity to fully understand and make decisions on such enormously consequential matters. Mahmoud ¶¶ 2, 18-19; Roman ¶¶ 2, 19; Persak ¶¶ 2, 10-14. The Parents believe it requires religious sensitivity to

determine how and when to introduce these topics to their children. Mahmoud ¶ 18; Roman ¶ 13; Persak ¶¶ 12-16. They believe that every person has equal dignity before God and deserves love and respect from others without exception. Mahmoud ¶¶ 3, 29; Roman ¶¶ 4-5; Persak ¶ 8. And they respect the right of others to make their own decisions about sexuality and gender identity. Mahmoud ¶ 4; Roman ¶¶ 4-5; Persak ¶ 9. But they believe they have a religious obligation to encourage their children to make these decisions consistent with God's will. Mahmoud ¶¶ 4, 14; Roman ¶ 12; Persak ¶¶ 3-4, 7.

Forcing their children to read and discuss the Pride Storybooks undermines the Parents' efforts to form their children in their faith, including by encouraging children to question their sexuality and gender identity, focus prematurely on romantic relationships, and disregard their parents and their parents' religious teachings on these issues. Mahmoud ¶¶ 19-20; Roman ¶¶ 19-20; Persak ¶¶ 12-16. As in *Yoder*, this "substantially interfer[es] with the religious development of … children and [their] integration" into a religious "way of life" and "faith community." *Yoder*, 406 U.S. at 218. That interference is happening at a "crucial … stage of development"—far younger than in *Yoder*—when children are particularly vulnerable and impressionable. *Id*. This carries "a very real threat of undermining [the Parents'] religious practice." *Id*. at 218.

"The First Amendment ensures that religious … persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered," *Obergefell v. Hodges*, 576 U.S. 644, 679-80 (2015). Because the no-opt-out policy threatens that right, strict scrutiny is triggered.

**2. The School Board's no-opt-out policy separately violates the Free Exercise Clause under *Fulton* by allowing individualized exemptions.**

Strict scrutiny also applies whenever the government "has in place a system of individual exemptions" that "len[ds] itself to individualized governmental assessment of the reasons for the relevant conduct." *Smith*, 494 U.S. at 884 (citing *Sherbert v. Verner*, 374 U.S. 398 (1963)); *see also Fulton v. City of Philadelphia,* 141 S. Ct. 1868, 1877 (2021) (strict scrutiny applies when the government provides "a mechanism for individualized exemptions"). The mere existence of a system of exemptions means the policy is not generally applicable, "regardless whether any exceptions have been given." *Fulton*, 141 S. Ct. at 1879.

Here, a system of discretionary exemptions exists both in writing and in practice. The School Board's Religious Diversity Guidelines provide that schools should "make reasonable and feasible adjustments to the instructional program to accommodate requests from students [or their parents] to be excused from specific classroom discussion or activities that they believe would impose a substantial burden on their religious beliefs." Compl. Ex. A at 3. It provides that, in some instances, students may be allowed to sit out entire aspects of a class. For example, in a music class, "schools may seek to avoid, if possible, requiring a student with a religious objection to play an instrument or sing." *Id.* at 4.

Students "who do not want to participate" may also be excused when schools teach about religious holidays or events "in a factual manner" or even ostensibly secular events that "may be viewed by others as having religious overtones." *Id.* "[E]ach situation must be addressed on a case-by-case basis." *Id.* at 2. Also, "[b]ecause free exercise of religion is a constitutional right," students cannot be denied a "perfect attendance" award when their "only absences" have been for "observance of religious holidays." *Id.* at 2. While the School Board's practice to offer exemptions is laudable,

17

the highly discretionary nature of the process necessarily triggers strict scrutiny. *Fulton*, 141 S. Ct. at 1879.

The policy's application further invites strict scrutiny. When the School Board introduced the Pride Storybooks, it announced that their use was "expect[ed]" but "optional," because it is "standard practice that teachers have a choice regarding which materials to use." *Age-Appropriate and Grade-Level Inclusive Books to be Added to MCPS Schools*, Montgomery County Public Schools (Jan. 18, 2023), https://perma.cc/C7WK-9PS7; *see also* Compl. Ex. L at 4. Parents were also assured that "readings are not mandatory" and "will not be scheduled … until families are notified." Compl. Ex. D at 5. As recently as March 22, the School Board affirmed that parents could "choose[] to opt out." Ramirez, https://perma.cc/8L5G-XQ9X. Even after the School Board's March 23 about-face, principals were authorized to continue allowing opt-outs for the remainder of the school year. Mahmoud ¶ 27; Compl. ¶ 161; Compl. Ex. L at 7.

