# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TAMER MAHMOUD, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> MONIFA B. MCKNIGHT, *in her official capacity as Superintendent of the Montgomery County Board of Education, et al.*, <br><br> *Defendants*. | )<br>)<br>)<br>)  Case No. 8:23-cv-01380-DLB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Bruce M. Berman (*pro hac vice*)
bruce.berman@wilmerhale.com
Jeremy W. Brinster (*pro hac vice* pending)
jeremy.brinster@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20037

Alan E. Schoenfeld (*pro hac vice*)
alan.schoenfeld@wilmerhale.com
Thomas K. Bredar (MD No. 21635)
thomas.bredar@wilmerhale.com
Emily Barnet (*pro hac vice* pending)
emily.barnet@wilmerhale.com
Cassandra A. Mitchell (*pro hac vice* pending)
cassie.mitchell@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ................................................................................................................1

    A.    Montgomery County Public Schools Serve A Diverse Community ......................1

    B.    MCPS Is Guided By Principles Of Equity And Inclusion In The Selection Of Instructional Materials ......................................................................................3

    C.    After A Multi-Year Process, MCPS Introduces LGBTQ-Inclusive Books As Part Of Its Language Arts Curriculum ..............................................................5

    D.    MCPS Clarifies That Parents Cannot Opt Their Children Out Of Classroom Instruction Using The LGBTQ-Inclusive Books For Any Reason......................................................................................................................6

    E.    Plaintiffs Sue MCPS And Seek A Preliminary Injunction On Their Free Exercise and Due Process Claims............................................................................8

LEGAL STANDARD........................................................................................................8

ARGUMENT ......................................................................................................................9

I.    Plaintiffs Are Unlikely To Succeed On The Merits of Their Free Exercise Claims ..........9

    A.    The MCPS Policy Does Not Infringe Plaintiffs' Free Exercise Rights .................9

    B.    Even If The Policy Incidentally Burdens Religious Practice, It Is Generally Applicable And Neutral And Thus Subject To Rational-Basis Review ..................................................................................................................17

        1.    MCPS's policy is generally applicable under *Fulton* because it does not contemplate any exceptions........................................................17

        2.    MCPS's policy is generally applicable and neutral under *Tandon* because it does not favor secular over religious conduct..........................20

        3.    MCPS's policy is neutral under *Masterpiece Cakeshop* because Plaintiffs cannot establish religious hostility .............................................22

    C.    Plaintiffs' Free Exercise Claims Fail Under Any Standard Of Review................25

        1.    MCPS's policy satisfies rational-basis review...........................................25

        2.    MCPS's policy satisfies strict scrutiny .....................................................25

II.    Plaintiffs Are Unlikely To Succeed On The Merits Of Their Due Process Claims ..........27

III.    Plaintiffs Do Not Satisfy The Remaining Preliminary Injunction Factors ......................29

CONCLUSION..................................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

## CASES

*303 Creative LLC v. Elenis*,
    2023 WL 4277208 (U.S. June 30, 2023) ..........................................................................10

*Alive Church of the Nazarene, Inc. v. Prince William County*,
    59 F.4th 92 (4th Cir. 2023) ....................................................................................................22

*Association of American Publishers, Inc. v. Frosh*,
    586 F. Supp. 3d 379 (D. Md. 2022)........................................................................................30

*Bailey v. Virginia High School League, Inc.*,
    488 F. App'x 714 (4th Cir. 2012) ..........................................................................................28

*Bethel Ministries, Inc. v. Salmon*,
    2020 WL 292055 (D. Md. Jan. 21, 2020)..............................................................................22

*Bethel World Outreach Ministries v. Montgomery County Council*,
    706 F.3d 548 (4th Cir. 2013) ..................................................................................................25

*Blau v. Fort Thomas Public School District*,
    401 F.3d 381 (6th Cir. 2005) ..........................................................................................13, 28

*Boring v. Buncombe County Board of Education*,
    136 F.3d 364 (4th Cir. 1998) ..................................................................................................15

*California Parents for the Equalization of Educational Materials v. Torlakson*,
    973 F.3d 1010 (9th Cir. 2020) ........................................................................................10, 14

*Canaan Christian Church v. Montgomery County*,
    29 F.4th 182 (4th Cir. 2022) ....................................................................................17, 18, 19

*Carson v. Makin*,
    142 S. Ct. 1987 (2022)............................................................................................................10

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)........................................................................................................18, 22

*D.L. ex rel. K.L. v. Baltimore Board of School Commissioners*,
    706 F.3d 256 (4th Cir. 2013) ..........................................................................................13, 15

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017) ..............................................................................................8, 9

*Doe by and through Doe v. Boyertown Area School District*,
    897 F.3d 518 (3d Cir. 2018)...................................................................................................26

*Doe v. Catholic Relief Services*,
618 F. Supp. 3d 244 (D. Md. 2022) ............................................................21

*Edwards v. Aguillard*,
482 U.S. 578 (1987) ....................................................................................15

*Employment Division v. Smith*,
494 U.S. 872 (1990) ....................................................................................18

*Fleischfresser v. Directors of School District 200*,
15 F.3d 680 (7th Cir. 1994) ..................................................................11, 14

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021) ...........................................................................18, 19

*Grimm v. Gloucester County School Board*,
972 F.3d 586 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021) ................26

*Henderson for National Labor Relations Board v. Bluefield Hospital Co.*,
902 F.3d 432 (4th Cir. 2018) ......................................................................29

*Henderson v. Kennedy*,
253 F.3d 12 (D.C. Cir. 2001) ......................................................................29

*Herndon by Herndon v. Chapel Hill-Carrboro City Board of Education*,
89 F.3d 174 (4th Cir. 1996) ...................................................................28, 29

*Hines v. S.C. Department of Corrections*,
148 F.3d 353 (4th Cir. 1998) ......................................................................22

*John and Jane Parents 1 v. Montgomery County Board of Education*,
622 F. Supp. 3d 118 (D. Md. 2022), *appeal docketed*, 22-2034 (4th Cir.
Oct. 3, 2022) ................................................................................................26

*Jones v. Boulder Valley School District RE-2*,
2021 WL 5264188 (D. Colo. Oct. 4, 2021) ......................................11, 15, 16

*Kennedy v. Bremerton School District*,
142 S. Ct. 2407 (2022) ................................................................................25

*Leaders of a Beautiful Struggle v. Baltimore Police Department*,
2 F.4th 330 (4th Cir. 2021) .........................................................................30

*League of United Latin American Citizens v. Perry*,
548 U.S. 399 (2006) ....................................................................................26

*Leebaert v. Harrington*,
332 F.3d 134 (2d Cir. 2003) ..........................................................10, 14, 28, 29

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
  138 S. Ct. 1719 (2018) ....................................................................................22, 23, 24, 25

*Meyer v. Nebraska*,
  262 U.S. 390 (1923) ...............................................................................................15

*Mozert v. Hawkins County Board of Education*,
  827 F.2d 1058 (6th Cir. 1987) ..........................................................................11, 14

*Parker v. Hurley*,
  514 F.3d 87 (1st Cir. 2008) .....................................................................10, 13, 14, 28

*Pierce v. Society of Sisters*,
  268 U.S. 510 (1925) ...............................................................................................12

*Roswell v. Mayor & City Council of Baltimore*,
  2023 WL 3158728 (D. Md. Apr. 28, 2023) ........................................................10, 30

*San Jose Christian College v. City of Morgan Hill*,
  360 F.3d 1024 (9th Cir. 2004) ...............................................................................29

*Saxe v. State College Area School District*,
  240 F.3d 200 (3d Cir. 2001) ...................................................................................26

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ...............................................................................................18

*Speech First, Inc. v. Sands*,
  69 F.4th 184 (4th Cir. 2023) ....................................................................................8

*Swanson v. Guthrie Independent School District No. I-L*,
  135 F.3d 694 (10th Cir. 1998) ...............................................................................15

