# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TAMER MAHMOUD, *et al.*,<br><br>    *Plaintiffs,*<br><br>  v.<br><br>MONIFA B. MCKNIGHT, *in her official capacity as Superintendent of the Montgomery Board of Education, et al.*,<br><br>    *Defendants.* | Case No. 8:23-cv-01380-DLB<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Hearing Requested** |

Eric S. Baxter
William J. Haun (pro hac vice)
Michael J. O'Brien* (pro hac vice)
Brandon L. Winchel* (pro hac vice)
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W., Suite 400
Washington, DC 20006
(202) 955-0095
whaun@becketlaw.org

*Not a member of the DC Bar; admitted in Louisiana and California respectively. Practice limited to cases in federal court.

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................. 1

ARGUMENT ................................................................................................... 3

   I.  The Parents are likely to succeed on the merits. ............................. 4

     A.  The Parents' free exercise is burdened and strict scrutiny is triggered. .... 4

     B.  Strict scrutiny is triggered under *Fulton*. ....................................... 7

     C.  Strict scrutiny is triggered under *Tandon*. ..................................... 8

     D.  Strict scrutiny is triggered under *Masterpiece* and *Lukumi*. ................. 10

     E.  Strict scrutiny is triggered under the Due Process Clause. ..................... 11

   II.  The no-opt-out policy cannot survive strict scrutiny. ................................ 12

     A.  There is no compelling interest. .................................................. 12

     B.  The policy is not the least restrictive means. ................................... 14

   III.  The remaining preliminary injunction factors are easily satisfied ............. 15

CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
    143 S. Ct. 2298 (2023) ........................................................................... 13

*Bailey v. Va. High School League, Inc.,*
    488 F. App'x 714 (4th Cir. 2012) ........................................................... 12

*Blau v. Fort Thomas Pub. Sch. Dist.,*
    401 F.3d 381 (6th Cir. 2005) ................................................................. 11

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) ........................................................................... 13

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) .................................................................................. 4

*Carson v. Makin,*
    142 S. Ct. 1987 (2022) ............................................................................. 4

*Church of Lukumi Babalu, Aye, Inc. v. City of Hialeah,*
    508 U.S. 536 (1992) .................................................................................. 8

*Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020) ................................................................................. 9

*Espinoza v. Mont. Dep't of Revenue,*
    140 S. Ct. 2246 (2020) ............................................................................. 6

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) ....................................................................*passim*

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020) ................................................................... 5

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.,*
    725 F.3d 293 (3d Cir. 2013) ................................................................... 13

*Herndon v. Chapel Hill-Carrboro City Bd. of Educ.,*
    89 F.3d 174 (4th Cir. 1996) ............................................................... 6, 11

*Hicks ex rel. Hicks v. Halifax Cnty. Bd. of Educ.,*
    93 F. Supp. 2d 649 (E.D.N.C. 1999) ................................................. 6, 11

*Holt v. Hobbs,*
    574 U.S. 352 (2015) ................................................................ 14

*Kennedy v. Bremerton Sch. Dist.,*
    142 S. Ct. 2407 (2022) ....................................................... 10, 11

*League of Women Voters of N.C. v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014) ................................................... 3

*Leebaert v. Harrington,*
    332 F.3d 134 (2d Cir. 2003) ..................................................... 6

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    140 S. Ct. 2367 (2020) ............................................................ 4

*Lovelace v. Lee,*
    472 F.3d 174 (4th Cir. 2006) ................................................... 4

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,*
    138 S. Ct. 1719 (2018) ....................................................... 10, 11

*Morse v. Frederick,*
    551 U.S. 393 (2007) ................................................................ 13

*Parker v. Hurley,*
    514 F.3d 87 (1st Cir. 2008) ..................................................... 7

*Saxe v. State Coll. Area Sch. Dist.,*
    240 F.3d 200 (3d Cir. 2001) ................................................... 12

*Sherbert v. Verner,*
    374 U.S. 398 (1963) ................................................................ 15

*Students for Fair Admissions, Inc. v.*
    *President & Fellows of Harvard Coll.,*
    143 S. Ct. 2141 (2023) ....................................................... 13, 14

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021) ......................................................... 8, 9

*Tatel v. Mt. Lebanon Sch. Dist.,*
    No. 22-cv-837, 2023 WL 3740822 (W.D. Pa. May 31, 2023) .................... 4, 5, 6, 12

