**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| TAMER MAHMOUD, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 8:23-cv-01380-DLB |
| | ) | |
| MONIFA B. MCKNIGHT, *in her official* | ) | |
| *capacity as Superintendent of the Montgomery* | ) | |
| *County Board of Education*, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF
DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Defendants respectfully submit this Notice to inform the Court of the recent decision of the United States Court of Appeals for the Second Circuit in *We The Patriots USA, Inc. et al. v. Connecticut Office of Early Childhood Development et al.*, -- F.4th --, 2023 WL 4982325 (Aug. 4, 2023). Plaintiffs in that case challenged a Connecticut law repealing a longstanding religious exemption from the State's vaccination requirements for students while retaining exemptions for medical reasons and certain previously granted religious exemptions. As relevant here, plaintiffs asserted claims under the Free Exercise Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment. The district court dismissed the complaint and the Second Circuit affirmed dismissal of all the constitutional claims.

As to the Free Exercise claim, the Second Circuit held that the law was neutral, rejecting plaintiffs' argument that "repealing any existing religious exemption is hostile to religion per se." 2023 WL 4982325, at *12. It explained that "the Supreme Court has long described religious exemptions as part of a mutually beneficial 'play in the joints' between the Establishment Clause and Free Exercise Clause," and that "Plaintiffs' argument, which would make every exemption

permanent once granted, threatens to distort the relationship between the Clauses." *Id.* (quoting *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 669 (1970)).  The Second Circuit next held that the law was generally applicable because the medical exemptions "'provide[] for an objectively defined category of people to whom the vaccination requirement does not apply,'" and therefore "do not 'allow the government to decide which reasons for not complying with the policy are worthy of solicitude.'" *Id.* at *13 (quoting *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 289 (2d Cir. 2021), *cert. denied sub nom. Dr. A. v. Hochul*, 142 S. Ct. 2569 (2022)). The Second Circuit also rejected the plaintiffs' argument that the law was not generally applicable because it authorized medical but not religious exemptions, in part because of the "difference in magnitude between the number of religious and medical exemptions that Connecticut families claimed." *Id.* at *16.  Finally, the court concluded that the law was subject to, and survived, rational basis review.  *See id.* at *18.

As to the Due Process claim, the Second Circuit reaffirmed its "join[ing of] other Circuits in holding there is not a parental right, absent a violation of the Religion Clauses, to 'direct *how* a public school teaches their child'" and that heightened scrutiny does not apply to "hybrid rights" claims.  2023 WL 4982325, at *20-21 (quoting *Skoros v. City of New York*, 43 F.3d 1, 41 (2d Cir. 2006)).  The Second Circuit therefore concluded that the district court correctly dismissed plaintiffs' childrearing claim "upon deciding that the free exercise claim was without merit." *Id.* at *21.

Dated: August 7, 2023

Respectfully Submitted,

/s/ Alan E. Schoenfeld
Bruce M. Berman (*pro hac vice*)
bruce.berman@wilmerhale.com
Jeremy W. Brinster (*pro hac vice*)
jeremy.brinster@wilmerhale.com
WILMER CUTLER PICKERING

HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20037

Alan E. Schoenfeld (*pro hac vice*)
alan.schoenfeld@wilmerhale.com
Emily Barnet (*pro hac vice*)
emily.barnet@wilmerhale.com
Cassandra A. Mitchell (*pro hac vice*)
cassie.mitchell@wilmerhale.com
Thomas K. Bredar (MD No. 21635)
thomas.bredar@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 7, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Alan E. Schoenfeld*
Alan E. Schoenfeld

2023 WL 4982325
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

WE THE PATRIOTS USA, INC.; CT Freedom
Alliance, LLC; Constantina Lora; Miriam
Hidalgo; Asma Elidrissi, Plaintiffs-Appellants,
v.
CONNECTICUT OFFICE OF EARLY
CHILDHOOD DEVELOPMENT; Connecticut
State Department of Education; Connecticut
Department of Public Health; Bethel Board of
Education; Glastonbury Board of Education;
Stamford Board of Education, Defendants-Appellees.

Docket No. 22-249-cv
|
August Term 2022
|
Argued: October 13, 2022
|
Decided: August 4, 2023

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT
(ARTERTON, J.)

**Attorneys and Law Firms**

Norman A. Pattis (Cameron L. Atkinson, on the brief), New
Haven, CT, for Plaintiffs-Appellants.

Darren P. Cunningham, Assistant Attorney General (Timothy
J. Holzman, Alayna M. Stone, on the brief), for William
Tong, Attorney General of Connecticut, Hartford, CT, for
Defendants-Appellees.

Before: Leval, Chin, and Bianco, Circuit Judges.

**Opinion**

Judge Bianco concurs in part and dissents in part in a separate
opinion.

Chin, Circuit Judge:

**\*1**  This case requires us to decide whether a State that
has for many years exempted religious objectors from its
vaccination requirements for students and participants in

childcare programs violates the Free Exercise Clause and
other federal constitutional and statutory guarantees by
repealing that exemption to protect the public health and
safety.

All States have such vaccination requirements. The
vast majority of States offer religious exemptions from
vaccination requirements. In 2021, Connecticut became the
fifth State to cease allowing such religious exemptions,
following in the footsteps of Mississippi, California, New
York, and Maine. West Virginia has never exempted
religious objectors. Plaintiffs-appellants are two membership
organizations and three individuals ("plaintiffs") who allege
that Public Act 21-6 (the "Act"), which revised the
Connecticut General Statutes to, *inter alia*, repeal the
religious exemptions, violates the Free Exercise Clause of the
First Amendment of the U.S. Constitution; other guarantees
under the Fourth, Fifth, and Fourteenth Amendments; and the
Individuals with Disabilities Education Act (the "IDEA"), 20
U.S.C. § 1400 *et seq.* Defendants-appellees are three state
agencies and three local boards of education ("defendants").
Plaintiffs argue, *inter alia*, that the Act demonstrates hostility
to religious believers, impermissibly treats religious and
nonreligious reasons for declining vaccination differently,
jeopardizes their rights to medical freedom and childrearing,
unlawfully discriminates on the basis of age, and denies one
plaintiff's disabled child a free appropriate public education
in the least restrictive environment possible.

Plaintiffs asked the district court to enter judgment declaring
that the Act violates the Constitution and the IDEA, as
well as an injunction prohibiting defendants from enforcing
the Act. The district court granted defendants' motion to
dismiss plaintiffs' complaint in its entirety, holding that (1)
the defendant state agencies were immune from suit under
the Eleventh Amendment of the U.S. Constitution; (2) the
organizational plaintiffs lacked standing to sue; and (3) all
five counts of the complaint failed to state a claim.

Only one court -- state or federal, trial or appellate -- has
ever found plausible a claim of a constitutional defect in a
state's school vaccination mandate on account of the absence
or repeal of a religious exemption. *See Bosarge v. Edney*,
—— F. Supp. 3d ——, No. 22-cv-233, 2023 WL 2998484
(S.D. Miss. Apr. 18, 2023) (entering preliminary injunction
requiring state officials to offer religious exemption from
school immunization mandate). *But see, e.g.*, *Phillips v.
City of New York*, 775 F.3d 538, 542-43 (2d Cir. 2015) (per

curiam); 🚩 *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 352-54 (4th Cir. 2011) (unpublished disposition);

🚩 *Whitlow v. California*, 203 F. Supp. 3d 1079, 1085-89 (S.D. Cal. 2016); *Love v. State Dep't of Educ.*, 29 Cal.App.5th 980, 240 Cal. Rptr. 3d 861, 868 (2018); *F.F. ex rel. Y.F. v. State*, 194 A.D.3d 80, 143 N.Y.S.3d 734, 742 (3d Dep't 2021), *cert. denied sub nom. F.F. ex rel. Y.F. v. New York*, ––– U.S. ––––, 142 S. Ct. 2738, 212 L.Ed.2d 797 (2022).

**\*2** We decline to disturb this nearly unanimous consensus. For the reasons that follow, we AFFIRM the district court's dismissal of the first four counts of the complaint. But we VACATE the portion of the district court's judgment dismissing the fifth count of the complaint and REMAND for further proceedings with respect to that claim.

## STATEMENT OF THE CASE

In reviewing the district court's decision to grant defendants' motion to dismiss, we take all the material facts alleged in the complaint to be true, and we draw all reasonable inferences in plaintiffs' favor. *See Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 712 (2d Cir. 2019) (per curiam) (discussing standards of review for motions to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6)). In addition to the facts alleged in the complaint, "as a fundamental matter, courts may take judicial notice of legislative history." *Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022) (citing 🚩 *Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226-27, 79 S.Ct. 274, 3 L.Ed.2d 257 (1959)), *cert. denied*, ––– U.S. ––––, 143 S. Ct. 1020, 215 L.Ed.2d 188 (2023).

### I. Statutory Background

#### A. Public Health Concerns

States have long conditioned enrollment in schools and other educational programs on students being immunized against communicable diseases. In Connecticut, vaccination mandates for schoolchildren date back to 1882, the same year the State began requiring attendance at school for children aged eight to fourteen. *See* 1882 Conn. Pub. Acts ch. 80, § 2, ch. 135, § 1.[1] In 1923, the Connecticut General Assembly first formally carved out medical exemptions, providing that a child need not be vaccinated upon presentation of "a certificate from a physician ... certifying that, in the opinion of such physician, such vaccination would not be prudent

on account of the physical condition of such child." 1923 Conn. Pub. Acts ch. 271, § 1. Religious exemptions followed in 1959, when the legislature began to exempt a child from vaccination upon a parent's or guardian's submission of "a statement ... that such vaccination would be contrary to the religious beliefs of such child." 1959 Conn. Pub. Acts ch. 588, § 1. Unlike many other States, Connecticut has never allowed students or their parents to claim exemption from vaccination on the basis of non-religious personal beliefs. *See generally* Elena Conis & Jonathan Kuo, *Historical Origins of the Personal Belief Exemption to Vaccination Mandates: The View from California*, 76 J. Hist. Med. & Allied Scis. 167, 172 (2021).[2]

1      Subject to exceptions not relevant here, Connecticut today mandates attendance at school (or its equivalent, such as homeschooling that offers "instruction in the studies taught in the public schools") from ages five to eighteen. 🚩 Conn. Gen. Stat. § 10-184.

2      Non-religious personal beliefs encompass such views as that vaccines pose immediate or long-term risks to individuals' physical and mental health, vaccine-preventable illnesses are rare, and people should be allowed to decide for themselves whether to receive vaccination. As of May 2022, only fifteen States allowed nonreligious personal beliefs of this sort to serve as grounds for exemption from vaccination. *See* National Conference of State Legislatures, *States with Religious and Philosophical Exemptions from School Immunization Requirements*, https://www.ncsl.org/health/states-with-religious-and-philosophical-exemptions-from-school-immunization-requirements (last updated May 25, 2022).

**\*3** In recent years, Connecticut has witnessed declines in the proportion of schoolchildren who are immunized against contagious diseases, particularly measles. During the 2012-2013 school year, 97.1% of the State's kindergartners received a full course of vaccines against measles, mumps, and rubella ("MMR"). By the 2019-2020 school year, however, the rate had dropped to 96.2% (92.1% in private schools). With 527,829 students enrolled in public schools across the State in kindergarten through twelfth grade that school year, and taking private school enrollment into account, the total

We The Patriots USA, Inc. v. Conn. Office of Early Childhood..., --- F.4th ---- (2023)

2023 WL 4982325

Case 8:23-cv-01380-DLB   Document 48   Filed 08/07/23   Page 7 of 34

number of unvaccinated students approached or exceeded 20,000. *See* Conn. Dep't of Educ., *Enrollment Report*, EdSight, https://public-edsight.ct.gov/Students/Enrollment-Dashboard/Enrollment-Report-Legacy?language=en_US (last visited Aug. 3, 2023).

Of particular concern to public health officials and legislators was the fact that unvaccinated students were not evenly distributed throughout the State. In the 2019-2020 school year, some 22% of the 544 schools enrolling thirty or more kindergartners had MMR vaccination rates below 95%. [3] Twenty-six schools had rates below 90%. [4] The Centers for Disease Control and Prevention recommends that "at least 95% of school students need to be vaccinated against measles" to maintain community immunity. DPH Testimony at 4. [5]

[3]     *See* Testimony Presented Before the Public Health Committee by Acting Commissioner Deidre S. Gifford, H.B. 6423, S.B. 568, 2021 Sess., at 4 (Conn. 2021), https://www.cga.ct.gov/2021/PHdata/Tmy/2021HB-06423-R000216-Department of Public Health-TMY.PDF (hereinafter "DPH Testimony").

[4]     *See* Connecticut General Assembly House Proceedings, H.B. 6423, 2021 Sess., at 966 (Conn. 2021) (hereinafter "House Proc."); Connecticut General Assembly Senate Proceedings, H.B. 6423, 2021 Sess., at 671 (Conn. 2021) (hereinafter "Senate Proc."). Both the House and Senate proceedings are contained in the full legislative history of the Act available at https://ctatatelibrarydata.org/wp-content/uploads/lhbills/2021_PA6_HB6423.pdf.
        In citing the House and Senate proceedings, we refer to the continuous pagination inserted into this PDF document by the Connecticut State Library. *See also* DPH Testimony at 4.

[5]     "Community immunity," sometimes also called "herd immunity," is the phenomenon that occurs when "a sufficient proportion of a population is immune to an infectious disease (through vaccination and/or prior illness) to make its spread from person to person unlikely." Centers for Disease Control and Prevention, *Glossary*, *Vaccines and Immunizations*, https://www.cdc.gov/

vaccines/terms/glossary.html (last visited Aug. 3, 2023).

As the rate of vaccination against MMR and other vaccine-preventable diseases was declining, the percentage of Connecticut kindergartners whose families claimed exemption from vaccination on religious grounds was on the rise. In school year 2012-2013, 1.4% of kindergartners were exempt from one or more vaccinations on account of religious objections; in school year 2018-2019, the percentage rose to a high of 2.5%, before dropping slightly, to 2.3%, in school year 2019-2020. The overall trend was toward an increase in religious exemptions. [6] In contrast, the percentage of Connecticut kindergartners claiming a medical exemption from vaccination remained roughly constant, at 0.2-0.3%, over the same period.

[6]     Indeed, even as the rate of religious exemptions declined slightly for kindergartners in school year 2019-2020, 3% of students enrolled in prekindergarten programs claimed a religious exemption that school year -- the highest percentage of any grade level. *See* DPH Testimony at 6.

Faced with this data, and troubled that declining rates of vaccination would leave Connecticut students and the broader public vulnerable to outbreaks of disease, the Connecticut General Assembly took up the legislation that would become Public Act 21-6.

