# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TAMER MAHMOUD, *et al.*,

      *Plaintiffs,*

    v.

MONIFA B. MCKNIGHT, *in her official capacity as Superintendent of the Montgomery Board of Education, et al.*,

      *Defendants.*

Case No. 8:23-cv-01380-DLB

**PLAINTIFFS' REPLY IN SUPPORT OF SUPPLEMENTAL BRIEF AND DECLARTION OF GRACE MORRISON IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Eric S. Baxter
William J. Haun
Michael J. O'Brien*
Brandon L. Winchel* (pro hac vice)
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W., Suite 400
Washington, DC 20006
(202) 955-0095
whaun@becketlaw.org

*Not a member of the DC Bar; admitted in Louisiana and California respectively. Practice limited to cases in federal court.

*Attorneys for Plaintiffs*

## INTRODUCTION

The School Board concedes that its family life and human sexuality instruction in Health Ed has "recently been updated to cover issues of sexual orientation, gender identity, intolerance, stereotypes, and stigmatization" (Supp. Resp. 2-3)—the same topics addressed by the Pride Storybooks for the same equity and safety interests. By banning opt-outs from the Pride Storybooks, while allowing them from Health Ed, the School Board has conceded a lack of general applicability, thus triggering strict scrutiny, where *it*—not the Parents—bears the burden of proof.

The School Board further concedes that instruction in the Pride Storybooks may give children "a new perspective not easily contravened by their parents" but claims this creates no cognizable burden on the parents' rights so long as they remain "free" to "discuss these matters" with their children at home. Supp. Resp. 4. But without notice, parents don't know what to discuss with their children or when. For elementary-age children, that can be enormously consequential. Moreover, *Wisconsin v. Yoder*—where parents were also free to discuss their children's "exposure" to "'worldly' influence[s]" in the public schools, 406 U.S. 205, 211 (1972)—already rejected the School Board's analysis.  There, the Court found a burden on Amish parents' religion because the state—against the parents' preferred approach—wanted to promote the children's "opportunity to make an intelligent choice between the [parents' religious] way of life and that of the outside world" and to "standardize" the children's perspectives by "forcing them to accept instruction" in the public schools. *Id*. at 232.

Here, the School Board concedes the same purpose to "normalize[]" certain perspectives, Opp. 3, which it admits may "not easily [be] contravened by their parents." Supp. Resp. 4. And it offers no limit to what such instruction may include. Under its theory, once a child is placed in public school, the School Board can teach anything it wants without parental notice and opportunity opt-out. But "[p]ublic

1

schools must not forget that 'in loco parentis' does not mean 'displace parents.'" *Tatel v. Mt. Lebanon Sch. Dist.,* No. 22-cv-837, 2023 WL 3740822, at *5 (W.D. Pa. May 31, 2023) (quoting *Gruenke v. Seip*, 225 F.3d 290, 307 (3rd Cir. 2000)). Courts cannot be in the business of denominational favoritism—that is, deciding that Amish objections to "exposure" constitute a religious burden under the Free Exercise Clause, but not the objections of parents of other faiths.

## I. The Health Education instruction and Pride Storybooks advance the same interests and are comparable under *Tandon*.

The School Board does not contest that its Health Ed instruction on family life and human sexuality includes instruction on gender and sexuality that advances the same equity and safety interests as the Pride Storybooks. Supp. Resp. 2-3; *see* Br. at 19. Because "the asserted government interest" is the same for both aspects of curriculum, the two are comparable under *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Consequently, the School Board's policy to allow opt-outs from family life and human sexuality instruction in Health Ed "for more than a decade," while denying opt-outs from family life and human sexuality instruction in the Pride Storybooks, is not generally applicable. Supp. Resp. 2; *see also Smiley v. Jenner*, No. 1:23-cv-01001, 2023 WL 5122437, at *5 (S.D. Ind. July 28, 2023) ("'instruction' and 'human sexuality' are terms that people 'use and understand in normal life.'") (citation omitted).

In response, the School Board repeats its argument that its inconsistent opt-out policy does not distinguish between religious and secular activity. Supp. Resp. 2; *see* Opp. 20-21. But under *Tandon*, strict scrutiny is triggered whenever the government treats "*any* comparable secular activity more favorably than religious exercise."[1] 141 S. Ct. at 1296. By the School Board's own admission, opt-outs—including "religious"

---

[1]    Indeed, the Court has also held laws unconstitutional when comparable religious activity is treated more favorably than the religious exercise in question. *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 536 (1993) (law's exemption for kosher slaughter but not sacrificial slaughter "support[ed] conclusion" that strict scrutiny applied).

opt-outs—are barred for the Pride Storybooks, while opt-outs—including "secular" opt-outs—are allowed for Health Ed. Opp. 20-21. "It is no answer that [the School Board] treats some comparable secular ... activities"—like secular opt-outs for Pride Storybooks—"as poorly as ... the religious exercise at issue," or vice versa. *Tandon*, 141 S. Ct. at 1296.

