**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **TAMER MAHMOUD**, *et al.*, | * | |
| **Plaintiffs,** | * | |
| v. | * | **Civ. No. DLB-23-1380** |
| **MONIFA B. MCKNIGHT**, *et al.*, | * | |
| **Defendants.** | * | |

**MEMORANDUM OPINION**

In this lawsuit, parents whose elementary-aged children attend Montgomery County Public Schools ("MCPS") seek the ability to opt their children out of reading and discussion of books with lesbian, gay, bisexual, transgender, and queer characters because the books' messages contradict their sincerely held religious beliefs about marriage, human sexuality, and gender. Last school year, MCPS incorporated into its English language arts curriculum a collection of storybooks featuring LGBTQ characters (the "storybooks" or "books") in an effort to reflect the diversity of the school community. Initially, parents could opt their children out of reading and instruction involving the books, as they could with other parts of the curriculum. In March of this year, the defendants—the Montgomery County Board of Education, the MCPS superintendent, and the elected board members (collectively, the "School Board")—announced that parents no longer would receive advance notice of when the storybooks would be read or be able opt their children out. Following the announcement, three families of diverse faiths filed suit against the School Board, claiming the no-opt-out policy violates their and their children's free exercise and free speech rights under the First Amendment, the parents' substantive due process rights under the Fourteenth Amendment, and Maryland law.

The parents have moved for a preliminary injunction that requires the School Board to give them advance notice and an opportunity to opt their children out of classroom instruction that involves the storybooks or relates to family life and human sexuality.  ECF 23.  The motion is fully briefed.  ECF 42, 43, 47.  The parties have filed supplements in support of their positions.  ECF 48, 49, 51, 52, 54, 55, 57.  The Court held a hearing on the motion on August 9, 2023.  ECF 50. For the following reasons, the motion is denied.

## I.      Background

Montgomery County Public Schools is the largest public school system in Maryland and one of the largest public school systems in the country.  ECF 36, ¶ 39.  As of fall 2021, it included 209 schools with approximately 160,000 students.  *Id.* ¶ 38.  Roughly 70,000 of those students attended an elementary school.  *Id.*  The Montgomery County Board of Education is the entity authorized by the State of Maryland to administer MCPS.  *Id.* ¶ 36.  It has authority to adopt educational policies, rules, and regulations consistent with state law.  *Id.* ¶ 37.

The School Board believes that diversity in its community is an asset that makes it stronger and that building relationships with its diverse community requires it to understand the perspectives and experiences of others.  ECF 43, ¶ 5.  These values are memorialized in the School Board's Policy on Nondiscrimination, Equity, and Cultural Proficiency, which supports "proactive steps to identify and redress implicit biases and structural and institutional barriers that too often have resulted in" disproportionate exclusion and underrepresentation.  *Id.* ¶ 6; *see* ECF 42-2. Accordingly, the School Board strives to "provide a culturally responsive . . . curriculum that promotes equity, respect, and civility" and prepares students to "[c]onfront and eliminate stereotypes related to individuals' actual or perceived characteristics," including gender identity and sexual orientation.  ECF 43, ¶ 6.  A critical part of the School Board's approach is

representation of diverse identities and communities in the curriculum.  *Id.* ¶ 21.  "Representation in the curriculum creates and normalizes a fully inclusive environment for all students" and "supports a student's ability to empathize, connect, and collaborate with diverse peers and encourages respect for all."  *Id.* ¶ 22.

### A.  The Storybooks

In October 2022, the School Board announced the approval of "over 22 LGBTQ+-inclusive texts for use in the classroom."  ECF 36, ¶ 113.  According to the associate superintendent for curriculum and instruction programs at MCPS, Niki T. Hazel, the School Board introduced the storybooks into the English language arts curriculum to further its system-wide goals of promoting diversity, equity, and nondiscrimination.  ECF 43, ¶¶ 23–26, 31.  In the spring of 2022, the School Board had determined that the books in its English language arts curriculum were not sufficiently representative because they did not include LGBTQ characters.  *Id.* ¶ 23.  It initiated procedures to evaluate potential new instructional materials that would be more inclusive.  *Id.* ¶ 24.  A committee of four reading specialists and two instructional specialists engaged in two rounds of evaluation and eventually recommended the approval of the storybooks, finding they "supported MCPS content standards and performance indicators, contained narratives and illustrations that would be accessible and engaging to students, and featured characters of diverse backgrounds whose stories and families students could relate to."  *Id.* ¶ 26; *see* ECF 49-1.

The plaintiffs have attached seven of the storybooks to their complaint.  ECF 1-4, 1-6 – 1-11.  *Pride Puppy!* chronicles a family's visit to a "Pride Day" parade and their search for a runaway puppy, using the letters of the alphabet to illustrate what a child might see at a pride parade.  ECF 1-4.  *Uncle Bobby's Wedding* tells the story of a girl who is worried that her soon-to-be-married uncle will not spend time with her anymore, but her uncle's boyfriend befriends her

and wins her trust.   ECF 1-6.   *Intersection Allies: We Make Room for All* features nine characters who proudly describe themselves and their diverse backgrounds and connects each character's story to the collective struggle for justice.   ECF 1-7.   *My Rainbow* tells the story of a mother who creates a rainbow-colored wig for her transgender child.   ECF 1-8.   *Prince & Knight* tells the story of a young prince who falls in love with and marries a male knight after they work together to battle a dragon.   ECF 1-9.   *Love, Violet* chronicles a shy child's efforts to connect with her same-sex crush on a wintry Valentine's Day.   ECF 1-10.   *Born Ready: The True Story of a Boy Named Penelope* is about an elementary-aged child who experiences triumphs and frustrations in convincing others what the child knows to be true—that he's a boy, not a girl.   ECF 1-11.   *Pride Puppy!* is for pre-kindergarten and the Head Start program; the other books are for kindergarten through fifth grade.   ECF 1-3; ECF 1-15, at 23.[1]

The plaintiffs contend state law requires MCPS to provide opt-outs from the storybooks because, in their view, the books concern family life and human sexuality.   The School Board's position is that the storybooks are part of its English language arts curriculum and opt-outs are required only for the family life and human sexuality unit of instruction, a separate curriculum. *See* ECF 43, ¶ 43.

### B.  State and MCPS Opt-Out Policies

Maryland law requires local school systems like MCPS to provide "a comprehensive health education" that includes "concepts and skills" related to "family life and human sexuality."   ECF

---

[1] In their preliminary injunction motion, the plaintiffs identify two additional books they object to: *What are Your Words?* and *Jacob's Room to Choose*.   ECF 23-5.   The former tells the story of a child figuring out their pronouns.   The latter depicts two gender-nonconforming children and their elementary-aged class deciding to replace male/female bathroom signs with different, non-binary signs.   The School Board recommends these books as "Resources for Students, Staff, and Parents – Affirming LGBTQ+ Young Adults."   *See id.* at 1–2.

36, ¶¶ 84–87.  This instruction must "represent all students regardless of ability, sexual orientation, and gender expression."  *Id.* ¶ 89.  Maryland law requires school systems to provide parents and guardians with an opportunity "to view instructional materials to be used in the teaching of family life and human sexuality objectives."  *Id.* ¶ 99 (citing COMAR § 13A.04.18.01(D)(2)(e)(iv)).  Like most other states that require or permit instruction on human sexuality in public schools, Maryland allows for opt-outs from such instruction in certain circumstances and requires schools to adopt "policies, guidelines, and/or procedures for student opt-out" and to provide alternative learning activities.  *Id.* ¶¶ 95, 100–01 (citing COMAR § 13A.04.18.01(D)(2)(e)(i) & (ii)).

Separately, the School Board has adopted an opt-out policy for parents and students who have religious objections to MCPS classroom instruction or activities.  *Id.* ¶¶ 104–12.  For the 2022–2023 school year, the MCPS School Board's "Guidelines for Respecting Religious Diversity" ("Religious Diversity Guidelines") stated, in part:

> When possible, schools should try to make reasonable and feasible adjustments to the instructional program to accommodate requests from students, or requests from parents/guardians on behalf of their students, to be excused from specific classroom discussions or activities that they believe would impose a substantial burden on their religious beliefs.  Students, or their parents/guardians on behalf of their students, also have the right to ask to be excused from the classroom activity if the students or their parents/guardians believe the activity would invade student privacy by calling attention to the student's religion.  When a student is excused from the classroom activity, the student will be provided with an alternative to the school activity or assignment.

> Applying these principles, it may be feasible to accommodate objections from students or their parents/guardians to a particular reading assignment on religious grounds by providing an alternative selection that meets the same lesson objectives. However, if such requests become too frequent or too burdensome, the school may refuse to accommodate the requests.  Schools are not required to alter fundamentally the educational program or create a separate educational program or a separate course to accommodate a student's religious practice or belief.

ECF 1-2, at 11–12.

## C.  The Plaintiffs' Objections to the Storybooks

The individual plaintiffs are Montgomery County residents of diverse faiths with children enrolled in MCPS.  ECF 36, ¶¶ 21–31.  Tamer Mahmoud and Enas Barakat are Muslims with three school-aged children, including a second grader.  *Id.* ¶¶ 24–25.  Jeff and Svitlana Roman are members of the Roman Catholic and Ukrainian Orthodox faiths, respectively, who also have a second grader in MCPS.  *Id.* ¶¶ 27–28.  Chris and Melissa Persak are Catholics with two elementary-aged children enrolled in MCPS.  *Id.* ¶¶ 29, 31.  Each believes all persons should be respected regardless of sex, gender identity, sexual orientation, or other characteristics.  *Id.* ¶¶ 50, 59, 66, 76.  Each also has religious objections to the storybooks.

The individual plaintiffs have submitted declarations in which they describe their religious beliefs and the grounds for their objections.  Mahmoud and Barakat believe they have "a sacred duty" to teach their children their faith, "including religiously grounded sexual ethics."  ECF 23-2, ¶¶ 4, 14.  Their religion teaches that mankind was divinely created as male and female and that sex and sexuality are sacred gifts from God to be expressed through the forming of a spiritual, marital bond that "entails sexually distinct but mutual duties and affections."  *Id.* ¶¶ 5–7.  "Inherent in these teachings" is the belief that "gender cannot be unwoven from biological sex . . . without rejecting the dignity and direction God bestowed on humanity from the start."  *Id.* ¶ 9.  Accordingly, they believe "humans attain their fullest God-given potential by embracing their biological sex," and their religion forbids medical procedures to alter the sex of a healthy person and condemns the imitation of the appearance of the opposite gender.  *Id.* ¶¶ 10–12.  With respect to instruction that uses the storybooks, they believe "there are detrimental spiritual consequences from letting authoritative figures such as schoolteachers teach" their children "principles concerning sexual and gender ethics that contravene" their faith.  *Id.* ¶ 16.  They view the books

as undermining their efforts to raise their second grader because the books "encourage young children to question their sexuality and gender, to identify with labels that categorize them by their sexuality, to focus prematurely on romantic relationships, to disregard differences between men and women, to accept gender transitioning, and to dismiss parental and religious guidance on these issues." *Id.* ¶ 19.  They state it would conflict with their religious duties to intentionally expose their son "to activities and curriculum on sex, sexuality, and gender that undermine Islamic teachings . . . ." *Id.* ¶ 18.  And because Islam "prohibits prying into others' private lives and discourages public disclosure of sexual behavior," they state it would violate their beliefs and the beliefs of their children if the children "were asked to discuss romantic relationships or sexuality with schoolteachers or classmates." *Id.* ¶ 17.

The Romans' faiths teach that all humans are created in God's image with inherent dignity. ECF 23-3, ¶ 4.  Based on the teachings of their faiths, the Romans believe biological sex is a divine gift that "entails differences in men's and women's bodies and how they relate to each other and the world." *Id.* ¶ 6.  They believe "a person's biological sex is both unchanging and integral to that person's being," that "gender and biological sex are intertwined and inseparable," and that "humans attain their fullest God-given potential by embracing their biological sex." *Id.* ¶¶ 10–11. They also view human sexuality as a divine gift that "calls for an authentic and healthy integration in the person" through the "virtue of chastity" and expression "only in marriage between a man and a woman for creating life and strengthening the marital union." *Id.* ¶¶ 8–9.  They have "a sacred obligation to teach these principles" to their son and "to encourage him at appropriate times to embrace" their religious way of life. *Id.* ¶ 12.  Based on these beliefs, the Romans believe that "encouraging children to unwind" gender and biological sex will teach them that their bodies are objects that may be disposed of at will rather than "a gift to be received, respected and cared for

as something intrinsic to the person." *Id.* ¶ 10.  They view much of the content of the storybooks as "false religiously and scientifically," and they would prefer children "enjoy a time of innocence, when it is not necessary for them to have detailed understanding of issues surrounding human sexuality," rather than for them to be encouraged "to focus prematurely on romantic emotions and relationships." *Id.* ¶¶ 13–14.  Because their son "loves his teachers and implicitly trusts them," they believe instruction on "sexuality or gender identity" that conflicts with their faiths "is spiritually and emotionally harmful to his well-being" and will significantly interfere with their "ability to form his religious faith and religious outlook on life." *Id.* ¶ 20.

