```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
                          SOUTHERN DIVISION
     _____
                                    )
     TAMER MAHMOUD, et al.,         )
                                    )
                     Plaintiffs,    )
                                    )
          v.                        )  Case No. 8:23-cv-01380-DLB
                                    )
     MONIFA MCKNIGHT, et al.,       )
                                    )
                     Defendants.    )
     _____)

                                       Greenbelt, Maryland
                                       August 9, 2023
                                       10:08 a.m.

               PRELIMINARY INJUNCTION HEARING
           BEFORE THE HONORABLE DEBORAH L. BOARDMAN


                    A P P E A R A N C E S

     ON BEHALF OF THE PLAINTIFFS:

          THE BECKET FUND FOR RELIGIOUS LIBERTY
          1919 Pennsylvania Avenue, N.W., Suite 400
          Washington, D.C.  20006
          BY:  ERIC S. BAXTER, ESQUIRE
               (202) 955-0095
               ebaxter@becketlaw.org
          BY:  WILLIAM J. HAUN, ESQUIRE
               (202) 955-0095
               whaun@becketlaw.org
          BY:  MICHAEL J. O'BRIEN, ESQUIRE
               (202) 955-0095
               mobrien@becketlaw.org
          BY:  BRANDON L. WINCHEL, ESQUIRE
               (202) 955-0095
               bwinchel@becketlaw.org



                          (Continued)
```

```
 1                  A P P E A R A N C E S :   (Cont'd)

 2     ON BEHALF OF THE DEFENDANTS:

 3           WILMER CUTLER PICKERING HALE AND DORR LLP
             7 World Trade Center
 4           250 Greenwich Street
             New York, NY  10007
 5           BY:  ALAN E. SCHOENFELD, ESQUIRE
                  (212) 937-7294
 6                alan.schoenfeld@wilmerhale.com
             BY:  EMILY BARNET, ESQUIRE
 7                (212) 230-8868
                  emily.barnet@wilmerhale.com
 8
             WILMER CUTLER PICKERING HALE AND DORR LLP
 9           2100 Pennsylvania Avenue, N.W.
             Washington, D.C.  20037
10           BY:  BRUCE M. BERMAN, ESQUIRE
                  (202) 663-6000
11                bruce.berman@wilmerhale.com
             BY:  JEREMY W. BRINSTER, ESQUIRE
12                (202) 663-6085
                  jeremy.brinster@wilmerhale.com
13

14

15

16

17

18

19

20

21

22

23                  PATRICIA KLEPP, RMR
                   Official Court Reporter
24             6500 Cherrywood Lane, Suite 200
                 Greenbelt, Maryland  20770
25                   (301) 344-3228
```

```
 1                      P R O C E E D I N G S

 2          (Call to order of the Court.)

 3              THE COURTROOM DEPUTY:  All rise.  The United States

 4     District Court for the District of Maryland is now in session,

 5     the Honorable Deborah L. Boardman presiding.

 6              THE COURT:  Okay.  Good morning, everyone.  Please be

 7     seated.

 8              THE COURTROOM DEPUTY:  The matter now pending before

 9     the Court is Civil Case No. DLB 23-1380, Tamer Mahmoud, et al.

10     v. Monifa McKnight, et al.  The matter now comes before the

11     Court for a hearing on Plaintiffs' motion for preliminary

12     injunction.  Counsel, please identify yourselves for the record,

13     beginning with counsel for the plaintiffs.

14              MR BAXTER:  Good morning, Your Honor.  Eric Baxter on

15     behalf of the plaintiffs.  To my right, my colleague, Will Haun;

16     directly behind me, Michael O'Brien; and behind me to the right,

17     Brandon Winchel.

18              THE COURT:  Okay.  Good morning to you, gentlemen.

19              MR. SCHOENFELD:  Good morning, Your Honor.  Alan

20     Schoenfeld for the Montgomery County Board of Education.  I'm

21     joined by Bruce Berman, Emily Barnet, and Jeremy Brinster.

22              THE COURT:  Okay.  Good morning to all of you.  Please

23     be seated.  Thank you.

24              Okay.  We're here today for a hearing on the

25     plaintiffs' motion for a preliminary injunction, which has been
```

1    fully briefed.  The motion is at ECF 23, which includes

2    exhibits.   The defendants' opposition is ECF 42, with exhibits.

3    The plaintiffs' reply is ECF 47, also with exhibits.  I also

4    received the defendants' notice of supplemental authority filed

5    on Monday, ECF 48, and the plaintiffs' supplemental declaration

6    with an exhibit filed last night, ECF 49.  I've also of course

7    reviewed the Complaint, ECF 1, and Amended Complaint, ECF 36,

8    and their exhibits.  The plaintiffs have also included citations

9    to URLs for public school board meetings, and television

10   reports, and other matters which I have reviewed.

11           The plaintiffs are three sets of parents of

12   elementary-age schoolchildren enrolled in Montgomery County

13   Public Schools, and another plaintiff is an organization called

14   Kids First, an unincorporated association of parents and

15   teachers that formed to advocate for the return of parental

16   notice and opt-out rights in Montgomery County Public Schools.

17   The parents and their children come from diverse faiths:

18   Muslim, Roman Catholic, Ukrainian Orthodox.

19           The parents challenge the decision of the Montgomery

20   County Board of Education, and the Montgomery County Public

21   Schools superintendent, and the elected board members.  I will

22   collectively refer to them today as the school board or the

23   board.  And they challenge a decision of the school board to

24   disallow them and other families from opting their children out

25   of instruction when their teachers read or discuss books which

1　have been incorporated into the English Language Arts curriculum

2　that feature characters who are lesbian, gay, bisexual,

3　transgender, or queer, LGBTQ, and that according to the

4　plaintiffs promote one-sided transgender ideology, encourage

5　gender transitioning, and focus excessively on romantic

6　infatuation, among other issues that the plaintiffs take.

7　　　　　The plaintiffs refer to the books as Pride Storybooks.

8　The defendants refer to them as the LGBTQ+ inclusive books.  I

9　will refer to them as the books or storybooks today.

10　　　　　The parents believe the reading and discussion of the

11　storybooks in the classroom will interfere with their sacred

12　obligations to raise their children in their religion and form

13　their children in their religious beliefs.  They assert

14　violations of the First and Fourteenth Amendments to the

15　United States Constitution and Maryland law.  They move for a

16　preliminary injunction before the start of the 2023-24 school

17　year, which begins on August 28th.  They seek to enjoin the

18　school board from denying them advance notice and an opportunity

19　to opt out of classroom instruction that involves the storybooks

20　or otherwise relates to family life or human sexuality.

21　　　　　I do not have the time here to summarize all of the

22　plaintiffs' allegations and the evidence in support of their

23　motion.  They are in the amended complaint as exhibits -- in the

24　exhibits to the plaintiffs' motion and reply, all of which I

25　have reviewed.

1    The claims on which the plaintiffs have moved for

2  preliminary injunctive relief are:

3    Count 1, a First Amendment claim that the defendants

4  have violated the free exercise rights of the parents to direct

5  the religious upbringing of their children;

6    Count 2, a First Amendment claim that the defendants

7  have violated their free exercise rights because the no-opt-out

8  policy is not generally applicable, because it prohibits

9  religious conduct while permitting similar conduct that

10  undermines the government's asserted interests in a similar

11  way -- I should say secular conduct -- and it provides a

12  mechanism for individualized exemptions;

13    Count 3 is a First Amendment claim that the defendants

14  have violated their free exercise rights because the no-opt-out

15  policy is not neutral, because it is specifically directed at a

16  religious practice;

17    They are not moving on Count Four, which is a free

18  speech claim;

19    And finally, Count 5 they are moving for preliminary

20  injunctive relief on.  That is a Fourteenth Amendment claim that

21  the defendants have violated the parents' substantive due

22  process rights to direct their children's education and

23  upbringing.

24    Let me just state the standard for a preliminary

25  injunction for the record.  Before the entry of a final

1  judgment, a Court may enter a preliminary injunction under

2  Federal Rule of Civil Procedure 65(a).  A preliminary injunction

3  is an extraordinary remedy that may only be awarded upon a clear

4  showing that the plaintiff is entitled to such relief and may

5  never be awarded as a matter of right.

6        Mountain Valley Pipeline v. Western Pocahontas

7  Properties Partnership, 218 F.3d 353 at 366 (4th Cir. 2019).  A

8  plaintiff seeking preliminary injunctive relief bears the burden

9  of proof and must meet a high bar by satisfying four factors.

10 The plaintiff must clearly show that it is likely to succeed on

11 the merits, that it is likely to suffer irreparable harm in the

12 absence of preliminary relief, that the balance of equities tip

13 in its favor, and that an injunction is in the public interest.

14 Those are the well-known Winter factors from the 2008

15 Supreme Court case.

16        Several of the preliminary injunction factors merge

17 when constitutional rights are at stake.  Leaders of a Beautiful

18 Struggle v. Baltimore Police Department, 2 F.4th 330 at 346

19 (4th Cir. 2021).  When there is likely a constitutional

20 violation, the irreparable harm factor is satisfied.  Likewise,

21 the two final factors, the balance of the equities and the

22 public interest, are satisfied when there is likely a

23 constitutional violation because the public interest favors

24 protecting constitutional rights and a state is in no way harmed

25 by issuance of a preliminary injunction which prevents the state

1   from enforcing restrictions likely to be found unconstitutional.

2          Okay.  Now that I set forth the procedural posture and

3   the standard -- there is of course no dispute on the standard --

4   I have some questions for the plaintiffs.

5          MR BAXTER:  Thank you, Your Honor.

6          THE COURT:  Okay.  So before we begin, let me just

7   say, if you could kindly please speak clearly into the

8   microphone for the benefit everyone, especially me and the court

9   reporter.  And -- speak slowly within reason, and if you are

10  reading anything, please speak slowly; we tend to speak faster

11  when we read something.  So thank you.

12         MR BAXTER:  Thank you, Your Honor.

13         THE COURT:  And I want this to be a conversation.  So

14  let me just -- we can agree that the challenged government

15  action is the board's no-opt-out policy.  That's the challenged

16  action -- regulation, correct?

17         MR BAXTER:  Correct.

18         THE COURT:  Okay.  So let's talk about burden first,

19  and before we get to that, let me just state, no one is

20  questioning the sincerity of your clients' religiously held

21  beliefs.  It's not an issue; I don't think we need to get into

22  that at all today, correct?

23         MR BAXTER:  That's correct.

24         THE COURT:  Now, what -- explain to me your burden

25  argument.  It doesn't seem to fit in the traditional types of

1    burdens that we see from the Supreme Court and Fourth Circuit,

2    like -- or other Court of Appeals.  So financial detriment, loss

3    of benefits, coercion, punishment; tell me what the burden is,

4    the constitutional burden.

5              MR BAXTER:  Yes, I'll answer that in two ways,

6    Your Honor.  First, there is a direct coercive element here.  If

7    you look, for example, at the Mahmoud declaration in

8    paragraph 17, the Quran specifically prohibits individuals,

9    Islamic individuals, from engaging in discussions that would

10   delve into the private affairs of individuals and especially

11   discussing anything related to their sexual behavior.  And for a

12   second- or third-grade student, that would include participating

13   in a discussion, for example, about what it means to like-like

14   someone, to exploring your pronouns, to discussing whether

15   your -- what it might mean to be cisgender or transgender.

16              And so -- and the Persaks and the Romans have -- in

17   their declarations have made similar statements.  I would refer

18   to the Persaks' declaration at 12 and 16 and the Romans' at 19

19   through 20, where they stated that they had made a decision not

20   to have their children -- a religious decision not to have their

21   children engaged in such discussions because it directly

22   contradicts what their religious teachings are and their desires

23   to influence their children's understanding of those issues in a

24   religious way.  And so there is that direct coercive element.

25              THE COURT:  Can I ask you this.  Is the burden, the

1    constitutional burden, is it being asked the question by the

2    teacher, or is it a forced response?

3              MR BAXTER:  It is participating in the discussion at

4    all, especially at a formative age, when children -- even the

5    cases that the school board cites, like Parker and Mozert,

6    recognize that children in particular are vulnerable to these

7    types of issues.  The Tatel case out of the District Court in

8    Pennsylvania, the Grimm v. Gloucester County case in this court

9    have recognized that a child's identity going to their sexuality

10   and gender identity are issues that go to the very identity of a

11   child, right at the heart of where parental authority lies and

12   how a parent would help their children.

13             But even if the Court doesn't accept that kind of a

14   direct coercion type of argument, that is the wrong standard --

15   that is not a required standard, I should say.  The

16   Supreme Court, in cases as far back as Thomas v. Review Board,

17   has recognized that simply putting an individual in a position

18   of having to choose between a publicly available program and the

19   religious beliefs, whether it's coercive or not, is sufficient.

20             So for example, in Thomas v. Review Board, the

21   plaintiff had left the job of his own accord because of a

22   religious objection and was denied benefits.  And the Court said

23   even though that was not coercive, he hadn't been coerced to

24   leave the job, he -- just being put in the position of having to

25   choose between your religious conscience and participating in

1    the government benefit was enough.

2            THE COURT:  I -- so I'll have to reread Thomas, but I

3    thought it was the denial of the unemployment benefit that

4    stemmed from his religious conduct.  So there, it's a denial of

5    an unemployment benefit.

6            MR BAXTER:  Well --

7            THE COURT:  Or a failure to meet the good cause

8    standard.

9            MR BAXTER:  -- he wasn't coerced -- excuse me for

10   speaking over you.  He was not coerced to leave his job, he

11   could have continued working, and here, the exact same situation

12   applies.  The student -- the parents are being told they either

13   have to not use the public school system, or they have to give

14   up their religious right to control what their children -- the

15   type of instruction their children receive.

16           And that's very similar to the Carson v. Makin case

17   that was just decided a term ago, where again, the parents were

18   just seeking the ability to have public funding for their

19   private -- their private religious school, which was available

20   to other students going to private school.  And the Court said,

21   even though had other options, they could have gone to public

22   school, there was nothing coercive, the indirect pressure of

23   them to sacrifice their religious beliefs just to receive the

24   advantage of the public program was sufficient burden for

25   purposes of the Free Exercise Clause.

1                And the Fulton v. City of Philadelphia case is very

2     similar.  There, it was even government contractors, where

3     you're not necessarily -- that wouldn't normally be described as

4     a benefit, but the opportunity to participate as a government

5     contractor, the Court said that was a burden, that the --

6                THE COURT:  So is the burden here that they're being

7     forced to choose public versus private schools because if

8     there's no-opt-out, they will put their children in private

9     schools?

10               MR BAXTER:  So that's -- of course, some of these

11    parents don't -- many of the parents don't have that option;

12    their public school is their only option.

13               THE COURT:  I understand.

14               MR BAXTER:  And so they are -- whether they would

15    remove their children or not, they're being forced into either

16    accepting the option of public school or maintaining their

17    religious beliefs if they want -- once they put their kids in,

18    that's it.

19               THE COURT:  Well, they can still of course maintain

20    their religious beliefs and teach their children in their faith.

21    What -- again, help me understand, when the children are in the

22    classroom, the mere listening to these ideas that are offensive

23    to their religion is a constitutional burden?

24               MR BAXTER:  Certainly.  That's the same situation that

25    you would have had in Carson, Fulton, and in Thomas v. Review

1    Board, where those individuals could have continued to exercise

2    their faith, nothing stopped them from continuing to, you know,

3    get another job, from, you know, continuing in their work, from

4    going to another school; they simply --

5            THE COURT:  But in Thomas, it wasn't -- the issue

6    wasn't that he was fired for his religion; it was, he was

7    subsequently denied unemployment benefits because he quit, and

8    that was not deemed good cause.  So that's a denial of

9    unemployment benefits.  In Carson, it was also a denial of

10   public funds for schools.  So --

11           MR BAXTER:  Precisely.  So even in the same situation

12   here, if these parents choose to maintain their religious

13   beliefs, that they will not allow children to participate in

14   instruction that encourages them to question their sexuality,

15   their gender identity, if they choose to exercise that right to

16   fully withdraw their -- to fully protect their children from

17   that kind of counter-instruction, then they're not -- then they

18   can't participate in the public schools.  And so they would --

19   in order to exercise their religious rights under the school

20   board's theory, they would have to withdraw their children from

21   the public schools.

22           Now, even without that -- I mean, under the current

23   analysis of the Supreme Court, I mean, just look at whether

24   strict scrutiny is triggered.  So you look at is the Court

25   treating religion equally, and here, it's clearly not.  I mean,

1    the situation under the school board's theory, where a

2    high school student can opt out of this exact same instruction

3    given in his health ed class --

4             THE COURT:  I do want to talk about that, but I just

5    want to make sure we agree, there has to be a constitutional

6    burden before we get to strict scrutiny, right?

7             MR BAXTER:  Well, in Tandon, Fulton, and -- the Court

8    did not explicitly address burden; it asked first whether

9    religion was being treated fairly, and if it wasn't, then it

10   went to strict scrutiny.  But there is no question that there's

11   a burden here, in that the parents are being forced to allow

12   their children to submit to instruction that violates their

13   religious beliefs.  The Mahmouds' third-grade student would be

14   directly violating the teaching of the Quran by participating in

15   those discussions about sexuality, romance, gender identity.

16   And so forcing them to compel that at the -- it's a cost of

17   going to public school; it is a clear burden.