In short, the no-opt-out policy is highly discretionary, both as written and implemented. Because it allows the school officials in their "sole discretion" to decide which requests are "worthy of solicitude," the no-opt-out policy is subject to strict scrutiny. *Fulton*, 141 S. Ct. at 1879.

### 3. The School Board's no-opt-out policy violates the Free Exercise Clause under *Tandon* because it includes categorical exclusions for comparable secular conduct.

The School Board also triggers strict scrutiny by categorically allowing some students to opt out of instruction on "family life and human sexuality" while forcing pre-K and elementary students to stay in. Supreme Court precedent confirms that a government restriction on religion is not "generally applicable"—and thus triggers strict scrutiny—when its "categorizations" treat comparable activities differently. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020).

18

"[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Here, the School Board's asserted interest is in promoting "inclusive and safe spaces for students, including those who identify as LGBTQ+ or have family members in the LGBTQ+ community." Ramirez, https://perma.cc/8L5G-XQ9X. This interest is rooted in Maryland's "Equity Regulation," which was adopted by the Maryland Board of Education in 2019 and requires every school district to ensure "educational equity" to "maximize [students'] academic success and social/emotional well-being." COMAR § 13A.01.06.01(A). "[E]ducational equity" is defined as "view[ing] each student's individual characteristics as valuable," including their "[f]amily structure," "[g]ender identity and expression," and "[s]exual orientation." § 13A.01.06.03(B)(2) & (5).

After adopting the Equity Regulation, the Maryland Board of Education amended its "Health Ed" regulation to reflect the new equity standards. *See* Memorandum from Superintendent Karen B. Salmon to Members of the State Board of Education (June 25, 2019), https://perma.cc/6JCX-B7RC. The Health Ed Regulation sets the standards for all "Health Education Instructional Programs for Grades Prekindergarten—12." § 13A.04.18.01. It has long required—"in or prior to the grade 5"—comprehensive instruction on "family life and human sexuality." § 13A.04.18.01(C)(1)(c) & (D)(2)(d). The 2019 amendment to the Health Ed Regulation added that this instruction "shall represent all students regardless of ability, sexual orientation, gender identity, and gender expression." Salmon Memo at 12, https://perma.cc/6JCX-B7RC; *see also* § 13A.04.18.01(D)(2)(a). The Pride Storybooks are a part of this "inclusive" effort. Ramirez, https://perma.cc/8L5G-XQ9X.

But the Health Ed Regulation explicitly requires school districts to establish "procedures for student opt-out regarding instruction" related to any "family life and human sexuality objectives" other than "menstruation." § 123A.04.18(D)(2)(e)(*i*) &

19

(*iii*). And the School Board agrees that "[s]tudents and families" can continue to opt out of the "Family Life and Human Sexuality Unit of Instruction" in their health classes—but not when the same topics are introduced for the same purpose during story time for children as young as pre-K. Ramirez, https://perma.cc/8L5G-XQ9X. Because the School Board's no-opt-out policy plainly treats the Parents' religious exercise less favorably than "comparable secular activity," *see Tandon*, 141 S. Ct. at 1296, it fails general applicability and triggers strict scrutiny. *Fulton*, 141 S. Ct. at 1877.

The School Board's suggestion that only opt-outs from a "Unit of Instruction" are "specifically permitted by Maryland law," Ramirez, https://perma.cc/8L5G-XQ9X, is mistaken. Under the plain language of the Health Ed Regulation, the mandate to provide instruction and allow opt-outs applies to *any* instruction on "family life and human sexuality" in *all* "Grades Prekindergarten–12." COMAR § 13A.04.18.01(heading), (A)(1)-(2), (C)(1)(c), & (D)(2)(d)-(e). Nothing in the law suggests that the opt-out requirement is available only for certain classes or units of study. But even if the School Board were correct, strict scrutiny would still apply, because "whether two activities are comparable for purposes of the Free Exercise Clause" is not judged by government labeling, but by "the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1297. Here, the Pride Storybooks comprise instruction on family life and human sexuality that is provided for the same "equity" and "inclusion" purposes as related material in health class. Categorically allowing opt-outs in one circumstance but not the other, whether dictated by Maryland law or not, triggers strict scrutiny.