*Tandon v. Newsom*,
  141 S. Ct. 1294 (2021) ......................................................................................20, 21

*Tatel v. Mt. Lebanon School District*,
  2023 WL 3740822 (W.D. Pa. May 31, 2023) .........................................................16

*Taylor v. Freeman*,
  34 F.3d 266 (4th Cir. 1994) .....................................................................................8

*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022) .................................................................................24

*Troxel v. Granville*,
  530 U.S. 57 (2000) ..................................................................................................27

iv

*West Virginia State Board of Education v. Barnette*,
　319 U.S. 624 (1943)..........................................................................................12

*Wisconsin v. Yoder*,
　406 U.S. 205 (1972)......................................................................................11, 12

*Workman v. Mingo County Board of Education*,
　419 F. App'x 348 (4th Cir. 2011) ...................................................................29

## STATUTES, RULES, AND REGULATIONS

COMAR § 13A.01.06.01 ...........................................................................................2

COMAR § 13A.01.06.03 ...........................................................................................2

COMAR § 13A.04.18 ...............................................................................................21

## OTHER AUTHORITIES

Video of Montgomery County Board of Education Business Meeting
　(Jan. 12, 2023), https://mcpsmd.new.swagit.com/videos/196679 ....................24

## INTRODUCTION

All children deserve to see themselves and their families represented at school. When instructional materials reflect the diversity of a school community, children learn better and are better equipped for personal, academic, and professional success. This principle guides Montgomery County Public Schools (MCPS) as it oversees the development and implementation of a curriculum serving students of all backgrounds. And it animated the careful process through which MCPS decided to incorporate books featuring characters who are lesbian, gay, bisexual, transgender, or queer (LGBTQ) into its language arts curriculum.

Plaintiffs in this case—parents of children who attend public schools in Montgomery County—do not want their children to read, listen to, or discuss these books because they believe the books will expose their children to sensitive topics in ways that do not align with their religious beliefs. But neither the Free Exercise Clause nor the Due Process Clause gives parents a veto over a public school's curriculum. Nor does MCPS's refusal to permit opt outs for any student, for any reason, suggest that it has impermissibly singled out Plaintiffs based on their religious faith. Plaintiffs have failed to prove that they are likely to succeed on the merits of their claims, that they have suffered an irreparable injury, or that the public interest or balance of the equities favors injunctive relief. A preliminary injunction should therefore be denied.

## BACKGROUND

### A.    Montgomery County Public Schools Serve A Diverse Community

Montgomery County Public Schools is Maryland's largest school district, serving a diverse community north and west of Washington, D.C. *See* Decl. of Niki T. Hazel in Support of Defs.' Opp. to Plfs.' Mot. for Prelim. Inj. ¶ 1 ("Decl."). The school serves a population of over 160,000 students of many different backgrounds. *Id.* ¶¶ 1, 19. The Montgomery County Board of Education, MCPS's official policy-making body, oversees the process for selecting

1

instructional materials.  Shebra Evans, Lynne Harris, Grace Rivera-Oven, Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, and Julie Yang are members of the Board of Education and Monifa McKnight is the Superintendent of Schools.[1]

Central to MCPS's mission are curricula that represent the wide range of families calling Montgomery County home.  By ensuring that curricula reflect the community to which its students belong, MCPS helps to "foster[] a positive learning environment that embraces all unique and individual differences" and to "ensure compliance with all federal, state, and local nondiscrimination laws."  Ex. 1 at 1-2 (Policy ACA).  Among these laws is Maryland's "Equity Regulation," which was adopted by the Maryland State Board of Education in 2019 and requires every school district to ensure "educational equity" to "maximize [students'] academic success and social/emotional well-being."  COMAR § 13A.01.06.01(A), (B).  "[E]ducational equity" is defined as "view[ing] each student's individual characteristics as valuable," including their "[e]thnicity," "[f]amily structure," "[g]ender identity and expression," "[r]ace," "[r]eligion," and "[s]exual orientation."  *Id.* § 13A.01.06.03(B)(2) & (5).

As part of its commitment to serving its diverse community, MCPS works to accommodate families of all religious backgrounds.  MCPS authorizes absences for religious holidays, ensures that students can make up missed assignments, and provides that students cannot be denied a perfect attendance award due to such absences.  Decl. ¶ 20.  MCPS no longer schedules classes on Eid al-Fitr and Eid al-Adha—two Islamic holidays significant to many MCPS students—and recognizes dozens of "days of commemoration" on which principals are advised not to schedule tests or other major events.  *Id.*  And MCPS has adopted Guidelines for

---

[1] This brief refers to the Board, its members, and the school system as "MCPS."

Respecting Religious Diversity (the "Guidelines") that provide a reference for schools regarding applicable MCPS policies, regulations, and state and federal laws. Compl. Ex. A. at 1.[2]

**B.    MCPS Is Guided By Principles Of Equity And Inclusion In The Selection Of Instructional Materials**

MCPS recognizes that to meet its curriculum goals, it must take "proactive steps to identify and redress implicit biases and structural and institutional barriers that too often have resulted in identifiable groups of students and staff being unjustifiably or disproportionately excluded from or underrepresented in key educational program areas[.]" Ex. 1 at 1-2. MCPS therefore strives to "provide a culturally responsive Prekindergarten to Grade 12 curriculum that promotes equity, respect, and civility among [its] diverse community." *Id.* at 5. Such a curriculum prepares students to "[c]onfront and eliminate stereotypes related to individuals' actual or perceived personal characteristics," *id.*, such as race, religion, sex, gender identity, sexual orientation, and other "protected attributes or affiliations," *id.* at 3. MCPS accordingly expects that "[i]nstructional materials used in [its] schools will reflect the diversity of the global community[.]" *Id.* at 3, 5-6. Representation in the curriculum creates and normalizes a fully inclusive environment for all students, supporting each student's ability to empathize, connect, and collaborate with peers of different background and encouraging respect for all. Decl. ¶ 22.

To these ends, MCPS strives to devise "[p]rograms, curricula, instructional materials, and activities … [that] will provide all students with the knowledge, skills, attitudes, and behaviors that promote cultural proficiency and behaviors that enable students to live and work together in our increasingly diverse county, state, nation, and world." Ex. 1 at 7. For example, the English Language Arts (ELA) curriculum is designed to "promote[] instruction that," among other goals,

---

[2] This brief refers to the exhibits to Plaintiffs' original Complaint as "Compl. Ex." and refers to the operative First Amended Complain as "FAC."

"nurtures appreciation and understanding of diverse individuals, groups, and cultures." Ex. 2 at 2. Teachers are expected to engage students in "core learning practices," including "[s]electing from a range of diverse texts to understand and appreciate multiple perspectives." Ex. 3.

MCPS follows a long-established, written policy to evaluate and select new instructional materials. Ex. 4. Any materials that are to be approved for use county-wide must be evaluated by a committee of professional staff members and subject-area experts. *Id*. at 3. That committee evaluates potential materials for inclusion in the curriculum based on a number of criteria, including whether the materials are "age/grade appropriate[]," "support … student achievement toward MCPS curriculum standards," and, of particular relevance here, are "relevant to and reflective of the multicultural society and global community." *Id*. at 4; *see also* Ex. 5. Once the committee has identified books for potential inclusion in the curriculum, they are made available for community review and input; they are made available for examination in person by parents and staff for 30 calendar days, and their titles are posted on the Montgomery County Public Schools Evaluation and Selection website. *Id*.; Decl. ¶¶ 16-17. Any parent feedback is taken into account before a final decision is made to approve a book for instructional use. Decl. ¶ 17.