*Thomas v. Rev. Bd.,*
    450 U.S. 707 (1981) ................................................................ 4

*Wisconsin v. Yoder*,
　406 U.S. 205 (1972) ................................................................4, 5, 6, 12

**Other Authorities**

*Approval of Family Life Advisory Committee Opt-Out
　Recommendations for Grades PreK through 5 Family Life Unit*,
　Carroll County Public Schools (Jan. 11, 2023) ...................................... 14

Attachment to Memorandum from Karen B. Salmon, State
　Superintendent of Schools, to Members of the State Board of
　Education (Oct. 22, 2019)............................................................................ 9

*Elementary Health Education Frequently Asked Questions (FAQ)*,
　Frederick County Public Schools ............................................................ 14

Lynne Harris, Remarks at the MCPS Board Meeting (Mar. 28, 2023) ................... 11

*Health Education Frequently Asked Questions: Baltimore County
　Public Schools (BCPS) System,* Division of Curriculum and
　Instruction.................................................................................................. 14

## INTRODUCTION

The School Board's assertion of authority over students is astonishing. If parents want to use the public school, they lose all control over what is taught. While the School Board claims "to accommodate families of all religious backgrounds," Opp.2, bets are off if—in its selective view—requests are "too frequent" or "too burdensome," Opp.6. In other words, the more offensive the curriculum, the less parents will be heard. "Let them home school"(or pay exorbitant private tuition) is the School Board's apparent response. It's a shocking perspective from elected officials asked to represent the taxpaying *parents* in a highly diverse school district. And not just parents. Documents produced from the School Board show that the Pride Storybooks were imposed over the concerns of MCPS principals—who collectively told the School Board last November that the books "seem to support the explicit teaching of gender and sexuality identity," were age-inappropriate, and provided guidance to teachers that was "dismissive of religious beliefs." McCaw, Ex. B at 2, 4.

The School Board asserts that opt-outs are required only if compelled participation in classroom instruction would result in the destruction" of a religious community. Opp.11. Yet three years ago, the Supreme Court rejected that extreme reading of *Yoder*. Never mind that confusing young children's understanding of gender and sexuality—in Pre-K—*is* an existential threat to their self-understanding, as well as to the Parents' religious beliefs that uphold marriage and procreation as essential for perpetuating family relationships and humanity. As the MCPS principals told the School Board: "It is problematic to portray elementary school age children falling in love with other children, regardless of sexual preferences." McCaw Ex. B at 2.

Beyond *Yoder*, the School Board's own admissions show that its system for granting religious exemptions is one of unfettered discretion. Accommodations allowed one day (*e.g.*, March 22, 2023) can be withdrawn the next. High school students can opt out of sex ed, but kindergarteners cannot opt out of the Pride

1

Storybooks, even though both are admittedly driven by the same equity concerns. Students can opt out of Halloween parties, choir, and any other class or activity that contradicts their faith, but not grade-school story hour where they are encouraged to share what it means to "like like" someone, to explore their pronouns, and to accept that their sex is just some doctor's guesswork. Even before adding accusations that the Parents here are "white supremacists" and "xenophobes" promoting "hate" and "a dehumanizing form of erasure"—which the School Board *still* has not disavowed—there is no real dispute: the School Board has unbridled discretion over which religious concerns will be accommodated, and that triggers strict scrutiny. Br.13.

Once strict scrutiny applies, the School Board's decision to ban opt-outs for the Pride Storybooks flunks. Everyone agrees with ensuring a "safe educational environment" and student "health and safety." Opp.26. But the Supreme Court has repeatedly rejected such generalized interests as "imponderable" and insufficient to justify denying religious accommodations to specific individuals. It is impossible to know when "safety" is reached, so the School Board could always use "safety" to suppress constitutional rights. That concern is amplified here, where the School Board insists that mere disagreement creates intolerable "stigma" and "isolation." Hazel ¶ 39. The right to disagree is one of the *most protected* features of our constitutional system. Vague notions of safety—or equally vague claims of "antidiscrimination policies"—are not enough to suppress it. Indeed, the only policy directly on point—Maryland's regulation regarding instruction on family life and human sexuality—requires opt-outs.