**\*4**  In doing so, Connecticut was following in other States' footsteps. West Virginia has never offered a religious exemption from school immunization mandates. There, exemptions are available only upon presentation of "the certification of a licensed physician stating that the physical condition of the child is such that immunization is contraindicated or there exists a specific precaution to a particular vaccine." W. Va. Code Ann. § 16-3-4 (West). *See* *Workman*, 419 F. App'x at 352-54 (rejecting Free Exercise Clause challenge). In Mississippi, more than four decades ago, the state high court struck down a provision limiting religious exemptions to those who could prove, by presenting a certificate issued by a "recognized denomination," that they "are bona fide members of a recognized denomination whose religious teachings require reliance on prayer or spiritual means of healing." *Brown v. Stone*, 378 So.2d 218, 219 (Miss. 1979) (quoting Miss. Code. Ann. § 41-23-37 (1972 Supp.)). The legislature never replaced the invalidated

We The Patriots USA, Inc. v. Conn. Office of Early..., --- F.4th ---- (2023)
2023 WL 4982325

Case 8:23-cv-01380-DLB   Document 48   Filed 08/07/23   Page 8 of 34

provision, and until July 15, 2023, exemptions were only available when "offered on behalf of a child by a duly licensed physician" and "accepted by the local health officer when, in his opinion, such exemption will not cause undue risk to the community." 🚩 Miss. Code. Ann. § 41-23-37 (West). *See generally* James Colgrove & Abigail Lowin, *A Tale of Two States: Mississippi, West Virginia, and Exemptions to Compulsory School Vaccination Laws*, 35 Health Affs. 348, 349-51 (2016). [7]

[7]  This year, a court in the Southern District of Mississippi entered a preliminary injunction requiring state officials to "develop a process by which persons may request a religious exemption from the Compulsory Vaccination Law." *Bosarge*, ——— F. Supp. 3d at ———, 2023 WL 2998484, at *17. State officials complied, *see* No. 22-cv-233, Dkt. 82 (S.D. Miss. July 7, 2023), and the case is set for trial on April 1, 2024, *see id.* Dkt. 79. *Bosarge* is an outlier among school vaccination cases, however, because the Mississippi Attorney General conceded that the state's vaccination mandate "would substantially burden the rights of some people with sincerely-held religious objections" under Mississippi's Religious Freedom Restoration Act ("MRFRA") but argued that MRFRA, independently of the Free Exercise Clause, required the state to provide religious exemptions because the vaccination mandate could not satisfy strict scrutiny. *Bosarge*, ——— F. Supp. 3d at ———, 2023 WL 2998484, at *7-8. The court rejected the Attorney General's argument and held that plaintiffs had demonstrated a likelihood of success on their free exercise claim. *See id.* at ———, 2023 WL 2998484 at *8. In a single paragraph, the court concluded that "[b]ecause the evidence shows that there was a method by which Mississippi officials could consider secular exemptions ... the Compulsory Vaccination Law would not be neutral or generally applicable." *Id.* at ———, 2023 WL 2998484 at *10.

More recently, three States preceded Connecticut in repealing religious or philosophical exemptions from school immunization requirements. California did so in 2015; Maine and New York followed suit in 2019. *See* 2015 Cal. Legis. Serv. ch. 35 (West) (amending 🚩 Cal. Health & Safety Code § 120325 *et seq*.); 2019 N.Y. Sess. Laws ch. 35 (McKinney) (amending 🚩 N.Y. Public Health Law § 2164(9)); 2019 Me. Legis. Serv. ch. 154 (West) (amending 🚩 Me. Rev. Stat. Ann. tit. 20-A, §§ 6355, 🚩 6358, 🚩 6359; tit. 22, §§ 802, 8402). [8] Courts have upheld the California and New York laws against Free Exercise Clause challenges. *See* 🚩 *Whitlow*, 203 F. Supp. 3d at 1086-87; *Love*, 240 Cal. Rptr. 3d at 868; *F.F.*, 143 N.Y.S.3d at 742. [9]

[8]    A recent report of the Centers for Disease Control and Prevention indicates that kindergartners in these States, along with West Virginia and Connecticut, have some of the highest rates of MMR vaccination. *See* Ranee Seither et al., *Vaccination Coverage with Selected Vaccines and Exemption Rates among Children in Kindergarten -- United States, 2021-22 School Year*, Morbidity & Mortality Wkly Rep. (Jan. 13, 2023), https://www.cdc.gov/mmwr/volumes/72/wr/mm7202a2.htm?s_cid=mm7202a2_w.

[9]    A challenge to Maine's statute is pending. *See Fox v. State of Maine et al.*, No. 22-cv-251 (D. Me. Aug. 17, 2021). Defendants in the Maine case have withdrawn portions of their motions to dismiss in light of the First Circuit's decision in *Lowe v. Mills*, 68 F.4th 706 (1st Cir. 2023), which reversed and remanded the dismissal of a complaint alleging that a vaccination mandate for Maine healthcare workers violated the Free Exercise Clause.

### B. The Legislative Record

**\*5**  As in these other States, the Act was not adopted without controversy. The legislative record reflects a spirited debate that unfolded over several years. At public hearings in February 2021, some 2,000 individuals requested to testify concerning what were then two identical pieces of legislation, House Bill 6423 and Senate Bill 568. The legislature's joint Public Health Committee heard from approximately 250 speakers over a twenty-four-hour period. Members of the public submitted more than 1,700 written comments. Some 95% of those who spoke and submitted comments opposed the Act. In the minority, however, were numerous public health agencies and associations, including the Connecticut Department of Public Health, the Connecticut Hospital Association, the Connecticut Children's Medical Center, and the Connecticut Nursing Association, which all advocated in favor of the Act.

We The Patriots USA, Inc. v. Conn. Office of Early..., --- F.Supp.3d ---- (2023)
2023 WL 4982325

Case 8:23-cv-01380-DLB   Document 48   Filed 08/07/23   Page 9 of 34

In the State House of Representatives, the final debate, which began on April 19, 2021, ran for more than fifteen hours and concluded well past midnight. The Act's primary sponsor referred to "a clear trend over the past decade towards higher levels of religious exemptions resulting in as many as a hundred schools at any given time with vaccination rates below the community immunity threshold." House Proc. at 791. Other proponents said that the Act would prevent "a real public health crisis, just over the horizon." *Id.* at 847. Opponents predicted that the Act would create "religious refugees," *id.* at 909; said that it would "segregat[e]" and "separat[e]" families, especially those with some, but not all, children already in school, *id.* at 868; and worried that it would worsen food insecurity by prohibiting students from not only attending school but also receiving free or subsidized meals, *id.* at 1215-16. Some opponents expressed concern about the Act's "legacy" provision, which provided that certain children who were already enrolled in school and had previously been granted religious exemptions would remain exempt. [10] According to these opponents, the inclusion of the legacy provision in the bill undermined the notion that Connecticut was facing a public health emergency. Other opponents argued that students who are unvaccinated due to medical contraindication pose the same public health risk as those who receive religious exemptions. [11]

[10]   Both sets of parties, as well as members of the General Assembly, referred to this provision as the "grandfather clause."

[11]   The legislative history includes numerous references to a third category of individuals, those who are "noncompliant" with Connecticut's mandated schedule of vaccines. Some legislators expressed the view that the Act permitted noncompliant students to remain unvaccinated while mandating vaccination for those who sought religious exemptions. As the Act's sponsor in the Senate explained, however, noncompliant students are those who have developed a plan with their healthcare provider to catch up on missed vaccines. The Act expressly permits healthcare providers to certify that "initial immunizations have been given ... and additional immunizations are in process." Public Act 21-6 § 1(a)(1). Other than its medical exemptions and legacy provision, the Act does not allow unvaccinated students to enroll or remain enrolled in school without presenting such a certificate.

During the debate, the House amended the legislation twice. The original version of the Act made legacy exemptions available only to students in the seventh and later grades, but the House voted to extend the legacy provision to those enrolled in kindergarten through sixth grade as well. A second amendment clarified that students with religious exemptions would not lose them if they moved from one Connecticut school to another. The amended legislation passed the House, 90-53.

A similar debate unfolded when the State Senate convened to consider the Act on April 27, 2021. Proponents again stated that the Act's purpose was to proactively protect public health in the face of declining vaccination rates; a supporter called it "a very modest and highly incremental response to a major crisis in public health and a major public health problem." Senate Proc. at 788-89; *see also id.* at 616 (alluding to "the significant vulnerability present in our schools and communities"), 707 ("[W]e are supposed to make policies to prevent illnesses"). Opponents raised many of the same objections as in the House, with one senator calling the Act "fundamentally wrong, immoral and I would say even anti American." *Id.* at 636. Although senators proposed four further amendments, none passed. The Senate adopted the legislation, 22-14. Governor Ned Lamont signed it the following day, April 28, 2021, and nearly all provisions of the Act became effective immediately upon the Governor's signature. *See* Public Act 21-6 §§ 1-9, 12. [12]

[12]   As described further below, sections 10 and 11 of the Act require that certain insurance plans cover extended consultations between patients and medical providers concerning vaccination. These provisions took effect January 1, 2022. *See* Public Act 21-6 §§ 10-11.

### C. Public Act 21-6

**\*6** The Act amended vaccination requirements scattered across several titles of the Connecticut General Statutes. As to children enrolled in public and nonpublic schools, the Act repealed the exemption from immunization for children whose parents present "a statement ... that such immunization would be contrary to the religious beliefs of such child or the parents or guardians of such child." Conn. Gen. Stat. § 10-204a (2020). The Act did not repeal the exemptions for students who present "a certificate ...

from a physician, physician assistant or advanced practice registered nurse stating that in the opinion of such physician, physician assistant or advanced practice registered nurse such immunization is medically contraindicated because of the physical condition of such child," or who provide documentation that they had had a confirmed case of, or were too old to receive immunization against, certain diseases. Public Act 21-6 § 1(a)(2)-(5). As amended, the Act provided that children enrolled in kindergarten through twelfth grade who had been previously granted religious exemptions would remain exempt. *See id.* § 1(b). The Act did not, however, extend the same accommodation to students in preschool and prekindergarten programs. *See id.* § 1(c). As Connecticut had done since 1882, the Act required that local or regional boards of education provide vaccinations free of charge to those unable to pay. *See id.* § 1(d); *see also* 1882 Conn. Pub. Acts ch. 135, § 1. It did not change the schedule of required immunizations, which is determined by Connecticut's Commissioner of Public Health. Public Act 21-6 § 1(e). [13]

[13]   The Act became law during the COVID-19 pandemic, and the legislative debates are replete with references to COVID-19. Nevertheless, as we explain further below, the Act did not mandate vaccination against COVID-19. At the time the legislature passed the Act, COVID-19 vaccines were not authorized for all children.

Other provisions of the Act concerned students enrolled in public and private institutions of higher education, as well as children who attend childcare centers and group childcare homes. *Id.* §§ 3-6. Broadly speaking, the Act treated college and university students the same as those enrolled in kindergarten through twelfth grade: It permitted those who had previously been granted religious exemptions to remain exempt, but it provided that new exemptions would be granted only for medical contraindication. *Id.* §§ 3(b), 4. As to participants in childcare programs, the Act contained a legacy provision for children enrolled in kindergarten through twelfth grade. *Id.* §§ 5(b)(2)-(3), 6(g)(2)-(3).

Because the Act makes vaccination or exemption a condition of enrollment in any licensed Connecticut school, institution of higher education, or childcare program, unvaccinated children who do not qualify for a medical exemption or legacy provision may not attend.

The Act contained several miscellaneous provisions relevant to this appeal. In setting forth the contents of the certificates of medical exemption that healthcare providers may issue, the Act broadened the grounds on which a provider may determine that a vaccine is contraindicated for a patient. *Id.* § 7. These grounds may now include reasons that are "not recognized by the National Centers for Disease Control and Prevention" but that nevertheless, "in [the provider's] discretion," constitute contraindication. *Id.* The Act also established within the Connecticut Department of Public Health an Advisory Committee on Medically Contraindicated Vaccinations, which among other responsibilities is charged with ensuring consistency in the administration of medical exemptions as well as offering continuing education for medical providers. *Id.* § 8. The Act required state officials to collect data concerning exemptions and report annually to relevant committees of the General Assembly. *Id.* § 9. And to educate the public about the benefits of vaccines, the Act mandated that certain individual and group health insurance plans cover "at least a twenty-minute consultation" between medical providers and persons eligible to be vaccinated. *Id.* §§ 10-11.

## *II. The Parties and Prior Proceedings*

On April 30, 2021, two days after Governor Lamont signed the Act, plaintiffs commenced this lawsuit. Plaintiffs include two not-for-profit organizations: We The Patriots USA, Inc., and CT Freedom Alliance, LLC are public interest organizations dedicated to advocating for constitutional rights, including religious freedom (the "Organizational Plaintiffs"). Plaintiffs also include three individuals who each have at least one child who must be vaccinated to attend school under the Act (the "Individual Plaintiffs").

 **\*7**  The Individual Plaintiffs object to vaccination on religious grounds; some of the specific reasons vary from individual to individual, but they all object to the use of "cell lines descended from aborted fetuses" in the research, development, testing, and production of vaccines. App'x at 41. Constantina Lora, a Greek Orthodox Christian, is the parent of a preschooler in Bethel, Connecticut, as well as of middle and high school students who have legacy exemptions. Lora and her family moved from New York to Connecticut after New York repealed its religious exemption. Miriam Hidalgo is a Roman Catholic and the parent of two children in Glastonbury, Connecticut. In fall 2021, her children became eligible for preschool. Pursuant to Hidalgo's religious beliefs, she and her spouse are raising their children as vegans; they object to vaccines that contain cells from animals. Asma

Elidrissi, a Muslim, is the parent of two children in Stamford, Connecticut. When the Act took effect, one of her children had not completed registering for kindergarten; the other was eligible for preschool beginning in fall 2021. Elidrissi and her spouse object to vaccinating their children on two religious grounds not shared by the other plaintiffs. First, they abstain from consuming pork products, which they allege are used as a stabilizer in some vaccines. Second, after one of Elidrissi's children received the MMR vaccine, he developed "serious symptoms and ultimately a speech and learning disorder for which he now receives special services." App'x at 44. Elidrissi holds a religious belief that harming children is morally wrong, and she objects to vaccinating her children further because of the harm she alleges the previous vaccine caused. *Id.*

Plaintiffs named six defendants. Three of them are state agencies: the Connecticut Office of Early Childhood Development, the Connecticut State Department of Education, and the Connecticut Department of Public Health (the "State Agency Defendants"). The other three are the local school boards in Bethel, Glastonbury, and Stamford (the "School Board Defendants").

Plaintiffs sought declaratory and injunctive relief, along with attorney's fees. The complaint enumerated five counts. Plaintiffs contended the Act violates (1) the Free Exercise Clause of the First Amendment; (2) a right to privacy and medical freedom that plaintiffs argued is implied in the First, Fourth, Fifth, and Fourteenth Amendments; (3) the Equal Protection Clause of the Fourteenth Amendment; and (4) the liberty interest in childrearing implicit in the Due Process Clause of the Fourteenth Amendment. Plaintiffs brought these four counts against all defendants. The complaint's fifth and final count, claiming that the Act violates the IDEA, was brought by Elidrissi alone against the State Agency Defendants and the Stamford Board of Education.