Last, the School Board attempts to shift its burden by claiming *the Parents* must prove that the School Board's concerns about "absenteeism," "administrative infeasibility," and "social stigma" are the same with respect to both aspects of the curriculum. Supp. Resp. 2-3. Easy enough. It cannot reasonably be disputed that a fifth grader being excused from instruction on family life and human sexuality has the exact same impact whether being excused from story time or Health Ed. But more importantly, the School Board is wrong about the burden. On comparability, all the Parents must show is that the same government interests (here, promoting equity and safety) underlie both aspects of the curriculum and "w[ere] not applied in an evenhanded, across-the-board way." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022). The School Board does not dispute this point, and that triggers strict scrutiny. If the School Board then wants to justify its disparate treatment for reasons of "absenteeism," "administrative infeasibility," and avoiding "stigma," the burden falls on the School Board alone. *Tandon*, 141 S. Ct. at 1296 ("[T]he government has the burden to establish that the challenged law satisfies strict scrutiny.").

Plaintiffs have already demonstrated that the School Board's concerns regarding administrability and stigma are not cognizable compelling interests. Br. 24-30; Reply 12-15. And even if they were, the School Board has not even tried to justify how administrability is a more pressing concern for students in story hour than for the same students in Health Ed, where all opt-outs must be honored. Nor can it justify how its asserted interested in reducing stigma is furthered by disallowing opt-outs in one context but not the other, especially where students in both concededly may voice

disagreement with the teaching, even in ways that might hurt other students' feelings. In short, the School Board has the burden to satisfy strict scrutiny, but has not even tried, and would fail if it did.

## II. The Morrison Declaration shows a substantial burden on parental rights.

The School Board argues that the Morrison Declaration does not support injunctive relief because Kids First has not moved for a preliminary injunction. Supp. Resp. 3. But the requested injunction "would protect Kids First too." Reply 3 n.1.

Rather than dispute the Morrison Declaration, the School Board defends its decision to indoctrinate children in ways that may "not easily [be] contravened by their parents." Supp. Resp. 4. So long as parents "remain[] free to discuss these matters" with their children, "the parents' rights have not been violated." *Id.* Under the School Board's theory, schools are free to teach children anything—graphic sexual instruction, that the Holocaust didn't happen, that slavery benefited Black people,[2] or (as the School Board has previously argued) that "[r]eligion has often been misused to justify hatred and oppression." *Citizens for a Responsible Curriculum v. Montgomery Cnty. Pub. Schs.*, No. 8:05-cv-1194, 2005 WL 1075634, at *10 (D. Md. May 5, 2005) (entering TRO against prior curriculum that favored some religious beliefs over others).  Per the School Board, so long as parents can "discuss these matters" with their children after the fact—if the parents even know it was taught, and no matter how futile those discussions might be—the parents' rights are not violated.

Wrong. As Justice Alito's controlling opinion in *Morse* explained, "[i]t is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school

---

[2]   *See, e.g.*, Antonio Planas, *New Florida standards teach students that some Black people benefited from slavery because it taught useful skills*, NBC NEWS (July 20, 2023), https://perma.cc/Q7TH-MUVN.

authorities." *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring); Reply 12-13. As with the Morrisons, "[m]ost parents, realistically, have no choice but to send their children to a public school." *Morse*, 551 U.S. at 424 (Alito, J., concurring). Instructing children in materials that run "contrary to" the parents' beliefs "substantially interfere[s]" with parental rights. *Yoder*, 406 U.S. at 218.

The School Board cites an inapplicable case: *D.L. ex rel. K.L. v. Baltimore Bd. of Sch. Comm'rs*. The issue is not whether public schools must "accommodate [parents'] educational preferences." 706 F.3d 256, 264 (4th Cir. 2013). Rather, the issue is whether parents—already preempted by their children's schools in raising complex and sensitive issues on sex, sexuality, and gender—have the right to know and opt their children out of public school instruction that violates their religious beliefs.

"[I]ntroducing [the Pride Storybooks'] topics before the parent would have done so can undermine parental authority." *Tatel*, 2023 WL 3740822, at *8. The School Board's response is to defend its undermining. Resp. 4 ("not easily contravened"). If this isn't conflating "in loco parentis" with "displace parents," it's hard to see what would be. *Tatel*, 2023 WL 3740822, at *5. The Parents need an injunction to retain their "*primary* authority and duty to raise, educate, and form the character of their children." *Id.* at *6 (quoting *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2053 (2021) (Alito, J., concurring) (emphasis added)).

Dated: August 16, 2023                    Respectfully submitted,

/s/ Eric S. Baxter
Eric S. Baxter
William J. Haun
Michael J. O'Brien*
Brandon L. Winchel* (pro hac vice)
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W., Suite 400
Washington, DC 20006
(202) 955-0095
whaun@becketlaw.org

*Not a member of the DC Bar; admitted in
Louisiana and California respectively.
Practice limited to cases in federal court.

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2023, the foregoing brief was served on counsel for all parties by means of the Court's ECF system in compliance with Fed. R. Civ. P. 5.

Dated: August 16, 2023                    /s/ Eric S. Baxter
                                          Eric S. Baxter