The Persaks, too, believe "all humans are created as male or female, and that a person's biological sex is a gift bestowed by God that is both unchanging and integral to that person's being."  ECF 23-4, ¶ 5.  They view themselves as having "a God-given responsibility" to raise their children in accordance with the tenets of their faith, including "the Catholic Church's teachings on the immutable sexual differences between males and females, the biblical way to properly express romantic and sexual desires, and the role of parents to love one another unconditionally and sacrificially within the confines of biblical marriage . . . ." *Id.* ¶ 7.  They view the storybooks as going "far beyond teaching kindness and respect," to the point of imposing "an ideological view of family life and sexuality that characterizes any divergent beliefs as 'hurtful.'" *Id.* ¶ 15.  They believe the books encourage children "to question their sexuality and gender, ignore important differences between men and women, approve gender transitioning, focus prematurely on romantic relationships and sexuality, and dismiss parental and religious guidance on these issues." *Id.* ¶ 16.  Because they regard young children as "highly impressionable to ideological instruction presented in children's books or by schoolteachers," particularly "when ideological instruction is imposed to the exclusion of other viewpoints," they believe the books undermine

their efforts to raise their children in their faith.  *Id.* ¶¶ 13–14, 16.  Accordingly, they believe "exposing" their children to "viewpoints on sex, sexuality, and gender that contradict Catholic teaching on these subjects is inappropriate and conflicts with" their religious duty to raise their children in their faith.  *Id.* ¶ 12.

The individual plaintiffs' concerns are shared by Kids First, an unincorporated association of parents and teachers that formed "to advocate for the return of parental notice and opt-out rights with respect to any instruction related to family life and human sexuality" in MCPS.  ECF 36, ¶¶ 32–33.  Kids First includes members of diverse faiths and is open to individuals of all faiths. *Id.* ¶ 34.  The association's members believe in prioritizing the needs of children and "allowing elementary-age children to be kids first, without prematurely exposing them to issues regarding human sexuality, gender identity, and gender transitioning."  *Id.* ¶ 72.  They believe parents have the primary responsibility to decide how and when to instruct their children on such matters.  *Id.* ¶ 73.  And they believe they have religious obligations to ensure their children are taught about family life and human sexuality in a manner consistent with their faiths.  *Id.* ¶ 74.

After the August 9 motion hearing, the plaintiffs submitted a declaration of Grace Morrison, a board member of Kids First.  ECF 52, ¶ 2.  Morrison and her husband are Roman Catholics and adhere to the Catholic Church's teachings on marriage, family, sex, sexuality, and gender.  *Id.* ¶ 4.  They believe gender is "interwoven" with sex and that "marriage is the lifelong union of one man and one woman—distinct from each other, while complementary to each other— and that the nature and purpose of human sexuality is fulfilled in that union."  *Id.* ¶ 5.  Their ten-year-old daughter has Down Syndrome and Attention Deficit Disorder.  *Id.* ¶ 3.  She is enrolled in MCPS's Learning for Independence Program, has an Individualized Educational Plan ("IEP"), and is assisted by a full-time, one-on-one paraeducator.  *Id.*  The Morrisons believe they have a "sacred

obligation . . . to form [their] daughter's understanding of what it means to be a woman, to love another person, the nature and purpose of marriage, and how to embrace the vocation she is called to by God." *Id.* ¶ 7.  They believe their religious obligation is "pressured" by the storybooks, which conflict with their religious understandings of marriage, sexuality, and gender.  *Id.* ¶ 8. Because of their daughter's learning challenges, she does not "understand or differentiate instructions from her teachers and her parents" and "will not be able to understand how or why" the Morrisons disagree with the content of the storybooks. *Id.* ¶ 9.  For these reasons, the Morrisons believe "it is practically impossible" for them to contradict instruction involving the books.  *Id.* ¶ 8.  At the same time, because of their daughter's needs, they do not believe they have "a clear alternative" for their daughter's education "except to remain in the public schools" and use public school resources.  *Id.* ¶ 10.

The plaintiffs articulate strong objections to the storybooks.  As a general matter, they object to the introduction of concepts of gender identity, sexuality, and transgenderism to their elementary-aged children.  *See* ECF 36, ¶ 119.  They note, for example, that *Pride Puppy!* includes among a list of words to search for in its picture "[drag] king" and "[drag] queen," "leather," "underwear," and the name of a prominent sex worker and gay liberation activist.  *Id.* ¶ 116.  They read it to "encourage unqualified support for pride parades," without acknowledging pride parades "often contain material that many parents find inappropriate for young children."  *Id.* ¶¶ 117, 131. Similarly, they object to *Intersection Allies* because it defines sex, gender, and transgender and asks readers what pronouns fit them best, and they object to *Love, Violet* because it depicts children experiencing romantic feelings.  *Id.* ¶¶ 136, 140–41.  The plaintiffs believe the books, and the School Board's guidance on their use, promote "an ideologically one-sided view of issues" that is

contrary to their faiths and their understandings of scientific evidence.  *Id.* ¶ 132.[2]  They note the

resource guide for *Pride Puppy!* comes from the Human Rights Campaign, which they describe as

an "activist organization" that advocates for "sex positivity" and "ideological education on sexual

orientation and gender identity starting in kindergarten"; that the teacher's guide for *My Rainbow*

"eschews analysis of the various other ways parents might appropriately help their children

experiencing gender dysphoria"; and that the resource guide for *Born Ready* encourages teachers

to respond to questions and comments about the main character's "body parts" by suggesting

people only "make a guess" about gender at birth.  *Id.* ¶¶ 120–32, 138, 141–44.  In short, they

believe the storybooks "promote one-sided transgender ideology, encourage gender transitioning,

and focus excessively on romantic infatuation[.]"  *Id.* ¶ 5.

### D.  How Teachers Will Use the Storybooks

The MCPS English Language Arts Framework and Core Learning Practices for English

Language Arts state in broad terms the goals and strategies of the curriculum, but they do not

provide specific guidance on the use of any particular texts, including the storybooks.  *See* ECF

42-3; ECF 42-4.  Hazel states MCPS teachers decide how they will use the storybooks in their

classrooms.  ECF 43, ¶¶ 29–31.  The MCPS Office of Curriculum and Instructional Programs

suggested teachers incorporate the books into the curriculum like any other book, "namely, to put

them on a shelf for students to find on their own; to recommend a book to a student who would

enjoy it; to offer the books as an option for literature circles, book clubs, or paired reading groups;

or to use them as a read aloud."  *Id*. ¶ 29.  While the School Board expects "that teachers use the

LGBTQ-Inclusive Books as part of instruction," as with all curriculum resources, teachers have a

---

[2] The plaintiffs refer to scientific literature that is, in their view, consistent with their religious beliefs.  ECF 36, ¶¶ 145–51.

choice "regarding which MCPS-approved materials to use and when to use them through each unit" and may "choose among the texts" rather than being limited to a single book corresponding to grade level.  *Id.* ¶¶ 30–31.  The School Board has stated "there [was] no planned explicit instruction on gender identity and sexual orientation in elementary school, and that no student or adult is asked to change how they feel about these issues."  *Id.* ¶ 30; *see* ECF 1-5, at 3.  Rather, the books will be "used to assist students with mastering reading concepts like answering questions about characters, retelling key events . . . , and drawing inferences about story characters based on their actions."  ECF 43, ¶ 31.  In advance of the books' introduction into the curriculum in the 2022–2023 school year, MCPS offered a professional development session on their use that drew more than 130 participants.  *Id.* ¶ 28.

The plaintiffs take issue with some of the guidance the School Board has given to teachers on how to use the storybooks.  They refer to official MCPS documents and instructional materials referenced in a November 15, 2022 *Fox News* article published on the *New York Post* website that discussed the books.  *See* ECF 1-5.  The School Board has not disputed the accuracy of any information in the article.  The article discusses a PowerPoint presentation on the storybooks from a professional development workshop held in August 2022.  *Id.* at 2–4.  That presentation appears to have substantially overlapped with a document titled "Responding to Caregivers/Community Questions," which the plaintiffs also provide.  *See* ECF 55-4.  The proposed responses in this document are comprehensive, and the Court shares only excerpts.  If parents ask why children should learn about sexuality and gender in school, or whether elementary school is too early for such learning, educators might respond:

> The learning we're talking about will happen through exposure to diversified gender and sexuality representation, not explicit instruction.  Students are already learning about gender and sexuality identity in myriad ways.  For example, when we read a story with a mom and dad, a Prince kisses a Princess at the end of a

> fairytale. . . . Children are already learning about it and mostly see "straight" and
> "cisgender" representations around them. . . . By learning about the diversity of
> gender, children have an opportunity to explore a greater range of interests, ideas,
> and activities. . . . Beginning these conversations in elementary school will help
> young people develop empathy for a diverse group of people and learn about
> identities that might relate to their families or even themselves.  It is never too early
> for schools to set up a foundation of understanding and respect.

*Id.* at 2.  If parents express concerns that these ideas conflict with their values and ask whether the

lessons are teaching children to reject those values, educators might say:

> Absolutely not. . . . Teaching about LGBTQ+ is not about making students think a
> certain way; it is to show that there is no one "right" or "normal" way to be. . . .
> While one aim for learning about diversity is to become more accepting of those
> around us, not everyone will be best friends. . . . The purpose of learning about
> gender and sexuality identity diversity is to demonstrate that children are unique
> and that there is no single way to be a boy, girl, or any other gender.  If a child does
> not agree with or understand another student's gender identity or expression . . . ,
> they do not have to change how they feel about it.  However, they do not get to
> make fun of, harass, harm, or ignore the existence of other students . . . .

*Id.* at 3.  If parents ask about opt-outs, teachers are encouraged to explain why the instruction is

important and how the books are used:

> While there are no planned explicit lessons related to gender and sexuality, students
> will see these identities embedded in our curriculum and learning environment.
> Explicit instruction involves teaching a specific concept or procedure in a highly
> structured and carefully sequenced manner where there is an opportunity to model,
> coach and apply the learning.  The concepts or terms that relate to gender and sexual
> identity are not taught explicitly, but there may be a need to define words that are
> new and unfamiliar to students. . . . No child who does not agree with or understand
> another student's gender, expression, or their sexual identity is asked to change how
> they feel about it.  Parents always have the choice to keep their student(s) home
> while using these texts; however, it will not be an excused absence.

*Id.* at 3–4.

The *Fox News* article also provides excerpts of proposed "think aloud" moments for some

of the books.  After reading *Intersection Allies*, students "will recognize their own responsibility

to stand up to exclusion, prejudice and injustice."  *Id.* at 4.  For *Prince & Knight*, students might

notice "that the prince doesn't seem happy about all the princesses trying to get his attention" and

wonder "how he might feel about the pressure his parents are putting on him to find a princess." *Id.* at 5.  For *Love, Violet*, students might acknowledge "how uncomfortable we might [be] in situations when we feel our heart beating 'thumpity thump' & how hard it can be [to] talk about our feelings with someone that we don't just 'like' but 'like like.'"  *Id.*  They "will develop language and knowledge to accurately and respectfully describe how people (including themselves) are both similar to and different from each other and others in their identity groups." *Id.* at 6.  And for *Born Ready*, students might notice "how happy [the main character] is when his mom hears him and commits to sharing with their loved ones that he is a boy"; teachers might then say "that we know ourselves best."  *Id.*  The article states that another slide of the presentation encouraged teachers, "Use five of the books by the end of December."  ECF 1-5, at 2.

According to the article, educators who attended the workshop received a list of potential questions from students and a list of suggested responses.  *Id.* at 6.  The article appears to be referring to a document titled "Sample Student Call-Ins."  *See* ECF 55-3.  The following excerpts are representative but not exhaustive.  If a student says being "gay, lesbian, queer, etc." is "wrong and not allowed" by his or her religion, teachers might respond,

> I understand that is what you believe, but not everyone believes that.  We don't have to understand or support a person's identity to treat them with respect and kindness.  School is a place where we learn to work together regardless of our differences.  In any community, we'll always find people with beliefs different from our own and that is okay—we can still show them respect.

*Id.* at 2.  If a student says "she can only like boys because she's a girl" or "boys can't paint their nails," teachers might try to "disrupt the either/or thinking" and provide examples like "Harry Styles wears dresses" or "my best friend is a woman and she is married to another woman."  *Id.* at 2–4.  If a student says "that's gay" or "that's weird" about gay characters, teachers might explain that the word gay "describes people of the same gender who love each other.  In our school we

respect all people so we don't talk about being 'gay' in a negative way, like saying it's 'weird.'"
*Id.* at 2.  Teachers might also say "using gay to describe something negative reflects a long history
of prejudice against LGBTQ+ people" and "when I ask you to not use expressions like 'that's so
gay,' I'm just trying to make you aware that it is hurtful to a lot of people."  *Id.* at 4.  If a student
says, in reference to transgenderism and the main character in *Born Ready*, "That's weird.  He
can't be a boy if he was born a girl," or asks about the character's "body parts," teachers are
encouraged to respond,

> That comment is hurtful; we shouldn't use negative words to talk about peoples'
> identities.  Sometimes when we learn information that is different from what we
> always thought, it can be confusing and hard to process.