18            THE COURT:  So I'm looking at the paragraph 17 of the

19   Mahmoud Barakat declaration, which says, "It would violate our

20   religious beliefs and the religious beliefs of our children if

21   they were asked to discuss romantic relationships or sexuality

22   with schoolteachers or classmates."  So is it a violation if the

23   teachers merely ask a question about romantic relationships or

24   sexuality?

25            MR BAXTER:  You know, I can't -- I don't know exactly

1  where they would draw the line, but my understanding is that

2  yes, any of those kinds of private discussions about --

3  especially at a second- or third-grade level, discussion about

4  romance, sexuality, gender identity --

5         THE COURT:  This doesn't say gender identity, this

6  just says romantic relationships or sexuality.  Which of the

7  books discuss sexuality?

8         MR BAXTER:  Well, sexuality would include questions

9  about your gender identity.  And all of the books -- I mean,

10  each of the books has some element of sexuality and gender

11  identity.  I don't know that we can clearly distinguish between

12  those two, but sexuality is a broad topic would cover all of

13  those.

14         THE COURT:  Okay, okay.

15         THE COURT REPORTER:  Excuse me.  Could you please move

16  the microphone closer?  Because I can hear you, but some

17  words --

18         MR BAXTER:  Okay, I'll try to keep my mouth closer,

19  thank you.

20         THE COURT:  I saw in your complaint and I think in one

21  of the declarations there was an inclusion of the word

22  "inculcation."  Are you arguing that the free exercise burden is

23  an inculcation of your clients' children?  I mean, are you

24  pursuing that theory?

25         MR BAXTER:  Well, I think there certainly are facts

1    that would support that.  The school board has not backed away

2    from the fact that it is -- explicitly stated it is trying to

3    ensure a fully inclusive environment that is trying to reduce

4    stigmatization, that even walking out of a classroom would be

5    hurtful, that disagreeing would be hurtful.  The school board's

6    own principals union for elementary principals expressed concern

7    that the school board was looking for books that were looking to

8    disrupt heteronormativity and cis-normativity.  That's in both

9    the McCaw declaration and in the second Baxter declaration that

10   was submitted last night.

11          And so there is no question that the school board is

12   trying to enforce a certain end point, and that in itself is

13   problematic and again goes to undermining of the general

14   applicability, where the school board is saying that, you know,

15   walking out of a classroom would be hurtful.

16          But we know from cases like Tinker, from the Mahanoy

17   decision in the Supreme Court last term that -- and that's at

18   141 Supreme Court 2038 -- that students don't lose their rights

19   when they walk into the classroom.  And students have the

20   right -- if they stay in those discussions, it's clear they have

21   a right to express contrary decisions, do so even vehemently in

22   ways that might be offensive to other students, as long as it

23   doesn't disrupt the overall classroom atmosphere.

24          And so for the school board to say that it can ban

25   students from walking out because it's hurtful, that clearly

1   cannot be a compelling government interest or a basis for,

2   you know, satisfying strict scrutiny.

3          So I think your question was as to whether there is an

4   effort here to inculcate students, and the school board has not

5   shied away that it is trying influence the students and change

6   their view.  And that's inappropriate in this context, both as a

7   matter of the religious burden and for purposes of strict

8   scrutiny.

9          THE COURT:  Okay.  Let's switch gears just slightly.

10  We're still talking about burden.  Parker is the 2008 First

11  Circuit case, of course not binding on me or here in the

12  Fourth Circuit, but it's certainly relevant, and the defendants

13  rely heavily on it.  How is it distinguishable?

14         MR BAXTER:  I would say it's distinguishable in two

15  ways.  First, the level of the burden, in Parker, one of the

16  students was not even required to read it.  And the second

17  student was required to sit through the reading of the book, but

18  there was no discussion about it.  The Court, in Parker,

19  recognized that there -- under its theory, there would be a

20  sliding scale, and as it moved more toward an effort to

21  indoctrinate or inculcate values into the students, that that

22  would trigger a First Amendment violation.

23         So I think the level of the burden is much more

24  significant here, where you have the school expressly admitting

25  that it is seeking to influence the way students view these and

1   to stop having views or taking actions that others might deem

2   hurtful.  The --

3           THE COURT:  Give me the second distinction.

4           MR BAXTER:  Yeah, the second is -- has to do with the

5   burden standard, where the Parker Court relied upon a direct

6   coercion standard which, as we've discussed, is simply not the

7   standard, was not the standard at the time, and is not the

8   standard under the most recent free exercise cases which --

9   where the Court has explicitly said that an indirect coercion is

10  sufficient and putting a plaintiff in the position of having to

11  choose between participating in the government program and

12  exercising their religious beliefs is sufficient to trigger

13  strict scrutiny.

14          THE COURT:  Okay.  Let's talk about the first

15  distinction.  So what is your evidence that there will be a

16  classroom discussion of these books?

17          MR BAXTER:  Well, first of all, the school board has

18  stated that the teachers are required to read the book.  So in

19  each class, one of the books has to be read at least -- one of

20  the books has to be read at least one year -- I'm sorry, one

21  time per year.  And they -- the school board has not disavowed

22  that its own instructions tell teachers, for example, to tell

23  students that disagreeing viewpoints are hurtful, that if

24  students question how one determines sex, that they are to be

25  told that doctors simply guess at birth what your sex is.  So

1    there's no question that the school board has not backed away

2    from that there will be discussions.

3         And once there's no notice, there's no way for parents

4    to know.  Of course, there may be some teachers who handle this

5    in a very careful manner, in a discreet manner, but it seems

6    inevitable that there will also be teachers who take full

7    advantage of what the school board is telling them to do and

8    aggressively, for example, talk to students about the difference

9    between what it means to like someone and what it means to

10   like-like someone, which again, the principals themselves have

11   said is inappropriate at this age regardless of sexual

12   orientation, that they're uncomfortable talking about these

13   issues with elementary-age students.

14        THE COURT:  Would your clients be satisfied if the

15   books were merely read and there was no discussion?  Is it the

16   discussion part that's concerning or that's burdensome?

17        MR BAXTER:  Your Honor, I'm sure it would depend for

18   each of my clients, and it would depend on the books.  Some of

19   the books explicitly, for example, promote ideas that children

20   know better than their parents and teachers how to determine

21   their gender identity or their sex.  I'm not sure how each of my

22   clients would break down on each individual book.

23        But one important point here is that the school

24   board's own policies, the religious diversity guidelines, allow

25   broad -- for broad accommodation of any religious objection.

1    You can be excepted from a class if you object to the Halloween

2    ac- -- or you can be opted out if you object to the Halloween

3    activity, if you object to some of the music that's being sung

4    or played in a band or choir class.  There's unlimited

5    discretion for parents to opt their children out under the

6    school board's own existing policy.

7              THE COURT:  I do want to talk about that, just let's

8    finish Parker for one minute.

9              MR BAXTER:  Sure.

10             THE COURT:  Thank you.  So you distinguish Parker.

11   The second ground was you said Fourth Circuit applied the wrong

12   burden standard; it was too high, it was direct coercion, and

13   the Supreme Court has held indirect coercion is all you need.

14   What are the top three Supreme Court cases I should read on

15   indirect coercion and how they apply here?

16             MR BAXTER:  I would say that there's a handful of

17   them.  You could read the Fulton v. City of Philadelphia, the

18   Carson v. Makin case, the Thomas v. Review Board.

19             THE COURT:  So those are the three, the indirect --

20             MR BAXTER:  I would also say the Hobby Lobby decision

21   and the Little Sisters of the Poor decisions talk about indirect

22   coercion, and -- I would say those are the leading cases on

23   that.

24             THE COURT:  Okay; just want to make sure I wasn't

25   missing anything.  All right.

1          So let's talk about Fulton, and you were just

2     referencing the system of exemptions here.

3          MR BAXTER:  Yes.

4          THE COURT:  So from the Hazel declaration, it seems to

5     me that the school was allowing opt-outs initially under the

6     religious guidelines, religious diversity guidelines; is that

7     your contention as well?

8          MR BAXTER:  Yes, and they did all through the end of

9     the last school year.

10         THE COURT:  Right.  The defendants take the position

11    that the challenged regulation or policy, I should say, is the

12    no-opt-out policy, and that no-opt-out policy applies across the

13    board, no matter if your request for exemption is religious,

14    secular, atheist, whatever, it applies across the board.  They

15    take the position, then, that it's generally applicable.  What's

16    wrong with that position?

17         MR BAXTER:  So in both Tandon and Fulton, the Court

18    said, when you're looking at how across-the-board a policy is,

19    you have to look at all the policies that implicate the same

20    underlying interests.  So for example, in the Lukumi case, the

21    Supreme Court looked at not just the city ordinances that dealt

22    with the killing of animals, and the question is whether you can

23    engage in ritual slaughter, but it looked at even state laws

24    that allowed the killing of animals and faulted the city for not

25    trying to close those loopholes.

1          And so here, the school board -- you'd have to ask all

2    of the times where the school board is trying to engage or

3    promote inclusivity, and even if you said LGBTQ inclusivity, the

4    odd thing here is that a student in fifth grade who has

5    sex education in his health class can opt out of that section of

6    the health class, make the -- do the same walking out that is

7    forbidden in the next hour, when the storybook is being read.

8    And so there is no general applic- -- high school students can

9    opt out, elementary students cannot opt out.

10          And so that -- right, that alone -- and there's

11    undisputed evidence that both of those policies, the inclusivity

12    in the health class, the inclusivity element of the English

13    Language Arts lessons, that those are pursued pursuant to the

14    same Maryland equity regulation which was passed in 2019 to

15    promote further equity in the school district among students.

16    We've cited evidence on 19 of our -- page 19 of our opening

17    brief that the same type of inclusivity instruction was added to

18    the health class regula- --

19          THE COURT:  Can I just pause you?

20          MR BAXTER:  Yes, mm-hmm.

21          THE COURT:  The way I read your briefs, what you're

22    talking about seems more to fall into your Tandon theory.  And I

23    understand Fulton and Tandon sort of intersect, and there is

24    some overlap there, but I think there are two different types of

25    theories you're advancing, at least in your papers.

1          So as I read your papers, the exemptions or the system

2    of exemptions, similar to Fulton, is the fact that there was --

3    or the religious diversity guidelines that allowed opt-outs.  If

4    the parents have sincerely held religious beliefs, opt-outs were

5    then granted by a host of Montgomery County principals last

6    year.  And then the board said no more opt-outs under that

7    policy.  So I read your papers as saying that's the system of

8    exemptions, not --

9          MR BAXTER:  I'm sorry, Your Honor.

10          THE COURT:  Okay.

11          MR BAXTER:  Let me refocus on that issue.  So yes,

12    from the very beginning, the school board said it would allow

13    opt-outs.  That was true last fall.  It continued until

14    March 22nd, when the school board issued a statement, I believe

15    it was to FOX news, saying that they would recognize -- they

16    would notify parents and recognize opt-out requests.  The very

17    next day, on March 23rd, they issued an e-mail to parents

18    saying, We will no longer provide notice and no longer provide

19    opt-outs.

20          Now, even after they did that, as proof of this

21    discretion, they continued to tell parents principals had

22    permission to tell parents that they could continue to opt out

23    for the rest of the year, but next year, they should not expect

24    that right.  There are still -- even though the school board has

25    issued this e-mail, there's nothing that guides them; they

1    haven't passed a regulation, they haven't formalized any

2    guidelines.  There's nothing that stops them from changing that,

3    just like they did before.

4            In fact, their own -- you know, they said they did

5    this pursuant to their escape hatch for opt-outs that had become

6    too burdensome or too numerous, a question which is itself

7    factually unsupported, but they, alone, are making that decision

8    about what becomes too burdensome or too numerous, and that has

9    itself numerous -- the discretion there has numerous problems.

10   Essentially, they're saying that the more objectionable their

11   instruction, the more parents who protest, the more right they

12   have to cut off the opt-out.  So in other words, widely held

13   religious beliefs are less protected than minority-held

14   religious beliefs.

15           So here, the school board is essentially saying, Our

16   instruction has become so offensive, that we are offending so

17   many people, that we now have the right to cut that off.  That

18   is infused with discretion, and it is that type of discretion

19   where the Supreme Court says, Well, let's take a closer look.  I

20   mean, if school boards can act and can flip on an overnight --

21   make an overnight decision that flips the rights that are at

22   issue, they retain discretion to continue to say, like, We can

23   do it here but not there, we can -- you know, even after we pass

24   the rule, we can continue to extend exemptions for another three

25   months.

 1          THE COURT:  So just to --

 2          MR BAXTER:  All that triggers strict scrutiny.

 3          THE COURT:  I'm sorry to interrupt.  Just to distill

 4    it, the discretion and the system of exemptions is in the

 5    religious diversity guidelines, not the opt-out policy itself,

 6    because right now, what the record before me is, the opt-out

 7    policy is no opt-outs.  I understand you're saying it could

 8    change in a month, but right now, that's the policy.  And it

 9    was, it seems to me, a change from their prior opt-out policy

10    pursuant to the religious diversity guidelines.  So there is a

11    bit of discretion there.  They decided that in this instance,

12    for this particular curricula, the religious -- the request for

13    opt-outs under the guidelines won't be applied.

14          MR BAXTER:  Right.  I mean, the e-mail from March 23rd

15    is simply an application of their religious diversity

16    guidelines.  It's not a separate policy, there's been no legal

17    action taken to recommend the policy, there's been no public

18    vote or discussion about a new policy; it is simply a decision

19    made under the religious diversity guidelines to deny opt-outs

20    for one batch of students.  And even then, the school board is

21    now saying that it won't allow them going forward, but after it

22    passed -- after it issued that decision, it continued to allow

23    opt-outs, demonstrating the existence of continuing discretion.

24          So -- and Lukumi also warned about this effort to

25    gerrymander your policy; you can't just carve off the one little

1    thing that you are going to ban and say, Well, this is its own

2    policy.  And that takes us back into Tandon, where it's like,

3    Well, you're not acting consistently across all of the policies

4    that affect the same governmental interest, and that alone

5    triggers strict scrutiny.

6            THE COURT:  Well, let's move on to Tandon, then.  So

7    it's a short but curious decision.  First, what is the

8    comparable secular conduct?

9            MR BAXTER:  So some- -- anybody who wants to object

10   for secular reasons, for example, from the health class, which

11   implicates the same underlying interest, that would be -- that

12   is sufficient to create -- the Supreme Court intends that any

13   secular exemption is sufficient.

14           THE COURT:  Doesn't there have to be an overlap in

15   what they're opting out of?  So if they're opting out of the

16   family life and human sexuality unit, and they can't opt out of

17   these books, doesn't there have to be similar instruction at

18   all?

19           MR BAXTER:  No.

20           THE COURT:  I mean --

21           MR BAXTER:  The --

22           THE COURT:  -- there has to be some comparable -- some

23   comparison between what the actual children are being opted out

24   of.

25           MR BAXTER:  Right.  Comparability is determined by the

1   government's stated underlying interest.

2           THE COURT:  In the no-opt-out policy.

3           MR BAXTER:  In -- right.  And their underlying

4   interest is -- as I understand it, is increased inclusivity.

5   That's the exact same interest pursuant to the Maryland equity

6   regulation.  It called for this same type of instruction to be

7   inserted into the health class.  And that's -- Lukumi --

8           THE COURT:  They've also said a reason for the

9   no-opt-out policy, according to Ms. Hazel's declaration, is

10  administrative infeasibility and avoiding sending discriminatory

11  signals.

12          MR BAXTER:  So the discriminatory signals would be the

13  same policy whether you opt out under either class.  As for the

14  administr- -- I mean, if you walked out of health class when

15  those dis- -- when those same topics come out, which is when you

16  would have walked out of the ELA lessons, the harm is the same,

17  and the government -- there's -- it's undisputed in the briefing

18  that both regulations were enacted pursuant to the same equity

19  purpose.

20          THE COURT:  How do I know what's taught in health

21  class?

22          MR BAXTER:  Well, the Maryland -- you know, we've set

23  forth in our brief, including on page -- I believe it's 19 of

24  the brief -- where -- and it's COMAR --

25          THE COURT:  I have the COMAR.

1          MR BAXTER:  You know, the 13A.04.18.01, I think.

2          THE COURT:  Right.

3          MR BAXTER:  -- that -- and we've cited also -- we have

4   a link at that page, at page 19, to where the state

5   superintendent I believe sends an e-mail to the State Board of

6   Education explaining why the Maryland health ed regulation was

7   amended to include requirements to have more discussion about

8   inclusivity for LGBTQ students.  And that was done in pursuit of

9   the Maryland equity regulation, which I believe is at 13A.01.06,

10  which is the same regulation that the school board admits in the

11  Hazel declaration, at 5 through 7, was the regulation that they

12  relied on to add the ELA inclusivity books.

13         THE COURT:  So I'm looking at the amended COMAR.

14  I think it's correct.  I've got 13A.04.18.01 -- let's see, hold

15  on -- (D)(2), Family Life and Human Sexuality.  (a) Maryland

16  Family Life and Human Sexuality instruction shall represent all

17  students regardless of ability, sexual orientation, gender

18  identity, and gender expression.  So that's all that I see that

19  COMAR says about that, just "shall represent all students."  I

20  don't see that there's instruction on it.

21         MR BAXTER:  Your Honor, and that -- and the school

22  board said that was done pursuant to the equity regulation,

23  which was the same interest that the school board is -- and I

24  believe -- well, the school board is pursuing with respect to

25  the ELA.  So there's no question about the common interest and

1    that they allow an exception and opt-out in one place and not

2    the other.  And I believe I may be able to find more -- an

3    example of the more explicit direction that comes from the

4    Montgomery County School Board website where it details

5    instruction and goes to this.