20

**4. The School Board's no-opt-out policy separately violates the Free Exercise Clause under *Lukumi* and *Masterpiece* because it targets religious exercise.**

"The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop, Ltd. V. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*, 508 U.S. at 534). "[M]ere compliance with the requirement of facial neutrality" is not sufficient. *Lukumi*, 508 U.S. at 534. "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id.*

Here, the school Board has long granted parental opt-outs from a wide variety of school activities. *See e.g.*, Compl. Ex. A at 2-4 (*e.g.*, books, band, Halloween). As required by Maryland law, this has always included opt-outs from instruction on "family life and human sexuality." COMAR § 13A.04.18.01; Ramirez, https://perma.cc/8L5G-XQ9X. The School Board's overnight decision to withdraw opt-outs for the Pride Storybooks only—and only after parents began raising religious objections—is alone sufficient to trigger strict scrutiny for lack of neutrality. Such targeting of religion is "not neutral … and therefore trigger[s] strict scrutiny under the Free Exercise Clause." *Tandon*, 141 S. Ct. at 1296.

The School Board's "'official expressions of hostility' to religion" make matters worse. Policies enacted with religious animosity can be "'set aside' … without further inquiry"—that is, without even conducting a strict-scrutiny analysis. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 n.1 (2022) (quoting *Masterpiece*, 138 S. Ct. at 1732); *see also Fulton*, 141 S. Ct. at 1877 ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs").

After parents requested opt-outs at a March 28, 2023, board meeting, Defendant Lynne Harris accused them on the record of perpetuating hate:

> Saying that a kindergartner can't be present when you read a book about a rainbow unicorn because it offends your religious rights or your family values

or your core beliefs is just telling that kid, "Here's another reason to hate another person."

Harris Remarks at 1:48:00-1:48:15, https://perma.cc/AW3T-DMJB; *see also* Compl. Ex. N at 16 (suggesting that religious parents seeking opt-outs are engaging in a "dehumanizing form of erasure"). Harris later made a similar comment in reference to parental testimony at a January 12, 2023 meeting on the Pride Storybooks, saying "[y]es, ignorance and hate does exist in our community." Compl. ¶ 155. Later, she also compared a largely Muslim group of concerned parents to "white supremacists" and "xenophobes." *See* Em Espey, *Parents, students, doctors react to MCPS lawsuit targeting LGBTQ+ storybooks*, MoCo360 (June 2, 2023), https://perma.cc/5GD9-2YVQ.

No other member of the School Board disavowed these comments. Nor did they object after a member of the County Council picked up the theme, claiming that concern over the Pride Storybooks puts "some Muslim families on the same side of an issue as White supremacists and outright bigots." Hannah Grossman, *Dem Maryland official says Muslim children aligned with 'White supremacists' for opposing LGBTQ curriculum*, Fox News (June 7, 2023), https://perma.cc/3AJE-RSBA. Rather, these statements are further evidence that the School Board's purpose in denying opt-outs is to counter parents whose religious beliefs it deems non-inclusive. *See* Espey, https://perma.cc/5GD9-2YVQ (quoting School Board Member Lynne Harris).

Persons raising religious concerns to government policies are "entitled to a neutral decisionmaker who would give full and fair consideration" to their objections. *Masterpiece*, 138 S. Ct. at 1731-32. Because the School Board's hostile statements about religious objectors "cast doubt on the fairness and impartiality" of the School Board, *id*. at 1721, the no-opt-out policy may be "set aside," even without strict scrutiny. *Kennedy*, 142 S. Ct. at 2422 n.1.

**B. Stripping opt-out rights also triggers strict scrutiny under the Due Process Clause.**

Separate and apart from the Free Exercise Clause, the School Board's no-opt-out policy also triggers strict scrutiny because it violates the Parents' rights under the Due Process Clause. Indeed, the parental right to direct a child's upbringing "is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel*, 530 U.S. at 65. Upheld in "a long line of cases," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), the right is deemed "essential" and "far more precious … than property rights," *Stanley v. Illinois*, 405 U.S. 645, 651 (1972).