MCPS works continuously to ensure that its pre-K through 12th grade curriculum reflects Montgomery County families. For example, MCPS has purchased books for use as part of the ELA curriculum that feature people and characters from traditionally underrepresented races and cultures. Decl. ¶ 21. These books include the *March* trilogy, which recounts the life of civil rights icon Congressman John Lewis, and *The Leavers*, which introduces readers to the story of an Asian-American immigrant family. MCPS also recently updated the social studies curriculum to include materials focused on local history and historically marginalized groups. *Id.*

### C.  After A Multi-Year Process, MCPS Introduces LGBTQ-Inclusive Books As Part Of Its Language Arts Curriculum

In recent years, MCPS determined that the books used in its existing ELA curriculum were not representative of many students and families in Montgomery County because they did not include LGBTQ characters.  Decl. ¶ 23.  MCPS therefore undertook, in collaboration with parents and educators, a formal process of supplementing the ELA curriculum with more diverse texts (the "LGBTQ-Inclusive Books").  *Id.* ¶¶ 23-24.

In selecting these books, MCPS followed the process outlined in MCPS Regulation IIB-RA.  Decl. ¶ 24.  As part of this process, a committee composed of four reading specialists and two instructional specialists participated in multiple rounds of evaluations to determine whether each book would be a suitable addition to the ELA curriculum.  *Id.* ¶ 25.  The committee recommended approval of the LGBTQ-Inclusive Books after finding that they supported MCPS content standards and performance indicators, contained narratives and illustrations that would be accessible and engaging to students, and featured characters of diverse backgrounds whose stories and families students could relate to.  *Id.* ¶ 26; *see also* Ex. 5.

The LGBTQ-Inclusive Books are just that—books that feature LGBTQ characters.  The books aim to impart critical reading skills while telling stories about diverse families.  These include stories about a family attending a Pride parade, Compl. Ex. B, a niece meeting her uncle's husband-to-be, *id.*, a prince falling in love with a knight as they work together to battle a dragon in a mythical kingdom, *id.*, a girl racing through the snow with her crush, *id.*, and a transgender boy sharing his gender identity with his family, *id.*  The books do not instruct children to "question sexuality and gender identity, focus on romantic feelings, … embrace gender transitioning," or take a side in religious or scientific debates surrounding sexual orientation or gender identity.  *Contra* Plfs.' Mem. in Support of Mot. for Prelim. Inj. at 4 ("PI

Br."). The LGBTQ-Inclusive Books are instead used to support students' ability to empathize, connect, and collaborate with diverse peers, to encourage respect for all, and to help students understand that different values are represented in the MCPS community. *See* Decl. ¶ 22.

MCPS has accordingly suggested that teachers fold the LGBTQ-Inclusive Books into the ELA curriculum in the same way that they would any other book—putting the books on shelves for students to find on their own; recommending a particular book to a student who would enjoy it; offering the books as an option for literature circles, books clubs, or paired reading groups; or reading the books aloud. Decl. ¶ 29. MCPS's communications with teachers also make clear that use of the books involves no instruction on sexual orientation or gender identity per se. *Id.* ¶ 30. As with all curriculum resources, there is an expectation that teachers use the LGBTQ-Inclusive Books as part of classroom instruction. *Id.* ¶ 31. Teachers have a choice regarding which MCPS-approved materials to use and when to use them throughout each unit, but they cannot elect to not use the books at all. This reflects MCPS's view that, if these instructional materials are not used at all, a teacher is not fulfilling MCPS's expectation that students will be taught pursuant to a representative and culturally responsive curriculum. *Id.*

### D. MCPS Clarifies That Parents Cannot Opt Their Children Out Of Classroom Instruction Using The LGBTQ-Inclusive Books For Any Reason

The MCPS Guidelines for Respecting Religious Diversity permit (but do not require) schools to make "reasonable and feasible adjustments to the instructional program to accommodate requests from students, or requests from parents/guardians on behalf of their students, to be excused from specific classroom discussions or activities that they believe would impose a substantial burden on their religious beliefs." Compl. Ex. A at 3-4. They also provide, "if such requests become too frequent or too burdensome, the school may refuse to accommodate the requests." *Id.* at 4.

At the beginning of the 2022-2023 school year, some parents asked teachers, principals, and staff that their children be excused from instruction with the LGBTQ-Inclusive Books. Decl. ¶ 33. Many of the opt out requests were not religious in nature. Some parents, for instance, opposed what they believed was an effort to teach students about sex, to teach students lessons about LGBTQ issues, or to use instructional materials that were not age-appropriate. *Id.* ¶ 34. In some instances, individual teachers and principals sought to accommodate these requests by allowing students to be excused when the books were read in class. *Id.* ¶ 35. Through conversations with principals, MCPS became aware that individual schools could not accommodate the growing number of opt out requests without causing significant disruptions to the classroom environment and undermining MCPS's educational mission. *Id.* ¶ 36.

Based on these concerns, MCPS decided that it was not feasible or consistent with its curricular goals to accommodate requests for students to be excused from classroom instruction using the LGBTQ-Inclusive Books. Allowing parents to remove their children from lessons in which those books were used would interfere with MCPS's efforts to cultivate an inclusive and welcoming learning environment and undermine its goals of reducing stigmatization and fostering social integration of all students and families. Decl. ¶¶ 37, 39. And it would impose unworkable burdens on educators who would be required to track and accommodate opt out requests—not only on teachers in individual classrooms, but also on media specialists and other instructors who teach in multiple classrooms each day across entire schools. *Id.* ¶ 38. On March 23, 2023, MCPS therefore informed parents, teachers, and principals that schools could no longer entertain requests for students to opt out of the LGBTQ-Inclusive Books for any reason. *Id.* ¶¶ 40-41. If schools already had granted accommodation requests, however, they could continue to accommodate those families through the end of the 2022-2023 school year. *Id.* ¶ 41.

### E. Plaintiffs Sue MCPS And Seek A Preliminary Injunction On Their Free Exercise and Due Process Claims

Plaintiffs—three sets of parents individually and on behalf of their minor children attending MCPS schools—brought this action against the Montgomery County Board of Education, its members, and the Superintendent of Schools. The amended complaint adds plaintiff Kids First, an unincorporated association of parents and teachers who oppose the no-opt-out policy. *See* FAC ¶ 32. Plaintiffs assert that MCPS's policy of refusing to permit parents to opt their children out of classroom instruction using the LGBTQ-Inclusive Books violates the Free Exercise and Free Speech Clauses of the First Amendment to the U.S. Constitution, the Due Process Clause of the Fourteenth Amendment, and several provisions of Maryland law. *See id.* ¶¶ 183, 218, 228, 245, 267, 284. Plaintiffs moved for a preliminary injunction on their free exercise and due process claims. PI Br. 1-2.[3]

### LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and "shall be granted only if the moving party clearly establishes entitlement to the relief sought." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citations omitted). "Mandatory injunctive relief"—such as the injunction Plaintiffs seek here, to alter rather than preserve the no-opt-out policy in effect—"in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994). "When a party moves for a preliminary injunction … it invites the district court to act as the finder of fact on a limited record." *Speech First, Inc. v. Sands*, 69 F.4th 184, 190 (4th Cir. 2023). Plaintiffs must therefore put forth sufficient evidence to "demonstrate 'that [they are] likely to succeed on the merits, that [they are]

---

[3] Plaintiffs did not seek an injunction on their free speech or Maryland law claims, nor did they argue that they are likely to succeed on those claims.

likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Di Biase*, 872 F.3d at 230.