That leads to a final point. The School Board has not even considered less restrictive ways to pursue its asserted interests. The School Board could promote the desired inclusivity with books that encourage kindness and respect, *despite differences in opinion*. Here, the Parents are not demanding a curriculum change. They simply seek the same notice and opportunity to opt out required by Maryland

law and the School Board's own Religious Diversity Guidelines—a solution that worked for the last school year and that works nationwide.

The most the Board can say is that "dozens" of students have opted out from a "single elementary school," with presumably hundreds of students spread through dozens of classrooms. What's more, the School Board told community representatives in private meetings that denying opt outs wasn't about administrability—it was about not "hurt[ing]" feelings. Garti ¶ 5. Besides, even if the administrability concern were true, it's a problem of the School Board's own making. As the MCPS principals told the School Board last November, pushing ideological storybooks on highly impressionable pre-K and elementary-school students would be "dismissive of religious beliefs," result in "shaming comment[s]" to children who disagreed, and "[s]tate[] as a fact" things that "[s]ome would not agree" are facts. McCaw Ex. B at 4. This isn't a religious challenge to a curriculum generally. Nor is it an effort to remove books from schools. Rather it's an effort to restore the opt-out policy that respected parental rights until March 23 of this year. By pressing forward anyway, the School Board isn't just lacking self-awareness, it's demonstrated a "how to" for triggering, and failing, strict scrutiny. A preliminary injunction should be entered.

## ARGUMENT

Despite the School Board's efforts to inflate the Parents' burden, Opp.8, the standard for injunctive relief here is the familiar one. Br.13. Moreover, an injunction that "require[s] a party who has recently disturbed the status quo to reverse its actions" is prohibitory, not mandatory, as it "restores, rather than disturbs, the status quo ante." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).[1]

---

[1]   Contrary to the School Board's contention, Opp.9 n.4, such an injunction would protect Kids First too. *See* FAC Prayer for Relief ¶ e.

## I. The Parents are likely to succeed on the merits.

### A. The Parents' free exercise is burdened and strict scrutiny is triggered.

The Pride Storybooks burden the Parents' religion because they "substantially interfere" with children's religious development at a "crucial … stage." *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972); Br.14-16. The School Board responses fail.

First, the School Board argues that the Free Exercise Clause is only triggered by "penalizing or prohibiting" religious exercise, and denying an opt-out from the Pride Storybooks doesn't do that. Opp.10. Wrong. Free exercise is burdened whenever an individual receives "substantial pressure … to modify his behavior and to violate his beliefs." *Thomas v. Rev. Bd.*, 450 U.S. 707, 718 (1981). The School Board claims the Parents "have not argued" that standard. Opp.11. Again, wrong. "It would violate our religious beliefs and the religious beliefs of our children if they were asked to discuss romantic relationships or sexuality with schoolteachers or classmates." Mahmoud ¶¶ 17-18; *accord* Persak ¶¶ 12-16; Roman ¶¶ 19-20. Such affirmations suffice. *See Lovelace v. Lee*, 472 F.3d 174, 187-89 & n.2 (4th Cir. 2006); *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022) ("indirect coercion" is a burden).

Next, the School Board "tell[s] the plaintiffs that their beliefs are flawed because … the end that they find to be morally wrong is simply too attenuated." *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (cleaned up). To the School Board, the Pride Storybooks "involve[] no instruction on sexual orientation or gender identity per se" and parents "are free to discuss [them] at home." Opp.6, 10. But not if there's no notice. And as MCPS principals said last November: the Pride Storybooks "seem to support the explicit teaching of gender and sexual identity" and childhood romances are "problematic" "regardless of sexual preferences." McCaw Ex. B at 4. Moreover, "courts must not presume to determine the plausibility of a religious claim." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014) (cleaned up). And trying to here is threadbare.

4

Gender goes to a person's "deeply felt, inherent sense" and "is formulated for most people at a very early age." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594, 612 (4th Cir. 2020). This is the logic behind Maryland—and most other jurisdictions— mandating opt-outs for instruction on family life and human sexuality. First Am. Compl. (FAC) [Dkt. 36] ¶¶ 87-88; Br.27-29. It is likewise no surprise that the School Board itself allowed opt-outs until March 23. Nor is it any surprise that MCPS principals relayed these same concerns to the School Board last November. McCaw Ex. B. "Introducing and teaching a child about complex and sensitive gender identity topics before the parent would have done so can undermine parental authority." *Tatel v. Mt. Lebanon Sch. Dist.*, No. 22-cv-837, 2023 WL 3740822, at *8 (W.D. Pa. May 31, 2023) (cleaned up). Denying parents both advanced notice and an opt out means they're left only to try un-ringing a rung bell. This pressures parents to "abandon belief and be assimilated into society at large." *Yoder*, 406 U.S. at 218; Br.9-12.