In the district court, the State Agency Defendants requested a pre-filing conference, which the court held on June 30, 2021. Plaintiffs declined the district court's invitation to amend the complaint following the pre-filing conference. Defendants subsequently moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and (6). The State Agency Defendants argued that the first four counts of the complaint should be dismissed as to them on sovereign immunity grounds; all claims of the Organizational Plaintiffs should be dismissed for lack of standing; and all five counts should be dismissed for failure to state a claim. The Glastonbury

Board of Education moved to dismiss the first four counts for failure to state a claim. The Bethel and Stamford Boards of Education joined the State Agency Defendants' motion to dismiss, except as to the State Agency Defendants' assertion of immunity under the Eleventh Amendment.

On January 11, 2022, the district court issued an extensive order granting defendants' motions to dismiss. *See*  *We The Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*, 579 F. Supp. 3d 290 (D. Conn. 2022). The district court dismissed the first four counts of the complaint as to the State Agency Defendants, concluding that they are immune from suit under the Eleventh Amendment; moreover, it denied plaintiffs' request for leave to amend the complaint to name agency officials, rather than the agencies themselves, as defendants. Separately, the district court dismissed all claims brought by the Organizational Plaintiffs, holding that they had not met the constitutional requirements for associational standing.[14] These rulings did not preclude the district court from reaching the merits of the complaint's five claims, all of which the court dismissed under Federal Rule of Civil Procedure 12(b)(6). Judgment was entered the following day. Plaintiffs timely filed their notice of appeal.

[14]
    We do not reach the district court's disposition of these jurisdictional issues because plaintiffs agree that the district court properly applied binding precedent in deciding that the State Agency Defendants are immune from suit under the Eleventh Amendment and because the issue is mooted by the fact that the district court dismissed on the merits all four counts of the complaint brought by the Organizational Plaintiffs and we are affirming that portion of the district court's ruling. We note, however, that one of the reasons the district court gave for its decision to deny leave to amend the complaint was that, at the time it decided the motion to dismiss, its individual rules of practice warned that the court "ordinarily will not grant leave to amend" where a plaintiff chooses not to amend a complaint after learning of grounds for dismissal at a pre-filing conference. *Pretrial Preferences*, U.S. Dist. Ct. Dist. of Conn. (Jan. 24, 2022), https://www.ctd.uscourts.gov/content/janet-bond-arterton[https://web.archive.org/web/20220124064903/https://ctd.uscourts.gov/content/janet-bond-arterton]; *see also*  *We The Patriots USA, Inc.*, 579 F. Supp. 3d at 300

n.5. The district court subsequently amended its rules, which now provide that "[a]t the pre-filing conference, the plaintiff will be given leave to amend the complaint to address issues that will be the subject of a motion to dismiss." *Pretrial Preferences*, U.S. Dist. Ct. Dist. of Conn., https://www.ctd.uscourts.gov/content/janet-bond-arterton (last visited Aug. 3, 2023). As an alternative basis for its decision, the district court concluded that amendment would be futile because it dismissed all counts of the complaint on the merits. *See* 🚩 *We The Patriots USA, Inc.*, 579 F. Supp. 3d at 300 n.5.

We have cautioned that individual rules of practice may not contravene federal procedural rules. *See* 🚩 *Fruit of the Loom, Inc. v. Am. Marketing Enters., Inc.*, 192 F.3d 73, 75 (2d Cir. 1999). In 🚩 *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015), we ruled that a district court may not deny a plaintiff leave to replead on the ground that the plaintiff failed to take advantage of the opportunity to do so before learning how the district court would rule on the defendant's motion to dismiss. The court's denial of leave in this case was impermissible for the same reason. The error was harmless, however, because as we discuss below, the court properly dismissed those counts on the merits and amendment would indeed have been futile.

**\*8** Following oral argument, we held this case in abeyance pending the decision of another panel of this Court in *M.A. v. Rockland County Department of Health*, 53 F.4th 29 (2d Cir. 2022) ("*Rockland County*"). As we describe more fully below, *Rockland County* involved a Free Exercise Clause challenge to a set of emergency orders issued by county officials in response to an outbreak of measles. The panel issued its decision on November 9, 2022. We ordered the parties to submit supplemental briefing as to the effect of the *Rockland County* decision on this case, and we have now considered those submissions.

### DISCUSSION

We review *de novo* the district court's dismissal of each of the complaint's five claims pursuant to Federal Rule of Civil Procedure 12(b)(6), "accepting as true all facts alleged in the complaint and drawing all reasonable inferences in favor of plaintiffs." 🚩 *Phillips*, 775 F.3d at 542. To overcome a motion to dismiss for failure to state a claim, a plaintiff's complaint "must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." 🚩 *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing 🚩 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🚩 *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing 🚩 *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). The plaintiff must offer more than facts suggesting a "sheer possibility" the defendant is liable, or facts that are "merely consistent with" that conclusion. 🚩 *Id.* (quoting 🚩 *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

We begin with plaintiffs' challenge to the Act under the Free Exercise Clause, which is the gravamen of the complaint. We then turn to plaintiffs' other constitutional claims. Finally, we address Elidrissi's claim under the IDEA.

## I. The Free Exercise Claim

### A. Applicable Law

#### 1. Incidental Burdens on Religious Exercise

Under the Free Exercise Clause, which the Fourteenth Amendment incorporated as to the States, *see* 🚩 *Cantwell v. Connecticut*, 310 U.S. 296, 304-05, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the government may sometimes burden the external practice of religion. In 🚩 *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court reaffirmed that a law that incidentally burdens religious exercise is constitutional when it (1) is neutral and generally applicable and (2) satisfies rational basis review. If the law is not neutral or not generally applicable, it is subject to strict scrutiny, and the burden shifts to the government to establish that the law is narrowly tailored to advance a compelling government interest. *See* 🚩 *Tandon v. Newsom*, ––– U.S. ––––, 141 S. Ct. 1294, 1296-97, 209 L.Ed.2d 355 (2021) (per curiam); 🚩 *Church of the Lukumi Babalu Aye,*

*Inc. v. City of Hialeah*, 508 U.S. 520, 546, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

The Court traced the principle animating 🚩 *Smith* back to the late nineteenth century, collecting a series of cases that "consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 🚩 *Smith*, 494 U.S. at 879, 110 S.Ct. 1595 (internal quotation marks and citation omitted); *see also* 🚩 *id.* at 879-80, 110 S.Ct. 1595 (citing 🚩 *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878); 🚩 *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); 🚩 *Minersville School Dist. Bd. of Educ. v. Gobitis*, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940); 🚩 *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); 🚩 *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (plurality opinion); 🚩 *Gillette v. United States*, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971)).

**\*9** A law is not neutral under 🚩 *Smith* if the government "proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." 🚩 *Fulton v. City of Philadelphia*, ––– U.S. ––––, 141 S. Ct. 1868, 1877, 210 L.Ed.2d 137 (2021) (citation omitted). A law may fail the neutrality prong either facially, that is, "if it explicitly singles out a religious practice," or on account of improper legislative intent, that is, "if it targets religious conduct for distinctive treatment." 🚩 *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir. 2021) ("🚩 *Hochul*") (per curiam) (internal quotation marks omitted), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021), *cert. denied sub nom. Dr. A v. Hochul*, ––– U.S. ––––, 142 S. Ct. 2569, 213 L.Ed.2d 1126 (2022). To fail the neutrality prong, is it not enough for a law to simply *affect* religious practice; the law or the process of its enactment must demonstrate "hostility" to religion.

*See, e.g.,* 🚩 *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rts. Comm'n*, ––– U.S. ––––, 138 S. Ct. 1719, 1729, 201 L.Ed.2d 35 (2018). The Supreme Court has stressed, however, that even "subtle departures from neutrality" violate the Free Exercise Clause, and thus "upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause

to remember their own high duty to the Constitution and to the rights it secures." 🚩 *Id.* at 1731 (quoting 🚩 *Church of Lukumi Babalu Aye*, 508 U.S. at 534, 547, 113 S.Ct. 2217) (internal quotation marks omitted). To determine whether the government has acted neutrally, courts look to factors such as the background of the challenged decision, the sequence of events leading to its enactment, and the legislative or administrative history. *See* 🚩 *id.* (summarizing 🚩 *Church of Lukumi Babalu Aye*, 508 U.S. at 540, 113 S.Ct. 2217)).

A law is generally applicable when it treats similar conduct similarly, without regard to whether the conduct is religiously motivated. The Supreme Court has explained that a law is *not* generally applicable in at least two circumstances: first, where it "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," and second, where it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." 🚩 *Fulton*, 141 S. Ct. at 1877 (internal quotation marks omitted). We have described this second inquiry in terms of whether a law is "substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it." 🚩 *Hochul*, 17 F.4th at 284 (quoting 🚩 *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014)).

In a series of decisions about limitations on the operation of houses of worship during the COVID-19 pandemic, the Supreme Court clarified how courts should determine whether a challenged law is generally applicable. Most relevant here, the Court held that regulations "are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." 🚩 *Tandon*, 141 S. Ct. at 1296. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue, ... [and] not the reasons why people gather." 🚩 *Id.*

*2. Vaccination Mandates*

Both the Supreme Court and this Court have considered whether vaccination mandates violate the Constitution.[15] The earliest such case, 🚩*Jacobson v. Massachusetts*, held that a state's police power included the capacity to mandate vaccination against smallpox for all adult residents who were "fit subject[s] of vaccination." 🚩197 U.S. 11, 38-39, 25 S.Ct. 358, 49 L.Ed. 643 (1905). 🚩*Jacobson*, which concerned a criminal penalty the town of Cambridge imposed on those who refused vaccination, "pre-dated the modern tiers of scrutiny" but "essentially applied rational basis review." 🚩*Roman Cath. Diocese of Brooklyn v. Cuomo*, ––– U.S. ––––, 141 S. Ct. 63, 70, 208 L.Ed.2d 206 (2020) (Gorsuch, *J.*, concurring). In 🚩*Zucht v. King*, 260 U.S. 174, 175, 43 S.Ct. 24, 67 L.Ed. 194 (1922), the Supreme Court upheld a city ordinance requiring that children be vaccinated before attending any school, public or private. In 🚩*Prince v. Massachusetts*, which followed the incorporation of the First Amendment against the States, the Supreme Court considered a Free Exercise Clause challenge to child labor laws. *See* 🚩321 U.S. at 159-60, 64 S.Ct. 438. Citing 🚩*Jacobson*, the Court commented in dictum that a parent "cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death." 🚩*Id.* at 166-67, 64 S.Ct. 438.

[15]   So has the Connecticut Supreme Court, which upheld an early predecessor of the Act against challenges under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *See* 🚩*Bissell v. Davison*, 65 Conn. 183, 32 A. 348, 350 (1894).

**\*10**   Recent cases of this Court, many of which have applied the 🚩*Smith* test, have reached similar conclusions. In 🚩*Phillips*, we held that "mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause." 🚩775 F.3d at 543. During the recent pandemic, we denied under 🚩*Smith* a request to preliminarily enjoin a regulation, which lacked a religious exemption, requiring healthcare workers to be vaccinated against COVID-19. *See* 🚩*Hochul*, 17 F.4th at 273-74.

In *Goe*, we decided that because the federal Constitution confers no fundamental right to an education, rational basis review applied to a regulation limiting medical exemptions to school immunization requirements to cases where physicians identified a contraindication or precaution that was consistent with nationally recognized medical standards. *See* 43 F.4th at 30-32.

Most recently, we considered a county executive's emergency declaration mandating that, during an outbreak of measles, unvaccinated children be excluded from places of public assembly, including schools. *See Rockland County*, 53 F.4th at 34. The emergency declaration exempted children whose physicians confirmed that they were immune from the disease or medically unable to receive vaccination. *Id.* The plaintiffs, who objected to vaccination on religious grounds, claimed that the emergency declaration violated the Free Exercise Clause because it targeted them on account of their beliefs. *Id.* at 34-35. The defendants, the county health department and various county officials, moved for summary judgment, which the district court granted. *See* 🚩*W.D. v. Rockland County*, 521 F. Supp. 3d 358, 371 (S.D.N.Y. 2021). Applying 🚩*Smith*, the district court held that the emergency declaration was neutral and generally applicable; it also held that the declaration satisfied rational basis review. 🚩*Id.* at 397-407.

We reversed because we found there were disputes of material fact as to at least three issues: (1) whether county officials acted out of anti-religious animus, (2) whether there were children in the county who were unvaccinated for reasons other than religious objection or medical contraindication, and (3) what the county's purpose was in enacting the emergency declaration. *See Rockland County*, 53 F.4th at 36. As to 🚩*Smith*'s neutrality prong, we held that a reasonable juror could find that the county officials acted out of animus. *Id.* at 36-38. As to the general applicability prong, we decided that the defendants presented insufficient evidence about the purpose and scope of the emergency declaration. *Id.* at 38-39.[16] Our decision in *Rockland County* did not, however, reach the constitutional question that case and this one share.

[16]   Judge Park concurred. He agreed that the district court had erred in granting summary judgment. Rather than remanding, however, Judge Park would have applied "🚩*Smith* to facts not in dispute" to find that "the Emergency Declaration

was neither neutral nor generally applicable."
*Rockland County*, 53 F.4th at 40 (Park, *J.*,
concurring). Judge Park noted that New York
repealed its religious exemption following the
events at issue in *Rockland County* but that this
Court has not considered whether the revised
vaccination mandate is constitutional. *See id.* at 41.

He also urged that 🚩*Smith* be overruled. *Id.* at
41-42.

### B. Application

The district court dismissed plaintiffs' free exercise challenge
for failure to state a claim, on two grounds. First, the district
court held that our precedents, especially 🚩*Phillips* and
🚩*Hochul*, foreclose plaintiffs' claim. Second, the district
court also concluded that, even if that were not the case,
the Act is subject to and passes rational basis review under
🚩*Smith*.

Plaintiffs' free exercise challenge presents a question of
first impression for this Court: whether a State, having
previously accommodated religious objections to vaccination
by providing a mechanism for objectors to obtain exemptions,
may repeal that mechanism without offending the Free
Exercise Clause. [17] We conclude that the Act satisfies both
prongs of the 🚩*Smith* test and also satisfies rational basis
review.

17
Although our decision in 🚩*Phillips* contains
persuasive dictum, we decided that case before
New York repealed its religious exemption, and
the issue there concerned only the temporary
exclusion of unvaccinated children from school
during an emergency. *See* 🚩775 F.3d at 543. In
🚩*Hochul*, a draft of the challenged regulation
contained a religious exemption, but the final
regulation did not, so there was no repeal of a
previously enacted exemption. *See* 🚩17 F.4th at
282-83. Moreover, 🚩*Hochul* denied preliminary
injunctive relief and thereby considered only the
plaintiffs' *likelihood* of success on the merits;
it did not definitively resolve the merits of the
controversy. 🚩*Id.* at 286-88. *Goe* concerned the
criteria for medical exemptions, not the availability

of religious exemptions. *See* 43 F.4th at 31. And
as we discuss further below, *Rockland County*
is factually distinguishable from this case: It
concerned a temporary measure undertaken in
the context of an outbreak of contagious disease;
it involved plausible allegations that government
officials acted with anti-religious animus; and the
scope of those affected by the county's emergency
declaration was unclear. Rockland County may
have permitted children to remain unvaccinated
on the basis of non-religious personal beliefs, but
Connecticut law has never done so. *See* 53 F.4th at
36-39.