> When we're born, people make a guess about our gender and label us "boy" or
> "girl" based on our body parts.  Sometimes they're right, and sometimes they're
> wrong.  When someone's transgender, they guessed wrong; when someone's
> cisgender, they guessed right.  Our body parts do not decide our gender.  Our gender
> comes from inside – we might feel different than what people tell us we are.  We
> know ourselves best.  When someone tells us what their gender is, we believe them
> because they are the experts on themselves.

> It's none of our business what body parts a person has, so we should never ask that
> question.

*Id.* at 2–3.  Generally, the suggested responses focus on tolerance, empathy, and respect for
different views.

### E.  Rollout and Opt-Out Policy

 A November 2022 white paper prepared by the Montgomery County Association of
Administrators and Principals expressed concerns about the content of some of the books, the
suggested responses to student questions, and the proposed end to opt-outs.  *See* ECF 47-1.  The
white paper noted "several of the books and supporting documents seemingly contradict [the]
message" that the books were not supposed to be teaching about sexual orientation or gender
identity as standalone concepts in elementary school.  *Id.* at 8.  It stated that teachers had "not been

trained on the use of these materials and subsequent questions, conversations, and class discussions that may occur," and it worried about the "potentially polarizing position" educators would be put in if individual schools or teachers were left to decide whether to use the books. *Id.* at 9. It referred to "numerous concerns" from educators and community members that some of the books were not appropriate for the intended age group. Singling out *Love, Violet*, for example, the white paper stated, "It is problematic to portray elementary school age children falling in love with other children, regardless of sexual preferences." *Id.* at 8. The white paper also critiqued excerpts from the list of anticipated questions and suggested answers. *Id.* at 10. Regarding the suggested answer "people make a guess about our gender," it stated, "Concern: Stated as a fact. Some would not agree this is a fact." *Id.*

According to Hazel, at the beginning of the 2022–2023 school year, some parents began requesting their children be excused from classroom instruction using the storybooks. ECF 43, ¶ 33. Some of the requests were religious in nature, but many others were rooted in opposition to what the parents perceived as efforts to teach students about sex and LGBTQ issues. *Id.* ¶ 34. In some instances, the teachers and principals who received these requests accommodated them by excusing students when the storybooks were read in class. *Id.* ¶ 35.

In communications with the individual plaintiffs in early 2023, school officials expressed uncertainty about whether parents would be allowed to opt their children out of classroom instruction on the storybooks. *See, e.g.*, ECF 1-12 – 1-14. The Romans corresponded with their school's principal, seeking to opt their son out and a guarantee that parents would continue to receive advance notice. ECF 36, ¶ 167. Eventually, the principal agreed their son did not have to be present when one of the books was read during class and that other parents could request the same treatment. *Id.* ¶ 168. Mahmoud and Barakat, meanwhile, were informed by their school's

acting principal that MCPS was not supporting opt-outs from the storybooks and that teachers were not required to provide alternative assignments, but the acting principal later agreed on March 20 to allow their son to sit outside his classroom while one of the books was being discussed.  *Id.* ¶¶ 169–74.  On March 22, an MCPS spokesperson responding to a media inquiry issued a statement confirming parents' notification and opt-out rights:

> When a teacher selects a curriculum, a notification goes out to parents about the book.  If a parent chooses to opt out, a teacher can find a substitute text for that student that supports these standards and aligns with curriculum.

ECF 36, ¶ 159.

The following day, March 23, the School Board reversed course and issued a "Revised Message Regarding the Use of Inclusive Texts" that stated:

> [T]here is an expectation that teachers utilize these inclusive lessons and texts with all students. . . . Students and families may not choose to opt out of engaging with any instructional materials, other than "Family Life and Human Sexuality Unit of Instruction" which is specifically permitted by Maryland law.  As such, teachers will not send home letters to inform families when inclusive books are read in the future.

*Id.* ¶ 160.  Hazel states the new no-opt-out policy was the result of meetings with a small group of principals in March 2023, during which the School Board determined that principals and teachers "could not accommodate the growing number of opt out requests without causing significant disruptions to the classroom environment and undermining MCPS's educational mission."  ECF 43, ¶ 36.  The School Board had three concerns.  First, high student absenteeism.  *Id.* ¶ 37.  In one instance, for example, parents sought to excuse dozens of students in a single elementary school from instruction.  *Id.*  Second, the infeasibility of managing numerous opt-outs.  *Id.* ¶ 38.  Teachers would have to track and accommodate opt-out requests for their students, and other staff who spent time in multiple classrooms would have to do so across an entire school.  *Id.*  Finally, the School Board was concerned that permitting some students to leave the classroom whenever books

featuring LGBTQ characters were used would expose students who believe the books represent them and their families to social stigma and isolation. *Id.* ¶ 39. The School Board believed that would defeat its "efforts to ensure a classroom environment that is safe and conducive to learning for all students" and would risk putting MCPS out of compliance with state and federal nondiscrimination laws. *Id.* Based on these concerns, the School Board decided to disallow opt-outs from the storybooks, regardless of the reason, after the 2022–2023 school year. *Id.* ¶¶ 40–42.[3] If schools already had granted opt-out requests, those accommodations would continue through the end of the school year. *Id.* ¶ 41. New requests would not be granted. ECF 36, ¶ 160.

On March 24, teachers at the Persaks' elementary school were instructed to introduce and read the books in their classrooms. *Id.* ¶ 163. Due to the Persaks' prior request for an opt-out for their daughter, she was excused from the classroom when one of the storybooks was read, but the principal made it clear to the Persaks that no further notifications or opt-outs would be provided. *Id.* ¶¶ 164–65.

On May 31, Morrison asked her daughter's teacher whether her class would be reading any of the storybooks and was told that some of the books would be used on June 2, 5, and 6. ECF 52, ¶¶ 11–12. Morrison asked whether she could opt her daughter out. The teacher said no, and the principal later confirmed to Morrison that the school would adhere to the School Board's no-opt-out policy. *Id.* ¶ 12. Morrison kept her daughter home on the days the books were being read. *Id.*

---

[3] Hisham Garti, the Outreach Director the Montgomery County Muslim Council, states in a declaration that Muslim community leaders met with School Board officials, including Hazel, on May 1, 2023. ECF 47-2. Garti recalls being told the "decision to rescind the opt-out was made after a few parents of the LGBTQ community complained [children] were offended and had their feelings hurt when students started leaving classrooms during instructions of these texts." *Id.* ¶ 5. According to Garti, that was "the only explanation MCPS provided for why it rescinded the opt-out." *Id.* ¶ 6.

### F.  MCPS Responses to Community Opposition

Both before and after the School Board's decision to end opt-outs, parents raised concerns about the books with the School Board at public meetings.[4]  At the January 12, 2023 board meeting, one parent objected to *My Rainbow* by stating, "the transgender ideology is throughout the whole book" and "this is not instruction, it is indoctrination."  (27:10 – 29:10).  She found "most appalling" the proposed teacher responses, such as saying people "guess" about gender at birth. *Id.*  She believed such statements undermine "any teaching or viewpoint that many families . . . have used at home."  *Id.*  She criticized the School Board for providing only its viewpoints, which implied that parents' religions and family traditions are wrong.  *Id.*  She asserted the School Board was not allowing kids to "think for themselves" and was indoctrinating students.  *Id.*  Another community member later expressed support for her comments and added that "many if not more parents . . . believe in traditional Judeo-Christian values as taught in the Bible" and are "opposed to gender-fluid ideology."  (30:47 – 33:02).  He expressed concern that introducing "highly sexualized concepts in elementary school" will "cause children to question their identity when they otherwise don't."  *Id.*

School officials responded to the parents' concerns in different ways.  At the meeting, Board Member Lynne Harris responded to these comments by stating:

> Some of the testimony today was disturbing to me personally.  Transgender, LGBTQ individuals are not an ideology, they're a reality.  And there are religions out there that teach that women should achieve only subservient roles in life, and MCPS would never think of not having a book in a classroom that showed a woman

---

[4] The plaintiffs provide abbreviated quotations of selected statements made during several School Board meetings, which were recorded and posted online.  The Court watched the recordings of the meetings referred to by the plaintiffs.  The January 12, 2023 board meeting is found at https://perma.cc/T234-559Q; the March 28, 2023 board meeting is found at https://shorturl.at/fAET6; and the May 25, 2023 board meeting is available at https://go.boarddocs.com/mabe/mcpsmd/Board.nsf/Public.  The Court cites general timestamps where appropriate.

as being a superintendent of a very large school system, or a doctor, or vice president of the United States.  So, our students, our staff, our part of the LBGTQ community, they are transgender.  The very few books that we're intentionally including in our curriculum—which, by the way, the language being suggested to support teachers in answering questions is evidence- and science-based—that is what we have pledged to do, is to make sure every student sees themselves reflected in the curriculum, in the course, in the work they're doing in their classrooms.  I am very proud that we're doing that work, and I continue to support it.

(38:35 – 39:40).  An MCPS student who sits with the board expressed similar sentiments:

It is our responsibility as a school system to equitably provide a high-quality education to all of our students, and that is impossible if every single student cannot see themselves reflected in the classroom.  Every student, regardless of their sexual orientation or their gender identity, regardless of what they look like or where they come from, has the right to be reflected in what they learn.  I know that I cannot speak for all of my peers, for all of the students in this county, but let me speak for many of them as I applaud the school system for their work in realizing this vision.  To the students of MCPS, yes, ignorance and hate does exist within our community.  Please know that every student, each of our 160,000 students in our large county, has a place in the school system, has a place in their school, and certainly has a place in their classroom.

(39:40 – 40:40).   After Hazel and Deputy Superintendent Patrick Murphy spoke about the storybooks and how their implementation would be communicated to families, Board Vice President Shebra Evans expressed her "full support" for the student board member's comments, stating "it was very important that that be stated out loud."  (44:05 – 44:36).

In a January 24 email, the Persaks' elementary school principal reflected on a recent parent meeting about the storybooks and stated, "several people (both staff and parents) expressed to me that they felt less safe as a result of some of the comments made by" community members who opposed the storybooks and that "the county is considering an 'opt out' for parents" to accommodate certain parents' "fears."   ECF 1-12.   The principal expressed her unequivocal opposition to an opt-out from "books with LGBTQ+ characters in them," likening it to a decision to opt out of "books with characters from other marginalized groups" such as Jews, Muslims, and African Americans.  *Id.*

At the March 28 board meeting, an individual representing various parent groups protested the decision to end opt-outs: "How is taking away parental rights to opt-out of teachings that go against religious rights, family values, and core beliefs helping us to trust you . . . ?" (1:08:50 – 1:10:45). Harris commented on the individual's concerns:

> I just want to address, what is it, Moms for Liberty? If we could talk about what this is really about. You say, "parents rights to pull their students out of lessons when they're going to be reading a book that has an LGBTQ character in it," because of your "religious rights, your family values, your core beliefs." But Rogers and Hammerstein got it right seventy years ago, you have to be taught to hate. No child is born other-izing, marginalizing, thinking somebody else is not as good as they are, because of the way they look or the way they talk or the religion they practice or who they love. I am proud of the work that this system is doing and is committed to doing, to say we are going to ensure that every student in our school at every age can seek themselves reflected in the work of their classroom and in the people in the schools that do that work with them. And even if they don't feel safe being who they are at home, or in their other community, we're going to create a space that acknowledges the humanity of everybody. Because saying that a kindergartener can't be present when you read a book about a rainbow unicorn because it offends your religious rights or your family values or your core beliefs is just telling that kid, "here's another reason to hate another person." And we are not going to do that in the school system.

(1:46:41 – 1:48:19). The student board member also shared his thoughts:

> We cannot opt out of diversity and inclusion. It's the school system's responsibility to deliver a meaningful education to all of our students, every student has the right to be reflected in what they learn. Which means that we cannot treat instruction that reflects some students any differently than as we treat instruction that reflects others. No aspect of a student's identity should limit the quality of their education—not what they look like, not where they come from, not what language they speak, not their sexuality, not their gender identity, and not their religion. To be clear, diversity is a necessity to a comprehensive education, so inclusion must stay.

(1:48:23 – 1:49:13).

At the May 25 board meeting, many more community members spoke about the storybooks and the no-opt-out policy, both for and against the change. In response, the student board member sought clarification about when state law required opt-outs and whether the storybooks were part

21

of the family life and human sexuality unit of the health curriculum.  (1:11:14).  Hazel explained

that state law required opt-outs only from the human growth and sexuality course and that the

storybooks were part of the literacy curriculum.  (1:11:54).  The student board member stated in

response:

> We heard this from all parts of our community, but, fundamentally, diversity is a good thing.  Inclusion is a good thing.  And by providing these diverse and inclusive texts, by aligning ourselves and following state guidance on when opt-out is appropriate, we are doing a service to our students by creating an inclusive education.  It is disheartening to hear about the cases of students being bullied about practicing their religious beliefs in schools, and we know of students facing discrimination based on sexuality or their gender identity.  But across the board, by staying true to the value of diversity and inclusion, we are addressing these issues in our schools, and I think that is the greatest service we can do for all of our students.  And this work around creating inclusive texts at the elementary school levels, the work around the anti-racist audit, the new pilot courses coming to our schools next fall . . . that are inclusive of so many communities in our school system are really starting to change the face of what it looks like to deliver an inclusive education. . . .  [I want to make sure we continue] to send a clear message to all our students that regardless of their gender identity or sexuality, regardless of their religion, this is their MCPS and they have a right to see themselves in what they learn everyday.