6              There's no question students are being taught these

7    same issues in health class as they're being taught in the ELA

8    class.

9              THE COURT:  Okay.

10             MR BAXTER:  And if I could, Your Honor, if -- unless

11   you have another question.

12             THE COURT:  Go ahead.

13             MR BAXTER:  I would just -- I would also just

14   emphasize that the Supreme Court, in the Masterpiece Cakeshop,

15   said -- Your Honor, especially, I think this is a possible

16   approach, where we're asking simply to maintain the status quo

17   for the pendency of the litigation.

18             In -- you know, in the League of Women Voters case,

19   the status quo ante, the last status before the action that

20   created the controversy, is that -- the statements of a couple

21   of the school board members, that the parents who were seeking

22   an opt-out were engaged in white supremacy, were xenophobes,

23   were promoting hate, that they were dehumanizing other

24   individuals.

25             Under the Masterpiece Cakeshop, those types of

1   statements, the Court said, are alone sufficient to set aside a

2   policy without further inquiry.  And so it certainly makes sense

3   where there have been those types of statements with no

4   disavowal from any other members of the school board, no

5   counterstatements, that that is alone sufficient to set aside

6   the policy and certainly for the duration of the litigation

7   while these issues can be further explored.

8         THE COURT:  So let's talk about your hostility claim.

9   And I'm focusing on hostility in the Masterpiece Cakeshop case.

10  Does it matter the distinction between the adjudicatory body in

11  Masterpiece and the fact that this is more of a legislative or

12  school board body?

13        MR BAXTER:  There's no policy or principle reason why

14  it would be -- why there would be a difference.  And the

15  Supreme Court, in Kennedy -- in footnote 1, it says -- in

16  Kennedy v. Bremerton School District, they said, simply, Any law

17  or policy that's accompanied by hostile remarks is alone

18  sufficient to justify setting the policy aside.

19        THE COURT:  How, based on the record before me, have

20  you connected the hostile remarks, in particular, Ms. Harris'

21  remarks on March 28th, to the decision to deny opt-outs; how are

22  they connected?

23        MR BAXTER:  Well, as parents have come in asked for

24  the opt-outs to be restored, those are the remarks that she made

25  directly following the testimony of parents asking for the

```
 1   opt-outs, and that was -- that those decisions -- that those

 2   parents were acting out of white supremacy.

 3            THE COURT:  I don't think she said white supremacy;

 4   I think Ms. Harris said other remarks.  Let me just pull them

 5   up.  One minute, please.

 6            MR. SCHOENFELD:  We've cited the testimony in our

 7   brief, which --

 8            THE COURT:  Yeah.

 9            MR. SCHOENFELD:  And she did say that it was --

10   that -- a member of the -- as I understand it, a member of the

11   County Council, Ms. Mink, also re- -- she softened it to say

12   that these were -- that the parents were aligned with white

13   supremacists, but --

14            THE COURT:  I understand.  That's Ms. Mink, that's in

15   June.  I'm not dis- -- I'm not saying that's irrelevant, but I

16   want to focus on Ms. Harris' comment.  She's the board member

17   and made statements about a week after the no-opt-out policy was

18   publicly announced.  I mean, you've directed me to these

19   statements.  She said -- this is on March 28th.  She said, I

20   just want to address, what is it, Moms for Liberty?  If we could

21   talk about what this is really about, you say parents to pull

22   their students out of lessons when they're going to be reading a

23   book that has an LGBTQ character in it because of your religious

24   rights, your family values, your core beliefs, but Rodgers and

25   Hammerstein got it right 70 years ago; you have to be taught to
```

1    hate.  No child is born other-izing, marginalizing, thinking

2    about somebody else is not as good as they are.  So that's a

3    comment you've pointed to for hostility, correct?

4              MR BAXTER:  I've lost -- yeah, I think the comment

5    that I was referring to we've cited on page 25 of our brief,

6    where we stated -- school board member, Lynne Harris, stating

7    that children who support opt-out rights were parroting dogma

8    from their parents.  Then, testimony after that --

9              THE COURT:  What date -- hold on.  What date is that

10   Ms. Harris statement; is that from January?

11             MR BAXTER:  No.  Well, I don't recall the day.  Let's

12   see, January 12th.  There's another statement, and maybe, you

13   know, if I'm confusing those, I apologize.  There's a second

14   citation, where it says, Comparing what we have -- wrote --

15   noted the statement comparing religious objectors to white

16   supremacists and xenophobes.  That was at the school board

17   meeting, and our cite doesn't directly state who it is.  My

18   recollection was that it was Lynne Harris.

19             THE COURT:  Okay.  Well, that's a fact we can verify.

20             So how do you connect those comments to the no-opt-out

21   policy?  Was she the decision-maker?

22             MR BAXTER:  She was one of the decision-makers.

23   She -- this was, you know, very soon, you know, in connection

24   with the opt-out policy.  I mean, some of those comments were --

25   happened before the opt-outs, and then the opt-out ban was put

1    in place.  And so we know that Lynne Harris was making those

2    types of statements before the opt-out -- the March 23rd e-mail

3    went out.  And that's very analogous to what happened in the

4    Masterpiece Cakeshop.  It said, those types of statements, in

5    connection with a decision like this, are sufficient to set

6    aside the decision.  And certainly, it would make sense for the

7    course of litigation.

8            THE COURT:  Of course, before you can make out a claim

9    for First Amendment violation under Masterpiece, there has to be

10   a burden, of course, right?

11           MR BAXTER:  Your Honor, I'm not sure that's correct in

12   Masterpiece.  I mean, again, the decision was made not because

13   there had been any decision that Mr. Phillips would have to bake

14   the cake; it was based on simply the comments alone triggered

15   strict scrutiny.  The Court held it cannot be satisfied, and in

16   that instance, the case was reversed simply on that point,

17   without ever getting -- the Court itself said, without further

18   inquiry, the existence of those types of comments.

19           THE COURT:  Wasn't the burden assumed in that case?

20           MR BAXTER:  I don't believe so, Your Honor.  And

21   again, there, it's -- you know, I'm not sure -- I'm not sure the

22   burden would be that much different as far as coercing our

23   students to participate in discussion that directly violates

24   their beliefs or, you know, forcing Mr. Phillips to create a

25   cake that violated his religious beliefs.

1          THE COURT:  Let's jump back to coercion again.  Is

2    there any evidence in the record that if a child said, I can't

3    talk about this, they would be forced to do so, or punished, or

4    their grade would be lowered?

5          MR BAXTER:  Yes, there is evidence that they would be

6    told, That's hurtful, that doctors -- so they're being

7    countered -- children, who are very trusting of their teachers

8    and are very susceptible to, you know, authority, to

9    instruction, are being told that their views are hurtful and

10   wrong.  And the parents are --

11         THE COURT:  Do you have any evidence that that

12   happened last year, or that couldn't have happened because

13   everyone got to opt out?

14         MR BAXTER:  Right, we don't have evidence that it did

15   happen, but we have evidence that the school board has

16   instructed it to happen.

17         THE COURT:  That's from the principals' memo?

18         MR BAXTER:  It's from the principals' memo, it's from

19   the guidance that we cited in our brief, that the school board

20   has not disputed that it was presented in the -- I believe the

21   New York Post article from November of last fall, where they

22   cited the teacher instruction guidelines and said that teachers

23   were instructed to say it's hurtful, teachers were instructed to

24   say that doctors only guess, and teachers are instructed to

25   basically, as students reject those teachings, to continue to

1    push back to encourage students to accept a different dogma.

2            And the coercion also lies in the parents' choice to

3    have to either give up their right to participate in public

4    education or subject their children to this type of very

5    sensitive, complex, and controversial instruction, which is --

6    the principals themselves have said is inappropriate for

7    children of this age.

8            THE COURT:  Okay.  Are there any books with LGBTQ

9    characters that your clients would be comfortable having be part

10   of the curriculum?

11           MR BAXTER:  Your Honor, I suspect there would be.

12   I -- you know, this -- these types of issues have been around

13   for a long time.  I suspect there may have been books.  There's

14   clearly something about these books that have not only triggered

15   reactions from my clients but for hundreds of parents in

16   Montgomery County.

17           So -- but the point is that the school board's policy

18   allows the parents to opt out regardless of the level of

19   instruction, for any reason that the parent feels that

20   instruction would violate the religious beliefs or practices of

21   the student.  Under the religious diversity guidelines, the

22   parents can opt out, and Maryland law says, "any instruction on

23   family life and human sexuality objectives."  So it's,

24   you know --

25           THE COURT:  Who defines that?  Who gets to define what

1    family life and human sexuality is, the parents or the school?

2    MR BAXTER:  Well, I believe, under the policy, the

3    parents have that right.  I mean, in the past, the school board

4    has broadly allowed these types of exceptions based on the

5    parents' assertion that they don't want their children to

6    participate in a Halloween lesson, or a Christian music

7    presenta- -- you know, Christian songs being sung in choir.

8    THE COURT:  But that's under the religious diversity

9    guidelines.  I'm talking about COMAR, under the law.

10   MR BAXTER:  So -- right.  And again, under the sex ed,

11   for students who want to opt out of the formal sex ed class --

12   which again, is not a requirement under the regulation, it just

13   says any instruction on family life and sexual -- human

14   sexuality objectives -- that those --

15   THE COURT:  Right.  That's what I'm asking, under

16   that; who interprets what --

17   MR BAXTER:  Right.  As far as I'm aware -- I'm sorry,

18   I didn't mean to cut you off.

19   THE COURT:  Go ahead.

20   MR BAXTER:  As far as I'm aware, parents or

21   students -- I personally know students who have just -- they

22   just choose to opt out, and it's just allowed; there's no

23   question about whether it's --

24   THE COURT:  Well, I understand that.  I mean, there's

25   a -- by this -- at this point in time, there's a formal

1   procedure for opt-outs from family life and human sexuality unit

2   instruction.

3           What I am saying is, you are suggesting that this

4   addition, supplemental reading to the English language

5   curriculum, falls within the statute's definition of family life

6   and human sexuality, correct, and that because it falls within

7   that, you are entitled to the opt-outs under the law.  The

8   school board is saying no, this isn't family life and human

9   sexuality, that's totally different.  There are designated units

10  for that.  We've got a system where -- this is not family life

11  and human sexuality.  Who decides whether this is family life

12  and human sexuality such that the opt-outs under COMAR apply?

13          MR BAXTER:  Well, I think there's a commonsense

14  reading of what family life and human sexuality is, that even if

15  it were this Court -- I mean, I don't -- the principals

16  themselves -- there's really no dispute that when you're talking

17  about a student's gender identity, their romantic attraction to

18  other individuals, that those implicate family life and human

19  sexuality.

20          And so the school board can't, you know, play games by

21  relabeling this an English language assignment, when it clearly

22  discusses the same things that a student might be discussing in

23  their sex ed class, about how do you -- what does is it mean to

24  like versus like-like someone; that's a very elementary school

25  way of saying, what is -- you know, what is sexual attraction.

1          THE COURT:  I don't have before me on the record what

2    they talk about in the health and family life.  I --

3          MR. SCHOENFELD:  That is one of the -- well, yeah, I

4    don't --

5          THE COURT:  I've read from COMAR what it includes, and

6    I don't need to go over it, but I can infer from the statute

7    what it is.  But I'm looking solely at the record.

8          MR BAXTER:  Well, even looking within the regulation

9    itself, for example, it says that menstruation is included

10   within.  That's in the regulation itself.

11         THE COURT:  Right.

12         MR BAXTER:  That's the one thing you can't opt out of.

13   There's no definition, as far as I know, within any of the

14   regulations that further explain what family life and human

15   sexuality is, and so I don't think the school board can just say

16   like, Well, we think that only includes the nuts and bolts of

17   sexual intercourse and not, for example, engaging in safe sex

18   practices or talking to children about romantic interests, or --

19   and the commonsense reading of family life and human sexuality

20   would include all of those topics.

21         THE COURT:  Is there a difference in your mind or your

22   clients' minds between gender identity and sexuality?

23         MR BAXTER:  Certainly, I would imagine.  Again, I

24   didn't ask my clients that question, but there's -- certainly,

25   those cover diverse, you know, or different -- a range of

1    topics, and a lot of people would consider those differently,

2    but they certainly implicate sexuality and family life.

3                THE COURT:  Gender identity implicates sexuality?

4                MR BAXTER:  I think in most people's minds that it can

5    affect your sexuality as well.

6                THE COURT:  I'm asking.  I mean, I really just -- I'd

7    like to hear your position on it.  Okay.

8                Okay.  Does My Uncle's Wedding violate your clients'

9    religious beliefs, having that book read?

10               MR BAXTER:  Your Honor, I haven't asked my clients

11   about each of the books that are read.  Again, the school's own

12   guidelines allow parents to decide when a book would violate

13   their religions beliefs.  And so whether -- you know, whether a

14   culling of certain books would satisfy -- there are around over

15   300 families in Kids First, and they may have different views on

16   those issues.

17               THE COURT:  Okay, I understand.

18               I'd like to switch gears and talk about your

19   substantive due process claim.  I certainly want to give you the

20   opportunity, and perhaps in rebuttal, to cover anything on your

21   First Amendments claims or anything else.  I don't want to

22   foreclose any argument, but I just want to make sure I have time

23   to get my questions answered, so --

24               MR BAXTER:  Sure.

25               THE COURT:  Okay.  So in Count 5, you are asserting a

1  substantive due process violation, and you allege that the

2  no-opt-out policy violates the parents' fundamental right to

3  make key decisions regarding the upbringing, education, custody,

4  care, and control of their children, including the right to opt

5  out their children of instruction on family life and human

6  sexuality that violates their religious beliefs.  That's the due

7  process right you are asserting is violated, correct?

8           MR BAXTER:  Correct.

9           THE COURT:  It seems to me, for the source of that

10  right -- well, the source, the Constitution, I understand that's

11  what you allege, but the Supreme Court cases are Yoder, Pierce,

12  and Meyer, and Troxel.

13           MR BAXTER:  Correct, Your Honor, those are the leading

14  cases on that issue.

15           THE COURT:  This is a very specific right that you've

16  identified exists.  What Court has held that specific right

17  exists?

18           MR BAXTER:  Well, Yoder is directly on point, and that

19  was an opt-out; it was an opt-out for students to be completely

20  removed from high school to go and work on the farm.  And the

21  Supreme Court held that -- upheld that right.  And so I think

22  Yoder is directly applicable.  The Troxel -- I'm sorry, the

23  Tatel case, which is a District Court case out of Pennsylvania,

24  also recognized that as a substantive due process right.

25           THE COURT:  The facts in Tatel are quite different,

1   though, we can agree, setting aside whether or not that's

2   controlling or binding authority.  I mean, the facts in Tatel,

3   the first grade teacher seemed to have an agenda that went

4   beyond the prescribed curriculum, told the student- -- the first

5   graders not to tell their parents that they could be

6   transgender.  I mean, those facts seem very different than those

7   here; would you agree with that?

8           MR BAXTER:  So the facts are always going to be

9   different from case to case.  A couple things in response,

10  though.  The Court in that case held that there was a de facto

11  policy that endorsed the teacher's approach because the school

12  board did not disavow it.  In the reconsideration opinion issued

13  just a couple of months ago, the Court reinforced that.  The

14  school board essentially acknowledged there was a de facto

15  policy supporting the teacher.

16          And it can't -- this can't turn on the extremity of

17  the facts, because that would call into question, like, which

18  religious objections; if you have -- if you only -- if you're

19  very religiously sensitive, you don't have protection; if you're

20  kind of religiously moderate, you do have protections.  So that

21  type of a reading would result in essentially denominational

22  discrimination.  That would discriminate against parents who

23  have more, I guess, sensitive religious beliefs.

24          THE COURT:  Okay.  The defendants, in their

25  opposition, I guess anticipatorily argued that you were

1    asserting a hybrid claim under Smith.  Are you asserting a

2    hybrid claim under Smith?  It's hard for me to tell.

3              MR BAXTER:  Yeah, and I think the Fourth Circuit seems

4    to suggest that it's open to a hybrid rights claim.  We haven't

5    really asserted it as a hybrid rights claim.  I think that when

6    you have religion connected to a substantive due process right,

7    under Herndon, the Court has indicated that that automatically

8    triggers strict scrutiny.  And so we think that that is another

9    way that this Court has to get to strict scrutiny.

10             THE COURT:  Because of Herndon.

11             MR BAXTER:  Because of Herndon.

12             THE COURT:  Can we talk about Herndon?

13             MR BAXTER:  Certainly.

14             THE COURT:  Great.

15             So Herndon did not involve a free exercise claim as we

16   have here.  It was, of course, the parents challenging a

17   North Carolina public school requirement of community service --

18   and the students, of course, too -- and the parents asserted a

19   due process claim, that we have the right to, you know, upbring

20   our children and direct their care, custody, and control.  And

21   the Court was grappling with whether the right they asserted,

22   the specific right they asserted in that case was subject to

23   rational basis or strict scrutiny.  Along the way, it made the

24   comment interpreting Yoder.

25             I'm just -- I need -- it said, When those rights --

1   the parental rights we just talked about -- combined with First

2   Amendment free exercise concerns, the Court, referring to the

3   Supreme Court, held they are fundamental, and then there's a

4   colon, and then they quote Yoder.  Was the Fourth Circuit.  In

5   Herndon saying, beyond the facts in Yoder, there is a

6   fundamental parental right whenever First -- free exercise

7   concerns are raised?