Parents who send their children to public schools do not forfeit this constitutional right at the schoolhouse door. *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2053 (2021) (Alito, J., concurring). "[T]he child is not the mere creature of the State," and "those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Troxel*, 530 U.S. at 65 (quoting *Pierce*, 268 U.S. at 535). This right arises from the "cardinal" principle "that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.* at 65-66. Thus, even "[p]ublic schools must not forget that '*in loco parentis*' does not mean 'displace parents.'" *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000).

Even prior to our nation's founding, "the common law placed considerable responsibility upon parents" to provide for their children's education and care given the "relative immaturity of minors." Eric A. DeGroff, *Parental Rights & Public School Curricula: Revisiting* Mozert *After 20 Years*, 38 J.L. & Educ. 83, 108-09 (2009). Constitutional jurisprudence likewise acknowledges that elementary-school children are uniquely susceptible to being influenced by third parties in their religious and moral upbringing. *See, e.g., Edwards v. Aguillard*, 482 U.S. 578, 584 (1987)

23

("Students in [public schools] are impressionable and their attendance is involuntary."). And so, while "[f]amilies entrust public schools with the education of their children," they "condition their trust on the understanding that the classroom will not purposely be used to advance religious [or ideological] views that may conflict with the private beliefs of the student and his or her family." *Id.*

Demanding that elementary-aged children contemplate complex and sensitive issues around sexuality and gender identity—from a one-sided perspective that is contrary to the Parents' religious convictions—strikes at the heart of the Parents' right to introduce and teach those topics on their own terms and timeline. As under the First Amendment, such "infringements on liberties deemed constitutionally 'fundamental'" are subject to "a heightened or 'strict' level of judicial scrutiny." *Herndon by Herndon*, 89 F.3d at 177-79.

## II. The no-opt-out policy cannot survive strict scrutiny.

"A government policy can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (cleaned up). This only happens in "rare cases." *Lukumi*, 508 U.S. at 546. This isn't one of them. Here, no matter why the School Board's policy triggers strict scrutiny, it fails the test.

### A. The School Board lacks a compelling governmental interest in stripping the Parents' opt-out rights for the Pride Storybooks.

The first step in strict scrutiny "obligate[s]" the School Board to show "that it had a compelling interest in" withdrawing opt-outs for the Pride Storybooks. *Redeemed Christian Church*, 17 F.4th at 510. What's more, "the government must show that pursuit of its compelling interest was the actual reason for its challenged action." *Id.* The School Board cannot meet its burden for three independent reasons.

First, the School Board cannot show a compelling interest in stripping opt-out rights because it allowed opt-outs to the Pride Storybooks until March 23, 2023—

including to the Parents in this case. Granting such exemptions before inexplicably withdrawing them, all while retaining discretion over what instruction is subject to notice and opt-out, fatally "undermines the [School Board's] contention that its [no-opt-out] policies can brook no departures." *Fulton*, 141 S. Ct. at 1882. Instead, the School Board has suggested that it has a compelling interest in reversing its own prior position in order to save children from the "dogma" and "bigot[ry]" espoused by their parents. *See* Espey, https://perma.cc/5GD9-2YVQ (School Board Member Lynne Harris stating that children who support opt-out rights are "parroting dogma" from their parents); Testimony at the Montgomery County Public Schools Business Meeting, at 27:11-29:09 (Jan. 12, 2023), https://perma.cc/T234-559Q (comparing religious objectors to "white supremacists" and "xenophobes"). But that argument fails under *Fulton*. *See* 141 S. Ct. at 1882 (holding that a "weighty" interest "in the equal treatment of prospective foster parents and foster children" is "undermine[d]" by "a system of exceptions"). And it fails under *Yoder* too: "There can be no assumption that today's majority is 'right' and the [Parents] and others like them are 'wrong.'" 406 U.S. at 223-24. And there is no duty "to 'save' a child from himself or his [religious] parents by requiring" that the Pride Storybooks be read. *Id.* at 232.

Moreover, the School Board's "insist[ence] that a categorical ban" on opt outs is now required flouts the "long history" and "continue[d]" practice of most states. *See Ramirez v. Collier*, 142 S. Ct. 1264, 1279 (2022). Most states—including Maryland—provide parents with advance notice and opt-outs for their children from instruction on human sexuality. Compl. ¶ 87. Others only have such instruction on an opt-*in* basis. *Id.* ¶ 88. Given this "historic[] and routine[]" consensus on traditional religious exercise, there is no "basis for deference" to the School Board's judgment. *Ramirez*, 142 S. Ct. at 1279-80.