## ARGUMENT

### I. Plaintiffs Are Unlikely To Succeed On The Merits of Their Free Exercise Claims

Plaintiffs have not "ma[d]e a clear showing" that they are "likely to succeed at trial" on their Free Exercise Claims. *Di Biase*, 872 F.3d at 230. Plaintiffs challenge MCPS's policy of refusing to permit parents to opt their children out of "reading, listening to, or discussing" the LGBTQ-Inclusive Books. *See* Mot. for Prelim. Inj. 1. This policy does not infringe Plaintiffs' free exercise rights because it does not penalize or prohibit their religious practice, nor does it curtail their freedom to direct the religious upbringing of their children. Even if Plaintiffs could make a "clear showing" that the policy incidentally burdens their religious practice, the policy is nonetheless subject to rational-basis review because it is neutral and generally applicable. It easily satisfies that standard. And even if strict scrutiny applied, the policy would survive because it is narrowly tailored to advance MCPS's compelling interests in fostering a safe and inclusive learning environment and complying with applicable nondiscrimination laws and policies. Plaintiffs' claims that they are constitutionally entitled to opt their children out of an element of the public-school curriculum that they disagree with therefore fails.[4]

### A. The MCPS Policy Does Not Infringe Plaintiffs' Free Exercise Rights

Plaintiffs cannot prove that the MCPS policy infringes their rights under the Free Exercise Clause because it does not impose any constitutionally significant burden on their

---

[4] The complaint also brings claims against MCPS on behalf of Kids First and individual plaintiffs' minor children, who are students at Montgomery County Public Schools. *See* FAC ¶¶ 24-35. Plaintiffs advance no arguments and present no distinct evidence that could establish that the free exercise or due process rights of their children or of Kids First have been infringed by MCPS's policy. Plaintiffs have thus failed to establish that those claims are likely to succeed.

religious practice. The Free Exercise Clause "only applies when the government burdens religious exercise" by penalizing or prohibiting it. *Roswell v. Mayor & City Council of Balt.*, 2023 WL 3158728, at *8 (D. Md. Apr. 28, 2023) (citing *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022)). That basic limitation forecloses Plaintiffs' claims here. It is well-established that classroom instruction pursuant to a public school's mandatory curriculum does not cognizably burden the free exercise rights of parents whose children attend that school.[5]

The MCPS policy is lawful because it does not coerce Plaintiffs into refraining from raising their children according to their religious values or penalize their efforts to direct their children's religious upbringing. Under the policy, Plaintiffs' children are expected to be present during class when their teachers read from and discuss books in order to impart critical reading skills. *See* Decl. ¶ 42. Plaintiffs' fundamental complaint is that the books in question, by virtue of the characters' sexual orientation or gender identity, may "expos[e]" Plaintiffs' children to "questions" about which Plaintiffs have sincerely held religious views. PI Br. 2. But such "expos[ure]" to "questions" does not coerce Plaintiffs to refrain from raising their children in their preferred religious faith or penalize them for their religious conduct. Consistent with that basic understanding, courts have uniformly held that a public school's refusal to excuse students from mandatory instruction does not place a constitutionally significant burden on parents' religious exercise, where, as here, parents have chosen to send their children to public school and are free to discuss the material and subject matter with their children at home. *See California Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020); *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008); *Leebaert v. Harrington*, 332 F.3d 134,

---

[5] The Supreme Court's recent decision in *303 Creative LLC v. Elenis* does not support Plaintiffs' motion, as it considered only compelled speech in a far different context, and did not address free exercise or due process claims. 2023 WL 4277208 (U.S. June 30, 2023).

144-145 (2d Cir. 2003); *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 690 (7th Cir. 1994); *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1060 (6th Cir. 1987); *Jones v. Boulder Valley Sch. Dist. RE-2*, 2021 WL 5264188, at *12 (D. Colo. Oct. 4, 2021).

Plaintiffs argue that the policy burdens their religious exercise because it restricts the right of parents, recognized by the Supreme Court in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), to direct the religious upbringing of their children, PI Br. 14. *Yoder* is inapposite for two reasons.

*First*, unlike in *Yoder*, Plaintiffs have not argued, let alone clearly established, that exposure to LGBTQ-inclusive books is fundamentally irreconcilable with their desire to raise their children consistent with their religious faith. In *Yoder*, the plaintiffs challenged their criminal convictions under a law requiring that they send their children to high school, based on their sincerely held belief that "attendance at high school, public or private, was contrary to the Amish religion and way of life," "interpose[d] a serious barrier to the integration of the Amish child into the Amish religious community," and "endanger[ed] their own salvation and that of their children." *Id.* at 209, 211-212. The *Yoder* plaintiffs presented expert testimony that compulsory high school attendance would "result in the destruction of the Old Order Amish church community as it exists in the United States today." *Id.* at 212. Here, by contrast, Plaintiffs have offered no evidence that the challenged policy would "gravely endanger if not destroy the free exercise of [the parents'] religious beliefs." *Id.* at 219. Instead, Plaintiffs assert that MCPS's policy "undermines [their] efforts to form their children in their faith," by exposing students to views contrary to their parents' religious teachings. PI Br. 16. For example, the Mahmoud-Barakats declare that exposure to the LGBTQ-Inclusive Books would "confuse [their son's] religious upbringing," Mahmoud-Barakat Decl. ¶ 20; the Romans that their son would find the books "confusing," Roman Decl. ¶ 19; and the Persaks that the books might "encourage"

their children to "dismiss parental and religious guidance on these issues," Persak Decl. ¶ 16.

Plaintiffs do not claim that exposure to the books is inherently incompatible with their religious

faith, only that it could raise questions about certain topics on which Plaintiffs have religious

views. Their concerns thus fall short of clearly establishing that the challenged policy coerces

them into refraining from religious exercise or penalizes their religious conduct.

*Second*, unlike in *Yoder*, Plaintiffs do not wish to withdraw their children from public

school but instead seek to pick and choose the elements of the public-school curriculum that their

children will experience. *Yoder* established no such right. It addressed only how to resolve

parents' claims that they were being compelled to subject their children to an educational system

fundamentally irreconcilable with their religious convictions. That is why *Yoder* drew on *Pierce

v. Society of Sisters*, 268 U.S. 510 (1925), in which the Supreme Court likewise considered a

compulsory public school attendance statute and questioned only the "general power of the State

to standardize its children by forcing them to accept instruction *from public teachers only*." 406

U.S. at 233 (quoting *Pierce*, 268 U.S. at 535) (emphasis added). Indeed, *Yoder* took pains to

emphasize that its holding "in no way alter[ed] [the Court's] recognition of the obvious fact that

courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of

discrete aspects of a State's program of compulsory education." *Id.* at 234-235. The Supreme

Court's decision in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943),

cited by Plaintiffs, likewise provides no support for a parental right to opt out of a mandatory

curriculum. In holding that the State could not require students to salute the flag, *Barnette*

expressly distinguished that coercive requirement—"a compulsion of students to declare a

belief" on a particular topic—with the type of educational requirement here: a practice under

which students are at most "merely made acquainted with" a topic. *Id.* at 631.

*Yoder*, *Pierce*, and *Barnette* therefore provide no support for Plaintiffs' arguments that the challenged MCPS policy places a constitutionally significant burden on their religious practice. Indeed, it is now "well recognized" that, having chosen to send a child to public school, a parent has no constitutional right to "'direct *how* a public school teaches their child.'" *Parker*, 514 F.3d at 102 (quoting *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005)). The Fourth Circuit explained this "critical distinction" in *D.L. ex rel. K.L. v. Baltimore Board of School Commissioners*, 706 F.3d 256, 263 (4th Cir. 2013). There, the court held that parents' free exercise rights were not unduly burdened by a public school district's refusal to provide disability-related educational services to a private school student because the parents "retain[ed] full discretion over which school" their child would attend. *See id.* The court further recognized that the parents' claims of a burden on religious free exercise "clash[ed] with case law upholding government's ability to make policies and curricular decisions in the best educational interest of students." *Id.* In light of this authority, the Fourth Circuit concluded, "[t]he right to a religious education does not extend to a right to demand that public schools accommodate [parents'] educational preferences." *Id.* at 264.

Returning to the wall of authority rejecting free exercise claims like those Plaintiffs advance here, the First Circuit's decision in *Parker v. Hurley* is particularly instructive. The parents there brought free exercise and due process claims against public school officials, "assert[ing] that they must be given prior notice by the school and the opportunity to exempt their young children from exposure to books they find religiously repugnant." 514 F.3d at 90. The First Circuit recognized that *Yoder* did not control, as the parents did "not allege coercion in the form of a direct interference with their religious beliefs, nor of compulsion in the form of punishment for their beliefs." *Id.* at 105. Like here, the parents were aware that the challenged

books would be used in classroom instruction and thus "retained their ability to discuss the material and subject matter with their children." *Id.* at 106. The court accordingly held that the parents' free exercise rights were not burdened because "the mere fact that a child is exposed on occasion in public school to a concept offensive to a parent's religious belief does not inhibit the parent from instructing the child differently." *Id.* at 105.