Ultimately, the School Board admits the behavioral pressure. It withdrew the opt-outs to "normalize[] a fully inclusive environment for all students," Opp.3, "reduc[e] stigmatization[,] and foster[] social integration of all students and families" (*id.* at 7). The mere sight of children leaving the classroom for unspecified reasons when the Storybooks are read, to the School Board, threatens a "safe educational environment." *Id.* at 26-27. Nor does the School Board dispute its guidance with *A Boy Named Penelope*: teachers should tell inquiring students that it is "hurtful" to claim a girl "can't be a boy if he was born a girl." Compl. Ex. D. [Dkt. 1-5] at 5. Nor is there any dispute that *Intersection Allies* encourages students to "stand[] together" to "rewrite the norms." Compl. Ex. F [Dkt. 1-7] at 37. Or that *A Boy Named Penelope* encourages students to "teach[]" gender identities to adults. Compl. Ex. I [Dkt. 1-11] at 24. *What are your words?* encourages students to determine their own pronouns. Baxter Ex. 1 at 20. What's more, the MCPS principals explained how the books are age inappropriate and how the School Board's teaching materials direct teachers to make

5

statements "dismissive of religious beliefs," that could "sham[e]" dissenting children, and that present "[q]uestionable" facts. McCaw Ex. B at 2, 4. The School Board can "disagree[]" that normalizing these perspectives is "tantamount to endorsement," but a free exercise burden still exists because the normalizing pressures the Parents and their children to modify their religious beliefs and behavior. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021); *see also* Br.9-12.

Second, the School Board claims that a "wall of authority" refutes the Parents' burden. Opp.12-17. The "wall" can't bear that load. Start with *Yoder*. The School Board's attempt to cramp *Yoder* requires ignoring *Espinoza*, which did not limit *Yoder* to policies that "gravely endanger if not destroy the free exercise of the parents' religious beliefs." Opp.11 (cleaned up); *see Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020). Rather, *Yoder* protects the "enduring American tradition" of religious educational choices. *Id.* (majority); *id.* at 2276 (Gorsuch, J., concurring) (*Yoder* "protect[s]" "parents' decisions about the education of their children"); *id.* at 2284 (Breyer, J., dissenting) ("the freedom of parents to teach their children the tenets of their faith").

Nor do the School Board's six string-cited cases help. Opp.10-11. One case, *Leebaert*, relies on the cramped, pre-*Espinoza* reading of *Yoder*—and its strict scrutiny analysis is inconsistent with the Fourth Circuit's. *Compare Leebaert v. Harrington*, 332 F.3d 134, 144-45 (2d Cir. 2003), *with Hicks ex rel. Hicks v. Halifax Cnty. Bd. of Educ.*, 93 F. Supp. 2d 649, 664 (E.D.N.C. 1999) (discussing *Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174, 178 (4th Cir. 1996)). *Torlakson*, *Fleischfresser*, and *Mozert* are general curriculum challenges, not religious-based opt-out requests to specific instruction. Collapsing that distinction leads the School Board to: overlook the long tradition of courts upholding opt-outs, Br.27-29; misunderstand *Tatel* as a case about a teacher "impart[ing] her personal views," Opp.16, when it's about a "de facto [school] policy," Br.29 n.5; and discuss a Fourth Circuit case (*D.L.*)

that has nothing to do with religious opt-outs to specific instruction, Opp.13. *Jones*, Opp.11, 15-16—as the School Board admits—is not a religious opt-out to specific instruction either, but to unpredictable, "organic[]" discussion. Opp.15. The remaining case—*Parker*, called "particularly instructive," Opp.13—teaches error. *Parker*'s "sum" is that religious parents lack opt-out rights because "there is no claim of direct coercion." *Parker v. Hurley*, 514 F.3d 87, 105 (1st Cir. 2008). But the Free Exercise Clause doesn't require direct coercion. *Supra* at 4. Strict scrutiny applies.