### 1. Neutrality

**\*11**  We begin with neutrality. The Act's legislative history
does not contain evidence of hostility to religious believers,
even when read with an eye toward "subtle departures from
neutrality" or "slight suspicion" of "animosity to religion or
distrust of its practices." 🚩*Masterpiece Cakeshop*, 138 S.
Ct. at 1731. Although plaintiffs contend in their supplemental
brief that they find "implicit hostility" in the legislative
debate, they have not pointed to any specific expressions of
animus. Appellants' Suppl. Br. at 8; *see also* Appellants' Br.
at 29. Nor did plaintiffs make such a claim before the district
court. *See* 🚩*We The Patriots USA, Inc.*, 579 F. Supp. 3d at
306 ("Plaintiffs have not advanced an argument that P.A. 21-6
was motivated by any religious animus and the legislative
history suggests, as Defendants argue, that the enactment
of this law was based upon declining student vaccination
rates.").

Both houses of the General Assembly debated the Act
respectfully, albeit vigorously. Many of the Act's proponents
acknowledged the impact it would have on children and
families who hold religious objections to vaccination but
balanced that impact against the risks to public health. *See*
*F.F.*, 143 N.Y.S.3d at 741 (noting that to "highlight the
tension between public health and socio-religious beliefs"
does not constitute anti-religious animus). To the extent the
debate contained intemperate language, it was more on the
part of legislators who denounced the Act because it was
"fundamentally wrong, immoral, and I would say even anti
American," Senate Proc. at 636; it would create "even more
segregation in the state of Connecticut," House Proc. at 892;
or it would turn families into "religious refugees," *id.* at 911.

We The Patriots USA, Inc. v. Connecticut Office of Early..., --- F.4th ---- (2023)
2023 WL 4982325
Case 8:23-cv-01380-DLB Document 48 Filed 08/07/23 Page 16 of 34

Far from expressing hostility, legislators accommodated religious objectors to an extent the legislators believed would not seriously undermine the Act's goals. Four accommodations deserve particular mention. Most significant is the legacy provision. The Department of Public Health expressed concern about this provision in written testimony before the General Assembly's Public Health Committee. *See* DPH Testimony at 5. Yet, contrary to the department's advice, the legislature expanded the legacy provision to include students enrolled in kindergarten and above. Indeed, some legislators who opposed the final version of the Act supported the amendment that extended the legacy provision to younger children. Proponents recognized that expanding the legacy provision at a time when vaccination rates for kindergartners had dipped substantially "represents some measure of risk" even as it also "postpones ... a day of reckoning" for some families. House Proc. at 809. Second, another amendment the legislature adopted made explicit that legacy students would not be required to be vaccinated if they changed schools.

Next, the legislature crafted some of the Act's provisions to make it less difficult for families to obtain medical exemptions if a healthcare provider finds vaccination to be medically contraindicated. Recognizing that some families were unable to obtain a medical exemption under Connecticut's previous, stricter regime, the legislature redefined the medical exemption to encompass contraindications not enumerated by federal public health agencies. *See* Public Act 21-6 § 7. Finally, the legislature recognized that some families declined vaccination because they did not have access to adequate information about its benefits and risks. In the Act, therefore, the legislature required that many insurance plans cover longer consultations between families and healthcare providers. *See id.* §§ 10-11.

These provisions demonstrate the legislature's solicitude for the concerns of religious objectors.[18] That the legislature declined to pursue other, even broader accommodations does not detract from the accommodations it did provide. For example, the House of Representatives defeated a proposed amendment that would have preserved the religious exemption for nonpublic schools, colleges and universities, and childcare centers. The Senate voted against an amendment that would have granted legacy status to students, including out-of-state college students, who move to Connecticut after obtaining religious exemptions in other States. While these and other proposals would have made the Act less jarring in effect, the record contains no indication

the legislature rejected them out of hostility to religion, rather than for reasons of health and safety.

18    The dissent argues that the accommodations contained in the Act undermine the General Assembly's conclusion that the increasing prevalence of religious exemptions constituted a threat to the health and safety of students and the public. *See post*, at —— – ——. But on the dissent's logic, the Act would better withstand a free exercise challenge if it were *less* solicitous of religious concerns. That proposition is inconsistent with the principle that government may act with "benevolent neutrality" toward religion, *see* 🚩 *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), and cannot be the law. Moreover, as we discuss below, the accommodations the General Assembly provided struck a rational balance between the competing goods legislators were weighing.

**\*12**  At bottom, plaintiffs' argument that the Act is not neutral under 🚩 *Smith* boils down to the proposition that repealing any existing religious exemption is hostile to religion per se. *See* Appellants' Br. at 28-29. We find this argument unpersuasive, for four reasons.

First, the Supreme Court has used a consistent cluster of terms to describe the kind of official attitude that violates the neutrality prong of 🚩 *Smith* -- "hostility," "animosity," "distrust," "a negative normative evaluation." 🚩 *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (quoting 🚩 *Church of Lukumi Babalu Aye*, 508 U.S. at 537, 547, 113 S.Ct. 2217). These terms denote a subjective state of mind on a government actor's part, not the mere fact that government action has affected religious practice. Here, the legislative record simply reveals no evidence of any such animus.

Second, we are persuaded to follow the common-sense approach of the New York state courts that considered a Free Exercise Clause challenge to the repeal of New York's religious exemption. These courts explained that, in deciding whether the legislature's action was neutral, the law should be considered "as a whole." *F.F. ex rel. Y.F. v. State*, 66 Misc.3d 467, 114 N.Y.S.3d 852, 864 (Sup. Ct. 2019), *aff'd sub nom. F.F. v. State*, 194 A.D.3d 80, 143 N.Y.S.3d 734

(3d Dep't 2021); *see also* ⚐*Hochul*, 17 F.4th at 282 ("The absence of a religious exception to a law ... does not, on its own, establish non-neutrality such that a religious exception is constitutionally required."). "That the Legislature repealed a previously authorized religious exemption does not in and of itself transmute the law into a non-neutral law that targets religious beliefs." *F.F.*, 114 N.Y.S.3d at 864. Viewed in this light, Connecticut's amended school immunization law mentions religion only to provide legacy exemptions. It contains no suggestion of hostility to religion.

Third, the Supreme Court has long described religious exemptions as part of a mutually beneficial "play in the joints" between the Establishment Clause and Free Exercise Clause. ⚐*Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). As with many of the other exemptions that benefit individuals and communities of faith -- not requiring religious organizations to pay income and property tax, for instance -- the government may constitutionally elect to accommodate religious believers but is not constitutionally *required* to do so. *See, e.g.,* ⚐*Carson v. Makin*, ––– U.S. ––––, 142 S. Ct. 1987, 2000, 213 L.Ed.2d 286 (2022) (holding States need not subsidize private education, including private religious schools, but must make any subsidies equally available to religious and nonreligious schools). Plaintiffs' argument, which would make every exemption permanent once granted, threatens to distort the relationship between the Clauses. In this respect, we find persuasive the Tenth Circuit's analysis in ⚐*Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014) (Gorsuch, *J.*), which concerned a Wyoming prison's decision to discontinue allowing a Native American prisoner to use a sweat lodge on prison property. "Surely the granting of a religious accommodation to some in the past doesn't bind the government to provide that accommodation to all in the future, especially if experience teaches the accommodation brings with it genuine safety problems that can't be addressed at a reasonable price." *Id.* at 58.

**\*13** Finally, adopting plaintiffs' rule would disincentivize States from accommodating religious practice in the first place. *See* ⚐*id.* Few reasonable legislators or other government actors would be willing to tie the hands of generations of their successors by enacting accommodations that could not be repealed or changed if they no longer served the public good.

For all these reasons, we conclude, as a matter of law, that the Act is neutral within the meaning of 🚩*Smith*.

### 2. General Applicability

We turn next to the question of general applicability, considering both whether the Act contains "individualized exemptions" and whether it is "substantially underinclusive." ⚐*Hochul*, 17 F.4th at 284.

#### a. Individualized Exemptions

The Act does not provide "a mechanism for individualized exemptions," meaning that it does not give government officials discretion to decide whether a particular individual's reasons for requesting exemption are meritorious. ⚐*Fulton*, 141 S. Ct. at 1877 (citing 🚩*Smith*, 494 U.S. at 884, 110 S.Ct. 1595). The medical exemptions the Act provides are instead mandatory and framed in objective terms: A student "shall be exempt" if, for instance, the student "presents a certificate ... from a physician, physician assistant or advanced practice registered nurse stating that in the opinion of such physician, physician assistant or advanced practice registered nurse such immunization is medically contraindicated because of the physical condition of such child." Public Act 21-6 § 1(a)(2).[19] Likewise, a student "shall be exempt" from immunization against measles, mumps, and rubella upon presentation of "a certificate from a physician, physician assistant or advanced practice registered nurse or from the director of health in such child's present or previous town of residence, stating that the child has had a confirmed case of such disease." *Id.* § 1(a)(3). In ⚐*Hochul*, we joined other Circuits in holding that where a law "provides for an objectively defined category of people to whom the vaccination requirement does not apply," including a category defined by medical providers' use of their professional judgment, such an exemption "affords no meaningful discretion to the State." 17 F.4th at 289; *see also* 🚩*Doe v. Bolton*, 410 U.S. 179, 199, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) ("If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment.").

19     This language requires the healthcare provider to reach a determination about medical contraindication that is more certain than what at least one other State requires. In *Does 1-3 v. Mills*, ––– U.S. ––––, 142 S. Ct. 17, 211 L.Ed.2d 243 (2021), the Supreme Court declined to grant injunctive relief to healthcare workers challenging Maine's COVID-19 vaccination mandate. Dissenting, Justice Gorsuch criticized the Maine law for permitting medical providers to grant exemptions where immunization simply "may be" inapposite. *Id.* at 19 (Gorsuch, *J.*, dissenting from denial of injunctive relief).

Plaintiffs are incorrect that the Act's requirement that specified documents supporting requests for medical exemptions be acknowledged by, *inter alia*, state and local officials affords such officials the discretion to approve or deny exemptions on a case-by-case basis. *See, e.g.*, Public Act 21-6 § 1(a)-(c). As in 🚩*Hochul*, these elements of the Act's medical exemption regime do not allow "the government to decide which reasons for not complying with the policy are worthy of solicitude." 🚩17 F.4th at 289 (quoting 🚩*Fulton*, 141 S. Ct. at 1879 (internal quotation marks omitted)).

### b. Substantial Underinclusiveness

 **\*14**   The second way the Act might arguably fail the general applicability prong calls for more complex analysis. As we have explained above, under this prong the Act may not pass muster if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." 🚩*Fulton*, 141 S. Ct. at 1877. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue ... [and] not the reasons why people gather." 🚩*Tandon*, 141 S. Ct. at 1296.

Therefore, we must first determine what interest Connecticut has asserted justifies the Act, then decide whether permitting medical exemptions and repealing religious exemptions promote the State's interest. We conclude that the Act's purpose is "to protect the health and safety of Connecticut students and the broader public," Appellees' Suppl. Br. at 9, and that medical but not religious exemptions serve this interest. It is only at this stage of the analysis that the dissent parts ways.

The State has described its interest in the Act in consistent terms throughout the legislative process, before the district court, and on appeal. For instance, the acting commissioner of the Department of Public Health testified before the Public Health Committee that the legislation "outline[d] a plan to strengthen the health of our school communities." DPH Testimony at 1. The Act's proponent in the State Senate asked rhetorically, "Why this Bill now?", and answered, "It is our obligation to protect the public health" in view of the rising number of nonmedical exemptions. Senate Proc. at 615. Other legislators spoke of the need to avoid "a real public health crisis," House Proc. at 847; said that "good public health policy is, by definition, proactive not reactive," *id.* at 1001, 1167; and noted that "the nature of a public health approach is to prevent an outbreak," *id.* at 1261. Upon signing the Act, Governor Lamont said that "[t]his legislation is needed to protect our kids against serious illnesses that have been well-controlled for many decades, such as measles, tuberculosis, and whooping cough, but have reemerged." Office of the Governor, *Governor Lamont Signs Legislation Updating School Immunization Requirements* (Apr. 28, 2021), https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2021/04-2021/Governor-Lamont-Signs-Legislation-Updating-School-Immunization-Requirements.

At oral argument before the district court, defendants "maintained that Connecticut's interest in P.A. 21-6 was to 'protect the health and safety of Connecticut's schoolchildren.'" 🚩*We The Patriots USA, Inc.*, 579 F. Supp. 3d at 307 (quoting Defs.' Mem. at 20). Although plaintiffs argued that the State had framed its interest at too high a degree of generality, the district court concluded that "the state legislators identified that the purpose of this law is to protect community health and Plaintiffs make no showing that this interest is pretextual or unwarranted." 🚩*Id.* at 307-08. On appeal, plaintiffs have not challenged these findings of the district court, and at oral argument before us, the State reiterated that its interest is in the "health and safety of the students." Recording of Oral Arg. at 11:21-23; *see also* 19:34 ("the health and safety of the students is paramount").

We conclude from the consistency of defendants' assertions that there is no cause to fear that Connecticut or the district court has "restat[ed] the State's interests ... at an artificially high level of generality" to sidestep the general applicability

requirement. *Mills*, 142 S. Ct. at 20 (Gorsuch, *J.*, dissenting); *see Rockland County*, 53 F.4th at 42 (Park, *J.*, concurring). Nor do we find any sign that the State has offered for litigation purposes a *post hoc* rationalization of a decision originally made for different reasons. *See Does 1-3*, 142 S. Ct. at 20 (Gorsuch, *J.*, dissenting).[20] We therefore turn to whether medical and religious exemptions serve the State's interest in students' health and safety.

[20]    The dissent faults Connecticut for, at times, "broaden[ing] [its] interest to include protecting the health and safety of the general public." *Post*, at ——. But it is not contradictory for the State to focus primarily on the health and safety of students while also acknowledging that the incidence of vaccine-preventable illness among students has implications for public health at large. "[T]he health of our school communities," DPH Testimony at 1, necessarily includes the health of persons other than students, including teachers, staff, parents, and members of the broader public.

**\*15** The district court found that while the Act's medical exemptions further Connecticut's interest, maintaining the repealed religious exemption would not. *See 🚩 We The Patriots USA, Inc.*, 579 F. Supp. 3d at 308. We agree.