(1:14:24 – 1:15:50).  Superintendent Monifa B. McKnight then discussed the value of diversity

within the MCPS community:

> When we think about the diversity that sits within our community, that's often referred to as a strength, and the school system absolutely has a responsibility to respect and support that.  Every day, when our children go home, then they have the lessons that are taught in their home that is reflective of culture, religion, and all of those pieces.  We would expect that to be the case and would continue in our community as it always has. . . .  We would expect that there are values that come out of every home, and those are the lessons that are taught in that home.  And this is not an invasion of that.

(1:16:20 – 1:17:12).

A June 2, 2023 article on the *MoCo360* website purports to quote statements made by Harris at the May 25 meeting.[5]  *See* ECF 23-1, at 30, (https://perma.cc/5GD9-2YVQ).  Harris stated she felt "kind of sorry" for an MCPS student who had expressed personal discomfort with the curriculum.  She wondered whether the student was "parroting dogma" learned from her parents.  *Id.*  She pushed back on the idea that the School Board was infringing parental rights, stating:  "There is no right for a parent to micromanage their child's public-school experience.  If they want their child to receive an education that strictly adheres to their religious dogma, they can send their kid to a private religious school."  *Id.*  Harris said she considered it a "badge of honor" to have been quoted four times in the complaint in this lawsuit, which had been filed the previous day, and she expressed concern about the precedent that would be set if the plaintiffs prevailed:  "Do [the plaintiffs] realize it would be an impossible disruption to the school system if teachers had to screen the content they plan to teach every day and send out notices so white supremacists could opt out of civil rights content and xenophobes could opt out of stories about immigrant families?"  *Id.*[6]

### G.  Relevant Procedural History

On May 24, 2023, the individual parents, on behalf of themselves and their children, filed this lawsuit against the Montgomery County Board of Education, Superintendent Monifa B.

---

[5] The Court could not locate the quoted statements during its review of the hours-long recording of the May 25 meeting or the recordings of the adjacent board meetings.  The accuracy of these quotations, which the School Board has not disputed, does not bear on the Court's analysis.

[6] The plaintiffs also highlight comments by a Montgomery County Council member who stated it was unfortunate that the issue put "some Muslim families on the same side of an issue as White supremacists and outright bigots."  *See* ECF 23-1, at 30, https://perma.cc/3AJE-RSBA.  She continued, "I would not put you in the same category as those folks, although, you know, it's complicated because they're falling on the same side of this particular issue."  *Id.*

McKnight, and board members Karla Silvestre, Shebra Evans, Grace Rivera-Oven, Rebecca Smondrowski, Julie Yang, Brenda Wolff, and Lynne Harris.  ECF 1.  They asserted violations of the Free Exercise Clause of the First Amendment, a violation of the Free Speech Clause of the First Amendment, a violation of the Due Process Clause of the Fourteenth Amendment, and a violation of Maryland law.  The federal constitutional claims are brought pursuant to 42 U.S.C. § 1983.  On June 12, the individual parents moved for a preliminary injunction based on the likely success of their free exercise and due process claims.  ECF 23.  On July 6, the plaintiffs filed an amended complaint, which added Kids First as a plaintiff.  ECF 36.  Kids First has not joined the preliminary injunction motion.[7]

## II.    Preliminary Injunction Standard

Before the entry of a final judgment, a court may enter a preliminary injunction.  Fed. R. Civ. P. 65(a).  "The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)).  In other words, a preliminary injunction enables the court to ensure that, should the plaintiff prevail, the relief sought will be available to it to the same extent as when it filed suit.  *See*

---

[7] Even though Kids First has not joined the parents' motion, the parents rely on a declaration from one of the association's members, Grace Morrison, to support their legal arguments, and they argue the requested injunctive relief also would protect Kids First and its members.  ECF 52 & 57.  The Court is not convinced that Kids First has standing to bring claims on behalf of its members, including Morrison.  An association has standing to bring suit on behalf of its members when "neither the claim asserted nor the relief requested requires the participation of individual members in the suit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Free exercise claims "ordinarily require[] individual participation."  *Harris v. McRae*, 448 U.S. 297, 320–21 (1980); *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133–34 (5th Cir. 2009).  The parties have not presented arguments on this issue, which was thrown into sharp relief by Morrison's post-hearing declaration about her family's unique situation.

*id.*  "A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008)).

A plaintiff seeking preliminary injunctive relief bears the burden of proof and must meet "a high bar" by "[s]atisfying . . . four factors." *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017); *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). The plaintiff must clearly show "[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc) (citing *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 170–71 (4th Cir. 2019)).

Several of the preliminary injunction factors merge when constitutional rights are at stake. *Leaders*, 2 F.4th at 346. To start, when "there is a likely constitutional violation, the irreparable harm factor is satisfied." *Id.*; *see also W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) ("[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of [the] plaintiff's First Amendment claim."). This is so because "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Leaders*, 2 F.4th at 346 (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))). Likewise, the final two factors—the balance of the equities and the public interest—are satisfied when there is a likely constitutional violation because "the public interest favors protecting constitutional rights" and "a

25

state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Id.* (quoting *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013)); *see also Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (noting the final two preliminary injunction factors "merge when the Government is the opposing party") (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The School Board contends the plaintiffs seek a mandatory preliminary injunction. Mandatory preliminary injunctions "alter rather than preserve the status quo" and are particularly "disfavored." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). They are "warranted only in the most extraordinary circumstances." *Taylor v. Freemen*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)).

The heightened standard for a mandatory preliminary injunction does not apply here because the plaintiffs ask the Court to maintain the status quo. An injunction that "maintain[s] the status quo and prevent[s] irreparable harm while a lawsuit remains pending" is prohibitory rather than mandatory. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013)). The Fourth Circuit has defined "the status quo" as the "last uncontested status between the parties which preceded the controversy." *Id.* In *Pashby*, the plaintiffs moved for a preliminary injunction the day before the policy they challenged took effect. 709 F.3d at 320. While the policy had been approved by the legislature months earlier, it had not taken effect at the time the plaintiffs filed their motion. *Id.* For that reason, the court held the plaintiffs sought a prohibitory injunction. *Id.* Here, the plaintiffs filed their motion on June 12, 2023, four days before the close of the 2022–2023 school year. At that time, the opt-out requests of the individual plaintiffs that previously had been granted were

still honored.  *See* ECF 36, ¶ 164; ECF 43, ¶ 41 (stating "accommodations would no longer be provided after the 2022–2023 school year ended").  The individual plaintiffs seek to stop the School Board from implementing a change in policy that has not yet caused them injury.  That is a prohibitory, not mandatory, injunction.

## III.   Discussion

### A.  Likelihood of Success on the Merits

The parties agree the preliminary injunction analysis in this case collapses into the first factor, the likelihood of success on the merits.  The plaintiffs claim the School Board's decision to disallow opt-outs from the storybooks likely violates their rights under the Free Exercise Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment.  The School Board argues the plaintiffs have not established a likely constitutional violation.

#### 1.   Free Exercise

The First Amendment, applicable to the states through the Fourteenth Amendment, provides in part that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof."  U.S. Const., amend. I.  The Free Exercise Clause "protects against laws that discriminate against or among religious beliefs or that restrict certain practices because of their religious conduct."  *Alive Church of the Nazarene, Inc. v. Prince William Cnty., Va.*, 59 F.4th 92, 108 (4th Cir. 2023).  To violate the Free Exercise Clause, a law, regulation, or government policy must "burden religious exercise."  *Fulton v. City of Philadelphia*, --- U.S. ----, 141 S. Ct. 1868, 1876 (2021); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462–63 (2017); *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 223 (1963) (noting "a violation of the Free Exercise Clause is predicated on coercion").  Even when state action burdens religious exercise, it still may be "constitutionally permissible" if it survives the requisite level of

judicial scrutiny. *Fulton*, 141 S. Ct. at 1876. A "facially neutral and generally applicable" law that has the incidental effect of burdening religious exercise is subject to rational basis review. *Alive Church of the Nazarene*, 59 F.4th at 108; *see Emp't Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 878–82 (1990). "Laws that are not neutral and generally applicable, however, are subject to strict scrutiny review." *Alive Church of the Nazarene*, 59 F.4th at 108.

The parties debate whether the plaintiffs' free exercise claims are subject to strict scrutiny or rational basis review. The plaintiffs argue, first, that strict scrutiny applies under *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972), whenever laws restrict the "right of parents . . . to direct the [religious] upbringing of their children." Next, they argue strict scrutiny applies under *Fulton v. City of Philadelphia*, 141 S. Ct. at 1877, which reaffirmed that policies are not generally applicable when they allow for individualized exemptions. The plaintiffs argue the Religious Diversity Guidelines, which allowed parents to opt out of the storybooks last school year, operate as a system of discretionary exemptions and invite "individualized governmental assessment of the reasons for" opt-out requests. *See Smith*, 494 U.S. at 884. Third, the plaintiffs argue strict scrutiny applies under *Tandon v. Newsom*, --- U.S. ----, 141 S. Ct. 1294, 1296 (2021), which held that laws are not generally applicable when they treat "*any* comparable secular activity more favorably than religious exercise." The plaintiffs argue the School Board allows opt-outs for secular reasons from its family life and human sexuality curriculum but refuses to allow opt-outs for religious reasons from the storybooks, which they view as covering some of the same topics. Finally, the plaintiffs argue the no-opt-out policy is not neutral because its adoption was surrounded by official expressions of hostility toward religion and, as a result, it is subject to strict scrutiny under *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, --- U.S. ----, 138 S. Ct. 1719 (2018), and *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). The defendants

argue the no-opt-out policy is neutral and generally applicable because it was not adopted based on hostility toward religion and no one can opt out of instruction involving the storybooks for any reason.  Thus, they contend, the policy is subject to rational basis review.

Before the Court may reach the question of the appropriate level of judicial review, it first must address the threshold question of whether the plaintiffs can establish that the no-opt-out policy burdens their religious exercise.  They assert the policy substantially interferes with their sacred obligations to form their children in their faiths and the religious exercise of their children.  The School Board argues the no-opt-out policy does not burden the plaintiffs' religious exercise because the parents and their children are not being directly or indirectly coerced into activity that violates their religious beliefs.

### a.  Burden – Legal Principles

"[T]he ordinary meaning of 'prohibiting the free exercise of religion' was (and still is) forbidding or hindering unrestrained religious practices or worship."  *Fulton*, 141 S. Ct. at 1896 (Alito, J., concurring).  Thus, "it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion."  *Schempp*, 374 U.S. at 223; *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014) (finding religious exercise burdened by a law that required the plaintiffs to "engage[] in conduct that seriously violates their religious beliefs").  Coercion can be direct or indirect.  *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988).  Direct coercion is the express prohibition of conduct required by faith or the compulsion to perform conduct prohibited by faith.  *See Smith*, 494 U.S. at 878 (recognizing an individual's religious exercise is burdened by any law that "requires (or forbids) the performance of an act that his religious belief forbids (or requires)").  Indirect coercion exists when government action places "substantial pressure on an adherent to modify his behavior

and violate his beliefs[.]"  *Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717–18 (1981).[8]

The early indirect coercion cases involved "state unemployment compensation rules that conditioned the availability of benefits upon an applicant's willingness to work under conditions forbidden by his religion."  *Smith*, 494 U.S. at 883.  For example, in *Sherbert v. Verner*, a woman lost her job and was unable to obtain other employment because she refused to work on her religious day of rest.  374 U.S. 398, 399 (1963).  She sought unemployment benefits, but under state law, she was ineligible because she had failed, without good cause, to accept available suitable work.  *Id.* at 400–01.  The Supreme Court held the state law burdened the plaintiff's religious exercise because "the pressure upon her to forego [the practice of her religion] is unmistakable"—the law "force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand."  *Id.* at 404.  "Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against [an individual] for her Sunday worship."  *Id.*; *see also Thomas*, 450 U.S. at 717–18.