8          MR BAXTER:  I mean, I think that's a fair reading of

9   Herndon, and I think -- and I think there's also little basis

10  for distinguishing what happened in Yoder and what is happening

11  here.  The school board wants to say that, like, Herndon only

12  applies if it would destroy your religious lifestyle; it has to

13  be something extremely -- again, there's -- no Supreme Court

14  case has ever interpreted Yoder that way.

15         If you look at how all of the Justices in the various

16  opinions in the Espinoza case -- I believe Justice -- you know,

17  I can't remember if it was Alito or Roberts who offered the

18  opinion.  There's a Breyer opinion, a Gorsuch opinion.  All of

19  them discuss -- in a case about getting access to, you know,

20  funding for private religious schools -- rely upon Yoder as --

21  for the general principle of protecting parents' rights to

22  control the religious education of their children.  And that

23  case was -- you know, was an opt-out case.

24         And it's also -- a Court doesn't have the competency

25  to say, like, how serious of a violation is this.  To say that,

```
1    like -- you know, it's not really accurate to say, for example,
2    that not allowing Amish children to opt out of their final years
3    of high school would destroy their faith any more than saying
4    that forcing children to sit through instructions directly
5    contrary to their faiths would not have a similar kind of
6    destructive --
7              THE COURT:  A little slower.
8              MR BAXTER:   -- would not be similarly destructive to
9    their faith.
10             From our parents' perspective, exposing
11   prekindergarten through fifth grade students to instruction
12   about what -- that encourages them to question their pronouns,
13   to decide for themselves what their sex is, to engage in
14   playground romances, all of those have significant impact that
15   could be destructive of their faith and their religious
16   understanding of the importance of sexuality, sex, gender in
17   their religious viewpoint.
18             And so for a Court to make a decision that one type of
19   instruction would be more destructive of faith than another type
20   of instruction really gets into religious questions that are
21   outside --
22             THE COURT:  Well, I certainly don't want to do that,
23   but when I've read your clients' declarations, I haven't read
24   that this would destroy their children's religious upbringing to
25   the same degree that it did in Yoder.  I mean, I -- I mean --
```

1          MR BAXTER:  Yeah, I guess the response is that that's

2   not a requirement, that it has to rise to that level.  The Court

3   just said the Amish don't want their children in high school;

4   they want them to work on the farm, which, you know, has its own

5   kind of social questions about the rights of children to be

6   fully educated and things like that, and the Court said, We'll

7   defer to the religious beliefs of the parents in that context

8   and allow them to opt out.

9          We're obviously asking for a much narrower opt-out, to

10  simply be able to opt out of classes, a procedure which has been

11  allowed by the school board for as long as we know, it's

12  required under Maryland law, and simply allows, you know,

13  students to feel like their rights are being protected.

14          I mean, everybody agrees here that students -- all

15  students should be helped and feel inclusive, to be respected.

16  I mean, my clients, they know; many of their children are

17  regularly bullied because of their religious distinctives, and

18  that's something that they abhor and they want to see ended.

19          But they also know that forcing their views on other

20  children is not the way to solve that problem, that you teach

21  respect and inclusivity by helping children be kind and

22  respectful, despite differences, and to recognize that people

23  are going to disagree on difficult and sensitive issues.  And

24  that allows everyone to feel like they are part of the system,

25  and they are invested in promoting and protecting the system, as

1   opposed to telling children that your religious beliefs are too

2   offensive, we're going to push you to the outside, you really

3   don't have a place in our society and in our system, and you

4   don't -- and you disincentivize those students, then, to support

5   and promote that system for others.

6          THE COURT:  All right, just give me one moment.

7          I think that's all the questions I have for now.  If

8   you have -- if you want to reserve anything else you'd like to

9   say for later, or are you -- I'm happy to hear from you now if

10  you'd like.

11         MR BAXTER:  I'll just briefly mention that the --

12  that, you know, the assertive compelling government interests

13  here are interests that have been disallowed by the

14  Supreme Court.  You can't assert interests in things that are as

15  amorphous and immeasurable as, you know, promoting inclusivity

16  because there's no way for the Court to measure it.  That would

17  give the government a blank check to continually suppress

18  religious rights.  The 303 Creative case said that when these

19  types of inclusive and diversity initiatives conflict with

20  religious rights, then the constitutional rights have to

21  prevail.

22         And here, again, the school board is not even

23  consistent; they would allow students to sit in class, make

24  comments that are disagreeing and even disagreeable, but they're

25  saying that you can't allow those students to walk out to the

1  library because that's too offensive.  So they've undermined

2  their own compelling government interests in that respect.

3         Even more importantly -- and I'm sorry; I'll slow

4  down.  Even more importantly, the government doesn't even try,

5  the school board doesn't even try to address the least

6  restrictive means; they've just said, Well, these books promote

7  our interests.  Well, that's not the question.  The question is,

8  could you achieve these interests in a different way.

9         Could you teach inclusivity without talking about

10 sexuality and gender identity, like Carroll County has done, if

11 you look at footnote 2 of our reply.  You can be like Baltimore

12 County, which has said, We have put this material throughout our

13 curriculum, and we discourage parents from opting out, but they

14 still have the right to opt out.  You have school boards across

15 the country that are teaching inclusivity, kindness, and respect

16 without denying parental opt-outs.  And the school board has not

17 even tried to show why it's different and cannot meet that same

18 standard, which is the requirement under the Holt v. Hobbs case.

19        And I'll remain -- unless you have questions, Your

20 honor, I'll reserve any other comments for rebuttal.

21        THE COURT:  All right.  Well, let's talk about the

22 compelling government interests, since you I think appropriately

23 raised it.  Based on my read of the defendants' papers -- and

24 of course, I'll be asking them about this -- I saw three

25 asserted government interests in their opposition that they

 1   claim that they're supported by Ms. Hazel's declaration.

 2          The first is to ensure a safe environment for all

 3   students.  I'm not exactly sure what that means, but I -- that's

 4   No. 1.  Ensuring health and safely of all LGBTQ students.  I

 5   believe that means protecting them from stigma or harassment

 6   that might occur if people leave the room when these books are

 7   being read.  And then the third is the interest in not violating

 8   antidiscrimination laws.

 9          So do you have anything specific in response to those

10   three that I think are the ones asserted?

11          MR BAXTER:  Certainly.  To the extent the first one is

12   different from the second, I'm not sure what they're getting at.

13   They fail to assert any kind of safety risks that actually come

14   from allowing students to opt out.  They allowed it all last

15   year, they allowed it in health sex ed class for as far -- as

16   long as we know.  And so I don't think they've actually asserted

17   any interest that would be cognizable in this Court.

18          And again, you know, in the Students for Fair

19   Admissions v. Harvard case, which was just decided this last

20   term, the Supreme Court said that those type of broad and

21   amorphous interests are not cognizable under strict scrutiny;

22   you have to show why allowing this student to opt out would

23   create a safety or health risk, and they have -- the government

24   hasn't even tried to meet that burden,

25   that to-the-person standard under the compelling government

```
1    interest.
2              As to -- I think I've already addressed kind of the
3    general desire to end stigmatization.  Again, same reasons,
4    those types of efforts to just generally not hurt people's
5    feelings is not cognizable because there's no way for the Court
6    to measure when that would ever be satisfied.  It would give the
7    government a blank check to continue to suppress protected
8    First Amendment rights.
9              And again, the possibility that people will be
10   offended by each other's beliefs is built into our
11   constitutional system; that's what the First Amendment protects,
12   is that right to disagree.  And so that can be a compelling --
13   you can't have a compelling government interest to wipe out the
14   First Amendment, and the Court reinforced that in the
15   303 Creative case.
16             As far as complying with state and federal law, they
17   have not identified any state or federal law that requires this
18   kind of teaching.  No other -- we're not aware of other school
19   districts that are not LGB- --
20             THE COURT:  No, that -- not the teaching, the
21   no-opt-out policy.
22             MR BAXTER:  And I don't -- they haven't identified how
23   the no-opt-out policy is required by state or federal law.  It's
24   contrary to the Maryland state regulation that requires opt-outs
25   for instruction on the merit of family life and sexuality.  And
```

1    I'm just not aware of any law.  And 303 Creative said that even

2    if there were a law, like a nondiscrimination law, for example,

3    if it comes into conflict with protected First Amendment rights,

4    that the First Amendment has already given us the answer, that

5    it prevails in protecting the rights of individuals.

6            THE COURT:  What about the Fourth Circuit's decision

7    in Doe, in which I believe the Court found that bathroom policy

8    permitting transgender use served a compelling government

9    interest in preventing -- in not discriminating against

10   transgender students; how, if at all, does that apply here?

11           MR BAXTER:  So if it applied, it would apply to say

12   maybe the school -- the school board may have an interest,

13   for example, in introducing the curriculum, and the parents have

14   not objected to that.  That's why we're not challenging the

15   curriculum.  That's the issue in most of the cases, the

16   so-called wall of authority that the school board cites.  Those

17   were all cases challenging an entire curriculum, and we're not

18   doing that here.

19           We're not saying that other students and other parents

20   can't have that instruction; we're just saying that even where

21   the school board does that, that there is an overriding interest

22   in protecting the First Amendment rights of those who object to

23   that instruction.

24           THE COURT:  Okay.  Thank you very much.

25           MR BAXTER:  Thank you, Your Honor.

1          THE COURT:  All right.

2          Just one minute.

3          MR. SCHOENFELD:  Of course.

4          THE COURT:  Good morning -- Ms. Klepp, are you good?

5          THE COURT REPORTER:  Yes, thank you.

6          THE COURT:  All right.

7          Okay.  Good morning, Mr. Schoenfeld.

8          MR. SCHOENFELD:  Good morning, Your Honor.

9          THE COURT:  All right.

10         All right.  So tell me why the plaintiffs and -- the

11    parents and the students have not alleged a burden on their

12    exercise of free religion if I've got affidavits from three sets

13    of parents telling me that this -- these books, what are in the

14    books, the classroom discussion that it can reasonably be

15    inferred will ensue when the books are read conflict with their

16    religious beliefs, interfere with their obligation, their sacred

17    obligation to raise their children in their faith; why is that

18    not a constitutional burden?

19         MR. SCHOENFELD:  I think every Court that has

20    addressed this question has said that exposure to school

21    materials, curriculum materials, no matter whether they are

22    offensive to religious beliefs or not, doesn't impose a

23    constitutionally significant burden.  I think Parker says this

24    best, and it says it reviewing, as we call it, a wall of

25    authority addressing this question, but mere exposure to those

1  sorts of materials in a classroom context is not a burden on

2  free exercise; no one is compelled to affirm any particular

3  belief, no one is penalized for their presence in the classroom,

4  no one is asked to do anything in particular, they don't forego

5  any benefit, they are not taking on any obligation by mere

6  exposure to those texts or even discussion with them.

7           THE COURT:  But isn't this a unique situation, where

8  we're dealing with elementary schoolchildren in their most

9  formative years, and they're being told ideas from their

10  teachers, people in authority whom their parents told them to

11  trust and to listen to; isn't -- doesn't that make this case

12  just a little bit different?

13           MR. SCHOENFELD:  I don't think so; I think that's

14  precisely the facts of Parker.  Parker was about elementary

15  schoolchildren.  The al- -- elementary schoolchildren.  The

16  allegation was that they were young, and impressionable, and

17  subject to potential indoctrination.  And the context there

18  I think is important; this was right after Massachusetts

19  recognized same-sex marriage, and the curriculum had been

20  introduced to normalize the existence of households headed by

21  same-sex couples.  And the first --

22           Am I doing okay?

23           THE COURT REPORTER:  Can you please slow down a little

24  bit?

25           MR. SCHOENFELD:  Sure.

1              And the First Circuit addressed that precise scenario,

2      and all of the concerns, they were -- these were religious-based

3      objections to having children be exposed to the type of

4      curriculum that I think is being challenged here as well.

5              And the Court made clear -- you know, the Court goes

6      on a long detour about whether indoctrination is a potential

7      First exercise violation.  It then makes clear that what it's

8      talking about is influence toward tolerance, rather than

9      indoctrination.  And influence toward tolerance, in the First

10     Circuit's view, was inarguably not a free exercise violation.

11     And we are very clearly on the influence toward tolerance side

12     of the spectrum, here.

13             I want to address one -- if I might, Your Honor --

14     recurring misstatement that counsel on the other side made.  I

15     think he used the word "hurtful" maybe a dozen times in his

16     presentation.  I want to be very clear about the context in

17     which that word used in the materials cited in the record.  This

18     is document 47-1, which is the letter from the principals, and

19     on the left side of the column, it says --

20             THE COURT:  Can you give me a minute to get there,

21     please?

22             MR. SCHOENFELD:  Sure.  It's page 10 of that document.

23             THE COURT:  This is the white paper from Mr. Bayewitz?

24             MR. SCHOENFELD:  Correct, Your Honor.

25             THE COURT:  Okay.  I'm page at page 10 of his

 1     document.

 2              MR. SCHOENFELD:  So on the left side of the grid, it

 3     says, "A student may say something like," and on the right side,

 4     it says, "We can respond with."  And the comment on the

 5     left side is, "That's weird; he can't be a boy if he was born a

 6     girl," and the "We can respond," which says, "That comment is

 7     hurtful; we shouldn't use negative words to talk about people's

 8     identities."  So what's hurtful in that context is calling

 9     another student weird.  I think all of us who have raised young

10     children can agree that you discourage your child, no matter the

11     substance of the disagreement, from using words like "weird" to

12     describe anyone.

13              No one's religious belief is impugned, no one's views

14     on gender identity is derogated; it's simply a reminder to

15     children not to call their classmates weird.  And I think we can

16     all argue that that's part of the tolerance and respect that

17     Mr. Baxter suggested is welcome in the curriculum, indeed,

18     encouraged in the curriculum.

19              So I want to make sure there is a clear distinction

20     between what students are being asked to do, which is, be

21     exposed to these inclusive texts, and what they're not being

22     asked to do, which is disa- -- they're encouraged to disagree,

23     they're encouraged to express their beliefs.  There is no

24     evidence in the record that any student was told something is

25     right versus wrong or asked to disagree with their religious

1    faith or in any way impugn any student's religious faith as part

2    of these discussions.  The only allegations in the declarations

3    are that students were asked participate in read-alouds where

4    these books were read.

5            THE COURT:  Do you agree that the record -- there is

6    record evidence that there will be classroom discussion about

7    these books?  I mean, it goes without saying, it seems so

8    obvious, but I need to pin that down.

9            MR. SCHOENFELD:  Sure.  I'll answer in two ways; I

10   want to make sure I satisfy you.  I don't dispute that there

11   will be discussion that ensues.  In fact, I think everyone would

12   hope that discussion ensues.  There is no evidence, however --

13   and that's sort of (1)(A) -- that there would be anything

14   derisive, or derogatory, or impugning anyone's religious faith,

15   or that anyone would be punished for expressions of religious

16   faith or beliefs rooted in religious faith as part of that

17   discussion.

18           I'll also make the second point, which is, none of the

19   declarations complains about some sort of discussion or anything

20   that happened in those discussions.  Each of the declarations is

21   specific, that their complaint is about exposure to the text in

22   the classroom.

23           THE COURT:  Well, with the exception of the

24   Mahmoud Barakat declaration at paragraph -- hold on, 16 or 17;

25   let's pull it up.

1          MR. SCHOENFELD:  Let me just turn to it.

2          THE COURT:  17, the one I read earlier.

3          MR. SCHOENFELD:  I was reading along with you, and

4    I think I might respectfully disagree, Your Honor.  So I agree

5    with you what paragraph 18 says.

6          THE COURT:  17.

7          MR. SCHOENFELD:  17, correct.  It is talking about a

8    specific prohibition of Islam into prying into others' private

9    lives and discourages public disclosure of sexual behavior.  "It

10   would violate our religious beliefs and the religious beliefs of

11   our children if they were asked to discuss romantic

12   relationships or sexuality with schoolteachers or classmates."

13         But then the specific allegation about what they're

14   complaining about is found in paragraph 23.  It says, "We asked

15   the acting principal of our son's elementary school for the

16   option to opt him out of the class reading of Prince & Knight

17   and to assign him an alternative activity."

18         Nothing in my presentation rides on whether there's

19   discussion or not, and so I don't want to make too much of a

20   fuss about it, but what they are complaining about is the

21   inclusion of these texts and the exposure of their children to

22   these texts as part of classroom read-alouds or discussions.

23         THE COURT:  What about the argument that -- I think

24   it's been made for the first time in oral argument today, not

25   really in the papers -- that if the parents are not allowed to

1    opt out, they will be in a position where they have to maybe

2    choose not to go to public schools.  I understand some can't

3    afford it, and that's very real, but what about that alleged

4    burden?

5               MR. SCHOENFELD:  So I don't think -- the line of cases

6    that Your Honor was discussing with counsel on the other side

7    relates to foregoing a specific burden.  Retirement benefits.

8    Sherbert v. Verner was about unemployment benefits.  Some

9    sort of public subsidy, as in Espinoza or Trinity Lutheran.

10   Real concrete harms that you're foregoing by observing a

11   particular religious tenet.

12               The substantial burden question goes to whether there

13   is a burden that actually requires you to forgo that benefit,

14   and the case law holds that exposure to these sort of offensive

15   texts is not a substantial burden.  If parents are going make

16   the choice to take their students out of public school and

17   enroll them in private school, that's not being compelled or

18   even indirectly compelled, as in Thomas or any of the other

19   cases that plaintiffs have cited; it's not an indirect

20   compulsion, it's a choice that they're making.