Second, the School Board cannot meet its burden because any interest the Board asserts must be "particular to the specific case." *Redeemed Christian Church*, 17

F.4th at 510. This "more precise analysis" means "courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Fulton*, 141 S. Ct. at 1881 (cleaned up); *see also Yoder*, 406 U.S. at 227 (requiring a "more particularized showing … to justify the severe interference with religious freedom such additional compulsory attendance would entail"). The School Board fails this requirement, too—because it cannot explain why *these* Parents cannot have *their* children opt out of the Pride Storybooks. *See Tatel v. Mt. Lebanon Sch. Dist.*, No. 22-837, 2022 WL 15523185, at *19 (W.D. Pa. Oct. 26, 2022) (applying *Fulton*'s holding to analogous gender identity classroom instruction).

The School Board has made broad commitments to religious accommodations in its Religious Diversity Guidelines—allowing opt-outs from all manner of classroom discussions, activities, and reading assignments. Compl. Ex. A at 2-4. And the School Board is required by Maryland law to provide notice and opt-out procedures for all instruction on "family life and human sexuality"— whether or not an opt-out is sought for a religious reason. "Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied." *Tandon*, 141 S. Ct. at 1297. Here, however, the School Board can't offer a compelling reason for violating Maryland law or its own Religious Diversity Guidelines. Nor is there a compelling interest in allowing parents to opt their high schoolers out of "family life and human sexuality" instruction, while their elementary school children must be made to read the Pride Storybooks without the parents' knowledge. *See 5 Things to Know*, https://perma.cc/6XVG-R3CF (affirming high school exemption); *Fulton*, 141 S. Ct. at 1882 ("The City offers no compelling reason why it has a particular interest in denying an exception to CSS while making them available to others.").

Third, the School Board cannot meet its burden because it must link its asserted interest to an analogous regulatory tradition—and the no-opt-out policy is a historical outlier.

*Yoder* held that compelling interests—especially ones invoked to support "relatively recent" regulations on longstanding religious exercise—must have historical analogues. *See* 406 U.S. at 226-30 (analyzing the "historical origin" of "compulsory education and child labor laws"). Recent cases confirm that those analogues must evidence "an early American tradition" that is analogous to the restriction at issue. *See Espinoza*, 140 S. Ct. at 2258-59 (refusing to credit "a tradition *against* state support for religious schools [that] arose in the second half of the 19th century"). Accordingly, there is no compelling interest in asserting "a categorical ban" on religious exercise that possesses a "long history" and is upheld by "longstanding [regulatory] practice." *Ramirez*, 142 S. Ct. at 1279-80, 1283; *see also New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022) ("[I]f earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.").[1]

Here, the School Board cannot root its Pride Storybook no-opt-out policy in a long historical tradition. That's because historical tradition is the opposite. At the time of the founding, "English cases from the Court of Chancery established the right of parents to make educational choices for their children despite the wishes of the child or even the preferences of civil authorities." DeGroff, 38 J.L. & Educ. at 110 & n.178 (collecting cases). "Even after the common school movement took hold in this country

---

[1]   The Fourth Circuit has recognized *Bruen*'s application to the Establishment Clause, and to other "constitutional provisions"—like the Free Exercise Clause— "where the Supreme Court has directed that historical tradition defines an exception, rather than the rule." *Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023). "There, the burden falls on the defendant to establish the exception," *id.*, as the defendant must do when identifying a compelling government interest.

in the mid- to late 1800s, and compulsory education laws became commonplace around the turn of the century, the courts generally deferred to parental preferences when disputes arose over curricular requirements in the new publicly-funded schools." *Id.* at 113.[2] The general common law rule was as follows: "so long as, in exercising his parental authority in making the selection of the branches [his child] shall pursue, none others are affected, it can be of no practical concern to those having the public schools in charge." *Trs. of Schs. v. People ex rel. Van Allen*, 87 Ill. 303, 309 (Ill. 1877). Courts upheld this common law rule into the twentieth century, especially when religious upbringing was at issue.[3] And throughout the twentieth century, the possibility of an opt-out often informed why there was *not* a free exercise or parental rights claim.[4]

---

[2]   Regardless, a contrary tradition developing that late cannot overcome the control parents presumptively had at the founding. *See Espinoza*, 140 S. Ct. at 2258-59.