Other courts have uniformly agreed, rejecting arguments that the curricular choices made by public school administrators impose constitutionally significant burdens on parents' free exercise rights. The Second Circuit has, for instance, held that a public school's refusal to excuse a student from its "mandatory health curriculum" does not create "an irreconcilable *Yoder*-like clash" with a parent's religious practice, as exposing a child to a health curriculum covering issues related to drugs, tobacco, and premarital sex is distinguishable from compulsory public-school attendance that may threaten a "community's entire way of life." *Leebaert*, 332 F.3d at 144-145. In *Fleischfresser*, the Seventh Circuit similarly concluded that a public school's use of reading materials featuring "supernatural beings" did not "preclude[e] the parents from meeting their religious obligation to instruct their children." 15 F.3d at 683, 689-690. The Sixth Circuit likewise rejected a free exercise challenge to the assignment of a book "that involved mental telepathy," *Mozert*, 827 F.2d at 1060, emphasizing that under *Yoder*, parents could have their children "excused from exposure to some ideas they find offensive" only by opting them out of public schooling altogether, *id.* at 1067. Finally, the Ninth Circuit affirmed the dismissal of a free exercise claim brought by parents challenging the depiction of Hinduism in California's model curriculum, as parents' religious exercise is not burdened just because a "'public school curriculum conflicts with their religious beliefs.'" *Torlakson*, 973 F.3d at 1020.

These holdings accord with the reality that, like any other school district, MCPS "need not serve up its publicly funded services like a buffet from which [Plaintiffs] can pick and choose," but instead has "the right to allocate resources and control curriculum as it s[ees] fit." *D.L.*, 706 F.3d at 264 (citing *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699-700 (10th Cir. 1998)). As the Supreme Court has recognized, "States and local school boards are generally afforded considerable discretion in operating public schools." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987). Courts have therefore been careful not to question "the state's power to prescribe a curriculum for institutions which it supports." *See Meyer v. Nebraska*, 262 U.S. 390, 402 (1923); *see also Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 371 (4th Cir. 1998) (holding that "the makeup of the curriculum" of public schools is generally "entrusted to the local school authorities").

Two recent out-of-circuit decisions further underscore that the use of the LGBTQ-Inclusive Books as part of the ELA curriculum does not burden Plaintiffs' religious exercise.

First, in *Jones v. Boulder Valley School District RE-2*, a magistrate judge in Colorado considered a challenge by parents to a school district's refusal to allow opt outs from "any class conversations, literature, lesson plans, teaching or materials that discuss[ed]" issues related to gender identity. 2021 WL 5264188, at *5. While the school district in *Jones* responded to initial parent complaints by allowing them to excuse their children from formal "transgender tolerance programming," including a planned assembly, *see id.* at *1-2, the district declined to "remove age-appropriate materials that address or discuss gender identity" or "opt students out of day-to-day discussions regarding gender that may arise organically," *see id.* at *7. The court found that none of the plaintiffs' children had actually been exposed to formal instruction about transgender issues, but it observed that, even if they had been, "exposure in school or class to concepts or

ideas that are antithetical to one's religious beliefs does not violate the Free Exercise Clause." *Id.* at *12. The court thus made clear that the district did not burden the parents' religious practice by exposing their children to a "curriculum that is 'pro-LGBTQ' or 'pro-Transgender'" in that it "seeks to weave principles of tolerance and understanding of different views and lifestyles into the courses taught at the School." *Id.* at *14. The court instead concluded that the parents had "no free exercise right to be free from any references to or discussion about transgender persons or transgender issues" and no entitlement to "any advance notice or warning of such discussions." *Id.*

Second, in *Tatel v. Mt. Lebanon School District*, the Western District of Pennsylvania held that parents *had* stated a Free Exercise claim—but in a very different context that underscores the deficiencies in Plaintiffs' claims here. *See* 2023 WL 3740822 (W.D. Pa. May 31, 2023). *Tatel* considered parents' allegations that a teacher attempted to impart her personal views outside the context of the prescribed curriculum—that she "pursued her own non-curricular agenda in which [she] attempted to inculcate in the first-grade children in her class the teacher's beliefs about a child's gender identity and to initiate and engage in discussions with the first-graders in her class about the children's *own* gender identity." *Id.* at *3. In finding that this burdened the parents' religious exercise, the court made clear that central to its analysis was that the parents sought "relief from a teacher's *noncurricular* transgender agenda, not the published curriculum." *Id.* at *10 (emphasis added); *see also id.* at *11 (the teacher's "alleged agenda about transgender topics goes far beyond merely reading one or three books in an objective manner [and] is not part of the school curriculum"). Here, Plaintiffs unequivocally take issue with "the published curriculum," and thus cannot show a Free Exercise Clause violation.

Because the policy does not infringe plaintiffs' free exercise rights under *Yoder* and decades of case law rejecting identical claims, these claims are unlikely to succeed on the merits.

**B.**     **Even If The Policy Incidentally Burdens Religious Practice, It Is Generally Applicable And Neutral And Thus Subject To Rational-Basis Review**

Even if Plaintiffs could prove that MCPS's policy against opt outs from the LGBTQ-Inclusive Books "has the incidental effect of burdening religious exercise," the policy would be subject to only rational-basis review as "a facially neutral and generally applicable regulation." *See Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 198 (4th Cir. 2022). Plaintiffs advance three arguments in an attempt to portray the policy as targeting their religious practice, but each fails. MCPS does not provide for any exemptions from the policy; the policy does not favor secular conduct over religious conduct; and the policy was not enacted out of hostility toward religion. Because Plaintiffs cannot establish that the policy is anything but generally applicable and neutral, it is "subject only to rational basis review." *Id.*

**1.**     **MCPS's policy is generally applicable under *Fulton* because it does not contemplate any exceptions**

MCPS has imposed an across-the-board policy prohibiting opt outs from classroom instruction using the LGBTQ-Inclusive Books. Decl. ¶ 42. There are no exceptions. The record instead shows that, while individual teachers and principals initially attempted to accommodate parents' objections to the LGBTQ-Inclusive Books, and allowed previously approved opt out requests to remain in place through the end of the 2022-2023 school year, *id.* ¶¶ 33-35, 41, the policy adopted by MCPS and challenged by Plaintiffs permits no opt outs of any kind, *id.* ¶¶ 40, 42. To put it plainly: A parent may not opt out her child for religious reasons; nor may a parent opt out her child for non-religious reasons.

This flat ban on opt-outs means that strict scrutiny is not triggered because the policy does not involve "[i]ndividualized assessments by the government with a mechanism for

granting exceptions." *Canaan Christian Church*, 29 F.4th at 198.  The Supreme Court has held

that a "'mechanism for individualized exemptions'" renders a policy "not generally applicable"

because it "'invites' the government to consider the particular reasons for a person's conduct."

*Fulton v. City of Phila.*, 141 S. Ct. 1868, 1877 (2021) (quoting *Employment Div. v. Smith*, 494

U.S. 872, 884 (1990)).  Application of such a policy can "devalue[] religious reasons" for

noncompliance "by judging them to be of lesser import than nonreligious reasons," and thus

expose religious practice to discriminatory treatment.  *Church of the Lukumi Babalu Aye, Inc. v.

City of Hialeah*, 508 U.S. 520, 537 (1993).  MCPS's policy has none of these attributes.

Indeed, MCPS's generally applicable policy offers a stark contrast with the policy that

triggered strict scrutiny in *Fulton*.  In *Fulton*, Philadelphia's policy prohibiting discrimination by

foster care providers allowed a city official to grant exemptions in his "sole discretion."  141 S.