**B. Strict scrutiny is triggered under *Fulton*.**

The School Board tries to dodge strict scrutiny under *Fulton*, Br.17-18, by claiming "[t]here are no exceptions" to its brand-new no-opt-out policy, Opp.17. Even if that were true, strict scrutiny would still be triggered, because the School Board's Religious Diversity Guidelines expressly allow for opt-outs. *See* Compl. Ex. A [Dkt. 1-2] at 3. ("Requests to be Excused from Instructional Programs for Religious Reasons."). That the School Board insists that it *currently* "permits no opt outs of any kind," Opp.17, is irrelevant because it retains discretion to re-implement them. That discretion alone "renders a policy not generally applicable, regardless whether any exceptions have been," or currently are being, "given." *Fulton*, 141 S. Ct. at 1879.

It also undermines the School Board's claim that its supposedly total ban on opt-outs eliminates "[i]ndividualized assessments," Opp.17, 19, and denies officials "sole discretion" to grant exceptions. Opp.18. The Guidelines themselves provide that, "*[w]hen possible*," schools should "*try*" to accommodate religious objections to "specific classroom discussions or activities." Compl. Ex. A [Dkt. 1-2] at 3 (emphases added). The March 23 about-face was itself proof of this highly discretionary system, allowing the School Board in its "sole discretion" to permit opt-outs through the end of the year, *see, e.g.*, Persak ¶¶ 18-19, but then deny them for any "inclusive books … read in the future," FAC [Dkt. 36] ¶ 160.

The School Board's recitation of the Guidelines' escape clause for opt-outs that "become too frequent or too burdensome," Opp.19, underscores the point. The School Board alone decides what is "too frequent" or "too burdensome," further exposing its discretion to deny opt-outs based on "individualized assessments" made in its "sole authority."

Nor can the School Board argue that the Guidelines "are not relevant here" because "[t]he challenged policy is MCPS's no-opt-out policy for the LGBTQ-Inclusive books." Opp.19. The School Board cannot carve out one *application* of its larger religious accommodation policy to avoid only the religious objections it doesn't like. *See Fulton*, 141 S. Ct. at 1879 (rejecting Philadelphia's effort to rely on one exemption-less contractual provision, despite another with exceptions). The "no-opt-out policy for the LGBTQ-Inclusive Books," Opp.19, is simply one application of the Guidelines—an application that itself proves the need for strict scrutiny.

**C. Strict scrutiny is triggered under *Tandon*.**

*Tandon* requires strict scrutiny because the School Board allows secular opt-outs from sex ed, but not religious opt-outs for elementary-school kids. Br.18-20. The School Board's responses all fail. First, the School Board argues that it is not "distinguishing between religious and secular activities," because neither "religious [n]or secular" opt-outs are permitted for the Pride Storybooks, while "both religious and secular" opt-outs are permitted from sex ed. Opp.20-21. Yet under *Tandon v. Newsom*, "[i]t is no answer that [the School Board] treats some comparable secular … activities as poorly as … the religious exercise at issue." 141 S. Ct. 1294, 1296 (2021). And it "contributes to the gerrymander" to apply "a pattern of exemptions" in one context but not another. *Church of Lukumi Babalu, Aye, Inc. v. City of Hialeah*, 508 U.S. 536-37 (1992). Because *Tandon* forbids "*any* comparable secular activity" from receiving treatment "more favorably than religious exercise," strict scrutiny applies. 141 S. Ct. at 1296.

Next, the School Board claims the Pride Storybooks and sex ed are not comparable because "Maryland law requires" opt-outs for sex ed, but that law is "silent on the question of opt outs from the ELA curriculum." Opp.21. But general applicability isn't resolved by deferring to government "categorizations." *Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (finding no general applicability despite government "categorizations" of "essential" and "non-essential businesses"). It is determined by "the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1297. When governments use their "categorizations" to produce "disparate treatment" toward religious exercise, strict scrutiny follows. 141 S. Ct. at 66.