In comparing the two types of exceptions, we must determine how the Supreme Court's guidance in 🚩*Tandon* -- which concerned limits on religious worship during the pandemic -- applies to the Act. In 🚩*Hochul*, we rejected plaintiffs' argument that the Supreme Court's precedents "require[d] us to confine our analysis to evaluating the risk of COVID-19 transmission posed by each unvaccinated individual." 🚩17 F.4th at 286. Instead, we highlighted the Supreme Court's reference to "the risks posed by groups of various sizes in various settings," concluding that this "suggests the appropriateness of considering aggregate data about transmission risks." 🚩*Id.* at 287. Indeed, when in 🚩*Tandon*, the Court discussed "the risks various activities pose," 🚩141 S. Ct. at 1296, the "activities" in question were not individual behaviors but instead aggregations of individual behavior -- gatherings that were religious or secular, private or commercial -- that might transmit COVID-19. When the Court spoke of "comparable secular businesses *or other activities*," it directed courts assessing COVID-19 restrictions to compare the risk posed by operating a store as opposed to

offering a religious service, not the risk posed by or to any individual shopper or worshipper. 🚩*Id.* (emphasis added). The Court reiterated the point by treating *in pari materia* the terms "secular activities" and "religious worship" and, likewise, "other activities" and "religious exercise." 🚩*Id.* at 1296, 1297. All these terms refer to aggregations of individual behaviors, not individual behaviors themselves.

We therefore reject plaintiffs' argument that we should cabin our analysis to the risk an individual child who is unvaccinated -- whether for medical or religious reasons -- might pose to the health and safety of Connecticut students. On plaintiffs' view, "[w]hen two unvaccinated children walk through the schoolhouse door, disease will not walk up to them and ask them why they are ... unvaccinated." Appellants' Br. at 32; *see also* Appellants' Suppl. Br. at 8. In other words, plaintiffs argue, because unvaccinated children are at heightened risk of developing and transmitting vaccine-preventable illnesses, regardless of their reason for not being vaccinated, medical and religious exemptions are comparable, and, under 🚩*Fulton*, the State may not prefer a medical reason over a religious one when the medical reason "undermines the government's asserted interests in a similar way." 🚩141 S. Ct. at 1877.

This reasoning, however, is based on a misunderstanding of the State's interest in mandating vaccination in schools, which the law requires nearly all of Connecticut's five-to eighteen-year-olds to attend. *See* 🚩Conn. Gen. Stat. § 10-184. Allowing students for whom vaccination is medically contraindicated to avoid vaccination while requiring students with religious objections to be vaccinated does, in both instances, advance the State's interest in promoting health and safety. To the contrary, exempting a student from the vaccination requirement because of a medical condition and exempting a student who declines to be vaccinated for religious reasons are not comparable in relation to the State's interest.

**\*16** The Act promotes the health and safety of *vaccinated* students by decreasing, to the greatest extent medically possible, the number of unvaccinated students (and, thus, the risk of acquiring vaccine-preventable diseases) in school. The Act also promotes the health and safety of *unvaccinated* students. Not only does the absence of a religious exemption decrease the risk that unvaccinated students will acquire a vaccine-preventable disease by lowering the number of

We The Patriots USA, Inc. v. Conn. Office of Early..., --- F.4th ---- (2023)

2023 WL 4982325

Case 3:23-cv-01380-DLB   Document 48   Filed 08/07/23   Page 20 of 34

unvaccinated peers they will encounter at school, but the medical exemption also allows the small proportion of students who cannot be vaccinated for medical reasons to avoid the harms that taking a particular vaccine would inflict on them. It is for these reasons that the acting commissioner of the Department of Public Health testified that "[h]igh vaccination rates protect not only vaccinated children, but also those who cannot be or have not been vaccinated." DPH Testimony at 1. In contrast, exempting religious objectors from vaccination would only detract from the State's interest in promoting public health by increasing the risk of transmission of vaccine-preventable diseases among vaccinated and unvaccinated students alike.

This analysis is bolstered by the public health data and expert testimony the General Assembly considered before adopting the Act, some of which are summarized in a document plaintiffs appended to the complaint. *See* App'x at 117-22. The material attached to the complaint is sparse, but, as we noted above, we may take judicial notice of the facts and analysis in the legislative record, including the testimony of the acting commissioner of the Department of Public Health and comments from numerous medical authorities. These materials show there is no question that there is a difference in magnitude between the number of religious and medical exemptions that Connecticut families claimed prior to the Act's adoption. In school years 2018-2019 and 2019-2020, more than ten times as many kindergartners claimed religious exemptions compared to medical exemptions. The legislative history, moreover, contains numerous indications that significant numbers of religiously exempt students attend the same schools. Against this backdrop, the Legislature reasonably judged that the risk of an outbreak of disease was acute, even if not necessarily imminent, and that continuing to permit religious exemptions, the State's only kind of nonmedical exemption, to multiply would increase that risk.

Plaintiffs and the dissent suggest that further development of the factual record might reveal that medical exemptions and religious exemptions are comparable for Free Exercise Clause purposes. But because the Act's medical exemptions further the State's interest in a way a religious exemption would not, permitting plaintiffs to proceed to discovery would require more of the State than what the Supreme Court has prescribed. Laws and regulations that incidentally burden religious exercise are subject to rational basis review unless they fail a prong of the ⚑ *Smith* test. *See* ⚑ *Tandon*, 141 S. Ct. at 1296. If, after the legislature and governor have made a policy decision, the State must go through discovery

notwithstanding plaintiffs' failure to proffer evidence that medical and religious exemptions are similarly situated, that would impermissibly shift onto the State a burden that remains on plaintiffs so long as the Act is subject to rational basis review. *See* ⚑ *id.*; *see also, e.g.,* ⚑ *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) ("Where the government seeks to enforce a law that is neutral and of general applicability, however, then it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices.").

The cases on which plaintiffs and the dissent rely are not to the contrary. First, this case differs substantially from those in which courts have held that comparable religious and secular activities *both* undermined a government interest.

In ⚑ *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366-67 (3d Cir. 1999) (Alito, J.), for instance, the court struck down a police department's policy allowing medical but not religious exemptions from the requirement that officers be clean-shaven. Because the department's asserted interest was in the appearance of its officers, that interest was *equally* undermined when officers grew beards for religious and medical reasons. *See also* ⚑ *Monclova Christian Acad. v. Toledo-Lucas Health Dep't*, 984 F.3d 477, 480-82 (6th Cir. 2020) (comparing pandemic-era restrictions on religious schools and secular businesses); ⚑ *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1234-35 (11th Cir. 2004) (comparing effect of business district zoning ordinance on houses of worship and private clubs and lodges). Here, as we have explained, religious but not medical exemptions undermine the State's interest. Moreover, a police department's interest in the *appearance* of its officers is of a different nature from a state's interest in the health of its schoolchildren.

**\*17** Second, the data about the relative prevalence of religious and medical exemptions distinguish this case from both ⚑ *Central Rabbinical Congress* and ⚑ *Hochul*. In the 2019-2020 school year, 2.3% of Connecticut kindergartners had religious exemptions, compared to 0.2% who had medical exemptions. *See* App'x at 119-20. Even though the proportion of students with religious exemptions declined slightly from school year 2018-2019 to school year 2019-2020, still more than ten times as many students had religious exemptions than medical exemptions. *See id.* The Act does not, therefore, offend the Free Exercise Clause because it is "substantially

We The Patriots USA, Inc. v. Connecticut Office of Early..., 2023 WL 4982325...

2023 WL 4982325

Case 8:23-cv-01380-DLB   Document 48   Filed 08/07/23   Page 21 of 34

underinclusive." *Cent. Rabbinical Cong.,* 763 F.3d at 197. In contrast, in *Central Rabbinical Congress*, the proportions of religious and secular conduct at issue were effectively reversed: "[F]ewer than 10%" of cases of neonatal herpes simplex virus infection were caused by religious conduct, compared with "approximately 85%" of cases caused by transmission from mother to child during birth. *See id.* at 187, 197. And in *Hochul*, we had "only limited data regarding the prevalence of medical ineligibility and religious objections" among healthcare providers regarding vaccination against a disease that had appeared less than two years before suit was filed. 17 F.4th at 287. Denying plaintiffs' request for a preliminary injunction, we explained that, even on a "sparse" record, "what data we do have indicates that claims for religious exemptions are far more numerous." *Id.* at 287-88. [21]

[21]    In *Central Rabbinical Congress* and *Rockland County*, moreover, there were reasons for concern that the challenged government actions were not religiously neutral. We decided *Central Rabbinical Congress* under the neutrality prong of *Smith*, finding that even if the regulation in question were "facially neutral ... it is abundantly clear that [it] is not neutral in operation, as assessed in practical terms." 763 F.3d at 194 (citation and internal quotation marks omitted). And in *Rockland County*, we held that the presence or absence of religious animus was "the sort of close factual question that should be left to the jury." 53 F.4th at 37-38.

Third, this case does not present meaningful uncertainties as to the scope or purpose of the Act. As we have described above, the General Assembly enacted, and Governor Lamont signed, the Act to promote the health and safety of Connecticut's schoolchildren and, consequently, the broader public; the State has articulated that interest throughout this litigation. The Act's text and legislative history make clear that students who are not vaccinated or in the process of being vaccinated may only attend school if they have received a medical exemption; there are no other possible bases for exemption. *See* Public Act 21-6 § 1(a)(1)-(2); Senate Proc. at 661. In contrast, in *Rockland County* there were serious factual questions about both the county's purpose in enacting

the emergency declaration and the categories of children that were affected by it.

For all these reasons, we conclude that religious and medical exemptions are not comparable in reference to the State's interest in the health and safety of Connecticut's children and the broader public. [22]

[22]    In this regard, the Act's medical exemptions are analogous to the medical exemption contained in the statute at issue in *Smith*, which permitted the possession of controlled substances "obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of professional practice." Or. Rev. Stat. § 475.992(4) (1987); *see also Smith*, 494 U.S. at 874, 110 S.Ct. 1595; *Hochul*, 17 F.4th at 289-90. The State's interest in preventing the unauthorized manufacture or delivery of controlled substances was not undermined when a licensed professional prescribed a substance or supplied it licitly but was undermined when the drug was made or distributed on the black market.

### 3. Rational Basis Review

Because the Act and its legislative history contain no trace of hostility toward religion but rather reflect significant accommodations on the part of the legislature, because the Act does not provide for a system of individualized exemptions, and because it is not substantially underinclusive, it is neutral and generally applicable. The district court did not err, therefore, when it concluded the Act is subject to rational basis review.

**\*18**   Although we are bound by *Smith* and its progeny, other reasons also support this conclusion. First, both the Supreme Court and this Court have long held that neither education nor absolute freedom from unwanted vaccination is a fundamental right. *See, e.g., Plyler v. Doe,* 457 U.S. 202, 223, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Goe*, 43 F.4th at 31. Second, as we discuss more fully below, courts that have reviewed substantive due process challenges to vaccination mandates have also applied rational basis review, whether or not those who objected to vaccination gave religious reasons. Indeed, some courts have upheld these laws "based

We The Patriots USA, Inc. v. Conn. Office of Early Childhood Dev., --- Fed.Appx. ---- (2023)
2023 WL 4982325

Case 8:23-cv-01380-DLB   Document 48   Filed 08/07/23   Page 22 of 34

on historical experience without the need for legislative fact-finding hearings." *F.F. on behalf of Y.F. v. State*, 65 Misc.3d 616, 108 N.Y.S.3d 761, 776 (Sup. Ct. 2019). Third, courts in two of the three other States that since 2015 have repealed religious exemptions from school immunization mandates have upheld the revised statutes against Free Exercise Clause claims without deciding that strict scrutiny was required. *See Love*, 240 Cal. Rptr. 3d at 868; *Whitlow*, 203 F. Supp. 3d at 1089; *F.F.*, 143 N.Y.S.3d at 742-43.

Plaintiffs do not dispute that the Act satisfies rational basis review. *See* Appellants' Br. at 40-42. They concede that protecting public health is a compelling government interest. *Id.* at 40 n.4. The Act's repeal of the religious exemption is rationally related to that interest because it seeks to maximize the number of students in Connecticut who are vaccinated against vaccine-preventable diseases. The Act's requirement that children be vaccinated to attend school -- as opposed to participate in "community sports leagues, religious gatherings, and social gatherings of all types," *see post*, at —— -- is rational because only at school is attendance mandated by law, *see* Conn. Gen. Stat. § 10-184. The Act's legacy provision is rationally related because it accommodates religious believers who are already in school without extending that accommodation to younger children. Also rationally related to the State's interest are the Act's other provisions: broadening eligibility for medical exemptions (in part as a way of curtailing misuse of the religious exemption), ensuring consistency in the administration of medical exemptions, and facilitating conversations about vaccination between individuals and healthcare providers.

Therefore, plaintiffs have not stated a plausible claim that the Act offends the Free Exercise Clause. Nor have they plausibly claimed the Act imposes unconstitutional conditions on the receipt of education or other state services, because it is a constitutional exercise of Connecticut's police power. *See Goe*, 43 F.4th at 34 n.16. We need not and do not decide whether the Act would also satisfy strict scrutiny.

## II. The Other Constitutional Claims

### A. Medical Freedom and Privacy

In their complaint, plaintiffs argued that the Act also violates their rights to privacy and medical freedom under the First, Fourth, Fifth, and Fourteenth Amendments. They subsequently narrowed their argument to encompass only the Fourteenth Amendment. This claim, however, is foreclosed by binding precedent.

In *Phillips*, we squarely rejected a substantive due process challenge to New York's then-existing vaccination mandate. 775 F.3d at 542-43; *see also Caviezel v. Great Neck Pub. Schs.*, 500 F. App'x 16, 19 (2d Cir. 2012) (summary order). Again in *Hochul*, we observed that "[b]oth this Court and the Supreme Court have consistently recognized that the Constitution embodies no fundamental right that in and of itself would render vaccine requirements imposed in the public interest, in the face of a public health emergency, unconstitutional." 17 F.4th at 293 (first citing *Jacobson*, 197 U.S. at 25-31, 37, 25 S.Ct. 358; and then citing *Phillips*, 775 F.3d at 542-43). In *Goe*, moreover, we reaffirmed that the federal Constitution confers no fundamental right to an education. We also noted that "no court has ever held that there is a right" for an individual to claim even a "medical exemption from immunization," where there is no "reasonable certainty" a vaccine would cause harm. 43 F.4th at 31 (quoting *Jacobson*, 197 U.S. at 39, 25 S.Ct. 358). "Nor has any court held that such a right is implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." *Id.* (internal quotation marks and citation omitted); *see also Dobbs v. Jackson Women's Health Org.*, ––– U.S. ––––, 142 S. Ct. 2228, 2283, 213 L.Ed.2d 545 (2022) (reiterating standard for substantive due process claims).