The Supreme Court has clarified that these cases support a general rule that "a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits."  *Carson v. Makin*, --- U.S. ----, 142 S. Ct. 1987, 1998 (2022).  Thus, in *Carson*, the Court

---

[8] At oral argument, the plaintiffs suggested a burden on religious exercise may not be required to establish a free exercise violation, citing three recent Supreme Court cases they say did not address burden.  However, in one case, the Court stated, "it is plain that the City's actions have burdened [the plaintiff's] religious exercise . . . ."  *Fulton*, 141 S. Ct. at 1876.  In the other cases, the burden was equally obvious.  California had prohibited private religious gatherings of a certain size.  *Tandon*, 141 S. Ct. at 1297.  And Colorado had ordered an individual to engage in conduct contrary to his beliefs.  *Masterpiece Cakeshop*, 138 S. Ct. at 1726.  These cases do not support the plaintiffs' position that a burden on religious exercise may not be required to establish a free exercise claim, a position that cannot be squared with the text of the Free Exercise Clause.

concluded a state law that provided certain parents with tuition assistance for their school-aged children but prohibited religious schools from receiving the state-issued tuition assistance burdened the parents' religious exercise. *Id.* The law forced the parents to choose between religious schooling and a public benefit, just as the unemployment benefits framework in *Sherbert* forced the worker to choose between honoring her religious day of rest and receiving unemployment assistance. *Id.*; *see also Trinity Lutheran*, 582 U.S. at 462 ("[T]he Department's policy puts Trinity Lutheran to a choice:  It may participate in an otherwise available benefit program or remain a religious institution."). Similar reasoning led the Court to find indirect coercion when a policy forced a religious organization to choose between "curtailing its mission" and violating its beliefs. *Fulton*, 141 S. Ct. at 1876. In *Fulton*, a Catholic foster care agency faced exclusion from municipal contracts for the placement of needy children into foster homes unless it agreed to certify same-sex foster families—conduct it viewed as "approving relationships inconsistent with its beliefs." *Id.* There, too, the coercive pressure to forgo religious exercise was clear.

This case involves objections to a public-school curriculum. The Fourth Circuit has not addressed the question of when a mandatory public-school curriculum might burden the religious exercise of students or parents. Other courts have. Every court that has addressed the question has concluded that the mere exposure in public school to ideas that contradict religious beliefs does not burden the religious exercise of students or parents. *See, e.g.*, *Parker v. Hurley*, 514 F.3d 87, 107 (1st Cir. 2008); *Bauchman v. West High Sch.*, 132 F.3d 542, 557 (10th Cir. 1997); *Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 690 (7th Cir. 1994); *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1065 (6th Cir. 1987); *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1542–43 (9th Cir. 1985); *Jones v. Boulder Valley Sch. Dist. RE-2*, No. 20-cv-3399-RM-

NRN, 2021 WL 5264188, at *14 (D. Colo. Oct. 4, 2021); *Coble v. Lake Norman Charter Sch., Inc.*, No. 3:20-CV-596, 2021 WL 1109360, at *7 (W.D.N.C. Mar. 23, 2021); *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 479 F. Supp. 3d 808, 818 (D. Az. 2020); *Cal. Parents for Equalization of Educ. Mats. v. Torlakson*, 267 F. Supp. 3d 1218, 1227 (N.D. Cal. 2017), *aff'd*, 973 F.3d 1010 (9th Cir. 2020); *Freedom From Religion Found. v. Hanover Sch. Dist.*, 665 F. Supp. 2d 58, 71 (D.N.H. 2009).  The Court will discuss a few of these cases in detail, but in brief, these courts reasoned that the mere exposure to ideas in public school did not burden religious exercise because (1) students were not required to behave contrary to their faiths or affirm any views contrary to their religious beliefs, and (2) parents were not prevented from discussing and contextualizing any contrary views at home.

In *Mozert v. Hawkins*, students and parents brought a free exercise challenge against a mandatory public-school curriculum involving a series of basic reading textbooks.  827 F.2d at 1059–60.  The families had religious objections to several themes in the books, including mental telepathy, evolution, and pacifism.  *Id.* at 1060–61.  Initially, the school worked with the families to provide an alternative reading program for students whose parents objected to the books.  *Id.* at 1060.  But the school board later voted to eliminate all alternative reading programs, making the books mandatory.  *Id.*  Several students who refused to read the books or attend reading classes in which they were used were suspended, others transferred schools or withdrew from public school, and a few received unsanctioned accommodations.  *Id.*  The families claimed the mandatory curriculum violated their rights under the Free Exercise Clause.  The lower court agreed, concluding "the plaintiffs' free exercise rights ha[d] been burdened because their 'religious beliefs compel[led] them to refrain from exposure to the [book] series,' and the defendant school board 'ha[d] effectively required that the student plaintiffs either read the offensive texts or give up their

free public education.'"  *Id.* at 1062.  But the Sixth Circuit reversed and held exposure to ideas did not burden the families' religious exercise.  *Id.* at 1065.  The court discussed indirect coercion cases, noting that in each, "there was compulsion to do an act that violated the plaintiffs' religious convictions."  *Id.* at 1065–66.  But nothing in the record suggested "any student was ever required to affirm his or her belief or disbelief in any idea or practice mentioned in the various stories."  *Id.* at 1063–64.  The plaintiffs pointed to guidance in teachers' materials that they viewed as encouraging teachers to present the objectionable ideas as "truth," but the court noted students did not read the teachers' materials and there was "no proof that any plaintiff student was ever called upon to say or do anything . . . or to engage or refrain from engaging in any act either required or forbidden by the student's religious convictions."  *Id.*  The court concluded "compulsion" must mean something beyond simply "reading and discussing assigned materials."  *Id.* at 1064.

Similarly, in *Fleischfresser v. Directors of School District 200*, the Seventh Circuit affirmed the dismissal of a free exercise challenge brought by parents against a public school district for its use of a series of books in a supplemental reading program.  15 F.3d at 690.  The parents alleged the book series focused on supernatural beings including "wizards, sorcerers, giants and unspecified creatures with supernatural powers" and "indoctrinate[d] children in values directly opposed to their Christian beliefs by teaching tricks, despair, deceit, parental disrespect and by denigrating Christian symbols and holidays."  *Id.* at 683.  The court acknowledged the parents' right "to control the religious upbringing and training of their minor children."  *Id.* at 689 (citing *Yoder*, 406 U.S. at 213–14).  But it found no free exercise violation because the parents had not alleged the use of the books had "a coercive effect that operate[d] against the [] practice of their religion."  *Id.* at 689–90.  The defendants were "not precluding the parents from meeting their religious obligation to instruct their children," and "the use of the series [did not] compel the

parents or children to do or refrain from doing anything of a religious nature.  Thus, no coercion

exist[ed] . . . ."  *Id.* at 690.  The court concluded by endorsing a concern Justice Jackson had

expressed nearly 50 years earlier:  "If we are to eliminate everything that is objectionable to any

[religious group] or inconsistent with any of their doctrines, we will leave public schools in shreds.

Nothing but educational confusion and a discrediting of the public school system can result from

subjecting it to constant law suits."  *Id.* (quoting *McCollum v. Bd. of Educ.*, 333 U.S. 203, 235

(1948) (Jackson, J., concurring)).

The most recent circuit-level analysis of free exercise challenges to public-school curricula

is found in *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008).  In that case, parents brought free exercise

challenges to two books that portrayed families with same-sex parents.  *Id.* at 90.  The parents

sought advance notice from the school about when the books would be used and the opportunity

to opt their children out of instruction using the books, which they believed contradicted their

religious beliefs.  *Id.*  The First Circuit affirmed the dismissal of the parents' claims, which it

characterized as seeking an "exemption from religiously offensive material."  *Id.* at 95, 104.  It

began with "the standard constitutional threshold question"—"whether the plaintiff's free exercise

is interfered with at all."  *Id.* at 99 (quoting N.M. Stolzenberg, *"He Drew a Circle That Shut Me

Out":  Assimilation, Indoctrination, and the Paradox of a Liberal Education*, 106 Harv. L. Rev.

581, 592–93 (1993)).  It found no allegations of direct coercion:

> The parents do not allege coercion in the form of a direct interference with their
> religious beliefs, nor of compulsion in the form of punishment for their beliefs . . . .
> Nor do they allege the denial of benefits.  Further, plaintiffs do not allege that the
> mere listening to a book being read violated any religious duty on the part of the
> child.  There is no claim that as a condition of attendance at the public schools, the
> defendants have forced plaintiffs—either the parents or the children—to violate
> their religious beliefs.

*Id.* at 105.  Instead, the court determined the "heart of the plaintiffs' free exercise claim is a claim of 'indoctrination': that the state has put pressure on their children to endorse an affirmative view of gay marriage and thus has undercut the parents' efforts to inculcate their children with their own opposing religious views."  *Id.*  It declined to decide whether such a theory might be cognizable, instead concluding that the plaintiffs had not alleged coercion through indoctrination.  *Id.*  "[A]s to the parents' free exercise rights, the mere fact that a child is exposed on occasion in public school to a concept offensive to a parent's religious belief does not inhibit the parent from instructing the child differently" because parents remain "free to discuss [objectionable] matters and to place them in the family's moral or religious context . . . ."  *Id.* (quoting *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005)).  In addressing the children's rights, the court imagined a spectrum between impermissible indoctrination and permissible "influence-toward-tolerance."  *Id.* at 106.  One child's rights were not burdened at all because he was never required to read the book, which in his case merely depicted same-sex couples and did not endorse homosexuality.  *Id.*  The other child had "a more significant claim" because he was forced to sit through a classroom reading of a book that did endorse same-sex marriage and homosexuality.  But his claim still fell well short of potentially actionable indoctrination because he was not required to affirm same-sex marriage, faced no consequences for disagreeing with the books or refusing to read them, and was not "subject to a constant stream of like materials."  *Id.*  The court concluded the "reading by a teacher of one book, or even three, and even if to a young and impressionable child, does not constitute 'indoctrination.'"  *Id.* at 107.

When courts have found free exercise violations based on public-school curricula, the challenged curricula involved more than exposure to ideas.  The curricula required conduct that conflicted with students' faiths.  In *Moody v. Cronin*, for example, parents and students brought a

free exercise challenge against a statewide requirement that public-school students "attend all coeducational physical education classes under penalty of suspension, expulsion, denial of credits for graduation and other discipline." 484 F. Supp. 270, 272 (C.D. Ill. 1979). The families had religious objections to their children being "required to view and interact with members of the opposite sex who are wearing 'immodest attire.'" *Id.* The court found the statewide requirement "substantially interfere[d] with the religious development of the Pentecostal children and their integration into the way of life of the Pentecostal faith community." *Id.* at 276. It reasoned:

> [T]here is a degree of visual and physical contact inherent in physical education that is not present in other classes. The required participation in coeducational physical education forces interaction with members of the opposite sex who are wearing "immodest attire." The nature of the activities engaged in effectively deprives the Pentecostal children of the decision of "taking the second look" and is thus in direct violation of Church teachings regarding being a party to lust, either by being provocative themselves or by allowing themselves to be put in a position where the temptation is present.

*Id.* at 275. The court held the students could not be required to participate in coeducational physical education in violation of their religious beliefs. *Id.* at 277. Similarly, another court found a requirement that high school students participate in a military training program or be denied a diploma burdened the religious exercise of a student whose religious beliefs prohibited him from participating in training to prepare for war. *Spence v. Bailey*, 465 F.2d 797, 800 (6th Cir. 1972). That choice was tantamount to indirect coercion, as in *Sherbert*. *Id.* at 799. A court in this circuit found a school's uniform requirement that contravened a parent's religious beliefs burdened religious exercise. *Hicks ex rel. Hicks v. Halifax Cnty. Bd. of Educ.*, 93 F. Supp. 2d 649, 659 (E.D.N.C. 1999). And in yet another case, a court recognized that a school's refusal to excuse students with religious objections to watching movies and listening to recordings of any kind burdened parents' rights to pass on their faiths because it "allows to be done in school what is prohibited at home. It places the children between the Scylla of obeying their parents' religious

teachings and the Charybdis of obeying the commands of their teachers and school authorities."
*Davis v. Page*, 385 F. Supp. 395, 399–400 (D.N.H. 1974).

Each of these cases relied on *Yoder*, a seminal Supreme Court case that reaffirmed the "right of parents to direct the religious upbringing of their children." 406 U.S. at 233. In *Yoder*, Amish parents challenged their convictions under a state criminal statute requiring them to cause their children to attend public or private school until age 16. *Id.* at 207. The parents had declined to send their 14- and 15-year-old children to public or private school. *Id.* They believed their children's attendance in school was contrary to the Amish religion and way of life, and that "by sending their children to high school, they would not only expose themselves to the danger of the censure of the church community, but . . . also endanger their own salvation and that of their children." *Id.* at 209. Substantial evidence supported the parents' contention that their religious communities were "characterized by a fundamental belief that salvation requires life in a church community separate and apart from the world and worldly influence." *Id.* at 209–210. The evidence included "the unchallenged testimony of acknowledged experts in education and religious history, almost 300 years of consistent practice, and strong evidence of a sustained faith pervading and regulating respondents' entire mode of life . . . ." *Id.* at 219. Based on this evidence, the Supreme Court found that

> secondary schooling, by exposing Amish children to worldly influences in terms of attitudes, goals, and values contrary to their beliefs, and by substantially interfering with the religious development of the Amish child and his integration into the way of life of the Amish faith community at the crucial adolescent stage of development, contravenes the basic religious tenets and practice of the Amish faith[.]