21               The point is that the offense taken at being exposed

22   to these texts doesn't rise to the level of a constitutional

23   burden.  There are plenty of things that are taught in schools

24   with no opportunity to opt out that offend people.  Evolution

25   offends people, based on their religious beliefs.  There is no

1   free exercise protective right to opt out of science classes.

2        And even though some would say, based on their

3   religious beliefs, that it substantially burdens their ability

4   to teach about creation, they have no right to opt out, and they

5   can't complain that if they choose to enroll their children in

6   private religious school, as many do, and as is protected by

7   Yoder, that they're being forced to do so in a constitutionally

8   protected way.

9        THE COURT:  Will the teachers be instructing children

10  that gender is anyone's guess at birth?

11       MR. SCHOENFELD:  I think that is one of the -- that is

12  a paraphrase of one of the Q and A that's provided.  I think

13  that's a way of answering a specific question presented to a

14  child.  And so that may well be part of the discussion.  I --

15  that statement may take place as part of the discussion.  There

16  is nothing free exercise violative of that statement, right; it

17  is a way of describing to a questioning child how gender

18  identity works.

19       Parents are aware -- as is evidenced by this case,

20  parents are aware of that sort of discussion potentially

21  happening; they remain free to have those discussions with their

22  children at home.

23       THE COURT:  One thing the plaintiffs argue -- and it

24  wasn't raised here, but it's in their declarations -- is that

25  they don't want to have those discussions so early, that they're

1    being forced now to have those discussions to preempt and defuse

2    what they believe is information that conflicts with their

3    religion.

4            MR. SCHOENFELD:  I understand that.  And you know,

5    age-appropriateness of curriculum is a choice that school

6    districts always have to make.  And this was the same issue that

7    was raised in Parker.  Once professional educators make a

8    decision to include this in the curriculum, the question -- and

9    it may be a good decision, it may be a bad decision; that's why

10   public school boards are democratically elected, and that's why

11   school board meetings are open to the public, and that's why the

12   process for selecting these texts is meant to be open and

13   participatory, as it was here.

14           The question before the Court, and the challenging

15   one, is whether there's a free exercise claim to including

16   age-inappropriate -- or that some would claim are

17   age-inappropriate texts; the answer is no.  Some principals may

18   take that view, some teachers may take that view.  The question

19   before the Court is whether it violates someone's free exercise

20   rights to have their child exposed to that and have them come

21   home asking certain questions.

22           THE COURT:  Okay.  Go ahead.

23           MR. SCHOENFELD:  I would just make one observation

24   about your colloquy, and you maybe get at this, but your

25   colloquy with Mr. Baxter about the healthy life curriculum or

1   whatever it's called.  You know, it struck me that his

2   description of the family life curriculum is precisely why

3   Montgomery County has introduced these texts.  As I understood

4   his argument -- and I'm sure he'll clarify if I have it wrong --

5   anything that mentions LGBT people should be subject to a

6   special curriculum about human sexuality and family life.

7          And these texts were introduced in order to defuse

8   that notion, that families are straight, and they're white, and

9   they have two kids, and there's a mom and a dad, and to push

10  everything that acknowledges the existence and humanity of LGBT

11  people into a special curriculum from which people may have the

12  opt-out right in Maryland I think is precisely what this

13  curriculum is meant to fight against.

14         And this then gets to some of the compelling interest

15  part of the argument, but document 1-15, which is the

16  introduction of the grade-level-specific books and the

17  explanation of the school board's rationale for it -- tell me

18  when you're there.

19         THE COURT:  Yeah, give me one minute.  I'm at 1-15.

20         MR. SCHOENFELD:  So page 17 talks about the impact of

21  including the LGBT-inclusive text in the curriculum, and it

22  talks about the fact that, "Compared to students in schools

23  without an LGBTQ-inclusive curriculum, LGBTQ students and

24  schools with an LGBTQ-inclusive curriculum were less likely to

25  hear homophobic remarks, were less likely to hear negative

1    remarks about gender expression often or frequently."

2           And Your Honor can read it, and the exhibit is in the

3    record, but I think that goes precisely to each of the

4    compelling interests that the school district has advanced here,

5    including compliance with state and federal law.  If you are

6    allowing a climate where students hear homophobic remarks or

7    negative remarks about gender expression often or frequently,

8    you are suborning a hostile environment, a hostile educational

9    environment, potentially in violation of Title VI or Title IX.

10   So this is part of the compelling interest that the government

11   is advancing here, by including these curriculum for younger

12   children.

13          THE COURT:  How is the no-opt-out -- well, are the

14   books the least restrictive means -- are these books -- do they

15   go beyond advancing the goal of inclusion?  I mean, are there --

16   is there anything in the books that you would agree might go

17   beyond just merely including LGBTQ characters?

18          MR. SCHOENFELD:  So let me answer the question I think

19   in three different ways, only the third of which directly

20   answers your question, but to start, obviously, our position is

21   that the no-opt-out policy is subject to rational basis review

22   and not strict scrutiny, so it's --

23          THE COURT:  And we can talk about that.

24          MR. SCHOENFELD:  Yeah, of course, but I just wanted

25   make that observation.

 1           The second point is, I think you asked whether the

 2   books are the narrowest tailored way to do this.  I think it's

 3   whether allowing -- I think the way I've been thinking about it

 4   is that the question is whether requiring opt-outs or permitting

 5   opt-outs is the most narrowly tailored way.

 6           THE COURT:  So that is the better way to put it, I

 7   agree with that, but I wanted to get to the books themselves.

 8           MR. SCHOENFELD:  Sure, yes.  And I apologize for the

 9   indirect--

10           THE COURT:  No, there's no apology, that's the correct

11   legal way to frame it, but I wanted to get to the books.

12           MR. SCHOENFELD:  So I think Your Honor's question was,

13   is there anything that goes beyond what I think the

14   First Circuit called influence toward tolerance to

15   indoctrination?  I don't think so.

16           There may be disagreement, rational good-faith

17   disagreement about whether some of the texts are pedagogically

18   sound, whether they are age-inappropriate, whether it's

19   appropriate to introduce fourth-graders who might otherwise be

20   reading Sleeping Beauty, or Romeo and Juliet, or William Steig's

21   Shrek, or anything else that involves a romantic relationship,

22   whether talking about someone's heart going thumpety thump is

23   age-inappropriate in that -- those are all subject to rational

24   disagreement, but there's nothing in those books that I view as

25   indoctrinating anyone or even in the discussion materials as

1    indoctrinating anyone.

2            I think Parker and then Tatel, in its extended

3    discussion of Parker, makes clear that this is not -- this is

4    not like a weekly drumbeat of particular text; this is one book

5    included in a curriculum that ought to be read maybe once a year

6    or left on a library shelf.  This is about making a curriculum

7    modestly more representative of the community that the students

8    come from.  There's nothing that directs students to think a

9    particular way.  Again, no one is penalized, no punishment is

10   meted out, no benefit is withheld from anyone expressing a

11   particular view about any of the topics at issue here.

12           THE COURT:  So your answer raised a question in my

13   mind, which is, it's reading the book once a year; that's what

14   the requirement is?

15           MR. SCHOENFELD:  So the requirement is that teachers

16   are meant to teach to particular ELA standards, and books are

17   provided to teachers to create their lesson plans.  They're not

18   required to read any particular book for any particular lesson.

19   They are required to choose some book from the LGBT-inclusive

20   texts as part of the curriculum.  For some teachers, maybe that

21   means one book read over the course of the year, for some

22   teachers that may mean more.  But there's nothing in the record

23   to suggest that any teacher is sort of beating her students over

24   the head with a particular agenda, as was the case in Tatel.

25           I think one of the points that Parker makes and that

1    Tatel makes is, it may be a different thing if a teacher is

2    targeting specific students whom the teacher believes has

3    particularly intolerant views for some kind of reeducation and

4    there's a real focus on those students, but it's a completely

5    different thing to have a generally applicable curriculum, of

6    which these texts are part of, as part of a broader curriculum

7    to teach English Language Arts, with the secondary message of

8    ensuring respect and toleration as part of that curriculum.

9          THE COURT:  All right.  Let's talk about -- I

10   understand your position is that rational basis applies, but my

11   questions are concerning the cases that apply strict scrutiny.

12         Let's first discuss Fulton.  How is this opt-out --

13   no-opt-out policy not the product of a system of exemptions?  It

14   existed, and then it didn't exist.

15         MR. SCHOENFELD:  So I don't think it's the existence

16   of the system of exemptions that matters under Fulton or

17   Sherbert.  What Fulton says specifically is that what matters to

18   a system of exemptions is, quote -- is when it "Invites the

19   government to consider the particular reasons for the conduct."

20   In other words, a system of exemptions doesn't necessarily

21   violate Fulton; if it did, We the Patriots would have come out

22   differently.

23         The issue in Fulton was that the decision-maker had

24   sole discretion to consider the reason for the exemption, and

25   because there were allegations in that case that the reason for

1    the exemption or the exemption request was what drove the

2    decision-maker's exercise of her discretion, that was

3    constitutionally impermissible.

4         Here, there is no inquiry whatsoever into the reason

5    for the exemption.  All students, no matter the reason, can opt

6    out of the health education curriculum.  No students, no matter

7    the reason, can opt out of the English Language Arts curriculum

8    or the reading of the LGBT books.

9         THE COURT:  But what I heard Mr. Baxter say is that

10   the no-opt-out policy is an application of the religious

11   guidelines, which itself is discretionary.

12        MR. SCHOENFELD:  It -- so I think that's -- I want to

13   make sure that I'm being clear for the record here.  I don't

14   view the no-opt-out policy as an application of the guidelines;

15   I view it as a policy.  The guidelines contemplate opt-outs; the

16   policy of the board is not to allow opt-outs, and that's the

17   focus here.  I think that --

18        THE COURT:  Well, how can they be so separated?  There

19   were opt-outs for a whole school year under the religious

20   guidelines policy.  Now the school board has said no opt-outs

21   under that same policy.

22        MR. SCHOENFELD:  Well, so I think what I'm trying to

23   get at is, even when it was sort of pursuant to the religious

24   guidelines, the opt-out policy applied to all requests to opt

25   out no matter the reason.  There were people who -- if you had

1    an opt-out for political reasons, or your core beliefs, or

2    anything else, your opt-out was honored without any inquiry into

3    the basis of the reason for the request.

4           So I think what I'm trying to say is that the opt-out

5    policy could have been a fulfillment of what's mentioned in the

6    religious guidelines, but it also applied more broadly to

7    nonreligious opt-outs.  And there's no allegation and certainly

8    nothing in the record that suggests that the opt-out policy was

9    ever applied discrepantly or discriminatorily; opt-outs were

10   honored no matter the reason.  And the new policy that's being

11   challenged here is that no opt-outs are honored.

12          This is obviously quite different from the Connecticut

13   vaccine policy at issue in We the Patriots, where it's explicit

14   on its face that students who are seeking exemptions from the

15   vaccine requirement for religious reasons won't have that

16   exemption honored, whereas students who are seeking exemptions

17   based on medical reasons will have it honored.  There's none of

18   that here.

19          THE COURT:  Well, I'm looking at Ms. Hazel's

20   declaration.  And perhaps I'm either misinterpreting what she

21   says or I'm not understanding your argument, but I'm at

22   paragraph 32 of her declaration.  I'll give you a minute.

23          MR. SCHOENFELD:  I'm here.

24          THE COURT:  And there, she says, During the 2022-23

25   school year -- and she refers to the guidelines for religious

1   diversity -- provided that they should make, you know,

2   exceptions for sincerely held religious beliefs when feasible.

3   So to me, she's telling me that at least some of the opt-outs,

4   the religious-based opt-outs were done pursuant to this policy.

5   You're telling me other people who opted out, perhaps because

6   they thought it was just simply age-inappropriate, were granted

7   opt-outs just because they were granted opt-outs.

8           MR. SCHOENFELD:  Correct, and I don't -- certainly,

9   what Ms. Hazel has described is right.  I think the point is

10  that in the old days, when opt-outs were honored, they were

11  honored for any reason.  This was the specific articulation with

12  respect to religious-based opt-outs, but now there is no opt-out

13  for anyone, no matter the reason.  It's not like a religiously

14  justified request to opt out is subject to different scrutiny.

15          That puts the decision-maker in a position of

16  evaluating the merits of that decision, and that's precisely

17  what the Court and that's only what the Court found to violate

18  the Constitution in Sherbert and in Fulton.  It doesn't go

19  beyond that to say that any system that is discretionary

20  violates the Free Exercise Clause.  The question is whether the

21  decision-maker needs to make inquiry and normatively evaluate

22  the weight of the rationale that's being offered, and there's

23  none of that here.  There's certainly no allegation of that

24  here.

25          I mean, I think everyone concedes or everyone agrees

1    that the policy that's being challenged is a blanket no-opt-out

2    policy.  And there's nothing constitutionally impermissible

3    about withdrawing an old opt-out policy and creating a blanket

4    no-opt-out policy, and I think We the Patriots identifies all of

5    the reasons why that is so, including that it would create a

6    one-way ratchet that meant that anytime you would introduce any

7    type of opt-out, including an opt-out for religious reasons, it

8    then becomes constitutionalized in a way that the government

9    after can't walk it back for any reason.

10            THE COURT:  I believe what you're telling me, that

11   there were opt-outs granted for non-religious reasons and

12   secular reasons.  Where in the record is that?

13            MR. SCHOENFELD:  So I think at paragraph 34, Ms. Hazel

14   says -- and this is during the 2022-2023 school year.  She says,

15   "Many of the opt-out requests were not religious in nature.

16   Some parents, for instance, expressed their opposition to what

17   they believed was an effort to teach students about sex, to

18   teach students lessons about LGBTQ issues, or to use

19   instructional materials that were not age-appropriate."

20            THE COURT:  Were they granted?

21            MR. SCHOENFELD:  They were.

22            THE COURT:  Where does it say that?

23            MR. SCHOENFELD:  I don't -- I don't know that it's --

24   I don't know that it explicitly says this, but paragraph 33 says

25   at the beginning of the 2022-2023 school year.  Paragraph 34

1  follows from that.  It describes the pre-March 23rd policy

2  revision, it describes that -- the state of that world.

3          So my understanding is that there were non-religiously

4  based opt-outs that were honored.  I don't think it ultimately

5  matters to the constitutional analysis for the reasons given in

6  We the Patriots, but my understanding is that -- and I think the

7  Hazel declaration is consistent with this -- that opt-outs were

8  honored for any reason, and now they are not allowed for any

9  reason at all.

10          THE COURT:  All right.  Let's talk about Tandon,

11  please.

12          MR. SCHOENFELD:  Sure.

13          THE COURT:  Tell me why Tandon doesn't apply here.

14          MR. SCHOENFELD:  So Tandon held only -- and as

15  Your Honor pointed out, that's sort of a short decision, but it

16  held only that a system of exemptions must treat similar

17  religious and secular activities similarly.  The opt-out policy

18  does; no opt-outs are allowed, no matter whether it's religious

19  or secular.

20          I understand Plaintiff's argument under Tandon

21  essentially to be that the apples-to-apples comparison -- or

22  maybe it's the apples-to -- well, I'm going to not use --

23          THE COURT:  Not use fruit, no fruit.

24          MR. SCHOENFELD:  My understanding of their argument is

25  that there is something Tandon-relevant between the health

1    education curriculum, which allows opt-outs, and the ELA

2    LGBT-inclusive texts, which do not allow opt-outs.  I don't

3    think that's the relevant comparison for Tandon, because that's

4    not about secular versus religious activity; it's about a

5    universe in which all opt-outs are permitted and a universe in

6    which no opt-outs are permitted.

7         And the distinction between the health education

8    curriculum and the ELA curriculum has multiple rational

9    justifications.  One is a hermetically sealed off curriculum

10   that is scheduled.  I think COMAR requires that it be done in,

11   you know, one 90-minute window or multiple 45-minute windows.

12   But it's practical to opt students out of it, and it's a

13   long-standing policy.

14        And I want to make sure I address counsel's argument

15   about the relationship of the equity imperative to that.  But

16   number one, it's much easier to allow students, just as a

17   practical matter, to opt out of the health curriculum than it is

18   to opt them out of reading a particular text, which might be

19   unscheduled and could arise organically in a classroom if

20   students pick it off the shelves.

21        Number two, the decision could ra- -- I think was made

22   but could rationally be made that health education is simply

23   more dispensable than is learning English Language Arts at the

24   young -- at a young age.  Maryland made the decision, for

25   whatever reason, as many states have done, to allow students to

 1   opt out of sex education.  Notably, they're not allowed to opt

 2   out of instruction relating to menstruation.  So there's at

 3   least some piece of the health education curriculum that is

 4   compulsory and not subject to opt-out rights.

 5           But my point is that there's a rational reason for

 6   distinguishing between the health education curriculum and the

 7   ELA curriculum, if that were required, but it's not even

 8   required, because under Tandon, I think Plaintiffs are just

 9   making the wrong comparison.

10           THE COURT:  But under Tandon, aren't I supposed to

11   look at the asserted government interest for the challenged

12   regulation -- and the challenged regulation is the no-opt-out

13   policy.  The asserted government interest for that challenged

14   regulation, my understanding is, because you want to make sure

15   all students are exposed to this inclusivity curricula, and it

16   would also potentially stigmatize and result in harassment of

17   people that fall within that inclusive community.  And I think

18   the other interest for the no-opt-out policy was administrative

19   infeasibility.