[3]   *See, e.g.*, *Vollmar v. Stanley*, 255 P. 610, 613-14 (Colo. 1927) (upholding right of Catholic parent to excuse his child from morning readings of the King James Version Bible, as "one of the liberties guaranteed by the Fourteenth Amendment to the national Constitution"), *overruled on other grounds in Conrad v. City & Cnty. of Denver*, 656 P.2d 662, 670 n.6 (Colo. 1982); *Hardwick v. Bd. of Sch. Trs.*, 205 P. 49, 54 (Cal. App. 1921) (granting parental "object[ion] to his children being coerced by the school authorities into taking part in [dancing] exercises contrary to the teachings they have received from their parents upon that subject; and the fact that he asks … is not unreasonable"); *Spiller v. Inhabitants of Woburn*, 12 Allen 127, 127 (Mass. 1866) (upholding school policy to begin each morning with a Bible reading and prayer, because it provided that the "parents" could "request that [the student] shall be excused from doing so"); *see also State v. Ferguson*, 144 N.W. 1039, 1042 (Neb. 1914) ("no pupil attending the [public] school can be compelled to study any prescribed branch against the protest of the parent"); *accord Rulison v. Post*, 79 Ill. 567, 574 (Ill. 1875); *Morrow v. Wood*, 35 Wis. 59, 63-64 (Wis. 1874) ("there is a great and fatal error in" concluding that "the parent, by the very act of sending his child to school, impliedly undertakes to submit all questions in regard to study to the judgment of the teacher").

[4]   *See, e.g.*, *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1533 (9th Cir. 1985) ("minimal" religious burden because the student "was assigned an alternate book" and was "given permission to avoid classroom discussions"); *Spence v. Bailey*, 465

More recently, courts have regularly upheld the right of parents to opt their children out of classroom discussions on "'sensitive topics before a parent [introduces them],'" to not "'complicate [or] even undermine parental authority.'" *Tatel v. Mt. Lebanon Sch. Dist.*, No. 22-837, 2023 WL 3740822, at \*5-6 (W.D. Pa. May 31, 2023) (quoting *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005)). As in *Tatel*, the parental opt-out right extends to curricula on gender identity. Such instruction is not "merely … to influence tolerance of *other* children or families, but efforts to inculcate a teacher's beliefs about transgender topics in Plaintiffs' *own* children." *Id.* at \*10.[5] The historical tradition of American law simply does not support that kind of intrusion into religious upbringing. As such, the Board cannot identify a compelling interest that survives "the strictest scrutiny" of constitutional law. *Espinoza*, 140 S. Ct. at 2257.

## B. The no-opt-out policy is not the least restrictive means for achieving the asserted government interest.

Finally, even if the School Board could identify a compelling interest, the School Board still cannot show that its absolutism is narrowly tailored to achieve that interest. "[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881. And here, the School Board has never explained what changed between March 22, 2023 (where notice and opt outs were broadly provided, including to the Parents here) and March 23, 2023

---

F.2d 797, 799 (6th Cir. 1972) ("since Tennessee has made the R.O.T.C. training course optional with physical education, it would be difficult to conclude that the R.O.T.C. program was vital to the State's welfare"); *Moody v. Cronin*, 484 F. Supp. 270, 277 (C.D. Ill. 1979) ("the state could adopt a third alternative which would be to exempt plaintiffs from the physical education requirement").

[5] While the schoolteacher's instruction in *Tatel* was "not part of the school curriculum," (2023 WL 3740822, at \*11), the school "allegedly adopted a de facto policy that prohibits Plaintiffs from notice and the ability to opt their children out of [the teacher's] transgender agenda based on their religious beliefs." *Tatel*, 2023 WL 3740822, at \*14.