Ct. at 1878.  *Fulton*, moreover, drew on precedent holding that policies requiring decisionmakers

to consider the justification for a requested exemption were not generally applicable.  The Court

cited *Lukumi*, for example, which involved a law whose application "require[d] an evaluation of

the particular justification" given for noncompliance, providing "individualized exemptions from

a general requirement."  508 U.S. at 537.  And the Court discussed *Sherbert v. Verner*, which

considered a law under which applicants could not receive unemployment benefits if they failed

to accept suitable work unless they had "good cause" for their failure.  374 U.S. 398, 400, 407

n.7 (1963).  As *Fulton* explained, "the unemployment benefits law in *Sherbert* was not generally

applicable because the 'good cause' standard permitted the government to grant exemptions

based on the circumstances underlying each application."  141 S. Ct. at 1877.  The policy

authorizing exemptions in each of those cases thus explicitly allowed—if not encouraged—the

decisionmaker to grant or deny exemptions based on the reason the exemption was sought.  The

policy at issue here prohibits opt outs for any reason, "without exception," and thus "*Fulton* is inapplicable." *Canaan Christian Church*, 29 F.4th at 199.

Plaintiffs seek to establish that the MCPS policy governing LGBTQ-Inclusive Books violates this general applicability requirement by cherry-picking language from MCPS's Guidelines for Respecting Religious Diversity to portray a nonexistent "system of discretionary exemptions." PI Br. 17-18 (citing Compl. Ex. A). But the Guidelines are not relevant here. The challenged policy is MCPS's no-opt-out policy for the LGBTQ-Inclusive Books, which is fully consistent with *Fulton* because it permits no "exemptions based on the circumstances underlying each application." *See* 141 S. Ct. at 1877. In any event, the Guidelines, like the no-opt-out policy, are generally applicable. They do not permit individual assessments of the motivations for parents' objections to classroom instruction. The Guidelines permit schools to "make reasonable and feasible adjustments to the instructional program" to accommodate requests to excuse students from classroom discussion. Compl. Ex. A at 3. They thus permit schools to evaluate whether requests can realistically be accommodated but do not establish a framework under which schools are permitted to evaluate the reasons for those requests or to determine which reasons are "worthy of solicitude." *Fulton*, 141 S. Ct. at 1879. The Guidelines, moreover, expressly recognize that it may not be feasible to accommodate objections to certain instructional programs *at all*—as was the case here: if opt out requests "become too frequent or too burdensome, the school may refuse to accommodate the requests." Compl. Ex. A at 4. Nothing in this provision invites a school to consider the reasons behind an accommodation request.

Contrary to Plaintiffs' assertions, MCPS's no-opt-out policy does not trigger strict scrutiny under *Fulton* simply because the section of the Guidelines covering "Religion in the Instructional Program" envisions that MCPS may accommodate religious objections in some

contexts, where accommodations are feasible, but not others, where accommodations are not. Plaintiffs take issue with other sections of the Guidelines that explain how MCPS strives to respect religious diversity when it comes to "Absences for Religious Holidays" and "Teaching About Religion or Religious Holidays in Schools." PI Br. 17-18 (citing Compl. Ex. A at 2, 4). But MCPS's approach toward students who wish to observe religious holidays, or refrain from "holiday activities" they view as having "religious overtones," Compl. Ex. A at 2, 4, does not suggest that the policy at issue here (the policy of no opt outs from the LGBTQ-Inclusive Books) is "highly discretionary" and thus subject to strict scrutiny, PI Br. 18. And contrary to Plaintiffs' suggestion, the Guidelines do not require schools to address all religious objections "on a case-by-case basis." *Id.* As the Guidelines make clear, this "case-by-case" assessment is limited to a scenario not at issue here—when teachers must determine how long an extension to grant students who have missed class for a religious holiday. Compl. Ex. A at 2.

### 2. MCPS's policy is generally applicable and neutral under *Tandon* because it does not favor secular over religious conduct

MCPS's no-opt-out policy is also generally applicable and neutral because it treats secular and religious activity exactly the same. The Supreme Court has held that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Strict scrutiny has therefore been applied to pandemic restrictions that "treat[ed] some comparable secular activities," such as patronizing hair salons and restaurants, "more favorably than" religious activities, such as "at-home religious exercise." *Id.* at 1297.

Plaintiffs object to the fact that MCPS treats opt out requests under one curriculum differently from opt out requests under another curriculum. PI Br. 19-20. MCPS allows no opt

outs of any kind—religious or secular—from the use of the LGBTQ-Inclusive Books in the ELA curriculum. By contrast, MCPS does allow opt outs—both religious and secular—from aspects of the health education curriculum serving "family life and human sexuality objectives," as it must under Maryland law. *See* COMAR § 13A.04.18(D)(2). Plaintiffs' argument that these policies implicate *Tandon* fails out of the gate because they have not established that MCPS is distinguishing between religious and secular activities. Plaintiffs offer no evidence that the conduct MCPS forbids (opt outs from the ELA curriculum) is religious while the conduct that MCPS permits (opt outs from the health education curriculum) is secular. MCPS's no-opt-out policy for the LGBTQ-Inclusive Books thus does not trigger strict scrutiny under *Tandon*.

Plaintiffs independently fail to establish, as they must under *Tandon*, that opt outs from the ELA curriculum are comparable to opt outs from the health education curriculum. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1296. A "relatively close comparison" is required, *Doe v. Catholic Relief Servs.*, 618 F. Supp. 3d 244, 255-256 (D. Md. 2022), and is lacking here. Opt outs from the two curricula are not comparable because the curricula are tailored to different grade levels, cover different topics, and serve different educational objectives. The asserted government interests behind the two opt-out policies are also distinct. The government interest justifying MCPS's policy of allowing opt outs from the health education curriculum is clear: Maryland law requires it. Decl. ¶ 43. By contrast, Maryland law is silent on the question of opt outs from the ELA curriculum. MCPS has prohibited such opt outs here—whether religious or secular—because they would disrupt classroom instruction and undermine MCPS's efforts to create a learning environment free from discrimination. *Id.* ¶¶ 36-39.

In an attempt to establish that opt outs from the two curricula are comparable, Plaintiffs point to a Maryland State Board of Education requirement that health-education instruction "represent all students regardless of ability, sexual orientation, gender identity, and gender expression." PI Br. 19. But this *state-level* health education standard does not change the analysis. None of the sources Plaintiffs cite suggests that MCPS offers the family life and human sexuality unit of the health education curriculum to be more inclusive of LGBTQ individuals, or that opt outs from that unit pose the same risks of disrupting the classroom or undermining nondiscrimination goals that motivate MCPS's no-opt-out policy for the LGBTQ-Inclusive Books. *See* PI Br. 19. MCPS therefore has not treated comparable conduct differently.

### 3. MCPS's policy is neutral under *Masterpiece Cakeshop* because Plaintiffs cannot establish religious hostility

MCPS's policy is also neutral because it "proscribes conduct without regard to whether that conduct is religiously motivated or not." *Hines v. S.C. Dep't of Corr.*, 148 F.3d 353, 357 (4th Cir. 1998). The object of the challenged policy, that is, is not to "infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. Nor does an examination of the policy's enactment reveal any "'clear and impermissible hostility' toward religious beliefs." *Bethel Ministries, Inc. v. Salmon*, 2020 WL 292055, at *8 (D. Md. Jan. 21, 2020) (quoting *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1729 (2018)). Rather, a "look behind the [policy]'s text" confirms that it was put in place "in spite of," rather than "because of," any incidental effect it might have on religious exercise. *Alive Church of the Nazarene, Inc. v. Prince William Cnty.*, 59 F.4th 92, 108 (4th Cir. 2023).