Here, the interest underlying the Pride Storybooks and sex ed is the same: educational "equity" on matters of family life and human sexuality. Hazel ¶¶ 5-7. As the School Board acknowledges, "Maryland's 'Equity Regulation'" is "[a]mong the[] laws" the Pride Storybooks were adopted to comply with—and it is also why instruction in Health Education was amended in 2019, where opt-outs are allowed on family life and human sexuality. Opp.2; *see also* Br.19-20. As the School Board told Maryland, the Equity Regulation for "Comprehensive Health Education" contains "the shared commitments expressed" in the policies that the School Board cites for the Pride Storybooks. *Compare* Attachment to Memorandum from Karen B. Salmon, State Superintendent of Schools, to Members of the State Board of Education 39 (Oct. 22, 2019), https://perma.cc/2LYT-R5G3 ("Education's Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*") *with* Hazel ¶ 6 (same). That "disparate treatment" in pursuing the same equity interest shows a lack of general applicability. *Diocese of Brooklyn*, 141 S. Ct. at 66.

Similarly, the "risk[]," Opp.22, that students would respectfully be excused from the Pride Storybooks is no different than students respectfully walking out of sex ed when various gender identities are explored.

9

As such, the School Board's third argument—that there's no "suggest[ion] that MCPS offers … the health education curriculum to be more inclusive of LGBTQ individuals"—is simply wrong. Opp.22. The School Board's own Policy ACA on Nondiscrimination, Equity, and Cultural Proficiency—"memorializ[ing]" the "diversity" and "equity" values espoused by "[t]he Board," Hazel ¶ 6—applies to all "[i]nstructional materials used in MCPS schools," and states "[t]he Board recognizes that equity goes beyond meeting the letter of the law." Opp. Ex. 1 at 2, 5, 7. Students can opt out of any discussion of "equity" on family life and human sexuality during sex ed and any other "specific classroom discussion or activities,"  Compl. Ex. A [Dkt. 1-2] at 3—unless the Pride Storybooks are at issue. That is not generally applicable.

**D. Strict scrutiny is triggered under *Masterpiece* and *Lukumi*.**

In response to its religious targeting, Br.21, the School Board argues that "allowing opt outs of any kind was infeasible" and "[o]nly a subset of the opt-out requests … cited religious motivations." Opp.23. This doesn't show neutrality toward religion. Rather, it's an admission that—as to the Pride Storybooks only—the case-by-case analysis of the Religious Diversity Guidelines was discarded.

Pivoting to religious hostility, the School Board cramps *Masterpiece*'s holding to "adjudicatory bod[ies]." Opp.23. This is belied by *Kennedy*, which holds that *Masterpiece* applies to any "law[]" or "policies" that are "accompan[ied]" by "official expressions of hostility." 142 S. Ct. 2407, 2422 n.1 (2022). Ultimately, the School Board—like other decisionmakers, must afford religious objectors "neutral and respectful consideration." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1729 (2018). That consideration doesn't just apply, as the School Board argues, before a policy takes effect. *See* Opp.24. Rather, the failure to later "object[]" to or "disavow[]" hostile comments casts doubt on the School Board's "neutral and respectful consideration" going forward. *Masterpiece*, 138 S. Ct. at 1729-30.

Here, the School Board's consideration of religious objections to the Pride Storybooks was—and remains—compromised. Defendant Harris demonstrated overt religious hostility at the March 28 board meeting when she accused religious parents of perpetuating hate. *See* Lynne Harris, Remarks at the MCPS Board Meeting, at 1:48:00-1:48:15 (Mar. 28, 2023), https://shorturl.at/fAET6. The School Board sees her words as neutral because she deplored other "core beliefs" and "family values" too. Opp.24-25. But such comparisons aggravate, not ameliorate, religious hostility. *Masterpiece*, 138 S. Ct. at 1729. The School Board correctly observes that Harris did not say, at another meeting, that "ignorance and hate does exist in our community." Opp.24. But another board member *did* make that comment, *see* FAC [Dkt. 36] ¶ 158, so all the School Board has proved is that hostility is not confined to Harris alone. No other board members have "object[ed]" to or "disavow[ed]" the hostile comments. *Masterpiece*, 138 S. Ct. at 1729-30. The ban on opt-outs for the Pride Story books must thus be "set aside." *Kennedy*, 142 S. Ct. at 2422 n.1.

**E. Strict scrutiny is triggered under the Due Process Clause.**

The School Board's policy also violates the Parents' fundamental due process right to direct their children's education and upbringing. Br.23-24. The School Board does not deny that this right is "fundamental." Opp.27. Instead, it argues that infringement is subject only to rational-basis review and that the same crumbling "wall of authority" forecloses such a claim here. Neither argument has purchase.