**\*19** These precedents dictate the result here, and we see no reason to depart from them. First, plaintiffs attempt to distinguish *Hochul* (on the basis that the regulation challenged in that case was promulgated during an emergency and affected a smaller number of individuals than the Act) as well as *Phillips* (on the basis that the plaintiffs in that case described the right they claimed at too high a level of generality). *See* Appellants' Br. at 43. But plaintiffs give no reason why emergency circumstances or the number of individuals whose rights are affected should factor into our analysis. Our decision in *Phillips* was not premised on the level of specificity of the right the plaintiffs claimed, and indeed the *Phillips* plaintiffs invoked a right to "religious freedom, privacy[,] and bodily autonomy" not unlike that described by plaintiffs here. Reply Brief for

Plaintiffs-Appellants at 20, *Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015) (per curiam) (No. 14-2156), 2014 WL 4794681, at *20. Plaintiffs have therefore failed to demonstrate why our holdings in *Phillips* and *Hochul* do not foreclose their claim.

Second, plaintiffs have offered no evidence that the right to be free from unwanted vaccination is either implicit in the concept of ordered liberty or deeply rooted in U.S. history and tradition. To the contrary, for more than a century, courts have consistently rejected the notion that there is a "fundamental right ingrained in the American legal tradition" to avoid vaccination. *Klaassen v. Trs. of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021); *see also, e.g.*, *Jacobson*, 197 U.S. at 31, 25 S.Ct. 358; *Zucht*, 260 U.S. at 176, 43 S.Ct. 24; *Workman*, 419 F. App'x at 355-56; *Phillips*, 775 F.3d at 542; *Hochul*, 17 F.4th at 293; *Goe*, 43 F.4th at 30-31; *Doe v. Zucker*, 520 F. Supp. 3d 217, 251 (N.D.N.Y. 2021); *B.W.C. v. Williams*, 990 F.3d 614, 622 & n.16 (8th Cir. 2021). Other cases have alluded to the balance that the law has long struck between individuals' freedom to refuse medical treatment and the government's interest in public health. *See, e.g.*, *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). To the extent that plaintiffs rely on precedents regarding medical privacy that the Supreme Court overruled in *Dobbs*, that decision undercuts their arguments. *See* Dkt. No. 71 (defendants' letter filed pursuant to Fed. R. App. P. 28(j)).

Finally, although the Act imposes substantial consequences where a student or childcare participant is not vaccinated or does not obtain a medical exemption, defendants are correct that the Act "does not compel vaccination, but simply makes it a condition for enrolling in school." Appellees' Br. at 51. What we said in *Hochul* applies with equal force here: "[I]ndividuals who object to receiving the vaccines on religious grounds have a hard choice to make, [but] they do have a choice." 17 F.4th at 293-94; *see also Goe*, 43 F.4th at 31; *Doe v. Zucker*, 520 F. Supp. 3d at 252. For this and the foregoing reasons, the Act does not violate plaintiffs' substantive due process rights to privacy and medical freedom.

### B. Equal Protection

Plaintiffs contend the Act is also subject to strict scrutiny under the Equal Protection Clause of the Fourteenth Amendment because the legacy provision, by continuing to exempt children enrolled in kindergarten and later grades but not children who are younger, creates an age-based classification that burdens their free exercise rights. U.S. Const., amend. XIV, § 1. We agree with the district court that strict scrutiny does not apply, and we affirm its dismissal of this claim.

Under the Equal Protection Clause, claims that the government has discriminated based on age are typically subject to rational basis review because age is not a suspect classification. *See Gregory v. Ashcroft*, 501 U.S. 452, 470, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Where an age-based "classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class," however, strict scrutiny applies. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *see also Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

**\*20** In *Zucht*, the Supreme Court upheld a school vaccination mandate against an Equal Protection Clause challenge. 260 U.S. at 176-77, 43 S.Ct. 24. Although *Zucht* was decided before the categories of modern equal protection law developed, the Supreme Court anticipated what today we call rational basis review when it held that "in the exercise of the police power reasonable classification may be freely applied, and [a] regulation is not violative of the equal protection clause merely because it is not all-embracing." *Id.* at 177, 43 S.Ct. 24; *see also Workman*, 419 F. App'x at 354-55 (relying on *Zucht* to dismiss religiously based equal protection challenge to West Virginia's school vaccination requirement).

While plaintiffs are correct that the free exercise of religion is a fundamental constitutional right, we have already concluded that the Act does not impermissibly burden plaintiffs' free exercise rights. *See supra* Part I(B). Plaintiffs' attempt to argue that they need only "demonstrate a burden on a fundamental constitutional right," Appellants' Br. at 48, rather than plead a Free Exercise Clause claim under the applicable tests, is without support in the Supreme Court's cases. In *Williams*

*v. Rhodes*, 393 U.S. 23, 30-34, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), on which plaintiffs attempt to rely, the Court had no need to make such a distinction because the laws under review patently violated Ohio voters' associational rights under the First Amendment. In *Murgia*, likewise, the Court listed cases reaffirming fundamental rights without suggesting that courts should apply different tests when those rights are alleged to have been violated in a discriminatory way. 427 U.S. at 312 n.3, 96 S.Ct. 2562. Because there is no reason to apply heightened scrutiny to plaintiffs' equal protection challenge, we evaluate it under rational basis review.

We decided above that the legacy provision, like the law at issue in *Zucht*, is rationally related to the State's interest in protecting the health and safety of Connecticut's students. *See supra* Part I(B). As the district court observed, although the legacy provision will delay the full implementation of the Act, "[t]he class of unvaccinated students who may keep their religious exemptions will diminish as the students graduate, allowing the state to reduce the number of unvaccinated students, protect the public's health, and balance the expectation interests of parents with currently enrolled students." *We The Patriots USA, Inc.*, 579 F. Supp. 3d at 312. Therefore, the district court did not err in dismissing this claim.

### C. Childrearing

Plaintiffs next argue that the Act violates the fundamental liberty interest in childrearing protected by the Fourteenth Amendment because the Act's "vaccination requirement that prohibits the Plaintiffs from educating their children in any forum -- public or private -- completely interferes with their right to decide what is best for their children's health and to raise them according to their religious beliefs." App'x at 48. This claim also fails.

As plaintiffs note, the Supreme Court has repeatedly held that parents have a liberty interest "in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (collecting cases including *Prince*). In applying *Troxel*, we have cautioned that the Supreme Court "left the scope of that right undefined." *Leebaert v. Harrington*, 332 F.3d 134, 142 (2d Cir. 2003). In the educational context, we have joined other Circuits in holding there is not a parental right, absent a violation of the Religion Clauses, to "direct *how* a public

school teaches their child." *Skoros v. City of New York*, 437 F.3d 1, 41 (2d. Cir 2006) (quoting *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005)); *see also Brown v. Hot, Sexy and Safer Prods., Inc.*, 68 F.3d 525, 535 (1st Cir. 1995), *abrogated on other grounds as stated in Martinez v. Cui*, 608 F.3d 54, 63 (1st Cir. 2010); *Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 700 (10th Cir. 1998).

**\*21** In *Smith*, the Supreme Court observed that even where a law is neutral and generally applicable, some heightened level of scrutiny might apply where a petitioner brings forward a free exercise claim connected with a "communicative activity or parental right." 494 U.S. at 882, 110 S.Ct. 1595. We have held, however, that this language was dictum because the plaintiffs in *Smith* presented no such claim. *See Leebaert*, 332 F.3d at 143 (citing *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001)). Accordingly, like at least one other Circuit, we do not apply heightened scrutiny to "hybrid rights" claims. *Id.*; *see also Kissinger v. Bd. of Trs. of Ohio State Univ., Coll. of Veterinary Med.*, 5 F.3d 177, 180 (6th Cir. 1993).

The district court correctly held that plaintiffs' claim that the Act violates their liberty interest in childrearing was coextensive with their Free Exercise Clause claim. Therefore, upon deciding that the free exercise claim was without merit, the district court correctly dismissed plaintiffs' childrearing claim as well. Indeed, this claim is foreclosed by our precedents: As in *Leebaert* and *Skoros*, plaintiffs assert no liberty interest in the rearing of their children that is not encompassed in their free exercise claim.

### III. The IDEA Claim

Finally, plaintiff Elidrissi brings a claim against the State Agency Defendants and the Stamford Board of Education. The latter is responsible for the education of Elidrissi's son.

### A. Applicable Law

The IDEA requires States that receive federal funding to provide children with disabilities a "free appropriate public education that emphasizes special education and related

services." 20 U.S.C. § 1400(d)(1)(A). Where a State is sued for a violation of the IDEA, legal and equitable remedies "are available ... to the same extent as those remedies are available for such a violation in the [*sic*] suit against any public entity other than a State." *Id.* § 1403(b).

As defined in the IDEA, a "child with a disability" is a child who experiences one or more of a list of enumerated disabilities, including "speech or language impairments," and "who, by reason thereof, needs special education and related services." *Id.* § 1401(3)(A)(i)-(ii). A child who requires "related services" but not "special education" does not qualify as a "child with a disability." 34 C.F.R. § 300.8(a)(2)(i). "Special education," as defined in the IDEA, is "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29).

### B. Application

The district court dismissed Elidrissi's IDEA claim because the complaint pled that her child receives only "special services," not "special education." 🔖 *We The Patriots USA, Inc.*, 579 F. Supp. 3d at 315-16; *see* App'x at 44. The court held there was no "factual basis to infer that the child's condition could fall under the regulatory definition of a 'child with a disability' and not just a 'speech and learning disorder for which he needs special services.'" 🔖 *We The Patriots USA, Inc.*, 579 F. Supp. 3d at 314.

The district court's distinction between "special services" and "special education" was overly strict. The IDEA and its associated regulations do not use the phrase "special services." A reasonable inference from the allegation that Elidrissi's son suffers from "a speech and learning disorder for which he now receives special services," combined with the allegation that he "is disabled within the meaning of the IDEA," is that the "special services" the complaint mentions constitute "special education" rather than "related services." App'x at 44, 49. Therefore, although it is close, we conclude that because the district court parsed the complaint too restrictively, failing to draw reasonable inferences in Elidrissi's favor, the court erred when it found Elidrissi had not stated a plausible claim for relief under the IDEA. *See* 🔖 *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (holding that a claim is plausible where a plaintiff's allegations enable the court to draw a "reasonable inference" the defendant is liable).

**\*22** We therefore vacate and remand this aspect of the district court's judgment. On remand, it will be for the district court to consider defendants' challenges to the merits of Elidrissi's claim.

### CONCLUSION

For the reasons stated above, we AFFIRM the district court's judgment to the extent that it dismissed the first four counts of the complaint. We VACATE the portion of the district court's judgment dismissing the fifth count of the complaint and REMAND for further proceedings with respect to that claim.

Joseph F. Bianco, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority opinion as to all claims, except for its affirmance of the district court's dismissal of plaintiffs' claim challenging Public Act 21-6 (the "Act") under the Free Exercise Clause. I respectfully part company with the majority opinion as to Section I Parts B(2)(b) and B(3) where the majority concludes, *at the motion to dismiss stage*, that the Act passes constitutional muster under rational basis review pursuant to the legal standard articulated by the Supreme Court in 🔖 *Emp. Div., Dep't of Hum. Res. of Ore. v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

I emphasize, as a preliminary matter, that this case is not about a state's general authority to enact a mandatory vaccination law for schoolchildren. The Supreme Court and this Court have made clear, and with good reason, that it is within a state's police powers to establish such a requirement. *See* 🔖 *Zucht v. King*, 260 U.S. 174, 176, 43 S.Ct. 24, 67 L.Ed. 194 (1922) ("[I]t is within the police power of a state to provide for compulsory vaccination." (citing 🔖 *Jacobson v. Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905)); *accord* 🔖 *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) (per curiam)). Instead, today, we address a narrower question: whether a mandatory vaccination requirement, which repeals its previously existing religious exemption and allows *some* unvaccinated students —those with medical exemptions—to join their peers in schools, but excludes students who are unvaccinated due to religious objections, raises a plausible free exercise claim that survives a motion to dismiss. On this narrower question, the

district court erred in concluding that plaintiffs' free exercise claim was foreclosed by our prior precedent. Indeed, as the majority opinion acknowledges, "[p]laintiffs' free exercise challenge presents a question of first impression for this Court." [1] *Ante*, at ——.

1    In 🚩*Phillips*, we stated that "New York could constitutionally require that *all children* be vaccinated in order to attend public school." 🚩775 F.3d at 543 (emphasis added). However, as the majority opinion notes, that portion of our decision in 🚩*Phillips* was dictum. *Ante*, at —— n.17. In any event, as Judge Park has correctly observed in another case, "we have never said that allowing some unvaccinated students (*i.e.*, those with medical exemptions) to mingle with their peers in schools, while excluding religious objectors, would be constitutional." *M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health*, 53 F. 4th 29, 41 n.4 (2d Cir. 2022) (Park, *J.*, concurring).

In addition, it is important to note the limited task before us at this juncture. Specifically, we must determine whether, at the motion to dismiss stage, plaintiffs have stated a *plausible* free exercise claim by asserting that the Act, which requires students in public or private school to be vaccinated against certain communicable diseases and maintains a secular exemption while simultaneously eliminating a religious exemption, fails to satisfy the requirements for rational basis review articulated by the Supreme Court in 🚩*Smith*, and thus must be subject to strict scrutiny. *See* 🚩*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (holding that, to survive a motion to dismiss, the complaint "must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face' " (quoting 🚩*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007))). A determination that plaintiffs have plausibly asserted such a free exercise claim would not invalidate the Act, but rather would allow plaintiffs to conduct discovery on, *inter alia*, the disputed factual issues that bear upon what level of scrutiny should apply in reviewing the constitutionality of the Act under the Free Exercise Clause.

**\*23**    Under 🚩*Smith*, a state's law that burdens religious exercise avoids strict scrutiny only if it is "a valid and neutral law of general applicability." 🚩494 U.S. at 879, 110 S.Ct.

1595 (internal quotation marks and citation omitted). A law is "not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it."

🚩*Cent. Rabbinical Cong. of the U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene* (*Cent. Rabbinical Cong.*), 763 F.3d 183, 197 (2d Cir. 2014).

Here, for over fifty years, Connecticut maintained a religious exemption to the mandatory vaccination requirement for students. Connecticut contends that the Act's elimination of the religious exemption in 2021 was necessary to protect the health and safety of its schoolchildren. However, as set forth below, an analysis of the Act raises a plausible claim that it is substantially underinclusive to the extent it fails to regulate secular conduct, including by allowing an exemption to the mandatory vaccination law for students with medical objections, that is at least as harmful to the legitimate interest of promoting the health and safety of students and the public as is the religious conduct.

Although Connecticut asserts that this differing treatment between religious and secular exemptions was prompted by a substantial increase over recent years in the number of religious exemptions and an acute risk of an outbreak of disease, Connecticut fails to explain how forty-four states and the District of Columbia have maintained a religious exemption for mandatory student vaccinations without jeopardizing public health and safety. Connecticut also fails to articulate how having the "grandfather clause" in the Act that allows students with current religious exemptions to remain unvaccinated until they graduate high school (which could be over a decade if they were in kindergarten at the time of the passage of the Act) is consistent with its position that the elimination of the religious exemption was necessary to prevent an acute risk of an outbreak of disease among students.