*Id.* at 218. In other words, the record showed compulsory school attendance for Amish children "carrie[d] with it a very real threat of undermining the Amish community and religious practice as they exist today; they must either abandon belief and be assimilated into society at large, or be

forced to migrate to some other and more tolerant religion." *Id.* The Court acknowledged the state's interest in universal compulsory education but held it was not absolute and did not outweigh the Amish parents' fundamental rights and interests "with respect to the religious upbringing of their children . . . ." *Id.* at 214–15.

The *Yoder* Court was clear that its holding was inexorably linked to the Amish community's unique religious beliefs and practices. *Id.* at 235–36. It stated its heightened scrutiny of the challenged law was compelled by the combination of "the interests of parenthood" and "a free exercise claim *of the nature revealed by this record*." *Id.* at 233 (emphasis added). It anticipated "probably few other religious groups or sects could make" a showing similar to the evidence provided by the Amish parents, including the interrelationship of their beliefs and a centuries-long practice of isolated and self-sufficient communal living, and it counseled courts to "move with great circumspection in performing the sensitive and delicate task of weighing a State's legitimate social concern when faced with religious claims for exemption from generally applicable educational requirements." *Id.* For these reasons, *Mozert* distinguished *Yoder* as resting "on such a singular set of facts that . . . it cannot be held to announce a general rule that exposure without compulsion to act, believe, affirm or deny creates an unconstitutional burden." 827 F.2d at 1067. *Parker*, too, observed that "*Yoder* emphasized that its holding was essentially sui generis, as few sects could make a similar showing of a unique and demanding religious way of life that is fundamentally incompatible with *any* schooling system." 514 F.3d at 100. Still, *Yoder* stands as the ultimate application of the Free Exercise Clause's protection against compulsory public-school education that violates parents' religious beliefs.

Finally, it is worth emphasizing one throughline in all these cases. The Supreme Court never has "interpreted the First Amendment to require the Government *itself* to behave in ways

that the individual believes will further his or her spiritual development or that of his or her family."

*Bowen v. Roy*, 476 U.S. 693, 699 (1986).  In *Bowen*, parents challenged the government's practice of assigning and using Social Security numbers.  They asserted that practice, as applied to their two-year-old daughter, would violate their religious beliefs and limit their daughter's spiritual development.  The Court rejected their claims because the "Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens."  *Id.*  "Just as the Government may not insist that appellees engage in any set form of religious observance, so appellees may not demand that the Government join in their chosen religious practices by refraining from using a number to identify their daughter."  *Id.* at 699–700.  "The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures."  *Id.* at 700.  The Court acknowledged that the parents' "religious views may not accept this distinction between individual and governmental conduct[,]" but it concluded that "the Constitution, rather than an individual's religion, must supply the frame of reference."  *Id.* at 701 n.6.  For the same reasons, the Court rejected free exercise challenges to federal agency actions that had authorized road construction across land used for religious purposes.  *Lyng*, 485 U.S. at 442.  The Court reaffirmed the Free Exercise Clause's protection against forms of indirect coercion like the disqualification from unemployment benefits based on religious conduct, which it analogized to direct fines on religious worship.  *Id.* at 450.  But the Court held that line of indirect-coercion cases "does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require" judicial scrutiny.  *Id.* at 450–51.

### b.  Burden – Application

With these principles in mind, the Court considers whether the plaintiffs likely have established their and their children's religious exercise rights will be burdened by the no-opt-out policy.   In their declarations, the parents claim a sacred obligation to teach their children their faiths and their religious views on family structure, gender, and human sexuality.   ECF 23-2, ¶¶ 4, 14; ECF 23-3, ¶ 12; ECF 23-4, ¶ 7; ECF 52, ¶ 7.   Mahmoud and Barakat state their faith prohibits prying into others' private lives and discourages public disclosure of sexual behavior.   ECF 23-2, ¶ 17.   They state it would violate their religious beliefs and the beliefs of their children if their children "were asked to discuss romantic relationships or sexuality with schoolteachers or classmates."  *Id.*   They also state "[i]ntentionally exposing" their children to contrary instruction would conflict with their religious obligations.  *Id.* ¶ 18.   The Romans state their child loves his teachers and implicitly trusts them, so "[h]aving them teach principles about sexuality or gender identity that conflict with [their] religious beliefs significantly interferes with [their] ability to form his religious faith and religious outlook on life and is spiritually and emotionally harmful to his well-being."  ECF 23-3, ¶ 20.   The Persaks state "exposing" their children to viewpoints that contradict their beliefs "conflicts" with their religious duties and "undermines [their] efforts to raise [their] children in accordance with [their] faith . . . ."  ECF 23-4, ¶¶ 12, 16.   Finally, Morrison, a board member of Kids First, states her religious obligations are "pressured" by the books because "it is practically impossible for [her and her husband] to contradict" contrary instruction due to her child's learning disability, which prevents her from understanding their disagreement with the books and differentiating their instruction from her teachers' instruction.   ECF 52, ¶¶ 8–9. Morrison also states she has no realistic alternative to public school for her child's education.  *Id.* ¶¶ 10, 14.

The Court begins with the asserted burden on the children's religious exercise. The plaintiffs contend not allowing opt-outs from the storybooks exerts "behavioral pressure" on the children to "modify their religious beliefs and behavior." ECF 47, at 10–11. The pressure comes from the books' calls to action and introspection and the inevitable teacher-led discussion, which advance the School Board's express goal to normalize an inclusive environment. In essence, the plaintiffs argue that by being forced to read and discuss the storybooks, their children will be pressured to change their religious views on human sexuality, gender, and marriage. The Court interprets this argument as an indoctrination claim of the sort contemplated in *Parker*.

The plaintiffs have not identified any case recognizing a free exercise violation based on indoctrination. The closest any court has come to doing so appears to be *Tatel v. Mount Lebanon School District*, 637 F. Supp. 3d 295 (W.D. Penn. 2022). In *Tatel*, the court denied a motion to dismiss a free exercise claim brought by parents who challenged a public-school teacher's non-curricular instruction on transgender topics. *Id.* at 330. The parents alleged the teacher had engaged in a year-long course of instruction to first graders on gender dysphoria, including books, videos, discussions, and private counseling. *Id.* at 303–05. She also had "instructed the children in her first-grade class that their parents might be wrong about their children's gender," told one student that he could dress like a different gender, said she would never lie to them (suggesting their parents would), and encouraged her students "not to tell their parents about her instruction." *Id.* Such instruction was "contrary to the District's published curriculum," though administrators allegedly had adopted a *de facto* policy allowing the teacher to continue her activities. *Id.* at 304.

The *Tatel* Court's basis for finding a burden on the parents' religious exercise is not clear, but the court's analysis seems to align with the First Circuit's description of indoctrination in *Parker*. In distinguishing *Parker*, the court noted that the teacher "did attempt to indoctrinate" the

children by telling them their parents "may be wrong and her teachings about gender identity were right." *Id.* at 325.  Later, in summarizing its reason for finding a viable free exercise claim, the court stated the teacher had impermissibly "advocated her own agenda and beliefs about gender identity" in the classroom despite the parents' objections.  *Id.* at 330.[9]  The teacher allegedly engaged in a consistent, multi-pronged, year-long effort to convince her first-grade students to believe her views on gender and, in some cases, to change their gender identities.  *Id.* at 303–05.  She told her students she would never lie to them, and she encouraged them not to discuss her instruction with their parents.  *Id.*  The students were not just exposed to ideas.  They were being pressured by their teacher to change their religious views on gender identity.

Here, the plaintiffs have not shown that the no-opt-out policy likely will result in the indoctrination of their children.  Their allegations do not approach the parents' allegations in *Tatel* or the description of indoctrination in *Parker*.  To be sure, the topics in the storybooks the plaintiffs find objectionable—gender identity, transgenderism, and same-sex marriage—outnumber the single objectionable issue (same-sex marriage) in the two books in *Parker*.  And some of the books may be viewed as endorsing particular viewpoints, like one of the books in *Parker* that the court

---

[9] On a motion for reconsideration, the court expanded on its analysis.  *Tatel v. Mt. Lebanon Sch. Dist.*, --- F. Supp. 3d ----, 2023 WL 3740822, at *13–14 (W.D. Penn. May 31, 2023).  The court reasoned, first, that the plaintiffs did not have to allege coercion because "a non-neutral policy to the detriment of a religious belief is a per se burden on Free Exercise rights" under *Kennedy v. Bremerton School District*, --- U.S. ----, 142 S. Ct. 2407 (2022).  *Tatel*, 2023 WL 3740822, at *13.  In support, the court cited the following language from *Kennedy*:  "[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"  142 S. Ct. at 2421–22.  The Court does not read this language from *Kennedy* as describing a *per se* burden.  Rather, the language explains when strict scrutiny may be triggered by a law that imposes a burden.  The *Tatel* Court reasoned in the alternative that the plaintiffs had pled coercion because they "must either withdraw their children from the public school or submit to [the teacher's] advocacy."  2023 WL 3740822, at *14 n.18.  This reasoning seems to find indirect coercion based on the pressure either to "submit to" indoctrination or abandon a public education.

suggested presented "a more significant claim." *Parker*, 514 F.3d at 106.  But the storybooks are still a small subset of many books used in the MCPS English language arts curriculum; they are not a "constant stream of like materials." *Id.*  Moreover, as in *Parker*, the School Board "imposes no requirement that the student[s] agree with or affirm" the books' views on the topics and threatens no punishment if they refuse to do so.  *Id.*  To the contrary, it consistently has stated, "No child, or adult, who does not agree with or understand another student's gender identity or expression of their sexual identity is asked to change how they feel about it." ECF 1-5; ECF 43, ¶ 30; ECF 55-3, at 2 (suggesting teachers to respond to student religious objections by saying, "I understand that is what you believe, but not everyone believes that" and "we don't have to understand a person's identity to treat them with respect and kindness").  Even if one or two of the suggested answers to possible student questions in the School Board's guidance could be interpreted to promote a particular view as correct, they are not required answers, and they are outliers among the suggested answers that do not promote a particular view.  ECF 55-3.  And some MCPS educators have expressed concerns about the more assertive suggested answers, suggesting those responses are less likely to be used in the classroom.  ECF 47-1, at 10.  On the current record, the plaintiffs have not shown that MCPS's use of the storybooks crosses the line from permissible influence to potentially impermissible indoctrination.  Therefore, as in *Parker*, the Court need not decide whether indoctrination burdens religious exercise.

The plaintiffs contend the Morrisons' daughter, at least, has a viable indoctrination claim. Their daughter has Down Syndrome and Attention Deficit Disorder.  She is enrolled in the Learning for Independence Program, has an IEP, and qualifies for the full-time, one-on-one assistance of a paraeducator.  Morrison states her daughter's learning disability prevents the child from understanding or differentiating instructions from her teachers and her parents and renders

her unable to understand how or why her parents disagree with the ideas presented in the storybooks.  As a result, Morrison states, it is practically impossible for Morrison and her husband to contradict instruction the child receives at school that conflicts with the family's religious beliefs.

The Morrisons are not named plaintiffs, and the Court questions whether Kids First has standing to bring claims on their behalf.  *See Harris*, 448 U.S. at 320–21; *Cornerstone Christian Schs.*, 563 F.3d at 133–34 (rejecting religious school's claims of associational standing to bring free exercise challenges on behalf of parents and students); 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Fed. Prac. & Proc.* § 3531.9.5 (3d ed.) ("Some substantive claims may seem inherently so personal that individual participation should be required simply because of the nature of the claim.").  Even if the Court were to assume the Morrisons' claims are properly presented, the Morrisons have not shown the use of the storybooks will result in their daughter's indoctrination.  She may be uniquely vulnerable to indoctrination due to her neurodivergence, but on the current record, the Morrisons still have not established that indoctrination is likely to occur. The evidence suggests that, generally, MCPS teachers will occasionally read one of the handful of books, lead discussions and ask questions about the characters, and respond to questions and comments in ways that encourage tolerance for different views and lifestyles.  That is not indoctrination.  That the Morrisons' child cannot distinguish between what her parents and teachers instruct does not convert the teachers' instruction into indoctrination—nothing suggests she will be pressured to affirm or agree with the views presented in the storybooks.  Moreover, the Morrisons have not offered evidence about how the books will be incorporated into the Learning for Independence Program or whether the Morrisons have requested a modification to their

daughter's IEP to accommodate her disability as it relates to the storybooks. Based on the evidence before the Court, the Morrisons are likely to succeed on an indoctrination claim.[10]

Separate from any indoctrination claim, Mahmoud and Barakat contend their son would be forced to violate Islam's prohibition of "prying into others' private lives" and its discouragement of "public disclosure of sexual behavior" if his teacher were to ask him to discuss "romantic relationships or sexuality." ECF 23-2, ¶ 17. Forcing a child to discuss topics that his religion prohbits him from discussing goes beyond the mere exposure to ideas that conflict with religious beliefs. But nothing in the current record suggests the child will be required to share such private information. Based on the evidence of how teachers will use the books, it appears discussion will focus on the characters, not on the students. *See* ECF 43, ¶ 30 (stating the books "are used to assist students with mastering concepts like answering questions about characters, retelling key events . . . and drawing inferences about story characters"); ECF 1-15, at 24 (same); ECF 1-5 (noting "think-aloud moments" about what characters feel). While some instructional guidance seems to encourage student introspection, none encourages students to share their personal experiences or to discuss their or their families' romantic relationships, gender identities, or sexuality. *See* ECF 55-3, at 3 ("Are you comfortable sharing your pronouns with me?"). Additionally, Mahmoud and Barakat have not established the likelihood that prohibited conversations will occur. They do not allege they have told their son's teachers that his religion does not allow him to discuss prohibited topics with others or that his teachers, when on notice that he cannot discuss these topics, will pressure him to do so. Thus, the Court cannot conclude the child is likely to be coerced into violating his beliefs in the manner identified by his parents.