20           So don't I need to look at those interests to see if

21   that undermines the interests in the family life and sex ed

22   opt-outs?

23           MR. SCHOENFELD:  I think the answer is no, but I also

24   think that on those comparisons, the school board's policy is

25   justified.  I think you only get to the comparison if you first

1     identify similar secular and religious activity, which you

2     cannot here.  Both are subject to the same -- both are subject

3     to opt-out policies, opt-outs in one and opt-outs in the other,

4     which are agnostic as to the justification for the opt-out.  You

5     don't think about religion or secular justifications in one, nor

6     do you in the other.

7                So I think in order for you to get to the point where

8     you are evaluating -- I think what you described is how you

9     evaluate facial discrimination between secular and religious

10    activity.  And in Tandon, it was apparent, right; you couldn't

11    have people congregating in a home for religious purposes, but

12    you could have more than three households congregating in a

13    barber shop or for other reasons.  It was apparent from the face

14    of the regulation that the state was making a distinction

15    between secular and religious activity.

16                The next step --

17                THE COURT:  But the ban on the household gatherings

18    apply across the board -- no, excuse me, the other way around.

19                MR. SCHOENFELD:  Yeah, I'm not sure what that's ...

20                THE COURT:  So -- yeah.

21                MR. SCHOENFELD:  So my recollection of Tandon -- and

22    it's short, so we both should remember the facts specifically,

23    is that --

24                THE COURT:  Indeed, I should.

25                MR. SCHOENFELD:  -- there was a distinction in the way

 1  multifamily gatherings were treated for secular and religious

 2  purposes.

 3          THE COURT:  Oh, it's all private gatherings,

 4  regardless, secular or nonreligious, at home.  That's where --

 5          MR. SCHOENFELD:  Right, yes, because this is where the

 6  question about the ventilation systems comes in.

 7          THE COURT:  Right.

 8          MR. SCHOENFELD:  But the point was that -- so in that

 9  case, the question was whether the outright ban on gatherings in

10  a private home had a relevant comparator to unregulated secular

11  activity in public spaces.  There's still a relevant

12  distinction; I mean, you can argue about whether home versus

13  home or home versus public space is the right apple or orange to

14  compare it to, but on the face of the regulation, you've got a

15  distinction between secular and religious activity.

16          There is none of that here; there is no distinction

17  between secular and relevant activity.  So because there is no

18  facial discrimination, there's no line being drawn, whether it's

19  a relevant line or not, no line being drawn between secular and

20  religious activity, you don't get to Your Honor's question,

21  which is, how do you justify the differential treatment between

22  secular and religious activity?

23          THE COURT:  But doesn't that turn on an assumption

24  that there is no religious instruction that's similar to what's

25  in the inclusive books in the health and family life; in other

1    words, is there an overlap of subject matter that's being

2    taught, and if that overlap violates religious beliefs, then

3    there seems to be comparable secular conduct.

4            MR. SCHOENFELD:  I don't think so, I think that goes

5    farther than Tandon requires, but I think this gets to a point

6    that Mr. Baxter was returning to, which is, the health education

7    curriculum has long permitted opt-outs under COMAR.  In 2019,

8    the health regulation was amended to include some application of

9    the broader equity policy; in other words, health education now

10   needed to be taught with these equity and diversity guidelines

11   in mind.  The fact that it is now more diverse and more

12   representative of the community doesn't undermine or modify in

13   any way the ultimate aim of the health education curriculum,

14   which is to prepare students for maturity and puberty.

15           In other words, it has a different purpose, even if

16   it's now infused with the same understanding that it needs to be

17   more reflective of the community that is being taught that

18   curriculum.  In other words, I think you can draw, even on the

19   face of COMAR, a rational distinction between the differential

20   treatment between the health education curriculum and the ELA

21   curriculum.

22           THE COURT:  Let's talk about their hostility claim in

23   Masterpiece Cakeshop.  Why haven't they alleged a hostility

24   claim?

25           MR. SCHOENFELD:  So let me answer it in two ways.  One

1    is procedural, and one is substantive.  I don't think that

2    they've alleged enough to satisfy Rule 12(b)(6) on a Masterpiece

3    Cakeshop or Lukumi-type claim.  They certainly haven't shown

4    they are clearly likely to succeed on the merits, and I think

5    that distinction is important for the posture that we're at now.

6    When we move to dismiss the complaint, we'll be making a

7    12(b)(6) argument for the reasons that I'm about to give, but

8    here, where their burden, especially seeking a mandatory

9    injunction, is to show a clear likelihood of success on the

10   merits, they certainly haven't gotten that far.

11          But on the merits of the Masterpiece Cakeshop claim, I

12   think -- I say this with a great deal of respect for my opposing

13   counsel -- I think they are being unfair to Ms. Harris on the

14   comment she made at that meeting.  She was very clear that she

15   was talking about all types of objections to the LGBT-inclusive

16   curriculum.  She was very clear that she was talking about

17   religious rights or family values or core beliefs.  In other

18   words, her point was, I don't care the reason for your decision

19   to opt out on this curriculum, I disagree with it no matter the

20   basis for the objection, which just takes us back to the Fulton

21   and Tandon problem.

22          This is a blanket policy.  People may think it's a

23   sledgehammer rather than a scalpel, but it is not

24   discriminatory, and it's not based on any religious animus.

25   It's a blanket policy, it says no opt-outs are allowed for this

1   aspect of the criticism that the school board believes is

2   critically important to educating students in a diverse society.

3          The only comment attributable to one member of a

4   seven-member board is the one that they focused on with

5   Ms. Harris, and I think, as Your Honor obviously has done,

6   you've listened to it in context; there is nothing to suggest

7   religious animus, certainly not anything like the language in

8   Masterpiece Cakeshop.

9          And just to quote some of it, "Freedom of religion and

10  religion has been used to justify all kinds of discrimination

11  throughout history, whether it be slavery, whether it be the

12  Holocaust, whether it be -- I mean, we -- we can list hundreds

13  of situations where freedom of religion has been used to justify

14  discrimination, and to me, it is one of the most despicable

15  pieces of rhetoric that people can use to use their religion to

16  hurt others."

17         That is categorically different from what was said

18  here.  And you see Ms. Harris' statement manifest in the policy

19  that was adopted.  She rattles off a number of reasons why

20  parents might want to opt out their kids of the LGBT-inclusive

21  texts, and she says, "In my view, as one member of this

22  seven-member voting board, none of them suffices."  None of them

23  suffices.  It would be a very different thing if she focused on

24  religion in particular and impliedly or directly said, I think

25  that is less worthy of deference as we consider whether students

1   are entitled to object.  And she said nothing like that.

2          THE COURT:  What's your response to Mr. Baxter's --

3   I think his position was that the plaintiffs don't have to

4   allege a constitutional burden to have a claim, a hostility

5   claim under Masterpiece.

6          MR. SCHOENFELD:  It's a hard question.  I don't know

7   that there's a clear answer to it.  I think that -- I guess my

8   view is, it's hard for me to see how a claim of religious bias

9   or animus, without an underlying constitutionally protected

10  interest, would be actionable, but I don't think Masterpiece or

11  Lukumi is clear on that.

12         You can see it -- you can see what the burden is in

13  each of these cases, right?  In Lukumi, they're not permitted,

14  as a matter of ordinance, to participate in something that is

15  central to the Santerian faith.  And in Masterpiece, all of

16  these issues are arising during a disciplinary proceeding before

17  the Colorado Civil Rights Commission.  So I think Your Honor had

18  said that the burdens were sort of assumed in those cases.  So I

19  think the better reading of those cases is that there's got to

20  be some cognizable burden before you get to the question.

21         The through line in all of these cases is, can you

22  identify, on the face of the text, through the adjudicatory

23  process, whatever, some evidence that religion is being treated

24  less well than secular justifications.  It seems to me that a

25  predicate is a --

1          THE COURT:  Where did you get that language from,

2     "treated less well"?  I've been trying to focus on to what

3     extent any purportedly hostile remarks have to be connected to

4     the decision, and it's not very clear to me.  I mean,

5     Masterpiece Cakeshop, of course, was -- I think we can all say,

6     based on what you've just discussed, a very clear set of facts;

7     there was religious hostility.

8          MR. SCHOENFELD:  Yeah.  So I think it is fair to read,

9     like Cuomo, Catholic Diocese of Rockville Centre v. Cuomo, maybe

10    Tandon -- sorry.

11         Got it?

12         I think it's fair to read those to say that one of the

13    things you were trying to suss out before you apply strict

14    scrutiny is, is religious observance being treated less well

15    than some secular comparator.  That's sort of how I make sense

16    all of the case law.  There is nothing in this case that

17    suggests that religious behavior is being -- or religious

18    conduct, or religious beliefs is being singled out for any

19    treatment that is less respectful than any nonreligious

20    objection to the same curriculum.

21         THE COURT:  I candidly haven't watched or listened to

22    all of the parents who testified at the hearings against the

23    opt-out.  I do remember, though, there was a woman in January

24    who testified.  I don't believe she referred to religion.  But

25    were there other parents who testified who were not raising

 1   religious objections but merely raising perhaps

 2   age-inappropriate objections?

 3           MR. SCHOENFELD:  I honestly don't remember the videos,

 4   but I think Ms. Hazel's declaration says that some of the

 5   objections and some of the criticism from the community was

 6   about issues relating to age-inappropriateness.  And I think the

 7   principals' document -- and you can take it for whatever it's

 8   worth, and I'm happy to talk about it -- talks about objections

 9   to age-appropriateness untethered to concerns about religious

10   beliefs.

11           THE COURT:  Is age-inappropriateness a core value or a

12   family value?

13           MR. SCHOENFELD:  Absolutely.  I mean, it can be.  If

14   you -- and it can have religious basis or nonreligious basis.

15   Saying that your child -- saying that your child is too young to

16   be exposed to the existence of LGBT people is a family value, is

17   a core value.  Some people think that you need to shelter your

18   young children from the existence of people whose choices, and

19   world views, and behaviors, and attitudes differs from yours.

20           And that concept, that perception varies across

21   communities along religious and nonreligious vectors.  There's

22   nothing uniquely religious about the belief that young people

23   should be told about dating, and sexuality, and LGBT people, and

24   same-sex marriages, and gender transition in elementary school

25   or middle or high school.  Some people are introduced to it of

1    necessity because their children happen to be transgender, and

2    they come out when they're six or seven.  I mean, there's

3    nothing -- there's nothing specifically religious about that

4    concept.

5           THE COURT:  What are your asserted compelling

6    interests in the no-opt-out policy?  I summarized them earlier

7    and it was based on my reading of your paper, but I want to hear

8    from you what they are.

9           MR. SCHOENFELD:  I thought you did a great job of

10   that.

11          THE COURT:  Well, I read them from your paper, so I --

12          MR. SCHOENFELD:  Yeah, I know, I'm only half joking.

13   I mean, I think that -- and I think we got to it before,

14   substantive due process.

15          So I can't find it.  I think one of them is in order

16   to ensure that students coming from diverse families see some

17   level of representation.

18          THE COURT:  Hang on one second; let's just -- I need

19   to moor myself in the briefs, and if you're going to deviate

20   from that, you have to let me know, but --

21          MR. SCHOENFELD:  Okay.  I'm happy to go back to it.

22          THE COURT:  All right.  I'm at your opposition, which

23   was ECF 42.

24          THE COURT REPORTER:  Are you able to get closer to the

25   microphone?

1          MR. SCHOENFELD:  I will; I apologize.

2          THE COURT:  Just give me one moment.

3          MR. SCHOENFELD:  So it's page 25 in their opposition.

4          THE COURT:  Yes, on to 26 is where I found the --

5          MR. SCHOENFELD:  Right.

6          THE COURT:  Great, okay.

7          MR. SCHOENFELD:  So I think we identify three.

8          The first is an interest in -- as a public school in

9    providing a safe educational environment, and I think

10   Ms. Hazel's declaration and also the document I read to you,

11   which is the sort of launch document for this curriculum, makes

12   clear that one of the purposes is to ensure through the

13   curriculum that it's cultivating an environment where students

14   are less likely to hear homophobic remarks or negative remarks

15   about gender expression often or frequently.

16          There's an interest in ensuring the health and safety

17   of LGBTQ students.  I think that's obviously related, but

18   I think it goes a little bit more to a question of the school's

19   obligation -- and this relates to its third one -- its

20   obligation to ensure against a hostile educational environment

21   for students who are LGBT.

22          And the third one is its interest in complying with

23   federal and state antidiscrimination policies and expectations.

24   One is the COMAR equity regulation, and the other is Title IX.

25   I think there's no shortage of cases where students have brought

1    viable Title IX claims because they were marinating in an

2    environment of hostility towards their sexual orientation or

3    gender identity.

4         And part of this curriculum is then to ensure that

5    there is a respectful environment for students that, you know,

6    are reflected in the texts that are used.  And just to sort of

7    preempt the point, it's not about indoctrinating anyone; you

8    don't need to agree with anyone about anything.  You are free to

9    express a different view, parents are free to teach their

10   children a different view; no one is penalized for anything.

11   But the point is that you have to learn to respect people who

12   are not like you.

13        THE COURT:  So what if a student says, in response to

14   a transgender discussion, My parents told me that being

15   transgender is against my religious beliefs.  What does the

16   teacher say at that point?

17        MR. SCHOENFELD:  Any good elementary school teacher

18   worth his or her salt would engage the student and engage the

19   classroom in a productive discussion that doesn't make any

20   student, including the transgender student in the class or the

21   religious student, feel bad about their beliefs or attitudes.

22   There are ways -- and this is why teachers are so well paid.

23   There are ways to -- that was a joke, that was a joke.

24        This is -- skilled teachers know how to navigate those

25   difficult discussions.  And there are ways to make sure that

1    students in those classrooms understand that this voices a

2    particular belief and that students are protected from any harm,

3    either the religious student expressing that belief or the

4    transgender student who feels in any way beleaguered or besieged

5    by that statement.

6              And that's what teachers do.  And that's what teachers

7    do in every context; it's not limited to these particularly

8    hot-button issues today.

9              THE COURT:  All right.  Let's mine down into your

10   three compelling government interests.

11             MR. SCHOENFELD:  Sure.

12             THE COURT:  I think the plaintiffs would characterize

13   No. 1, which is the safe environment for all students -- which I

14   interpret -- tell me if I'm wrong -- as different than No. 2,

15   which is more, if people can't opt out -- or if people do opt

16   out, those that remain may be stigmatized if the students know

17   why they were opting out.  But for No. 1, ensuring a safe

18   environment, why is that not an imponderable that can't be

19   defined?

20             MR. SCHOENFELD:  So I think that -- I mean, the slide

21   that I referred to earlier I think is based on empirical work

22   that shows the effect of having these curricula introduced into

23   the -- into -- or having these books introduced into the

24   curriculum.  This is different from SFFA, which talked about

25   improving the type of dialogue or improving -- you know,

1   improving the sort of diversity of discussion on college

2   campuses.

3           Courts have recognized the need to create a safe

4   environment for students.  In any number of cases -- and we

5   cite, you know, cases going back to Saxe in 2001 as well as

6   Grimm and Doe, all of which talk about not just -- these aren't

7   just bathroom cases; these are cases about things like referring

8   to students by their appropriate pronouns.  They all go to the

9   question of whether you are creating a safe environment for

10  students who are either LGBT themselves or come from LGBT

11  families.

12          THE COURT:  And allowing opt-outs for religious

13  reasons undermines those goals?

14          MR. SCHOENFELD:  Absolutely.  So I think -- that gets

15  to a separate part of the strict scrutiny analysis, but I think

16  Ms. Hazel talks about the fact that there was rampant

17  absenteeism, there was disruption caused by multiple children

18  needing to leave the classroom.  And again, this is narrow

19  tailoring to justify a no-opt-out policy at all, not one that is

20  based on any inquiry into the reason for the opt-out policy.

21          But she talks about high absenteeism, she talks about

22  disruption to lessons.  A third of students left a classroom,

23  and when they came back, they needed to be reintegrated into the

24  discussion, and there were challenges in making sure that

25  everyone could do the same assigned work.

1           THE COURT:  Does that overcome the First Amendment

2     objections or the -- if we assume there's a violation of the

3     First Amendment rights?

4           MR. SCHOENFELD:  I view these as explanations for why

5     the no-opt-out policy is narrowly tailored; yes.  I mean, the

6     alternative, as I understand it, is allowing opt-outs for this

7     curriculum, and I think it's unsustainable for

8     Montgomery County, for the reasons described in Ms. Hazel, and

9     nothing, then, stops families from opting out of tons of other

10    things.  I don't mean to invoke a kind of slippery slope

11    argument here, but this is the real experience of

12    Montgomery County Schools under a system where opt-outs were

13    allowed for these particular texts.

14          THE COURT:  Go ahead.

15          MR. SCHOENFELD:  No, I was done.

16          THE COURT:  I was going to ask -- so tell me more

17    about the experience last year.  I under- -- I've read what

18    Ms. Hazel has said.  Were there any reports of students who

19    might be transgender, or transitioning, or gay being bullied

20    because of opt-outs or harassed because of opt-outs?

21          MR. SCHOENFELD:  There's nothing in the record to that

22    effect, and I don't know why, but I think it's also the case

23    that the absence of those -- the absence of those incidents

24    might just be a testament to the fact that there was some

25    curriculum being introduced at that point in time.  I don't know

1  a way of making a kind of causation or correlation between the

2  two.