(where they are still broadly available except with respect to the Pride Storybooks). Claims of "administrative inconvenience associated with providing notice and opt out rights" won't do, given the infringement on religious exercise. *Tatel*, 2022 WL 15523185, at *19-20 (citing *Burwell v. Hobby Lobby*, 573 U.S. 682, 692 (2014)). Nor could such claims square with the School Board's Religious Diversity Guidelines, where the School Board has committed itself to providing alternative assignments and spaces for students that are opting out of classroom discussions, activities, and readings for religious reasons. Compl. Ex. A at 2-4. Nor are the Parents asking this Court to enjoin the Pride Storybooks altogether (though another judge on this Court did just that against analogous curriculum from Montgomery County, *see Citizens for a Responsible Curriculum v. Montgomery Cnty. Pub. Schs.*, No. 05-1194, 2005 WL 1075634, at *11-12 (D. Md. May 5, 2005)). Rather, the Parents here are asking only for the ability to opt their children out—a remedy that is, itself, narrowly tailored— as demonstrated by it being the approach of most jurisdictions nationwide. *See* Compl. ¶¶ 87-88; *see also Holt v. Hobbs*, 574 U.S. 352, 368 (2015) (strict scrutiny not met where Arkansas failed to show, "in the face of petitioner's evidence, why the vast majority of States and the Federal Government" permit beards, "but it cannot").

## III. The Parents satisfy the remaining preliminary injunction factors.

In addition to showing a likelihood of success on the merits, a preliminary injunction is warranted when plaintiffs demonstrate that they are likely to suffer irreparable harm in the absence of a preliminary injunction, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Dmarcian, Inc.*, 60 F.4th at 138. Plaintiffs easily satisfy these remaining factors.

***Irreparable harm.*** "[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). This

is because—as both the Supreme Court and this Court have emphasized—"[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Diocese of Brooklyn*, 141 S. Ct. at 67; *see also Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (same); *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (same).

Parents' First Amendment claims easily satisfy this low bar. As discussed above, the School Board blatantly violated the historic and traditional First Amendment right of parents to direct the upbringing of their children by denying notice to parents of family life and human sexuality materials and refusing to provide an opt-out option.

Likewise, Parents' Due Process Clause claim readily satisfies this standard. Where "there is a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). This is especially true where, as here, the School Board is seeking to introduce children to concepts of gender, sex, and sexuality far earlier than the Parents believe is appropriate. Innocence lost cannot be regained.

**Balance of equities and public interest.** The last two preliminary injunction factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In other words, "the government's interest *is* the public interest." *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (quoting *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)). "The court must balance the significant irreparable harms identified above against the harms th[e] [government] asserts will

arise from temporarily enjoining enforcement of the challenged rule." *Id.* As the Fourth Circuit has repeatedly held, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Leaders of a Beautiful Struggle*, 2 F.4th at 346. "If anything, the system is improved by such an injunction." *Id.* It is also "well-established that the public interest favors protecting constitutional rights." *Id.*; *see Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[U]pholding constitutional rights surely serves the public interest."). Consequently, because the School Board's policy violates Parents' rights under the Free Exercise and Due Process Clauses, the balance of equities and the public interest strongly support granting a preliminary injunction. The School Board cannot plausibly claim that an opt-out policy that is both required by state law and was willingly followed until March 2023 could somehow harm the public interest if followed for the duration of this case.

## CONCLUSION

For all the foregoing reasons, Plaintiffs request that their motion for preliminary injunction be granted in full.

Dated: June 12, 2023                    Respectfully submitted,

                                        /s/ William J. Haun
                                        Eric S. Baxter (readmission pending)
                                        William J. Haun (pro hac vice)
                                        Michael J. O'Brien* (pro hac vice)
                                        Brandon L. Winchel* (pro hac vice)
                                        THE BECKET FUND FOR RELIGIOUS LIBERTY
                                        1919 Pennsylvania Ave, N.W., Suite 400
                                        Washington, DC 20006
                                        (202) 955-0095
                                        whaun@becketlaw.org

James C. Mehigan, (Bar # 16239)
MEHIGAN LAW GROUP PLLC
11921 Freedom Drive, Suite 550
Reston, Virginia 20190
(703) 774-7281
jmehigan@mehiganlawgroup.com

*Not a member of the DC Bar; admitted in
Louisiana and California respectively.
Practice limited to cases in federal court.

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2023, a copy of the *Motion for Preliminary Injunction*, *Memorandum in Support of Motion for Preliminary Injunction*, with supporting declarations, and *Proposed Order*, which were electronically filed in this case on June 12, 2023, were emailed and mailed via First-Class Mail, postage prepaid, to the following in accordance with Fed. R. Civ. P. 5:

Alan Schoenfeld
Wilmer Hale
250 Greenwich Street
New York, NY 10007
Alan.schoenfeld@wilmerhale.com
*Attorney for Defendants*


Dated: June 12, 2023                         /s/ William J. Haun
                                             William J. Haun