Seeking to establish religious hostility where none exists, Plaintiffs reprise their insistence that allowing opt outs—religious or otherwise—from some school activities, while refusing to allow opt outs—religious or otherwise—from *this* required element of the curriculum

somehow targets their religious exercise.  It does not.  Nor can Plaintiffs establish that the no-opt-out policy shows hostility toward religion by arguing that MCPS ended opt outs "only after parents began raising religious objections."  PI. Br. 21.  The policy reflects MCPS's determination that allowing opt outs of any kind was infeasible.  *See* Decl. ¶ 40.  Only a subset of the opt-out requests fielded by MCPS cited religious motivations, *id.* ¶ 34, and Plaintiffs provide no evidence that MCPS decided to end opt outs based on those objections alone.

Plaintiffs cite *Masterpiece Cakeshop* in an effort to portray MCPS's policy as "enacted with religious animosity."  PI Br. 21.  In *Masterpiece Cakeshop*, the Supreme Court held that a government acting as "an adjudicatory body deciding a particular case" must "proceed in a manner neutral toward and tolerant of [the] religious beliefs" of the individual before it.  138 S. Ct. at 1730-1731.  In assessing governmental neutrality, "'the historical background of the decision under challenge'" and "'contemporaneous statements made by members of the decisionmaking body'" are relevant factors.  *See id.* at 1731.  *Masterpiece Cakeshop* determined that these factors demonstrated religious hostility because members of the government body in that case had made comments hostile to the petitioner's religion in the midst of adjudicating his case and had subjectively determined that his particular religious objections were illegitimate while finding that similar conscience-based objections were valid.  *Id.* at 1729-1730.

The record here, by contrast, is devoid of evidence that MCPS's policy was enacted with hostility toward religion.  At the outset, Plaintiffs offer no support for their attempt to extend *Masterpiece Cakeshop* to any circumstance in which a person "rais[es] religious concerns to government policies."  PI Br. 22.  *Masterpiece Cakeshop* involved an adjudicatory body weighing the legitimacy of a particular religious objection, 138 S. Ct. at 1731, not a policymaking body's *refusal* to adjudicate objections on a case-by-case basis, regardless of the

reason for the objection.  Other courts have rejected similar efforts to extend *Masterpiece Cakeshop* to remarks that "did not take place in an adjudicative context."  *See Tingley v. Ferguson*, 47 F.4th 1055, 1086-1087 (9th Cir. 2022).  What is more, nearly all of the statements that Plaintiffs point to postdate MCPS's adoption of an across-the-board policy prohibiting opt outs from instruction using the LGBTQ-Inclusive Books.  PI Br. 21-22.  Some even postdate the filing of Plaintiffs' complaint in this case.  *Id.* at 22.  These belated comments do not support Plaintiffs' claim that the no-opt-out policy was instituted out of religious animus.

Finally, the comments Plaintiffs cite do not establish that MCPS engaged in a "negative normative 'evaluation of the particular justification'" for any Plaintiff's "objection and the religious grounds for it."  *Masterpiece Cakeshop*, 138 S. Ct. at 1731.  For example, Plaintiffs claim that a presentation about the LGBTQ-Inclusive Books "suggest[ed] that religious parents seeking opt-outs are engaging in a 'dehumanizing form of erasure.'"  PI Br. 22 (quoting Compl. Ex. N at 16).  But the cited quote was not from any MCPS official; it is from a letter to Congress by children's book authors, describing their view of the consequences that may result "[w]hen books are removed or flagged as inappropriate."  *See* Compl. Ex. N at 16.  It is not about "religious parents seeking opt-outs."  PI Br. 22.  Nor did Board member Lynne Harris say, "in reference to parental testimony," that "ignorance and hate does exist in our community."  *Id.*  As Plaintiffs' own complaint reflects, this comment was not made by Harris, *see* FAC ¶ 158, and it made no reference to parents' opt out requests, or to religion at all, *see* Video of Montgomery Cnty. Bd. of Educ. Business Meeting (Jan. 12, 2023) at 00:40:24-00:40:42, https://mcpsmd.new.swagit.com/videos/196679.  The only comments Plaintiffs cite by a Board member referencing parental opt outs make clear that MCPS opposed opt outs for any reason: Plaintiffs quote Harris as opposing opts outs based on parents' "religious rights *or* [their] family

values *or* [their] core beliefs," and those based on non-religious objections such as xenophobia and white supremacy. PI Br. 21-22 (emphasis added). Plaintiffs identify no "official expression[] of hostility" toward religion "cast[ing] doubt on the fairness and impartiality" of the policy. *Masterpiece Cakeshop*, 138 S. Ct. at 1730, 1732. No such hostility exists here.[6]

### C.  Plaintiffs' Free Exercise Claims Fail Under Any Standard Of Review

MCPS's no-opt-out policy easily satisfies rational-basis review. But even if strict scrutiny applied, the policy would survive because the record at this stage amply demonstrates that it is narrowly tailored to serve MCPS's compelling interest in fostering an inclusive educational environment in which all students learn to read proficiently and think analytically.

### 1.  MCPS's policy satisfies rational-basis review

MCPS policy easily satisfies rational-basis review, and Plaintiffs make no attempt to argue otherwise. Rational basis scrutiny "requires merely that the law at issue be 'rationally related to a legitimate governmental interest.'" *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 561 (4th Cir. 2013). The policy prohibiting parents from opting their children out of classroom reading materials that depict diverse families is rationally related to MCPS's goals of reflecting the diversity of the MCPS community in educational materials, fostering inclusiveness, and reducing stigmatization. Decl. ¶¶ 6-8, 37-39.

### 2.  MCPS's policy satisfies strict scrutiny

Even if strict scrutiny applied, MCPS's policy would survive because it "serve[s] a compelling interest and [is] narrowly tailored to that end." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2426 (2022). MCPS has set goals of "reflect[ing] the diversity of … persons of

---

[6] The comments of "a member of the County Council," PI Br. 22, are irrelevant absent evidence that the speaker had any hand in formulating the policy at issue.

diverse gender identity, gender expression, or sexual orientation," Ex. 1 at 5-6, as well as

"[r]educ[ing] stigmatization" and "[f]oster[ing] social integration and cultural inclusiveness of

transgender and gender nonconforming students," Ex. 6 at 1. MCPS determined that the ELA

curriculum was not sufficiently representative, and therefore did not meet these pedagogical

goals, absent the use of instructional materials including LGBTQ characters. Decl. ¶¶ 23, 31.

MCPS's policy thus serves several interests that courts have indicated are compelling.

*See John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118, 137 (D.

Md. 2022), *appeal docketed*, 22-2034 (4th Cir. Oct. 3, 2022). The policy advances (1) MCPS's

interest as a public school in providing a safe educational environment, *see* Decl. ¶ 39; *Saxe v.

State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001); (2) its interest in ensuring the

health and safety of LGBTQ students, *see* Ex. 6 at 1; Ex. 1 at 5-6; *Grimm v. Gloucester Cnty.

Sch. Bd.*, 972 F.3d 586, 612 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021); *Doe by and

through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528 (3d Cir. 2018); and (3) its interest

in complying with federal and state antidiscrimination policies and regulations, *see* Ex. 6 at 1;

Ex. 1 at 2; *Grimm*, 972 F.3d at 618-619 (finding Title IX violation based on exclusion from

participation in an education program "on the basis of sex"); *see also League of United Latin

Am. Citizens v. Perry*, 548 U.S. 399, 518 (2006) (Scalia, J., concurring) (indicating that

"compliance with federal antidiscrimination laws can be a compelling state interest").