First, under Fourth Circuit precedent, when due process "parental rights" "combine with First Amendment free exercise concerns," the challenged policy is evaluated under "heightened scrutiny." *Herndon*, 89 F.3d at 178-79; *Hicks*, 93 F. Supp. 2d at 664 (same).

Next, the School Board fails to salvage its "wall of authority." Adding *Blau* and *Bailey*, Opp.27-28, doesn't help. *Blau* contained "no[] claim that the [school policy] was incompatible with any religious beliefs that [the plaintiffs] may hold." *Blau v.*

*Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 386 (6th Cir. 2005). Nor *Bailey. Bailey v. Va. High School League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012) ("does not implicate a fundamental right.").

The School Board's position—that parents have no say in "*how* a public school teaches their child[ren]," Opp.28—is inconsistent with the many courts recognizing that parental due process rights are implicated on sensitive subjects "that strike at the heart of parental decision-making authority on matters of the greatest importance," *Tatel*, 2023 WL 3740822, at *7; Br.27-29. The School Board is not "empowered, as parens patriae, to 'save' a child from himself or his [religious] parents by requiring [certain] compulsory" education. *Yoder*, 406 U.S. at 232.

## II. The no-opt-out policy cannot survive strict scrutiny.

### A. There is no compelling interest.

The School Board must—but can't—show a compelling interest in denying opt-outs. Br.24-29. That's confirmed by the "interests" purported in response.

First, interests in "a safe educational environment" and student "health and safety," Opp.26, fail the "more precise analysis" "demand[ed]" by the First Amendment. *Fulton*, 141 S. Ct. at 1881; Br.24-29. Closer inspection shows that these interests sound in censorship. Tellingly, the School Board's cited authority is *Saxe v, State College*, Opp.26, where a school policy claiming a "safe" educational environment was invalidated—partly because its censorial reach "could include much 'core' political and religious speech." 240 F.3d 200, 217 (3d Cir. 2001). Here, by denying opt-outs because their mere existence creates "stigm[a]" and prevents schools from "meeting the needs of the students who opt out," Opp.27, the School Board reveals its ideological goal: children excused from Pride Storytime are discriminators, and providing opt-outs hinders conformity. This was the tenor of the MCPS principals' concerns expressed to the School Board. Ex __. Giving "public school authorities" this censorial power "strikes at the very heart of the First Amendment."

12

*Morse v. Frederick*, 551 U.S. 393, 423 (2007) (Alito, J., concurring); *see also B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 309 (3d Cir. 2013) (Alito's opinion "controls" *Morse*).

Next, the School Board asserts that avoiding "stigmatization" is part of "complying with federal and state antidiscrimination policies and regulations." Opp.26; Hazel ¶ 39. "Such speculation is insufficient to satisfy strict scrutiny." *Fulton*, 141 S. Ct. at 1882. Plus, it's just wrong. Maryland law requires opt-outs—no matter how many—on all manner of family life and human sexuality instruction. Br.12, 20, 26. And religious liberty can supersede antidiscrimination law. *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2318 (2023) (public accommodations law cannot compel speech with "political and religious significance"); *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020); *Fulton*, 141 S. Ct. at 1882.

Finally, the School Board argues that "allowing *any* student to opt out hinders its educational mission." Opp.27 n.7. But "educational mission" "can easily be manipulated in dangerous ways." *Morse*, 551 U.S. at 423 (Alito, J., concurring). That's why "[i]t is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities." *Id.* at 424 (Alito, J., concurring).

As the Supreme Court just held, it is not "coherent for purposes of strict scrutiny" for courts to violate fundamental rights in the name of "imponderable" educational goals. *Students for Fair Admissions, Inc. ("SFFA") v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2166-67 (2023). Such goals include "enhanc[ing] appreciation, respect, and empathy" for minorities, imparting "new knowledge," and having a "robust" "exchange of ideas." *Id.* at 2166. Here, the School Board's "educational mission" comprises just such "imponderable[s]": "fostering an inclusive educational environment," "reducing stigmatization and fostering social integration of all students and families," and a "learning environment free of discrimination." Opp.25,

7, 30. "Although these are commendable goals," "it is unclear how courts are supposed to measure any of the[m]," or "know when they have been reached, and when the perilous remedy of [religious burdens] may cease." *SFFA*, 143 S. Ct. at 2166. As in *SFFA*, the School Board responds by demanding deference. *Compare* 143 S. Ct. at 2168 ("trust us") *with* Opp.15 (be "careful not to question" educational goals). Schools "may define their missions as they see fit. The Constitution defines" the judiciary's. *SFFA*, 143 S. Ct. at 2168.