Moreover, while preventing unvaccinated students with religious objections from attending school to avoid the spread of disease among students, Connecticut has done nothing to address the reality that those same unvaccinated students may continue to interact with other children and the general public in numerous places outside the school setting including, for example, community sports leagues, religious gatherings, and social gatherings of all types. Nor does Connecticut deal with the fact that students will also continue to interact with

unvaccinated adults, as the State does not regulate vaccination requirements for adults.

Notwithstanding these many fact-intensive questions regarding whether this law satisfies the general applicability requirement under 🚩 *Smith*, the majority opinion closes the courthouse doors to plaintiffs on their free exercise claim on a motion to dismiss before any discovery and before plaintiffs had an opportunity to present evidence bearing on the general applicability requirement in this particular context. The majority opinion does so by concluding, *inter alia*, that medical and religious exemptions are not comparable for free exercise purposes as a matter of law. Neither Supreme Court precedent nor this Court's jurisprudence allows a court to so summarily cast aside the fundamental constitutional right of individuals to the free exercise of religion. In reaching this conclusion before the development of any factual record in discovery, the majority opinion ignores two recent decisions by this Court addressing similar COVID-19 vaccination requirements. In both of these cases, we recognized that a plaintiff ultimately may be able to put forth evidence establishing that this precise type of differential treatment fails to satisfy the general applicability requirement in 🚩 *Smith*—thereby subjecting the law to strict scrutiny.

**\*24** Not only is the majority opinion's holding incorrect at this stage given the factual allegations in this case, but its analysis also has troubling implications for the future of the Free Exercise Clause as it relates to all types of vaccination requirements for students and other members of the public, including for COVID-19. In other words, under the majority opinion's analysis, a state or other governmental entity could expand mandatory vaccination requirements and simultaneously eliminate religious exemptions (while maintaining broad medical exemptions) and easily satisfy the low constitutional bar of rational basis review by invoking generalized concerns about public health and safety. If the allegations in this case cannot survive a motion to dismiss, many other "general applicability" challenges to vaccination requirements that contain a similar secular exemption but no religious exemption, will undoubtedly suffer the same fate.

In sum, for the reasons discussed below, I conclude that plaintiffs have stated a plausible free exercise claim and the question of what level of scrutiny applies to that claim cannot be resolved at the motion to dismiss stage in this particular case. Accordingly, I would vacate the judgment of the district court and remand for further proceedings as to the free

exercise claim (along with the IDEA claim) and, therefore, respectfully dissent from that portion of the majority opinion.

## DISCUSSION

The First Amendment bars the government from "prohibiting the free exercise" of religion. U.S. Const., amend. I; *see* 📒*Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (incorporating the Free Exercise Clause against the states). "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." 🚩*Smith*, 494 U.S. at 877, 110 S.Ct. 1595. "The Free Exercise Clause thus protects an individual's private right to religious belief, as well as the performance of (or abstention from) physical acts that constitute the free exercise of religion." 📒*Kane v. De Blasio*, 19 F.4th 152, 163–64 (2d Cir. 2021) (per curiam) (internal quotation marks and citation omitted). Therefore, "government enforcement of laws or policies that substantially burden the exercise of sincerely held religious beliefs is subject to strict scrutiny." 📒*Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002). However, under the framework established by the Supreme Court in 🚩*Smith*, "[w]here the government seeks to enforce a law that is neutral and of general applicability ... then it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices." 📒*Id.* (citing 📒*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) & 🚩*Smith*, 494 U.S. at 878–79, 110 S.Ct. 1595).

Here, there is no question that the imposition of a mandatory vaccination requirement for students to be able to attend a private or public school in Connecticut, with no religious exemption, substantially burdens the free exercise of religion. *See* 📒*Trinity Lutheran Church of Columbia, Inc. v Comer*, 582 U.S. 449, 462, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017) ("To condition the availability of benefits upon a recipient's willingness to surrender his religiously impelled status effectively penalizes the free exercise of his constitutional liberties." (alterations adopted) (internal quotation marks and citation omitted)). As to the level of review, plaintiffs argue that, because of the existence of the medical exemption and the repeal of the religious exemption to the mandatory

vaccination regime for students, the Act both lacks neutrality and general applicability and, therefore, is subject to strict scrutiny. I agree with the majority opinion that plaintiffs have failed to plausibly allege that the Act lacks neutrality. Plaintiffs concede that they have no particular allegations of religious animus and, instead, argue that non-neutrality is demonstrated by the elimination of the religious exemption from the Act. As the majority opinion notes, we have held that "[t]he absence of a religious exception to a law does not, on its own, establish non-neutrality such that a religious exception is constitutionally required." 🚩 *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 282 (2d Cir.) (per curiam), *opinion clarified*, 🚩 17 F.4th 266, 287 (2d Cir. 2021), and *cert. denied sub nom. Dr. A. v. Hochul*, ––– U.S. ––––, 142 S. Ct. 2569, 213 L.Ed.2d 1126 (2022). I agree with the majority opinion that the repeal of a religious exemption, by itself, also does not render a statute non-neutral for purposes of 🚩 *Smith*. Given the lack of particular allegations of religious animus or hostility with respect to the passage of the Act, plaintiffs have failed to plausibly allege that the Act is non-neutral under 🚩 *Smith*.

**\*25** However, with regard to general applicability, I respectfully disagree with the majority opinion and would conclude that plaintiffs have plausibly alleged that the Act lacks general applicability.[2] The general applicability requirement in 🚩 *Smith* "protects religious observers against unequal treatment, and inequality that results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." 🚩 *Cent. Rabbinical Cong.*, 763 F.3d at 196–97 (alterations adopted) (quoting 🚩 *Church of Lukumi*, 508 U.S. at 542–43, 113 S.Ct. 2217). Under 🚩 *Smith*, a law is not generally applicable if it (1) "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," or (2) "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." 🚩 *Fulton v. City of Philadelphia*, ––– U.S. ––––, 141 S. Ct. 1868, 1877, 210 L.Ed.2d 137 (2021) (alteration adopted) (internal quotation marks and citations omitted). Although the Act does not raise any issue under 🚩 *Smith* with regard to a mechanism for individualized exemptions, I conclude that plaintiffs have plausibly alleged that the Act, in repealing the

religious exemption while maintaining a medical exemption, "is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it" and thus lacks general applicability under 🚩 *Smith*. 🚩 *Cent. Rabbinical Cong.*, 763 F.3d at 197; *see also* 🚩 *Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 360, 365–66 (3d Cir. 1999) (holding, with respect to a "no-beard policy," "that the [Police] Department's decision to provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny under 🚩 *Smith* ....").

2    As an initial matter, I note that I agree with Judge Park's discussion in *Rockland County* which states that "the general-applicability test embraces a purposivist approach that is vulnerable to manipulation and arbitrariness" and "[u]ntil 🚩 *Smith* is overruled, its ill-defined test means that free-exercise rights risk being perennially trumped by the next crisis." 53 F. 4th at 42 (Park, *J.*, concurring) (internal quotation marks and citation omitted). In fact, "since 🚩 *Smith*, several Supreme Court justices have written or joined in expressing doubt about Smith's free exercise jurisprudence." 🚩 *303 Creative LLC v. Elenis*, 6 F. 4th 1160, 1205 n.11 (10th Cir. 2021) (Tymkovich, *C.J.*, dissenting), *rev'd*, ––– U.S. ––––, 143 S. Ct. 2298, ––– L.Ed.2d –––– (2023). In any event, 🚩 *Smith* continues to be binding precedent, and I apply its framework here.

"[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." 🚩 *Tandon v. Newsom*, ––– U.S. ––––, 141 S. Ct. 1294, 1296, 209 L.Ed.2d 355 (2021) (per curiam) (citing 🚩 *Roman Cath. Diocese of Brook. v. Cuomo*, ––– U.S. ––––, 141 S. Ct. 63, 67, 208 L.Ed.2d 206 (2020) (per curiam) (listing secular activities treated more favorably than religious worship that either "have contributed to the spread of COVID–19" or "could" have presented similar risks)). "Comparability is concerned with the risks various activities pose, not the reasons why people [undertake an activity]." 🚩 *Id.*

As an initial matter, Connecticut was less than precise in describing the scope of its asserted interest at the time of the Act's passage and should not be permitted under 🚩*Smith* to rely upon *post-hoc* rationalizations. *See Doe 1-3 v. Mills*, ---- U.S. ----, 142 S. Ct. 17, 20, 211 L.Ed.2d 243 (2021) (Gorsuch, *J.*, dissenting from the denial of application for injunctive relief related to regulation mandating COVID-19 vaccinations for Maine healthcare workers) (explaining that "when judging whether a law treats a religious exercise the same as comparable secular activity, this Court has made plain that only the government's *actually asserted* interests as applied to the parties before it count—not *post-hoc* reimaginings of those interests expanded to some society-wide level of generality"). As the majority opinion acknowledges, Connecticut maintained in the district court that its interest in the Act was to "protect the health and safety of 🚩Connecticut's schoolchildren," *We the Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 579 F. Supp. 3d 290, 307 (D. Conn. 2022) (internal citation omitted), and reasserted that same interest at oral argument in this Court, Oral Argument at 11:21, 19:34, *We the Patriots* (No. 22-249). At other times in its appellate papers, Connecticut has broadened that interest to also include protecting the health and safety of the general public. In any event, even adopting the broader articulation of Connecticut's asserted interests in the Act (as the majority opinion does), the failure to regulate secular conduct in the form of medical exemptions while regulating religious conduct raises substantial questions regarding whether the Act meets the general applicability requirement under 🚩*Smith*, which should not be decided on a motion to dismiss.

**\*26** To the extent the asserted interest justifying the Act is the prevention of the spread of communicable diseases among Connecticut students entering a school, it is obvious that an unvaccinated student with a medical objection who is allowed to attend school poses the same health risk to another student as an unvaccinated student with a religious objection. To be sure, the majority opinion is correct that we have emphasized that the analysis need not be limited to "a one-to-one comparison of the transmission risk posed by an individual [with a religious exemption] and ... an individual [with a medical exemption]," to ascertain comparability for general applicability purposes. 🚩*Hochul*, 17 F.4th at 287; *see also Ante*, at ---- – ----. Thus, the majority opinion focuses on "aggregate data about transmission risks." *Ante*, at ---- (internal quotation marks and citation omitted).

However, even when comparing the relative risks of the two groups of unvaccinated students in the aggregate, substantial factual questions remain as to whether the comparative risk of harm to other students posed by students unvaccinated due to religious objections is materially greater than that posed by students unvaccinated due to medical objections.

Connecticut cites limited data in its brief in support of its argument that the risks posed by the two groups are not comparable for free exercise purposes. In particular, it relies on data attached to the complaint, which shows that from 2019 to 2020, 2.3% of kindergarteners claimed a religious exemption to Connecticut's vaccine requirements while only 0.2% of kindergarteners claimed a medical exemption. *See* Appellee's Br. at 3–4, 38. The majority opinion acknowledges that this aggregate public health data that plaintiffs presented in an appendix to the complaint "is *sparse*." *Ante*, at ---- (emphasis added). The majority opinion then seeks to bolster this sparse record by utilizing legislative history, including comments by legislators who "spoke of the need to avoid 'a real public health crisis.' " *Id.* at ---- (quoting Connecticut General Assembly House Proceedings, H.B. 6423, 2021 Sess., at 847 (Conn. 2021)). For example, the majority opinion notes that "[i]n school years 2018-19 and 2019-20, more than ten times as many kindergartners claimed religious exemptions compared to medical exemptions." *Id.* at ----. The majority opinion further notes that these statistics reflect that "[t]he overall trend was toward an increase in religious exemptions," while medical exemptions remained constant. *Id.* at ----. Based on the threadbare data and unsupported statements in the legislative history, the majority opinion leaps to the legal conclusion "that religious and medical exemptions are not comparable in reference to the State's interest in the health and safety of Connecticut's children and the broader public," *id.* at ----, in part, because "the Legislature reasonably judged that the risk of an outbreak of disease was acute, even if not necessarily imminent, and that continuing to permit religious exemptions, the State's only kind of nonmedical exemption, to multiply would increase that risk," *id.* at ----.

The limited statistics in the "sparse record" hardly compel the conclusion as a matter of law that the aggregate risks associated with medical exemptions are not comparable to religious exemptions because of the increasing number of students seeking religious exemptions. As an initial matter, the percent of kindergartners claiming religious exemptions actually dropped (albeit slightly) from the 2018-19 school year compared to the 2019-20 school year. In any event, the

increase of religious exemptions over the last ten years, by itself, does not demonstrate that the risks associated with such exemptions are no longer comparable to the medical exemptions. Much more data and expert opinion would be necessary to engage in a meaningful analysis of the comparable risks, such as the levels of herd immunity for various illnesses that are the subject of the immunization requirements and whether the increase in exemptions has had any meaningful impact in Connecticut on such herd immunity. That type of fact-intensive analysis should not be conducted, as the majority opinion does, on a sparse record at the motion to dismiss stage.

**\*27** In addition, the majority opinion does not explain why, if Connecticut's interest in repealing a decades-old religious exemption is justified by an acute risk of outbreak of disease among children and "a real public health crisis," *id.* at ——, ——, it would enact a law that still allows students with current religious exemptions, from kindergarten to the 12th grade, to be "grandfathered in" and continue to attend school unvaccinated until they graduate from high school. In other words, under the Act, the purportedly large number of kindergartners with religious exemptions from the 2019 to 2020, upon which Connecticut relies to demonstrate an alarming increase in religious exemptions that risks an acute outbreak of disease, will be permitted to continue to attend school while unvaccinated for over a decade. *See* Public Act 21-6 § 1(b).

Moreover, although the Act may successfully keep students who are unvaccinated due to religious objections out of public and private schools, it does nothing to eliminate the comingling of those unvaccinated students with children (including those unvaccinated for medical reasons), in any other place of assembly including church, community sports events, restaurants, or any other social setting where children tend to gather. For this same reason, the Act appears to be substantially underinclusive to the extent it is aimed at the risk of disease purportedly created by "clustering." Appellees' Br. at 4 n.1. As described by Connecticut, "clustering," is "a phenomenon whereby individuals with religious objections to vaccines tend to cluster in particular communities, causing that community's vaccination rate to be especially low." *Id.* However, the students who refuse to be vaccinated for religious reasons even after passage of the Act and are clustered in a particular community and homeschooled, will likely continue to interact not only with each other, but also (as noted above) with children outside the clustered community in all types of public settings.

Even if Connecticut's interest is broadened to extend to the health and safety of the public in general, substantial questions remain regarding the Act's ability to satisfy the general applicability requirement in 🚩*Smith*. For example, even if the Act is successful in compelling religious objectors to vaccinate their children in order to be able to send them to school, the Act does not cover unvaccinated adults, who (whether clustered or not) could spread diseases and substantially undermine the State's asserted public health goal in eliminating the free exercise rights of students in this context.