---

[10] Even if Kids First has standing to bring a claim on behalf of the Morrisons and the Morrisons could satisfy the standard for a preliminary injunction, the unique situation of one family would not justify a broad injunction applicable to the individual plaintiffs and every Kids First member.

The *sine qua non* of a free exercise claim is coercion, and the plaintiffs have not shown the no-opt-out policy likely will result in the indoctrination of their children or otherwise coerce their children to violate or change their religious beliefs.  "Public schools are not obliged to shield individual students from ideas which potentially are religiously offensive, particularly when the school imposes no requirement that the student" violate his or her faith during classroom instruction.  *Parker*, 514 F.3d at 106.

The parents' burden arguments, too, fall short.  The parents assert that their children's exposure to the storybooks, including discussion about the characters, storyline, and themes, will substantially interfere with their sacred obligations to raise their children in their faiths.  The Court's analysis of the parents' asserted burden is guided by *Parker* and the other circuit-level cases, which the Court finds persuasive.  Under these cases, the parents' inability to opt their children out of reading and discussion of the storybooks does not coerce them into violating their religious beliefs.  *See Parker*, 514 F.3d at 105–06; *Fleischfresser*, 15 F.3d at 690; *Mozert*, 827 F.2d at 1065–66.  The parents still may instruct their children on their religious beliefs regarding sexuality, marriage, and gender, and each family may place contrary views in its religious context.[11]  No government action prevents the parents from freely discussing the topics raised in the storybooks with their children or teaching their children as they wish.  The no-opt-out policy

---

[11] The Morrisons, too, do not face any coercion to violate their sacred duty to raise their child in their faith.  Morrison states they cannot contextualize contrary ideas for their disabled daughter because her disability prevents her from understanding the difference between what her parents say and what her teachers say.  But the no-opt-out policy does not prevent the Morrisons from taking the action required by their religion—trying to teach their daughter their beliefs.

does not prevent the parents from exercising their religious obligations or coerce them into forgoing their religious beliefs.[12]

The plaintiffs argue this conclusion is inconsistent with Justice Alito's concurrence in *Morse v. Frederick*, which stated: "It is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities."  551 U.S. 393, 424 (2007) (Alito, J., concurring).  *Morse* involved a free speech challenge to a school's decision to punish a student for raising a controversial banner at an off-campus, school-approved event.  *Id.* at 396.  In context, Justice Alito was reaffirming that schools act as agents of the State and not private actors when they regulate student speech.  *See id.* ("When public school authorities regulate student speech, they act as agents of the State; they do not stand in the shoes of the students' parents.").  In the same paragraph, he observed that "[m]ost parents, realistically, have . . . little ability to influence what occurs in the school[,]" undermining the plaintiffs' argument that Justice Alito intended to suggest parents' have substantial control over public-school curricula.  *Id.*  The Court's findings here are not inconsistent with the holding in *Morse* or Justice Alito's concurrence.

The plaintiffs further argue *Parker*, *Mozert*, and *Fleischfresser* are not persuasive and should not be followed here.  They argue first that, even if they remain free to teach their beliefs to their children, their religious exercise is nonetheless burdened because the storybooks impede their efforts to instill their religious beliefs in their children.  In other words, they argue instruction

---

[12] The plaintiffs argue they will not know what to discuss with their children or when without advance notice of when the storybooks will be read.  But parents know the books are a part of the English language curriculum and must be used in the classroom at some point during the upcoming school year.  They may read the books for themselves and decide whether, when, and how best to address them with their children.  Not receiving notice of the precise dates on which the books will be read does not burden their religious exercise.

that uses the storybooks will make it less likely they will accomplish their religious obligations to raise their children in their faiths.  Yet, they cite no case that has recognized a free exercise claim based on government action that reduces the likelihood of meeting a sacred obligation.  Such a finding would seem to contravene the Supreme Court's guidance that the Free Exercise Clause cannot be used to "require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family."  *Bowen*, 476 U.S. at 699. It is not enough for a plaintiff to identify "the incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs[.]"  *Lyng*, 485 U.S. at 450.  "The crucial word in the constitutional text is 'prohibit':  'For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.'"  *Id.* (quoting *Sherbert*, 374 U.S. at 412).  With or without an opt-out right, the parents remain free to pursue their sacred obligations to instruct their children in their faiths. Even if their children's exposure to religiously offensive ideas makes the parents' efforts less likely to succeed, that does not amount to a government-imposed burden on their religious exercise.

The plaintiffs next argue that the no-opt-out policy is a form of indirect coercion, which they claim *Parker* did not address.  They contend the policy pressures them to choose between the benefits of a public education and exercising their religious rights.  Indirect coercion, as discussed above, is substantial pressure short of an express command to modify one's behavior or to violate one's beliefs.  Such pressure may come from conditions on receiving public benefits, which courts have found are analogous to fines.  Certainly, public education is a valuable public benefit.  And many families cannot afford to send their children to private schools.  But the benefit of a public education in this case is not conditioned on any activity or abstention that violates the parents'

religious beliefs.  The no-opt-out policy does not pressure the parents to refrain from teaching their faiths, to engage in conduct that would violate their religious beliefs, or to change their religious beliefs.  The policy may pressure them to discuss the topics raised by the storybooks with their children, but those discussions are anticipated, not prohibited, by the parents' faiths.  The parents are not pressured into violating their religious beliefs in order to obtain the benefits of a public education.

Third, the plaintiffs argue the Supreme Court's decision in *Yoder* compels the conclusion that the no-opt-out policy interferes with their rights to direct the religious upbringing of their children and teach their religious views on topics central to their faiths.  They claim the reading and discussion of the storybooks will interfere with this right by encouraging their children to think about and question their sexuality and gender identity, to focus prematurely on romantic relationships, and to disregard religious teachings.

*Parker* and *Mozert* are representative of how courts have viewed *Yoder* in cases challenging curricula on free exercise grounds.  The Sixth Circuit in *Mozert* noted "*Yoder* was decided in large part on the impossibility of reconciling the goals of public education with the religious requirement of the Amish that their children be prepared for life in a separated community" and the threat to the Amish way of life and religious practice posed by the public-school attendance requirement.  827 F.2d at 1067.  It found no similar threat to the parents on the facts before it because they wanted the benefits of a public education, albeit with greater control over the curriculum, and because they did not claim their children's exposure to the curriculum would prevent them from practicing their religion.  *Id.*  The First Circuit in *Parker* likewise found "substantial differences" between the parents' claims and the claims in *Yoder*, covering much the same ground as *Mozert*.  514 F.3d at 100.  Unlike in *Yoder*, the parents in *Parker* had chosen to

enroll their children in public school and made no claim of a distinct community and lifestyle threatened by the curriculum.  *Id.*  They had not shown that "exposure to the materials in dispute" would "automatically and irreversibly prevent [them] from raising [their children] in the religious belief that gay marriage is immoral."  *Id.*  By contrast, the continued education of the Amish children in *Yoder* would have prevented their parents from raising their children in their separate and distinct religious culture and lifestyle.  *Id.*  And, in both cases, the courts noted the parents had legal alternatives to public school (private schools and homeschooling) that would satisfy their religious concerns, whereas the Amish parents in *Yoder* did not.  *Id.*; *Mozert*, 827 F.2d at 1067.

The plaintiffs argue these readings of *Yoder* are too narrow and conflict with the Supreme Court's recent description of the parental right at issue in that case.  They cite *Espinoza v. Montana Department of Revenue*, in which parents challenged a state regulation that blocked private religious schools from receiving funds from a state scholarship program.  --- U.S. ----, 140 S. Ct. 2246, 2249 (2020).  The majority in *Espinoza* noted that *Yoder* supported the Court's longstanding recognition of "the rights of parents to direct 'the religious upbringing' of their children."  *Id.* at 2261.  Justice Gorsuch, writing in concurrence, stated "this Court has already recognized that parents' decisions about the education of their children . . . can constitute protected religious activity."  *Id.* at 2276 (Gorsuch, J., concurring).  And Justice Breyer, writing in dissent, noted "the Free Exercise Clause draws upon a history that places great value upon the freedom of parents to teach their children the tenets of their faith."  *Id.* at 2284 (Breyer, J., dissenting).  In each instance, *Yoder* is referred to in passing and at a high level of generality.

Such stray statements offer limited guidance here, with facts that are a far cry from both *Yoder* and *Espinoza*.  Neither the majority, the concurrence, nor the dissent stated lower courts' interpretations of *Yoder* in this context is incorrect or provided any analysis from which this Court

may infer their dissatisfaction with those interpretations.  At the same time, the plaintiffs offer no analogous case to support their proposed application of *Yoder* to these facts.  Even if the plaintiffs are correct that the Supreme Court has never adopted the reading of *Yoder* followed by lower courts in this context, the Court is persuaded to follow the persuasive authority in the absence of any controlling authority to the contrary.  *Yoder* is *sui generis*.  The Supreme Court itself said as much, anticipating few groups could match the Amish parents' claims.  The outcome in that case turned on the Court's findings that the Amish parents' religious beliefs required them to live apart from the modern world and that their children's continued enrollment in school would destroy their religious way of life.  Thus, the statutory requirement that they send their children to school on pain of criminal punishment coerced them to violate their religious beliefs.  The plaintiffs here do not and cannot make a similar claim.[13]

"[A] violation of the Free Exercise Clause is predicated on coercion," either direct or indirect.  *Schempp*, 374 U.S. at 223.  The plaintiffs have not shown the no-opt-out policy likely coerces them to violate their religious beliefs.  Regardless of the wisdom of affording opt-outs in these circumstances, the weight of existing authority is clear.  The plaintiffs' free exercise claims are not likely to succeed on the merits.[14]

---

[13] The plaintiffs argue distinguishing their claims from the Amish parents' claims requires the Court to engage in "doctrinal favoritism."  ECF 57, at 3.  Not so.  The Court's analysis does not turn on religious doctrine.  It turns on whether the facts involve government coercion to violate religious beliefs.  In *Yoder*, they did; here, they do not.

[14] Because the plaintiffs have not shown that the no-opt-out policy likely will burden their religious exercise, the Court need not address whether the policy is neutral and generally applicable under *Fulton*, *Tandon*, and *Masterpiece*/*Lukumi*.

### 2.  Substantive Due Process

The plaintiffs assert that the School Board's refusal to allow parents to opt their children out of reading and discussion of the storybooks infringes their right to direct their children's upbringing in violation of the Due Process Clause of the Fourteenth Amendment.  They claim this due process right is fundamental, triggering strict scrutiny.

Under substantive due process jurisprudence, "courts examine whether government intrusions into citizens' liberties are justified by adequate state interests."  *Herndon by Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174, 177 (4th Cir. 1996).  "A substantive due process challenge is considered under rational-basis review unless some fundamental right is implicated."  *Doe v. Settle*, 24 F.4th 932, 953 (4th Cir. 2022) (citing *Herndon*, 89 F.3d at 177).  Fundamental rights are those "which are, objectively, deeply rooted in this Nation's history and tradition."  *Hawkins v. Freemen*, 195 F.3d 732, 739 (4th Cir. 1999) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)).  "Critical to the 'fundamental interest' inquiry is the requirement that it be conducted on the basis of a 'careful description of the asserted fundamental liberty interest.'"  *Id.* (quoting *Glucksberg*, 521 U.S. at 720).  In defining the asserted liberty interest, courts must avoid "overgeneralization in the historical inquiry."  *Id.* at 747 (citing *Glucksberg*, 521 U.S. at 722–23).

In their complaint and preliminary injunction motion, the parents asserted a violation of their substantive due process rights to direct the upbringing of their children, which they described as "[s]eparate and apart from" their free exercise claims.  ECF 23-1, at 31; *see* ECF 36, ¶¶ 262–75.  But in their reply brief and at oral argument, they characterized their due process rights as concerning the *religious* upbringing of their children, blurring the line between their due process

arguments and their free exercise arguments based on *Yoder*. *See* ECF 47, at 16. The Court considers the asserted secular due process right and its religious variation, in turn.