3          THE COURT:  All right.  Let's switch gears to

4  substantive due process, please.

5          How do you interpret Herndon?

6          MR. SCHOENFELD:  It's dicta, and I think every other

7  Court that has addressed this question about the hybrid rights

8  has made the obvious observation that you can't tack on a

9  non-meritorious substantive due process claim to a

10  non-meritorious First Amendment claim and suddenly be entitled

11  to strict scrutiny.  The Second Circuit said that in Leebaert,

12  and I think every other Court of Appeals to address the question

13  has held the same way.

14          The only two cases they cite to for that principle, I

15  think, are Herndon, which describes that in dicta and Hicks,

16  which just sort of keys off of Herndon.  But there was no

17  religious-based claim in Herndon, and I don't think it's a

18  sustainable motive analysis.

19          THE COURT:  Let's just probe Herndon a bit more.

20          MR. SCHOENFELD:  Sure.

21          THE COURT:  It doesn't mention the words "hybrid

22  rights."  It did follow Smith.  Judge Britt, in Hicks,

23  distinguished between hybrid rights, and what the Judge

24  interpreted was the holding in Herndon as something separate.

25  So my question to you is, setting aside the hybrid rights issue

1   and the, you know, line of authority that's interpreted, what

2   Justice Scalia said in Smith, does Herndon create sort of a

3   separate substantive due process right when you have the

4   intersection of the right for a parent to control a child's

5   upbringing and free exercise concerns?  That's the language that

6   was used.

7            MR. SCHOENFELD:  Right, and I think the answer is no,

8   it's still dicta, because there were no free exercise concerns

9   in Herndon, and I think the Court was pretty explicit about

10   that.  And the same rationale would apply.  There's no good

11   reason why someone could take a non-meritorious substantive due

12   process claim and a non-meritorious free exercise claim and

13   combine them.  I forget which Court said it but said the level

14   of scrutiny doesn't vary based on the number of rights being

15   asserted.  I think that may have been Leebaert.

16            But I think that analysis is exactly right, that even

17   on the sort of evolutionary plane of First Amendment

18   jurisprudence, there's nothing in any of the recent

19   Supreme Court cases that would suggest that you could take a

20   claim in which Plaintiffs failed to establish a constitutionally

21   significant burden on their free exercise rights as well as a

22   plausibly alleged -- and I think that's brought into Herndon --

23   substantive due process claim and suddenly -- and subject to the

24   most exacting scrutiny known to the law.

25            THE COURT:  Let me ask you more about the least

1    restrictive means and the compelling of the -- the strict

2    scrutiny analysis.  So you've asserted three interests, all of

3    which existed last year when opt-outs were allowed.  What

4    evidence have you provided me that the no-opt-out policy is

5    the -- well, you've said the number of opt-outs, then, was

6    basically the reason that you instituted a no-opt-out policy.

7    How does that undermine those three interests, the

8    administrative and feasibility of it?

9              MR. SCHOENFELD:  So the interest is in making sure

10   that all students are exposed to this curriculum, to advance the

11   goals that we've described.  It doesn't work if only some

12   students are exposed to that curriculum.  The point of including

13   that in the curriculum is to ensure that there is a school

14   environment that is safe for all students, and that's what leads

15   to an environment where students are less likely to hear

16   homophobic remarks, et cetera.

17             The school was willing for a time to allow opt-outs

18   until it determined that it couldn't because of the

19   administrative infeasibility points that we raised here, which

20   is the absenteeism and the high number of opt-outs.  And I think

21   as Ms. Hazel describes, MCPS was concerned that when some

22   students are permitted to leave the classroom whenever language

23   arts lessons draw on books featuring LGBTQ characters, students

24   who believe that the books represent them or their families are

25   exposed to social stigma and isolation.  So there's a direct

1    connection drawn between the high number of opt-outs and the

2    specific goals that the school means to advance here.

3            THE COURT:  So it's not that it's difficult to

4    administer; it's that you didn't realize how many people would

5    be requesting opt-outs, and then that undermined your goal of

6    inclusion.

7            MR. SCHOENFELD:  That's certainly part of it.  I mean,

8    I think the bigger number -- well, so narrow tailoring, you

9    know, it also does need to be practicable, and there were

10   practical impediments to honoring the opt-outs, and I don't

11   think that should be lost in the analysis.

12           The fact that many students were leaving the classroom

13   to do different curriculum and then had to come back into the

14   classroom and be taught separately by teachers or media

15   specialists, because the exercises -- the character studies is

16   one that I think is cited -- were just being based on different

17   texts, that's not irrelevant to the narrow tailoring analysis.

18   I mean, schools sometimes try to accommodate students.  It's not

19   constitutionally required that there be an opt-out, but it turns

20   out that it's just not doable.

21           THE COURT:  I don't think I have any other questions

22   right now.  Do you have anything else to add?

23           MR. SCHOENFELD:  The only one -- and it's a very, very

24   minor point, but I'll just make it.  I do think the standard

25   here is higher, because this is a mandatory injunction and not a

1    prohibitory injunction.   League of Women Voters involved a case

2    where the injunction was prohibitory because the lawsuit was

3    filed the day the policy change was made, and the Fourth Circuit

4    is very careful to look at the language of a request for

5    prohibitory relief in the complaint, whereas the complaint here

6    makes very clear that what they are asking for is mandatory

7    injunctive relief.

8              And so the standard is higher.   It's not just, you

9    know, the Winter likelihood of success; it is a clear likelihood

10   of success on the merits of their claims.

11             THE COURT:   Thank you very much.

12             MR. SCHOENFELD:   Thanks, Your Honor.

13             THE COURT:   Ms. Klepp?   You can keep going?   All

14   right.

15             Mr. Baxter?

16             MR BAXTER:   Thank you, Your Honor.   I don't know --

17             THE COURT:   I'd be happy to hear from you.   I'm sure

18   I'll jump in, you've noticed I'm not shy, but --

19             MR BAXTER:   Yeah.   Thank you, Your Honor.   I do have a

20   list of issues, and I've tried to track them in the order that

21   they're discussed in the briefs.   There's a couple of

22   preliminary things that I'd like to have first.

23             Opposing counsel makes the -- or my friend on the

24   other side, I would like to say, indicates that my clients

25   oppose the very existence of LGBT children; nothing could be

1    further from the truth.  Some of my clients have LGBTQ members

2    of their own family, they know about these issues.  There's a

3    different question about whether you force children to talk

4    about these issues in very ideological ways when they are in

5    pre-K through fifth grade, and that is what my clients object

6    to.

7             I would like to just note that we have connected

8    Harris' comments on white supremacy and racism in our brief on

9    page 22.  It's true that some -- those particular comments came

10   after the no-opt-out ban was enacted, but under Masterpiece,

11   that is irrelevant.  The question is whether you can get neutral

12   and fair consideration of your request.  And it's been made

13   clear, both by Ms. Harris' statements before the opt-out policy

14   and after -- the ban and after, that they cannot get a fair

15   hearing on their objection because of her views that their

16   religious objections are akin to white supremacy and xenophobia.

17            THE COURT:  Just give me one moment.  It's page 22 of

18   your motion -- the memorandum in support of your motion?

19            MR BAXTER:  There's an article by Espey, and I think

20   it's the Montgomery360- --

21            THE COURT:  Just give me one moment.  I see.

22            MR BAXTER:  The very end of the first paragraph.

23            THE COURT:  Yeah.  We printed all your permalinks, so

24   I'm not sure I can readily get my hands on it, though.

25            MR. SCHOENFELD:  It just says she -- Harris later also

1    compared a largely Muslim group of concerned parents to "white

2    supremacists," xenophobes, see Em Espey, MoCo360 (June 2, 2023).

3            THE COURT:  Okay.

4            MR BAXTER:  Just, again, a couple of kind of

5    housekeeping matters before I get to the substance.  The

6    Montgomery -- and I -- we've -- I have the permalink for this,

7    we could submit it afterward, where Montgomery County

8    identifies, for example, what has to be taught in high school

9    sex ed class.  It includes analyzing how programs and policies

10   can promote dignity and respect for people of all sexual

11   orientations and gender identities, how programs and policies

12   can support people of all sexual orientations, gender

13   identities, and gender expression.  And so, you know, students

14   can walk out of those classes, but they can't walk out of that

15   same -- the type of discussion in the books.

16            I would also just note that in Bostock, the Supreme

17   Court said that homosexuality and transgender identity are

18   inextricably bound up with sex.  The Mahmoud, in the verified

19   complaint, First Amendment complaint, paragraph 55, Persaks at

20   paragraph 62, both said that in their religious view, these

21   understandings of sexuality and gender identity are interwoven

22   and cannot be separated, that your understanding of who you are

23   as your gender identity is interwoven in your -- in an

24   understanding of the importance of sexuality and the role that

25   it plays in propagating families.

1          To hit the substance --

2          THE COURT:  Can I ask you a follow-up question --

3          MR BAXTER:  Yes.

4          THE COURT:  -- about one of these procedural matters.

5  You said you'll give me a permalink on the health education

6  reference you just made.  How do the opt-outs in health

7  education work; can you just opt out of one particular part of

8  health ed that -- or my understanding -- and perhaps it's not

9  based on the record, but it is, you opt out of the entire

10  health ed program, not just this part of it I can't listen to,

11  but other parts I can.

12          MR BAXTER:  I'll -- I believe you -- you know, under

13  the rule, you can opt out of any part that you want because

14  it's -- under the Maryland reg, it just says you can opt out.

15  You have to provide opt-out procedures.  Under the

16  Montgomery County reg, it says you can opt out for any reason of

17  anything specifically that violates your religious beliefs.

18          I can only speak to my own personal experience.  My

19  son, when he was in Wheaton High School, I had no objection to

20  him participating in the class, but he came to me and said, Hey,

21  I'm not comfortable with some of the discussion in our class,

22  can I opt out, and we said sure, and he asked for an opt-out and

23  got it for a particular portion of the health class.  So I'm not

24  aware of anything that would limit any person from just opting

25  out of any particular part.  And again, that kind of parsing

```
1    would go to like, well, your religious objection is too narrow,
2    your religious objection is too broad, questions that a Court
3    really can't delve into.
4           On the question of Fulton -- and the school board can
5    bend itself, tie itself into pretzels trying to distinguish its
6    different aspects of the policy, but if you look at,
7    for example, Fulton, in that case, there was one provision of
8    the contract that absolutely banned any exception -- or,
9    you know -- so there could be no exceptions, and the
10   Supreme Court said, Well, you have to look at other portions of
11   the contract that do allow it.  And the city said, Well, that
12   doesn't apply in this context.  And the Supreme Court said,
13   you know, Disregard all of that, and said, You can't parse this
14   into different pieces, you have to look at the broad picture.
15   And in Lukumi, the Court looked at both state law and city law
16   and said that anything that -- that goes maybe perhaps more to
17   the Tandon question, but you look broadly at the discretions
18   available to the organization.
19          There's no question here that the school board has
20   broad discretion; at a whim, on March 22nd, it can allow them,
21   on March 23rd, it can disallow them, and there's nothing --
22   there are no specific guidelines.  You know, Counsel cited the
23   We the People case, but there, the Court said there was -- there
24   were specific medical guidelines; you had to have a doctor who
25   would say certain things to get you an exemption.  There's
```

1   nothing in here that would guide the school board's decision

2   about when they apply the religious guidelines to storybooks and

3   when they don't.

4          THE COURT:  But what I heard Mr. Schoenfeld say is,

5   the opt-outs were allowed for anyone.  I don't even know that

6   reasons were asked, just if you want to opt out, you can opt

7   out, and then they just revoked that policy without regard to

8   any reason for why.  So their position is, religion played no

9   part in it.

10         MR BAXTER:  But that doesn't undermine the discretion.

11  And he -- you know, he says you have to be looking at individual

12  religious, you know, positions.  There's nothing in the cases

13  that say that.  It says anything that would allow -- that would

14  give the government solicitude to decide which exemptions are

15  worthy of solicitude and which are not.

16         Here, the Court decided, Well -- sorry, the school

17  board decided that these ones are not worthy of solicitude

18  because they're too numerous, or they're too burdensome, which,

19  by the way, is not reflected in the record.  The most they

20  said -- in the Garti declaration, the school board said that it

21  wasn't because of numerosity, and the only thing in the Hazel

22  declaration is that there were dozens of students at a single

23  school.  When you're talking about across dozens of classrooms

24  and hundreds, potentially thousands of students, there's nothing

25  to suggest that that's unusual or inadministrable; there's

1    really no evidence to support the type of burden analysis.

2              And again, it's -- there's no question about the broad

3    discretion based on the facts and the written policy here that

4    the school board has.  Even if there was -- you know, the Court

5    has concerns about the existence of discretion, that pushes us

6    into the Tandon.

7              The types of arguments that the school has made are

8    the exact same arguments that were made in all of the COVID

9    cases in the Diocese of Brooklyn, where the government tried to

10   say, Well, we're -- this policy only applies to essential

11   businesses, not, you know, nonessential businesses, and the

12   Court said, None of that matters; you look at the underlying

13   interest, which is to avoid the spread, and any kind of

14   exception that undermines that triggers strict scrutiny.

15             The -- Counsel is also trying to say that a lot of

16   these differences are justified, but that goes into the strict

17   scrutiny analysis, not under whether a policy is neutral and

18   generally applicable.  So whatever justifications they have for

19   distinguishing between exception- -- you know, opt-outs in

20   storybook hour versus opt-outs in health class, those -- that

21   can go to strict scrutiny, which the government also fails, but

22   it doesn't go to whether the policy is neutral and generally

23   applicable.

24             And again, it's not relevant -- and this is directly

25   from Tandon.  It doesn't matter if some secular exceptions are

1    treated worse or as bad as the religion exceptions, it doesn't

2    matter if some religious objections are treated better; the fact

3    that there is this variation of treatment is alone enough to

4    trigger strict scrutiny.

5         On the question of burden --

6         THE COURT:  But is -- let's just mine down into Tandon

7    a bit.  So you've got family life and human sexuality units, and

8    you've got ELA curriculum that -- a subset of which is some of

9    these inclusive books.  How are those comparable?

10        MR BAXTER:  Because the underlying interest in both of

11   those is to promote -- and that's the reason --

12        THE COURT:  You're going back to the equity

13   guidelines.

14        MR BAXTER:  Right.

15        THE COURT:  Okay.

16        MR BAXTER:  It's to promote the equity, and the

17   interests they have asserted, which are ensuring that there's --

18        THE COURT:  But the human -- let me just interrupt.

19   The family life and human sexuality unit, I mean, that's been

20   around since -- I went to Maryland Public Schools; that's been

21   around since I went to public school.  It's just been updated to

22   include one line that says, Now we will include in our

23   curriculum a reflection of inclusive communities.  How does that

24   connect the two, for --

25        MR BAXTER:  So --

1          THE COURT:  -- comparison purposes?

2          MR BAXTER:  And that's the preliminary ones that I

3   mentioned where Montgomery County School Board has added further

4   guidance and talks about how do you promote diversity,

5   inclusion, and equity.  If the student walks out of that -- or

6   opts out of that portion of the discussion, that undermines the

7   same interest that's asserted in the ELA and the ELA storybooks.

8          On the burden issue, I would, you know, again point

9   the Court to the Lovelace decision out of the Fourth Circuit.

10   That's at 472 F.3d 174, citing Thomas v. Review Board, where it

11   says that the pressure to modify your beliefs is sufficient to

12   impose a burden.  The government wants to say, Well -- or the

13   school board wants to say, Well, they -- you know, they're just

14   sitting there, they don't want to have to do anything, but that

15   assumes, then, that they've already given up their religious

16   practice.  That, I think -- if they sacrifice their religious

17   objection, they can be in the schoolroom.

18          But the point is that if they practice their religion,

19   if they choose to walk off the job, then the Court's saying,

20   like, Yeah, you can't participate -- you can't just have the

21   opt-out; you have to go all the way out of the school.  You lose

22   the ability to participate in the school system.

23          THE COURT:  But you can still practice your

24   religion --

25          MR. SCHOENFELD:  So could Mr. Thomas.

1          THE COURT:  Let me just finish, one moment, please.

2          MR BAXTER:  I'm sorry.

3          THE COURT:  If you're a parent and you're a child of

4    Montgomery County Public Schools, you can still practice your

5    religion, espouse your religious views in the face of what you

6    view as conflicting views.  In fact, it may empower people to be

7    more strong in their religious views.  I mean, how is it

8    preventing the exercise of religion?

9          MR BAXTER:  Preventing the exercise of religion,

10   again, is not the standard under Thomas, under Lovelace; it's

11   are you being pressured to modify your religious beliefs.  And

12   if your religious belief is --

13         THE COURT:  So how are they being pressured to modify

14   what they believe?

15         MR BAXTER:  Because they have to either put their

16   child into a situation that would violate their religious

17   beliefs or leave the public school.  So that pressure -- if they

18   want to use the public schools -- which some of my parents are

19   under intense pressure to stay in the public schools; they have

20   no financial options to go elsewhere.  They're pressured --

21   they're being pressured to leave their children in these

22   classes.

23         THE COURT:  I didn't see any of this in their

24   declarations, this pressure that they feel.

25         MR BAXTER:  All of them said that this is a violation

1    of their religious beliefs to leave their children in, and so if

2    they -- it's obvious that they're having to choose between

3    putting their children in or to take advantage of the public

4    school system.  That pressure is alone sufficient to constitute

5    a burden on religion.