MCPS's policy is also narrowly tailored to advance these compelling government

interests. The interests that the policy advances are served by the very actions that Plaintiffs seek

to enjoin—exposing students to instructional materials that represent characters of diverse

backgrounds. MCPS cannot ensure that it is providing a classroom environment that is safe for

all students, that allows LGBTQ students to thrive, and that meets its obligations under state and

federal laws, if students can be excused from class any time their teacher uses the LGBTQ-Inclusive Books. Allowing such opt outs would undermine MCPS's curricular goals and prevent MCPS from meeting the needs of the students who opt out. Permitting opt outs would also harm MCPS's efforts to serve the student community as a whole, which includes children who see themselves or their families represented in the LGBTQ-Inclusive Books and would therefore bear the stigma of a policy that enabled students to leave class whenever the books are used.[7]

## II.      Plaintiffs Are Unlikely To Succeed On The Merits Of Their Due Process Claims

Plaintiffs cannot establish that they are likely to succeed on their due process claims because parents have no right to control how a public school educates their children. The challenged MCPS policy is therefore subject to—and easily satisfies—rational-basis review. Plaintiffs insist that strict scrutiny applies under the Due Process Clause, "[s]eparate and apart from the Free Exercise Clause," because parents have a fundamental "right to direct a child's upbringing." PI Br. 23. But binding precedent plainly holds that any standalone due process claim triggers rational-basis review. Nor has the Fourth Circuit applied strict scrutiny to so-called "hybrid" claims brought under both the Due Process and Free Exercise Clauses.

While the Supreme Court has "recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality), courts have also long recognized that this right is not unlimited, *see supra* Section I.A. Specifically, "[w]hile parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to

---

[7] Plaintiffs' scattershot arguments on strict scrutiny likewise fail. They cite no case suggesting that MCPS is not permitted to end opt outs and adopt an across-the-board no-op-out policy; they do not counter MCPS's explanation that allowing *any* student to opt out hinders its educational mission; and they come nowhere close to establishing an unequivocal tradition of parental veto power over public-school curricula, as their own sources explain. *See* PI Br. 25-28.

direct *how* a public school teaches their child." *Blau*, 401 F.3d at 395-396. Parents' "right to control individual components of their [children's] education … is not constitutionally protected." *Bailey v. Virginia High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012). Therefore, only rational-basis review applies when parents claim that a public school has infringed "their right to control their children's education." *Herndon by Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174, 179 (4th Cir. 1996).

Across many cases, courts have applied rational-basis review to reject due process claims, like Plaintiffs', relating to specific educational policies and curricula. The Second Circuit rejected a challenge to a public school's mandatory health curricula under rational-basis review. *Leebaert*, 332 F.3d at 142-143. Similarly, the Sixth Circuit rejected a challenge to a mandatory dress code on the ground that "issues of public education," including "the school curriculum," are "generally 'committed to the control of state and local authorities.'" *Blau*, 401 F.3d at 395-396. And the First Circuit held that, whether it applied rational-basis review or some form of heightened scrutiny, parents could not show that school officials violated the due process rights of parents by denying their requests for prior notice of, and exemptions from, instruction involving "books that portray diverse families, including families in which both parents are of the same gender" and that "depict[] and celebrate[] a gay marriage." *Parker*, 514 F.3d at 90.

Rather than confront this authority, Plaintiffs cite a handful of cases discussing the due process rights of parents in circumstances far removed from the situation here, involving child custody disputes, grandparent visitation rights, and a mandatory pregnancy test. *See* PI Br. 23-24. None suggests parents have a due process right to exempt their children from an aspect of a public-school curriculum. Courts have instead consistently held that there is no such right. Any due process claim "[s]eparate and apart from the Free Exercise Clause," PI Br. 23, therefore

triggers only rational-basis review, which the MCPS policy satisfies, *see supra* Section I.C.1.

To the extent Plaintiffs intend to argue that strict scrutiny should apply under a "hybrid" theory, *see* PI Br. 24, that too is unavailing. The Fourth Circuit has never held that strict scrutiny applies to "hybrid" claims. *See Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 353 (4th Cir. 2011) (noting a "circuit split over the validity of th[e] 'hybrid-rights' exception" to rational-basis review). *Herndon* observed that the Supreme Court had applied rational-basis review to all claims of a parental right to control their child's public-school education, except for the challenge in *Yoder*, where "religious concerns were central." 89 F.3d at 178. But *Herndon* did not endorse, nor has the Fourth Circuit since applied, strict scrutiny for "hybrid" claims. Indeed, the weight of authority suggests that Plaintiffs cannot join a weak free exercise claim with a weak due process claim to create a "hybrid" claim requiring the application of strict scrutiny. There is "no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiff asserts have been violated." *Leebaert*, 332 F.3d at 143. Instead, "in law as in mathematics zero plus zero equals zero." *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001). The few courts that have applied strict scrutiny to certain "hybrid" claims still require a "*colorable* claim that a companion right has been violated," *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1032 (9th Cir. 2004) (emphasis added), which Plaintiffs have not established, *see supra* Part I. And even if the Court were to apply strict scrutiny, MCPS's policy would satisfy that standard. *See supra* Section I.C.2.

## III. Plaintiffs Do Not Satisfy The Remaining Preliminary Injunction Factors

The Court need not consider the remaining factors because Plaintiffs have not clearly established that they are likely to succeed on their free exercise or due process claims. *See Henderson for Nat'l Labor Relations Bd. v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018). Plaintiffs moreover concede that their arguments on the remaining factors rise or fall with

the merits of their claims, making no argument that these other factors are independently satisfied.  PI Br. 30-32.  An injunction must therefore be denied.

In any case, Plaintiffs have not shown that an injunction is required to forestall irreparable harm.  MCPS's no-opt-out policy does not infringe Plaintiffs' constitutional rights, *see supra* Parts I and II, meaning Plaintiffs have not established "a likely constitutional violation."  *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).  Since the infringement of constitutional rights is the only irreparable harm Plaintiffs identify, their claim for injunctive relief must fail.  Nothing is stopping Plaintiffs from sharing with their children their religious teachings on issues of sex, sexual orientation, and gender identity.  *See Roswell*, 2023 WL 3158728, at *4 (no irreparable harm where plaintiff could continue to engage in protected speech, just not in his "'preferred method of communication'").

Nor do the balance of equities and public interest favor an injunction.  These factors merge when the government is the party opposing injunctive relief.  *Association of Am. Pubs., Inc. v. Frosh*, 586 F. Supp. 3d 379, 397 (D. Md. 2022).  Because there is no likely constitutional violation, these factors do not support an injunction.  *Roswell*, 2023 WL 3158728, at *5.  On the other hand, "'the public consequences in employing the extraordinary remedy of an injunction'" are severe.  *Association of Am. Pubs.*, 586 F. Supp. 3d at 397.  Requiring MCPS to permit opt outs from lessons using the LGBTQ-Inclusive Books would significantly disrupt classroom instruction, undermining MCPS's curricular goals and its efforts to foster a learning environment free of discrimination.  Decl. ¶¶ 36-40.  Both the balance of equities and the public interest thus tip sharply against an injunction.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

Dated:  July 12, 2023

Respectfully submitted,

MONIFA B. MCKNIGHT, *in her official capacity as Superintendent of the Montgomery County Board of Education*; THE MONTGOMERY COUNTY BOARD OF EDUCATION; *and* SHEBRA EVANS, LYNNE HARRIS, GRACE RIVERA-OVEN, KARLA SILVESTRE, REBECCA SMONDROWSKI, BRENDA WOLFF, AND JULIE YANG, *in their official capacities as members of the Board of Education*

By Counsel

/s/ *Thomas K. Bredar*
Bruce M. Berman (*pro hac vice*)
bruce.berman@wilmerhale.com
Jeremy W. Brinster (*pro hac vice* pending)
jeremy.brinster@wilmerhale.com
Wilmer Cutler Pickering
   Hale and Dorr LLP
2100 Pennsylvania Ave. NW
Washington, DC 20037

Alan E. Schoenfeld (*pro hac vice*)
alan.schoenfeld@wilmerhale.com
Thomas K. Bredar (MD No. 21635)
thomas.bredar@wilmerhale.com
Emily Barnet (*pro hac vice* pending)
emily.barnet@wilmerhale.com
Cassandra A. Mitchell (*pro hac vice* pending)
cassie.mitchell@wilmerhale.com
Wilmer Cutler Pickering
   Hale and Dorr LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 12, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Thomas K. Bredar*
Thomas K. Bredar