## B. The policy is not the least restrictive means.

"[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881. Banning opt-outs  flunks. Br.29-30. First, the School Board asserts that "allowing *any* student to opt out hinders its educational mission." Opp.27 n.7. School districts nationwide disagree. FAC [Dkt. 36] ¶ 93-97; Br.12. Within Maryland, school systems that expressly recognize that state law requires opt-outs at the elementary level on all family life and human sexuality instruction—not just in sex ed—include Baltimore, Frederick, and Carroll Counties.[2] The School Board hasn't shown why its "system is so different." *Holt v. Hobbs*, 574 U.S. 352, 367 (2015).

Second, the School Board argues that "accomodat[ing] the growing number of opt out requests" would result in "significant disruptions." Opp.7. This is "but another formulation of the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions." *Holt*, 574

---

[2]   *See Health Education Frequently Asked Questions: Baltimore County Public Schools (BCPS) System*, https://perma.cc/F45S-2FVL (acknowledging that content is "integrated" into the rest of the curriculum but that opt-outs are still allowed); *Elementary Health Education Frequently Asked Questions (FAQ),* Frederick County Public Schools, https://perma.cc/45LL-P7HF (outlining opt-out rights and alternative instruction); *Approval of Family Life Advisory Committee Opt-Out Recommendations for Grades PreK through 5 Family Life Unit*, Carroll County Public Schools (Jan. 11, 2023), https://perma.cc/A7BB-R35Y (same).

U.S. at 368. The Supreme Court rejects such arguments. *Id.* (citations omitted). And there are good reasons to reject it here too. For one, the School Board gave a different answer in private meetings—telling community members that opt outs were being denied to avoid having students' "feelings hurt," not because they're unadministrable. Garti ¶ 5. Moreover, "the one instance" School Board specified is that there were "dozens" of opt-out requests at one school—in a school district of "160,000 students of many different backgrounds." Hazel ¶ 37; Opp.1. Yet the School Board also "advises principals" to avoid scheduling "tests or other major events on dozens" of religious holidays, with no claimed administrability problem. Hazel ¶ 20. Finally—and most importantly—even if this evidence was credited, "it would plainly be incumbent upon the [School Board] to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights." *Sherbert v. Verner*, 374 U.S. 398, 407 (1963). If "administrability" justifies a categorical refusal to accommodate religious objectors, the School Board has an incentive to infringe First Amendment rights: avoid accommodation by increasing offense.

### III. The remaining preliminary injunction factors are easily satisfied.

The Parents have met the remaining preliminary injunction factors. Br.30-32. The School Board's only response is to claim that these other factors don't matter because there is no constitutional rights violation. Opp.30. Wrong, as the foregoing confirms.

CONCLUSION

Innocence lost is gone forever. The Court should grant the preliminary injunction.

Dated: July 26, 2023

Respectfully submitted,

/s/ Eric S. Baxter
Eric S. Baxter
William J. Haun (pro hac vice)
Michael J. O'Brien* (pro hac vice)
Brandon L. Winchel* (pro hac vice)
THE BECKET FUND FOR RELIGIOUS LIBERTY

1919 Pennsylvania Ave, N.W., Suite 400
Washington, DC 20006
(202) 955-0095
whaun@becketlaw.org

*Not a member of the DC Bar; admitted in
Louisiana and California respectively.
Practice limited to cases in federal court.

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2023, a copy of *Plaintiffs' Reply in Support of Motion for Preliminary Injunction*, *Declaration of Hisham Garti,* and *Declaration of Robert McCaw,* which were electronically filed in this case on July 26, 2023, were emailed and mailed via First-Class Mail, postage prepaid, to the following in accordance with Fed. R. Civ. P. 5:

Alan Schoenfeld
Wilmer Hale
250 Greenwich Street
New York, NY 10007
Alan.schoenfeld@wilmerhale.com
*Attorney for Defendants*


Dated: July 26, 2023                              /s/ Eric S. Baxter
                                                        Eric S. Baxter