Connecticut's assertion (adopted by the majority opinion), that the aggregate risk of disease to schoolchildren posed by religious exemptions is acute compared to the much lower risk posed by medical exemptions, also overlooks the fact that currently forty-four states, as well as the District of Columbia, have a religious exemption to state laws requiring children attending public school to be vaccinated. *See* Nat't Conf of State Legislatures, *States With Religious and Philosophical Exemptions From School Immunization Requirements*, https://www.ncsl.org/health/states-with-religious-and-philosophical-exemptions-from-school-immunization-requirements (last updated May 25, 2022). That data suggests that the harm posed to students by religious exemptions to vaccination requirements may, indeed, be comparable to the harm posed by non-religious exemptions.

The majority opinion sidesteps many of these questions by suggesting that "exempting a student from the vaccination requirement because of a medical condition and exempting a student who declines to be vaccinated for religious reasons are not comparable in relation to the State's interest" because, *inter alia*, the medical exemption allows students "to avoid the harms that taking a particular vaccine inflict on them." *Ante*, at —— – ——. That assertion, however, seems to ignore the fact that a medical exemption, which may support the State's interest in one way (namely, avoiding any harm to that student from the vaccination), may also undermine the State's interest in another way that is similar to the impact of a religious exemption (namely, avoiding the spread of disease in schools).

**\*28** Furthermore, the student with the medical objection to vaccinations can avoid that harm *and* other schoolchildren would be protected from disease if the student with the medical objection was not exempt and was left with the option of being homeschooled, which is now the only

option under the Act available for students with a religious objection. In other words, the statute at issue here is not a mandatory vaccination requirement for children at large, but rather for children attending public or private schools. Thus, the State's asserted interest in protecting schoolchildren from the spread of disease by unvaccinated students and its corresponding interest in not mandating a vaccine that would cause medical harm to certain students are *both* furthered if the Act treats medical objectors in the same manner as religious objectors and does not allow medical objectors into the school. Therefore, contrary to the majority opinion's analysis, a mandatory vaccination statute that excludes religious objections, but provides an exemption to students with medical objections, does not *automatically* avoid a general applicability issue under 🚩 *Smith* simply by pointing to concerns about avoiding medical harm to a student from the vaccine.

Indeed, this Court has recently acknowledged, on two separate occasions, that a compulsory vaccination law or regulation, which does not include a religious exemption but has a medical exemption, may raise potential general applicability problems under 🚩 *Smith*. The first instance was in 🏷️ *We the Patriots USA, Inc. v. Hochul,* where although we determined that a preliminary injunction against New York's emergency rule was not appropriate, we noted that a general applicability problem may arise after further fact development. 🏷️ 17 F.4th at 287–88. The second occasion was in *M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health,* when we decided that summary judgment in favor of the county was unwarranted because the record contained factual disputes as to, *inter alia,* whether the law at issue was generally applicable under 🚩 *Smith*. 53 F. 4th 29, 38–39 (2d Cir. 2022).

In 🏷️ *Hochul,* we reviewed two cases in tandem, both concerning New York's emergency rule requiring healthcare facilities to ensure that their employees were vaccinated against COVID-19 and containing a medical exemption but no exemption for religious objectors. 🏷️ 17 F.4th 266. Plaintiffs, in each of those cases, brought an action claiming, *inter alia,* that the emergency vaccination rule violated the Free Exercise Clause and moved for a preliminary injunction. 🏷️ *Id.* at 277–79. One district court granted the preliminary relief requested, enjoining the rule insofar as it prevented healthcare workers from being eligible for an exemption based on religious belief; the other denied it. *See* 🚩 *A. v. Hochul*, 567 F. Supp. 3d 362 (N.D.N.Y. 2021) (granting preliminary injunction); *We the Patriots USA, Inc. v. Hochul*, No. 21-cv-4954, 2021 WL 4048670 (E.D.N.Y. Sept. 12, 2021) (denying preliminary injunction). On appeal, we reversed the grant of the preliminary injunction relating to the emergency rule and affirmed the denial of the preliminary injunction in the tandem case. 🏷️ *Hochul*, 17 F.4th at 296.

In doing so, although we determined that a preliminary injunction was not appropriate at that early stage, we left open the possibility that further development of the record, including information about the risks posed by the two types of exemptions and the number of each type of exemption claimed, may raise a general applicability problem. 🏷️ *Id.* at 286–88. In particular, we concluded that "[w]ith a record as undeveloped on the issue of comparability as that presented here, we cannot conclude that the above vaccination requirements are *per se* not generally applicable ... so as to support a preliminary injunction." 🏷️ *Id.* at 287–88. However, we also noted, because "[t]he record before us contains only limited data regarding the prevalence of medical ineligibility and religious objections," 🏷️ *id.* at 287, the risks associated with medical exemptions and religious exemption "may, after factual development, be shown to be too insignificant to render the exemptions incomparable," 🏷️ *id.* at 286. Therefore, far from suggesting that a compulsory vaccination with a medical exemption, but not a religious one, is generally applicable as a matter of law, we recognized that fact-finding regarding the comparability of the two exemptions could be critical to determining whether such a law is generally applicable. *See also* 🏷️ *Cent. Rabbinical Cong.*, 763 F.3d at 197 (vacating denial of preliminary injunction involving a free exercise claim because, *inter alia,* "[i]n light of the sparse record at this preliminary stage, we cannot conclude that [the Ordinance at issue] is generally applicable"); *Bosarge v. Edney*, No. 22-cv-233, ––– F. Supp. 3d ––––, ––––, 2023 WL 2998484, at *10 (S.D. Miss. April 18, 2023) (granting preliminary injunction preventing enforcement of Mississippi's compulsory vaccination law requiring students to be vaccinated in order to attend public and private schools in the State and explaining that "[b]ecause the evidence shows that there was a method by which Mississippi officials could consider secular exemptions, particularly medical exemptions, [but not religious objections,] their interpretation

of the Compulsory Vaccination Law would not be neutral or generally applicable").

**\*29** More recently, in *Rockland County*, we explicitly confirmed the need for a fully developed record at trial on the comparable risks associated with religious and secular exemptions, in order to determine the general applicability of a law involving compulsory vaccinations for children. 53 F.4th at 38–40. More specifically, we held that fact issues precluded summary judgment in a Free Exercise Clause challenge to an emergency declaration that barred unvaccinated children from places of public assembly, other than those with medical exemptions. *Id.* at 39. In that case, the parents of minor children brought an action against the Rockland County Department of Health and several Rockland County officials asserting various claims, including a violation of the Free Exercise Clause, based on orders that excluded children who were not vaccinated against measles from attending school and an emergency declaration that barred unvaccinated children, other than those with medical exemptions, from places of public assembly. *Id.* at 32–33. The defendants moved for summary judgement, which the district court granted, determining that the challenged restrictions did not violate the Free Exercise Clause because 🚩*Phillips* "expressly held that 'mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause.' " 🚩*W.D. v. Rockland County*, 521 F. Supp. 3d 358, 405 (S.D.N.Y. 2021) (quoting 🚩*Phillips,* 775 F.3d at 543).

On appeal, however, we reversed, holding as to the general applicability prong that the defendants presented insufficient evidence about, *inter alia,* the purpose and scope of the emergency declaration. *Rockland Cnty. Dep't of Health,* 53 F.4th at 39. We decided that that the record was undeveloped as to "what governmental interest the Declaration was intended to serve, which [was] relevant to the question of whether the Declaration was 'substantially underinclusive,' and therefore, not generally applicable." *Id.* (citing 🚩*Hochul,* 17 F.4th at 284–85). We noted that "Rockland County's interest in issuing the Declaration could [have been] to stop the transmission of measles, which [could] lead a factfinder to question why there was a medical exemption, where ... medically exempt children are every bit as likely to carry undetected measles as a child with a religious exemption and are much more vulnerable to the spread of the disease and serious health effects if they contract it." *Id.* (alteration adopted) (internal quotation marks and citation omitted). We further noted, "[o]n the other hand ... the purpose

of the Declaration could be to encourage vaccination." *Id.* In such a situation, we concluded that what animates a seemingly facially neutral regulation that appears to be underinclusive is a "fact-intensive question that should be explored at trial through the examination of evidence that supports or undermines" the various potential purposes. *Id.* Accordingly, we held that, "because factual questions about the Emergency Declaration pervade the issues of neutrality and general applicability, the question of what level of scrutiny applies cannot be resolved on summary judgment, and Defendants fail to meet the high burden required to prevail at this stage." [3] *Id.*

3    I agree with the majority that *Rockland County* also contained facts regarding potential anti-religious animus, which impacted the neutrality prong of the 🚩*Smith* test, and are absent in this case. *See Ante,* at —— – ——. However, our denial of summary judgment on the general applicability prong in *Rockland County* was separate and independent from the evidence of anti-religious animus supporting the plaintiffs' claim on the neutrality prong in that case.

Notwithstanding this precedent and the many factual and legal questions regarding the general applicability prong in this particular case, including the imprecise nature of Connecticut's asserted interest in regulating religious conduct in this manner, the majority opinion concludes as a matter of law, at the motion to dismiss stage, that medical exemptions and religious exemptions are not comparable for free exercise purposes in the context of this mandatory vaccination statute. The majority does so even though it concedes that the aggregate health data supporting such a distinction is "sparse," and even though a remand would not only provide Connecticut with an opportunity to more clearly articulate its asserted interests in regulating religious conduct in this context, but also would also allow plaintiffs the opportunity to engage in discovery regarding why Connecticut asserts that allowing medically exempt children to attend school poses a lower risk of spreading communicable diseases than allowing religiously exempt children would. This would require further fact-finding about, among other things, the number of students trying to claim a religious exemption, who would not be subject to the legacy provision, versus the number trying to claim a medical exemption. Such information may help uncover the comparable risks and threats posed to school children by the two classes of exemptions. In addition, facts concerning the impact on herd immunity levels based on

the number and types of exemptions being claimed would further help explain if the two exemptions are comparable in light of the asserted interest. [4] Obviously, after gathering such discovery from Connecticut, plaintiffs would have the opportunity to submit any evidence to the district court at summary judgment undermining Connecticut's position.

[4]     The majority opinion quotes Governor Lamont who stated upon the signing of the Act that "[t]his legislation is needed to protect our kids against serious illnesses that have been well-controlled for many decades, such as measles, tuberculosis, and whooping cough, but have reemerged." *Ante*, at —— (internal citation omitted). However, it is entirely unclear from the record at this juncture that these serious illnesses have reemerged in a substantial way in Connecticut. For example, according to the Connecticut State Department of Health, with respect to confirmed cases of measles in Connecticut, there were four cases in 2019, zero cases in 2020, and two cases in 2021. Conn. State Dep't of Pub. Health, *Case Occurrence of Selected Diseases (Connecticut)*, https://portal.ct.gov/DPH/Immunizations/Case-Occurrence-of-Selected-Diseases-Connecticut (last visited July 19, 2023). Moreover, there was also at least one confirmed measles case in Connecticut in 2010, 2011, and 2012, all of which were before the purported concern regarding the material increase in religious exemptions. *Id.* Furthermore, while justifying the repeal of religious exemptions based on this articulated concern about the risk of re-emergence of illnesses caused by the increasing number of those exemptions, the Act actually *expanded* medical exemptions so as to allow reasons that are "not recognized by the National Centers for Disease Control and Prevention" but that "in [the provider's] discretion results in the vaccination being medically contraindicated." Public Act 21-6 § 7.

 **\*30**  I emphasize that, after such discovery, plaintiffs may be unable to demonstrate that the risks associated with religious and medical exemptions under the Act are comparable, and the district court may conclude that the Act falls within the broad ambit of public policy that satisfies rational basis review. Moreover, even if plaintiff demonstrates that the Act lacks general applicability following discovery, Connecticut will have the opportunity to argue that the Act survives strict

scrutiny. At this stage though, I narrowly conclude that it was error for the district court to find the free exercise claim implausible as a matter of law by making that critical fact-intensive determination on a sparse record before plaintiffs have had the opportunity to conduct discovery or to present evidence supporting their position on this issue to the court.

The majority opinion's analysis not only extinguishes the free exercise rights of Connecticut schoolchildren in the context of this Act, but has much broader ramifications for free exercise rights of individuals in the context of vaccine mandates more generally.  The mandatory vaccinations required under the Act are not limited to illnesses like measles, tuberculosis, and whooping cough.  Rather, the requirement extends to other illnesses, including a mandatory flu vaccination for students. Public Act 21-6 § 1(a) (requiring "each child to be protected by adequate immunization against diphtheria, pertussis, tetanus, poliomyelitis, measles, mumps, rubella, haemophilus influenzae type B and any other vaccine required by the schedule for active immunization adopted pursuant to section 19a-7f"). Thus, if Connecticut or any other state or government entity were to determine that mandatory COVID-19 vaccines for students were necessary in the future, Connecticut could do so without providing any religious exemption and survive rational basis review by invoking generalized concerns about the need to protect the health of students and the general public.

The majority opinion's analysis is also not limited to schools.  Any vaccination mandate imposed by a governmental entity upon its employees, or even its residents, would be analyzed with the low constitutional bar of rational basis review even if it had a medical exemption but no exemption for objections based upon sincerely held religious beliefs.  Therefore, challenges to any such mandatory vaccination laws, whether for COVID-19 or any other illness which the government deems sufficiently serious to warrant mandatory vaccinations in the future, would similarly be unable to survive a motion to dismiss on general applicability grounds under the majority opinion's analysis once the government invoked generalized concerns about public safety.  Such an approach allows the fundamental right of the free exercise of religion to be swept away under the mantle of rational basis review without any meaningful factual inquiry as to whether the differing treatment between the secular exemption and the religious exemption is warranted, even where a religious exemption has existed under the laws of a state for decades.  This narrowing of judicial review of the government's decision to regulate religious conduct in the name of public health, while

We The Patriots USA, Inc. v. Conn. Office of Early Childhood..., --- F.4th ----(2023)

2023 WL 4982325

simultaneously allowing the same conduct for one or more secular reasons, is extremely troubling and inconsistent with the important religious rights enshrined in the Free Exercise Clause. *See generally*  *Roman Cath. Diocese*, 141 S. Ct. at 68 ("Members of this Court are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area. But even in a pandemic, the Constitution cannot be put away and forgotten.").

Instead, consistent with the jurisprudence of the Supreme Court and this Court, we should allow plaintiffs in such situations, before they are stripped of their free exercise rights, the basic opportunity of discovery to attempt to show that the  *Smith* standard has not been met and, therefore, that such a law should be subject to strict scrutiny.

**\*31**  Accordingly, I respectfully dissent from the portion of the majority's opinion in Section I Parts B(2)(b) and B(3) where it holds, as matter of law at the motion to dismiss stage, that the Act does not lack general applicability and affirms the dismissal of the free exercise claim under rational basis review.

**All Citations**

--- F.4th ----, 2023 WL 4982325

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.