The "interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Nearly 100 years ago, the Court held that the "liberty" protected by the Due Process Clause includes the right of parents "to control the education of their own," *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923), and "to direct the upbringing and education of children under their control," *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925). *Troxel*, 530 U.S. at 65. In the subsequent decades, the Court has addressed parents' rights in different contexts, often using broad language. *See, e.g.*, *id.*; *Glucksberg*, 521 U.S. at 720 (noting the right "to direct the education and upbringing of one's children" under *Meyer* and *Pierce*); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights of man,' and '[r]ights far more precious . . . than property rights[.]'") (citations omitted). Relying on these cases, the parents argue the right to control the upbringing of their children is fundamental.[15]

There is no doubt parents have substantial rights under the Due Process Clause, but the Court still must define the specific right at stake with granularity. *Hawkins*, 195 F.3d at 747. Indeed, "'[a]lthough the Supreme Court has never been called upon to define the precise

---

[15] The plaintiffs cite several other cases that have no clear application to the facts of this case. *See, e.g.*, *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, --- U.S. ----, 141 S. Ct. 2038, 2043–44 (2021) (concerning a school's regulation of off-campus speech); *Troxel*, 530 U.S. at 60–63 (concerning parents' control over visitation rights for their children); *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) (concerning school's adoption of a religious curriculum in violation of the Establishment Clause); *Stanley*, 405 U.S. at 646–47 (concerning unwed father's custodial rights); *Gruenke v. Seip*, 225 F.3d 290, 295 (3d Cir. 2000) (concerning parents' rights to learn and control the disclosure of information about their daughter's pregnancy).

boundaries of a parent's right to control a child's upbringing and education,' it is clear that the right is neither absolute nor unqualified." *Bailey v. Va. High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012) (unpublished per curiam) (collecting cases) (quoting *C.N.*, 430 F.3d at 182). The Court has noted, for example, that there is "no support [for] the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society." *Runyon v. McCrary*, 427 U.S. 160, 177 (1976). And in several cases, the Court has expressly adopted a narrow reading of *Meyer* and *Pierce*. *Id.* (describing the rights established in *Meyer* and *Pierce* as protecting "the subject matter . . . taught at . . . private school" and the right to send children to private school); *Norwood v. Harrison*, 413 U.S. 455, 462 (1973) (finding *Pierce* "affirmed the right of private schools to exist and operate" and "said nothing of any supposed right of parochial schools" to state funding); *see also Leebaert v. Harrington*, 332 F.3d 134, 140–41 (2d Cir. 2003) (holding "*Meyer, Pierce*, and their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught"). So, while parents have the right to "control the education of their own" and "to direct the upbringing and education of children under their control," the existence of those rights does not require the application of strict scrutiny every time parents assert authority over a child's education. *Herndon*, 89 F.3d at 179; *see also Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005) ("While parents may have a fundamental right to decide whether to send their child to a public school, they do not have a fundamental right generally to direct how a public school teaches their child.").

The controlling Fourth Circuit authority regarding parental control over a child's public education is *Herndon by Herndon v. Chapel Hill-Carrboro City Board of Education*, 89 F.3d 174 (4th Cir. 1996). *Herndon* involved a substantive due process challenge by parents to a public

school's community service requirement.  *Id.* at 176–77.  The challenge was not motivated by religious objections.  *Id.* at 179.  After discussing the relevant Supreme Court cases, including *Meyer*, *Pierce*, and *Yoder*, the court summarized:

> [T]he Supreme Court has stated consistently that parents have a liberty interest, protected by the Fourteenth Amendment, in directing their children's schooling. Except when the parents' interest includes a religious element, however, the Court has declared with equal consistency that reasonable regulation by the state is permissible even if it conflicts with that interest.  That is the language of rational basis scrutiny.

*Id.*  Because the plaintiffs conceded "their interest [was] not religious," the court applied rational basis review to the service requirement.  *Id.*  Thus, *Herndon* stands for the proposition that the parental right to direct a child's education is not fundamental unless it includes a religious element. To the extent the parents' substantive due process claims are premised on a secular liberty interest, they do not assert a fundamental right, and their claims are subject to rational basis review.

The plaintiffs do not address this holding in *Herndon*.  Instead, they emphasize the religious nature of their opposition to the storybooks.  They argue that, under *Herndon*, whenever a due process claim involves both a parent's right to direct their child's education and free exercise concerns, as is the case here, strict scrutiny automatically applies.  They see support for such a rule in *Herndon*'s statement that the Supreme Court had applied rational basis review "[e]xcept when the parents' interest includes a religious element" and its subsequent discussion of *Yoder*, which it described as having "reaffirmed that parental rights are among the liberties protected by the Constitution."  89 F.3d at 178.  The court continued, "When those rights combine with First Amendment free exercise concerns, the [*Yoder*] Court held, they are fundamental[.]"  *Id.* (citing *Yoder*, 406 U.S. at 232).

There are several problems with the plaintiffs' reading of *Herndon*.  First, *Herndon* did not involve any free exercise concerns, so the court had no cause to adopt such a broad rule.  Its

description of *Yoder* is *dicta*, and it would be strange indeed if the court fundamentally rewrote its constitutional jurisprudence in a single sentence when its holding did not depend on such a revision.  Second, when the court discussed *Yoder*, it wrote descriptively.  It observed the parents' rights asserted in *Yoder* were fundamental for the reasons stated in *Yoder*.  It did not extend *Yoder*'s holding beyond its unique facts.  Neither *Yoder* nor the Fourth Circuit's interpretation of *Yoder* in *Herndon* holds that a parent's right to direct their children's upbringing automatically rises to the level of a fundamental right whenever the parent's interest includes a religious element.

At oral argument, the plaintiffs proposed another reading of *Herndon* that they believe warrants the application of strict scrutiny to the no-opt-out policy.  They suggested *Herndon* indicated the Fourth Circuit would be open to so-called "hybrid-rights" claims, in which two constitutional rights violations are based on the same set of facts.  The concept of hybrid-rights claims originated in *Smith*.  494 U.S. at 881–82.  *Smith*'s central holding was that the Free Exercise Clause "does not relieve an individual of the obligation to comply with" neutral and generally applicable laws.  *Id.* at 879.  In discussing that rule, the Court observed that "the only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections[.]"  *Id.* at 881–82.  The Court included *Pierce* and *Yoder* on its list of "hybrid" cases to which its general rule did not apply.  *Id.*

"Whether and how to apply the hybrid-rights exception described in *Smith* have been the subject of much debate and disagreement among the circuit courts of appeal and academic commentators" since *Smith*'s publication.  *Hicks*, 93 F. Supp. 2d at 659.  Over the years, several justices have expressed skepticism about the hybrid-rights doctrine.  Most recently, Justice Alito stated in his concurrence in *Fulton*, "[I]t is hard to see the justification for this curious doctrine . . .

such a scheme is obviously unworkable and has never been recognized outside of *Smith*." 141 S. Ct. at 1915 (Alito, J., concurring). Justice Alito also suggested "the hybrid-rights exception would largely swallow up *Smith*'s general rule" because "a great many claims for religious exemptions can easily be understood as hybrid free-exercise/free-speech claims." *Id.   But see Danville Christian Academy, Inc. v. Beshear*, --- U.S. ----, 141 S. Ct. 527, 529 (2020) (Gorsuch, J., dissenting) ("[U]nder this Court's precedents, even neutral and generally applicable laws are subject to strict scrutiny where a plaintiff presents a 'hybrid' claim—meaning a claim involving the violation of the right to free exercise *and* another right, such as the right of parents 'to direct the education of their children.'").

*Herndon* cannot be read to endorse a hybrid-rights theory. Beyond the fact that *Herndon* was not itself a hybrid-rights case and did not expressly refer to the concept, the Fourth Circuit more recently has confirmed that it has not taken a stance on the topic. *See Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 353 (4th Cir. 2011) (unpublished table opinion) ("We observe that there is a circuit split over the validity of this 'hybrid-rights' exception. However, we do not need to decide this issue here . . . ."). The Court does not read *Herndon* to require strict scrutiny anytime a plaintiff challenges a public-school curriculum based on both parental and religious rights.

Without Fourth Circuit guidance on when strict scrutiny *is* required in such cases, the Court looks outside the circuit. Notably, as of 2008, "[n]o published circuit court opinion . . . ha[d] ever applied strict scrutiny to a case in which plaintiffs argued they had presented a hybrid claim." *Parker*, 514 F.3d at 98. That observation remains true today. Three circuits have expressly rejected the hybrid-rights theory. *See Combs v. Homer-Center Sch. Dist.*, 540 F.3d 231, 244–47 (3d Cir. 2008); *Leebaert v. Harrington*, 332 F.3d at 143–44; *Kissinger v. Bd. of Trs. of Ohio St.*

*Univ., Coll. of Veterinary Med.*, 5 F.3d 177, 180 (6th Cir. 1993).  The circuits that have not rejected

the theory have held that the component claims must be, at least, colorable.  *See 303 Creative LLC*

*v. Elenis*, 6 F.4th 1160, 1188 (10th Cir. 2021), *rev'd on other grounds*, --- U.S. ----, 143 S. Ct.

2298 (2023); *Henderson v. McMurray*, 987 F.3d 997,1005–07 (11th Cir. 2021); *Parents for*

*Privacy v. Barr*, 949 F.3d 1210, 1237–38 (9th Cir. 2020); *Cornerstone Christian Schs.*, 563 F.3d

at 136 n.8; *Parker*, 514 F.3d at 97–99; *Civil Liberties for Urban Believers v. Chicago*, 342 F.3d

752, 764–65 (7th Cir. 2003).  "Colorable" in this context means likely to succeed on the merits.

*Parents for Privacy*, 949 F.3d at 1237.[16]

In the absence of persuasive authority to the contrary, the Court will not adopt a lower

standard.  Any hybrid-rights claim, if such a claim is cognizable at all, does not warrant strict

scrutiny here because the plaintiffs' free exercise claims are not likely to succeed on the merits.

The Court concludes the plaintiffs' asserted due process right to direct their children's upbringing

by opting out of a public-school curriculum that conflicts with their religious views is not a

fundamental right.  Rational basis review is the appropriate level of scrutiny.

Rational basis review "requires only that the [challenged state action] be shown to bear

some rational relationship to legitimate state purposes."  *Herndon*, 89 F.3d at 177 (quoting *San*

*Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37–40 (1973)); *see also Bethel World Outreach*

*Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 561 (4th Cir. 2013).  The plaintiffs do not

dispute the no-opt-out policy would survive rational basis review.  Indeed, the policy serves the

School Board's legitimate interest in "[f]oster[ing] social integration and cultural inclusiveness of

transgender and gender nonconforming students" by ensuring all MCPS students are exposed to

---

[16] At least one district court in this circuit has applied strict scrutiny to a hybrid-rights claim that
involved colorable free exercise and substantive due process claims.  *See Hicks*, 93 F. Supp. 2d at
657–63.

inclusive and representative instructional materials.  *See* ECF 42-7, at 4; ECF 43, ¶ 6.  It also helps prevent students who identify with characters in the storybooks from feeling stigmatized or discriminated against when other students leave the room when the books are read, furthering the School Board's interests in providing a safe and supportive learning environment for its students, protecting LGBTQ students' health and safety, and complying with anti-discrimination laws.  ECF 43, ¶ 39.

The plaintiffs are not likely to succeed on their substantive due process claim.

### B.  The Remaining Preliminary Injunction Factors

Because the plaintiffs have not established any of their claims is likely to succeed on the merits, the Court need not address the remaining preliminary injunction factors.  Nonetheless, because a constitutional violation is not likely or imminent, it follows that the plaintiffs are not likely to suffer imminent irreparable harm, and the balance of the equities and the public interest favor denying an injunction to avoid undermining the School Board's legitimate interests in the no-opt-out policy.  *See Leaders*, 2 F.4th at 346.

### IV.   Injunction Pending Appeal

At the hearing on the preliminary injunction motion, the plaintiffs made an oral motion for a stay pursuant to Rule 8(a)(1) of the Federal Rules of Appellate Procedure if the Court were to deny their motion.  That rule requires that a "party ordinarily move first in the district court for . . . a stay of the judgment or order of a district court pending appeal."  Fed. R. App. P. 8(a)(1)(A).  There is no judgment or order of this Court to be stayed.  The Court construes the plaintiffs' motion as a request for an injunction pending appeal under Federal Rule of Civil Procedure 62(d).[17]  The standard for injunctive relief pending appeal is the same as for a preliminary injunction.  *See Nken*,

---

[17] Fed. R. App. P. 8(a)(1)(C) requires parties to move for such relief first in the district court.

59

556 U.S. at 434; *Goldstein v. Miller*, 488 F. Supp. 156, 171–72 (D. Md. 1980).  This is so "because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined."  *Nken*, 556 U.S. at 434.

The plaintiffs seek the same relief pending appeal as in their preliminary injunction motion: an injunction that requires the Board to provide advance notice and opt-outs from instruction involving the storybooks and family life and human sexuality.  For the reasons stated in this opinion, the Court cannot conclude the plaintiffs are likely to succeed on the merits of an appeal. The plaintiffs' request for a preliminary injunction pending appeal is denied.

## V.    Conclusion

The plaintiffs have not established the requirements for a preliminary injunction.  Their motion is denied.  Their request for an injunction pending appeal is denied.  A separate Order follows.


Date: August 24, 2023

                                                 Deborah L. Boardman
                                               United States District Judge