6          And again, the school board wants to say, Well, you

7    have to -- it has to be much more severe, but getting into that

8    type of severity analysis again rewards parents who are less

9    religiously, you know, conservative or sensitive than parents

10   who maybe have, you know, more of what might be considered more

11   moderate views.

12         I would also again point to Fulton, where the Court

13   deferred to the parties' religious, you know, concerns.  There,

14   Catholic Social Services said that this was -- endorsing

15   families to be certified as, you know, fos- -- LGBTQ couples to

16   serve as foster parents was tantamount to endorsing that

17   relationship.  The City said, We're not asking them to endorse

18   the relationship; we're just trying to get them to show that

19   they meet certain statutory requirements of eligibility for

20   parenting.  And the Supreme Court deferred to the CSS's view

21   that doing that would be a violation of their religion.

22         And that same deference is required here.  The parents

23   have testified that putting their children in these situations,

24   when they're, you know, pre-K through fifth grade -- one of

25   our -- you know, this is outside the record, but I think it

1    reflects kind of common sense.  One of the members of Kids First

2    has a daughter who has Down's syndrome and autism, and they said

3    there's such a level of respect for what they hear from other

4    adults, and if this child sits in a discussion where she's told

5    these things, it's very -- it's almost impossible for them to

6    kind of undo that teaching.

7            And there's a range, of course, of things.  Some

8    parents may be successful in that, but at that age, a lot of

9    parents -- there were a thousand parents protesting at the

10   school board meeting in July -- have concerns that exposing

11   their children to this type of teaching, being told that their

12   sex is, you know, the doctor's best guess, that interrupts their

13   ability to direct the religious understanding of their children.

14           And again, the kind of parsing that the school board

15   wants to get into, about, you know, are we talking about books

16   that just introduce characters or -- you know, that kind of

17   parsing is the kind of parsing that this Court cannot get into,

18   because the First Amendment even protects views that we find

19   odious, or that we don't like, or are not popular.

20           There's just no way for the Court to draw the line

21   between what's -- how much is indoctrination and how much is

22   influencing, how much is just introducing.  You know, I think

23   it's telling that for the last decade, where LGBTQ individuals

24   have had prominent places in society, our teachers, our

25   administrators, that this has not been an issue, but that these

1    books trigger a different level of concern from the parents.

2           On the Masterpiece issue, counsel mentioned a 12(b)(6)

3    motion, the reasons he's about to give.  This was not in the

4    briefing.  I'm not exactly sure what we're arguing about.  He

5    says that there's a higher standard.  Again, I would point to

6    the League of Women Voters.  We are the parties that are trying

7    to preserve the status quo.  What has always existed is the

8    right to opt out.  It was the change on March 23rd that

9    triggered this lawsuit.  And the point of a preliminary

10   injunction is to preserve what happened before the last action

11   that created the controversy.  And so we are trying to --

12          THE COURT:  Help me understand that.  I mean, I,

13   frankly, can see it both ways.  Right now, there is a no-opt-out

14   policy.  If I were to grant a preliminary injunction, I would be

15   telling Montgomery County Public Schools, Change your policy,

16   not, Stop, you know, not keeping the status quo, because the

17   status quo right now is no opt-outs.

18          MR BAXTER:  You have to look at what is the challenged

19   action.  And so the challenged action -- the substance of the

20   lawsuit is the ban.  And so the Court in League of Women Voters,

21   says you look at what was the status quo immediately before

22   that.  If they always get the advantage because they just change

23   the policy, that would kind of undermine the point of a

24   preliminary injunction, which is always to go back to what

25   existed before the action that created the lawsuit.

1    They've also made the point that Ms. Harris objects to
2    everyone, not just the religious people.  But that was a similar
3    argument that was made in Masterpiece, and the Court said that
4    just because you also have feelings of hatred or -- you know, to
5    people who disagree with you for other reasons doesn't mean that
6    those who come with religious objections are going get a neutral
7    and fair proceeding.  It's clear from her statements that there
8    is not going to be a fair proceeding on this issue.  And what's
9    even more offensive is that no other member of the school board
10   has countered or disavowed her statements, which again, in
11   Masterpiece, was a point that reinforced the Court's decision.

12   Just quickly, a few additional items.  Counsel stated
13   that the hurtful statement was only talking about students
14   shouldn't call other students weird, but that misrepresents the
15   statement on page 10 of the declaration, where the student says,
16   "That's weird," not a person is weird, that's weird, you can't
17   be a boy if you're born a girl.  And the student -- the teacher
18   is told to say, That's hurtful to basically disagree with that
19   ideological statement.

20   And finally, the school board has made a bunch of
21   arguments about its compelling government interest.  It says
22   there's been empirical work in contrast for the Students for
23   Fair Admissions, and there's been thousands of studies about the
24   values of diversity.  And they were cited in the Students for
25   Fair Admissions case about the value of diversity in higher

1    education.  Here, there are no studies; there are simply

2    statements by Ms. Hazel that it's beneficial.  And even in that

3    case, with empirical -- extensive empirical studies in SFFA, the

4    Supreme Court said that that was insufficient.

5         And then finally, counsel says that -- on the SDP

6    point, I would just note that Herndon cites to Souter in Lukumi,

7    where Souter said that, "Where parents make a free exercise

8    claim Pierce's reasonableness test is inapplicable and you have

9    to go to strict scrutiny."

10        And finally, counsel just states that -- you know,

11   reinforces that the point is to, you know, change students'

12   views on these, that he wants to ensure a respectful environment

13   by making students agree with these -- or compelling students to

14   change their views on these issues that -- he says in one case,

15   you can state religious disagreements in class, but you can't

16   walk out.  It makes no sense and is an inconsistent application.

17   It can't be a compelling government interest if it's enforced in

18   one instance and not the other.

19        And it's not just about indoctrination per se, but

20   talking to preschool children about things like thumpety thump

21   in your heart, whether you like-like or just like someone, what

22   you think about your pronouns, these encourage students, in the

23   time of innocence, to think about things that they don't need to

24   think about.  They don't need to be thinking about what does it

25   mean -- you know, is my teacher gay or straight, is my

1    teacher -- how does my teacher identify.

2           Our parents are just saying, let children be children

3    for a period of innocence.  They will learn these things and

4    have exposure, but not at this stage and this time.  So it's not

5    just the indoctrination, but it's introducing thoughts and ideas

6    and topics that are heavy -- too heavy for children.

7           Again, just in closing, Your Honor, our -- the

8    First Amendment was designed to ensure a pluralistic society, to

9    allow people to be able to live side by side despite

10   differences.  We don't do that by, you know, compelling people

11   to believe or participate in things that violate their religious

12   beliefs; we do that by allowing parents to step aside when

13   there's something that violates their faith, would violate their

14   children, and allows every student to feel like they're part of

15   the system, that they belong, they have -- they're vested in our

16   constitutional system, they're protected, and they have an

17   incentive to protect others.

18          And that's what our parents are asking for here; let

19   the books be in the school, let the parents who object opt out,

20   supported by the -- Maryland's law and by the school board's own

21   regulations.  We'd ask for the Court to enter a preliminary

22   injunction.

23          We'd also move orally, if the Court is not inclined

24   to, to grant a stay pending appeal.  As required under Federal

25   Rule of Appellate Procedure 8, we have to move this Court, and

1    so we would orally ask the Court to -- if it were to rule

2    against the parents, to grant a stay pending appeal of the --

3    pending the appeal.  Thank you.

4            THE COURT:  Okay.  Thank you, Mr. Baxter.

5            Mr. Schoenfeld, I just have a question for you about

6    burden, and I then will have -- Mr. Baxter can have the last

7    word, since it's his motion.  So I'm inviting a -- I guess I'll

8    allow a surreply.

9            With respect to burden, I mean, Mr. Baxter takes the

10   position, or his clients take the position, the parents and

11   students take the position that they are being pressured to

12   choose between going to public schools and not because their

13   children will be exposed to ideas that violate their religion.

14   Why isn't that a constitutional burden?

15           MR. SCHOENFELD:  Because exposure -- because exposure

16   to offensive ideas doesn't violate the Constitution.  It doesn't

17   violate the Free Exercise Clause.  It's one thing to be

18   receiving a state subsidy, as in Espinoza or Trinity Lutheran,

19   and to say that you get the benefit, you know, the rubber for

20   the school playground or the money, you get the benefit if

21   you're going to a secular school but not if you're going to a

22   religious school.  That is a real, tangible, concrete --

23           THE COURT:  I understand those are different.  I mean,

24   I --

25           MR. SCHOENFELD:  Yeah.  So -- I mean, to answer your

1   question directly, I think every Court to have addressed this

2   question says that mere exposure to those sorts of texts doesn't

3   constitute pressure in any constitutionally cognizable way.

4   Again, I'll return to Parker --

5            THE COURT:  Well, what if the parents are claiming

6   they feel the pressure?

7            MR. SCHOENFELD:  I think that's exactly the argument

8   that was made in Parker, you know, if you enroll your students

9   in public school, then one of the things that comes along with

10  it is the possibility that they are going to be exposed to

11  content that is offensive to you, with which you disagree, or

12  where you would have taught it to them at a different age, but

13  that's part of the bargain in going to public school.

14            And I think Parker addressed precisely this issue.

15  Parker has been all over these briefs.  Plaintiffs' counsel have

16  never suggested that it's inconsistent with contemporary

17  Supreme Court jurisprudence or with Fourth Circuit jurisprudence

18  in this context.  And what it says is that the plaintiffs

19  contended in that case that, "The exposure of their children at

20  these young ages and in this setting is contrary to ways of

21  life, contrary to the parents' religious beliefs, violates their

22  ability to direct the religious upbringing of their children."

23            And what the Court said was, "As to the parents' free

24  exercise rights, the mere fact that a child is exposed on

25  occasion in public school to a concept offensive to a parent's

1   religious belief does not inhibit the parent from instructing

2   the child differently."  That's why there is no constitutionally

3   cognizable burden from being exposed to this instruction in

4   public school.

5          THE COURT:  All right.  Thank you very much.

6          MR. SCHOENFELD:  Can I make two additional points, if

7   I might.  So the first one is with respect to the mandatory

8   injunction piece.  I mean, League of Women Voters is sui

9   generis.  It involved an injunction that was sought the day the

10  policy was changed, and the Court is quite clear on that.  The

11  chronology here is that the policy was changed in March.

12  Plaintiffs filed suit in May and moved for a preliminary

13  injunction in June.  There is no world in which the status quo

14  ante is anything other than the policy that was announced in

15  March.

16          Moreover, in League of Women Voters, the Court looked

17  at what they were asking for and said that what they were

18  looking for was something prohibitory.  If you look at Prayer

19  for Relief (e) on page 40 of their complaint, it says, "Enter

20  preliminary and permanent injunctions prohibiting the school

21  boards from forcing the parents' children and other students,

22  over the objection of their parents, to read, listen to, or

23  discuss the school board's Pride Storybooks and also requiring

24  the school board to provide advance notice and an opportunity

25  for opt-outs to any other instruction related to family life or

1    human sexuality."  It is a mandatory injunction.  It is asking

2    the school board to begin doing something that it is not

3    currently doing and has not done since March.

4         Plaintiffs just asked for a stay of the injunction.  I

5    don't know what you would be staying; would you be staying the

6    no-opt-out policy, would you be staying the opt-out policy?

7    Like it -- just logically, as a matter of chronology, what

8    they're asking you to do is direct a different policy from the

9    one that exists now and to affirmatively introduce opt-outs as

10   the rules of the road for the '23-'24 school year.

11        And then the last point I'll make, Your Honor, is, on

12   Fulton, I don't think there's anything sort of pretzel-adjacent

13   about the argument here.  The Court was quite clear in Fulton

14   that what it was preoccupied with is whether a mechanism for

15   individualized exemptions would render a policy not generally

16   applicable because it "invites the government to consider the

17   particular reasons for a person's conduct."  That's what Fulton

18   prohibits.  That's what was the issue with Fulton, that's what

19   was the issue with Sherbert, that's what was the issue with

20   Lukumi Babalu Aye.  That is the substance of the Fulton

21   prohibition.

22        And the final point, if I may, just a note of personal

23   privilege, my point here was not -- or the point I made, the

24   first one Mr. Baxter addressed, was not to suggest anything

25   other than that his suggestion that all of this LGBT-inclusive

1    content should be treated as part of the healthy life curriculum

2    is precisely the reason why the school board has integrated it

3    into a broader curriculum.

4            It's not a segregable, hermetically sealed curriculum

5    where people are to learn about the existence of LGBT people and

6    LGBT families, but rather, it is meant to diversify curriculum

7    that up until the introduction of these texts was -- the

8    percentages are in the record -- was overwhelmingly

9    representative of non-LGBT families.

10           The point here is not to impugn anyone's motives or

11   impugn anyone's beliefs but instead to suggest that the ana- --

12   or the point that he was making I think just demonstrates the

13   wisdom behind the school board's decision in integrating this

14   curriculum in this way.

15           THE COURT:  Thank you.

16           MR. SCHOENFELD:  Thanks, Your Honor.

17           THE COURT:  Mr. Baxter.

18           MR BAXTER:  I'll just hit the points, Your Honor, that

19   were raised.  League of Women Voters, just to quote, Requires a

20   party who has recently disturbed -- An injunction that requires

21   a party who has recently disturbed the status quo to reverse its

22   actions is prohibitory, not mandatory, as it restores rather

23   than disturbs the status quo.  Again, it would make no sense if

24   the government could just simply always claim the status quo

25   based on the action that's at issue in the litigation.

 1              On the question of Fulton, getting to the particular

 2     reasons for conduct -- and Ms. Harris has made clear that that's

 3     what's going on here.  She thinks that the -- these particular

 4     objections are related to xenophobia and white supremacy, and

 5     that's at least supporting her reason for denying the opt-out.

 6     So even if they haven't explicitly said, We're looking at the

 7     reason, that's clearly what's underlying this whole discussion,

 8     is whether particular objections based on sexuality and gender

 9     identity are acceptable, as opposed to other types of exceptions

10     based on Halloween, or the music being played in band class, and

11     so forth.

12              On the issue of burden, which I think was the main

13     point, counsel can cite only Parker, a Second Circuit case,

14     which applied the wrong standard.  It said that there had to be

15     direct coercion.  It did not consider neutrality and general

16     applicability.  All the other cases and the supposed law of

17     authority were really cases challenging the curriculum itself,

18     and Courts have said that your right -- the burden doesn't give

19     you the right to challenge the curriculum itself, but they don't

20     speak anything about the opt-out possibility.

21              And Yoder itself was just that, was an opt-out.  The

22     parents there were not being forced to stop teaching their

23     children their religious beliefs, to continue to encourage them

24     to live the Amish lifestyle; they simply felt that keeping their

25     children in school might pressure them, might make them less

1    likely to want to live that lifestyle.

2           And that's the exact same type of burden that's at

3    issue here.  So regardless of -- and Parker, it's inconsistent

4    with Yoder.  You don't have to show that it would stop the

5    teachers.  The curriculum, based on counsel's own comments, is

6    clearly trying to normalize ideas that are contrary to our

7    clients' religious beliefs and at an age where their children

8    are uniquely susceptible and unable to distinguish these types

9    of issues on their own.

10          It's dangerous to their religious belief and pressures

11   them to either keep their children in religious -- in schools in

12   violation of their religious beliefs or pull them out and not be

13   able to take advantage of the public school system.

14          Thank you, Your Honor.

15          THE COURT:  Thank you very much.  All right, just give

16   me one moment.

17          Okay.  All right, I want to thank counsel for their

18   submissions and for their argument.  I don't think I have any

19   more questions.  And I will issue a ruling before August 28th.

20   Anything else from the parties?

21          Mr. Schoenfeld.

22          MR. SCHOENFELD:  Just one housekeeping matter.  If

23   Your Honor's going take up Plaintiffs' motion for a stay of the

24   injunction, we'd obviously like the opportunity to respond to

25   it.

1          THE COURT:  Well, let me understand your request,

2    again?

3          MR. SCHOENFELD:  Your Honor, under Rule 8 of the

4    Federal Rules of Appellate Procedure, if the Court were to rule

5    against the plaintiffs and we go up on appeal, we'd have to ask

6    both this Court and the Court of Appeals before -- before we can

7    ask the Court of Appeals, we have to ask this Court for a rule

8    granting the relief pending appeal.  And since they are

9    essentially the same -- asking the same relief, whether you

10   enjoin the opt-out ban or enjoin it just for the appeal, I'm

11   just flagging that for Your Honor so that they can both be

12   addressed in the same order.

13         THE COURT:  That hasn't been briefed.

14         MR. SCHOENFELD:  Correct.

15         THE COURT:  All right.  Let me think about it, and

16   I'll get back to you on that.  All right.  Thank you very much.

17         THE COURTROOM DEPUTY:  All rise.  This Honorable Court

18   stands adjourned.

19      (The proceedings were adjourned at 12:49 p.m.)

20

21

22

23

24

25

1    CERTIFICATE OF OFFICIAL REPORTER

2         I, Patricia Klepp, Registered Merit Reporter, in and for

3    the United States District Court for the District of Maryland,

4    do hereby certify, pursuant to 28 U.S.C. § 753, that the

5    foregoing is a true and correct transcript of the

6    stenographically-reported proceedings held in the above-entitled

7    matter and the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9                        Dated this 30th day of August, 2023.

10

11

12    _____/s/_____
      PATRICIA KLEPP, RMR
13    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25